1

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

Civil No. 1:20-cv-00061-GZS

* * * * * * * * * * * * * * * * * * * * *

PUBLIC INTEREST LEGAL
FOUNDATION, INC.,
                                    Plaintiff

    vs

SHENNA BELLOWS, in her official
capacity as Secretary of State
for the State of Maine,

                                    Defendant

* * * * * * * * * * * * * * * * * * * * *

DEPONENT: **N. CHRISTIAN ADAMS**

**ZOOM VIDEOCONFERENCE DEPOSITION** taken before Joanne P. Alley, a Notary Public in and for the State of Maine, on **February 8, 2021**, beginning at 10:00 a.m., pursuant to notice given.

---

2

APPEARANCES:
OFFICE OF ATTORNEY GENERAL
BY:  Jonathan R. Bolton, Esq.
     Phyllis Gardiner, Esq.
     6 State House Station
     Augusta, ME  04333-0006
     207-616-8551
     Jonathan.Bolton@maine.gov
     Phyllis.Gardiner@maine.gov
     Attorneys for Defendant

PUBLIC INTEREST LEGAL FOUNDATION, INC.
BY:  Noel H. Johnson, Esq.
     Kaylan L. Phillips, Esq.
     32 East Washington Street
     Suite 1675
     Indianapolis, IN 46204-3594
     317-203-5599
     NJohnson@publicinterestlegal.org
     KPhillips@publicinterestlegal.org
     Attorneys for Plaintiff

---

3

                    I N D E X

DEPONENT:

    N. CHRISTIAN ADAMS

    By Attorney Bolton              4

    By Attorney Johnson           168


                 E X H I B I T S

                                   PAGE

Exhibit No.  1                      94
    Notice of Deposition
Exhibit No.  2                      95
    PILF Website Page
Exhibit No. 3                       95
    PILF Website Screen Shot
Exhibit No. 4                       95
    Complaint
Exhibit No. 5                       96
    PILF Amicus Curiae Brief
Exhibit No. 6                       96
    Motion to File Amicus Curiae Brief
Exhibit No. 7                       97
    Amicus Curiae Brief
Exhibit No. 8                       98
    Amicus Curiae Brief
Exhibit No. 9                       98
    Motion to File Amicus Curiae Brief
Exhibit No. 10                     101
    Maine Statute 21-A MRS 196-A
Exhibit No. 11                     120
    Report Entitled Calm Before the Storm
Exhibit No. 12                     142
    Report Entitled Alien Invasion II
Exhibit No. 13                     145
    Complaint, Docket #18-cv-423
    Eastern District of Virginia

---

4

(ZOOM VIDEOCONFERENCE DEPOSITION was taken

before Joanne P. Alley, Notary Public, on February 8,

2021, beginning at 10:00 a.m.)

    (The deponent is administered the oath by the

Notary Public.)

    N. CHRISTIAN ADAMS, after having been duly

sworn by the Notary Public, was deposed and testified as

follows:

                EXAMINATION

BY MR. BOLTON:

Q.  Good morning, Mr. Adams.  My name is Jon Bolton,

    I'm an assistant attorney general and I'm

    representing the Secretary of State in this

    matter, and we're here to take your deposition in

    this case.  Have you ever been deposed before?

A.  Well, it's a 30(b)(6) deposition, so I've done a

    30(b)(6) deposition.

Q.  Okay, all right.  How many times have you done

    30(b)(6) depositions?

A.  I can't remember but at least -- at least once.

Q.  Okay, all right, and in that other 30(b)(6)

    deposition were you testifying on behalf of the

    Public Interest Legal Foundation?

A.  Yes.

Q.  Okay.  Now, if I refer to -- I've been in my head

5

1    referring to the Public Interest Legal Foundation
2    as PILF.  Is that how you refer to it as well?
3  A.  Well, for purposes of this definition --
4    deposition, that will be perfectly adequate for
5    me to know what you're talking about.
6  Q.  Okay, all right, so I'll refer to it as PILF.
7    Okay, well, I probably don't need to go over too
8    many of the ground rules here for depositions
9    given that you've done this before but do you
10   understand I'm here to ask you questions
11   concerning this litigation and that you're
12   answering on behalf of your organization PILF?
13 A.  Yes.
14 Q.  Okay.  I'll just ask, given that we're in the new
15   era of Zoom, that if we can, we should try to
16   avoid cross talk so that the court reporter can
17   take down both of our statements.  Does that make
18   sense?
19 A.  Yes.
20 Q.  It might require a little bit of a pause between
21   one person talking and the next.  In terms of
22   exhibits, my plan is I'm going to show you some
23   exhibits on the screen by sharing my screen.  If
24   at any point you're looking at an exhibit and you
25   want to see other portions of the page if the

6

1    whole page isn't showing or if you want to look
2    at a different page, just let me know.  I can
3    scroll to wherever you want me to go in the
4    exhibit.  Does that make sense?
5  A.  Yes.
6  Q.  Okay, all right, and I understand there is an
7    option that I can share an entire exhibit with
8    you via the chat function.  So if there's a point
9    at which you need to look at the entire exhibit,
10   we can try to share it that way by chat, just let
11   me know if you want me to do that with a
12   particular exhibit.  Does that make sense?
13 A.  Let's -- I've never done it this way so let's see
14   how it goes.
15 Q.  Okay.
16 A.  Let's see if it makes sense as we get there.
17 Q.  Okay, all right, and is there any reason that
18   you'd be unable to testify truthfully or
19   accurately this morning?
20 A.  None that I can think of.
21 Q.  Okay, all right.  So I think we've gone over --
22   you understand that you've been designated to
23   offer testimony on behalf of the Public Interest
24   Legal Foundation today, right?
25 A.  This is a 30(b)(6) deposition conducted under the

7

1    Federal Rules of Civil Procedure.  I understand
2    that.
3  Q.  Okay, and you've been designated specifically to
4    testify on behalf of the organization, Public
5    Interest Legal Foundation, correct?
6  A.  I am the 30(b)(6) designee.
7  Q.  For that organization?
8  A.  Correct.
9  Q.  Okay.  Let's take a look at the 30(b)(6) notice.
10   I'm going to share my screen.
11       MR. BOLTON:  Joanne, it says that the host
12   has disabled participant screen sharing.
13       (OFF RECORD DISCUSSION)
14 BY MR. BOLTON:
15 Q.  Okay.  Are you able to see that, Mr. Adams, that
16   document?
17 A.  Right, not well but I can see it adequately.
18 Q.  Okay, and have you seen this before?
19 A.  I believe so.
20 Q.  Okay.  This is the notice to take deposition of
21   the Public Interest Legal Foundation in this
22   case.  I'm going to scroll down to the Schedule
23   A, which is the list of topics.  Have you
24   reviewed this list of topics in Schedule A?
25 A.  Yes.

8

1  Q.  Okay, and are you prepared to talk about -- to
2    testify regarding the six topics that are listed
3    here?
4  A.  I would say so.
5  Q.  Okay, and what did you do to prepare to testify
6    on these six topics?
7  A.  I read the six topics, I looked at a variety of
8    records related to those six topics, and I did --
9    that's the -- that's the essential things that I
10   did.
11 Q.  Okay.  What sort of records did you look at?
12 A.  Records responsive or I should say records
13   relevant to the six topics.
14 Q.  Okay.  Can you be more specific?
15 A.  I can't, but I know that I looked at records
16   relevant to these six topics.
17 Q.  Okay, all right, and turning to Schedule B, there
18   are two document requests here.  Did you review
19   those as well?
20 A.  I did look at those requests in Schedule B.
21 Q.  Okay, and have you or are you
22   producing any documents responsive to Schedule B?
23 A.  I think that there's a written response from
24   counsel regarding that question that would be
25   better than anything I could offer here.

9

1  Q.  Okay.  Other than the written response that
2      counsel provided, you don't have any additional
3      documents that you're producing in response to
4      this?
5  A.  I have no additional documents or responses as it
6      relates to Schedule B beyond that that counsel
7      has already provided you.
8  Q.  Okay, all right.  What is your position at PILF?
9  A.  I am the president of PILF.
10 Q.  Okay.  Do you have any other positions there or
11     just the president?
12 A.  I'm general counsel also which -- but I'm the
13     authorized 30(b)(6) representative for this
14     deposition.
15 Q.  Understood.  How long have you been president?
16 A.  I'm not testifying in my personal capacity.  I'm
17     the 30(b)(6) designee for this deposition on
18     behalf of the corporation.
19 Q.  Sure, I understand.  I'm just trying to establish
20     some basic facts about your knowledge about --
21     about PILF, that's all.
22 A.  Okay.  Well, I have been president during the
23     entire time of this litigation.
24 Q.  Okay, and how long before that were you
25     president?

10

1  A.  I'm not testifying in my personal capacity.  I'm
2      testifying in relation to my designation as a
3      30(b)(6) designee of the corporation.
4  Q.  I understand that, but I think you still need to
5      answer my question, sir.
6  A.  Right.  I understand that this is not a personal
7      deposition.  I have been the president of PILF
8      since 2015.
9  Q.  All right, and what are your duties as president?
10 A.  I manage and oversee the activities of the
11     corporation.
12 Q.  Okay, all right, and you appear in various
13     litigation on behalf of PILF, correct?
14 A.  I have appeared occasionally in some litigation
15     on behalf of PILF.  I am not an attorney of
16     record in this particular case.
17 Q.  Okay, all right, and what are your duties as
18     general counsel?
19 A.  All of the things that are customary to the
20     management of litigation.
21 Q.  Okay, all right.  So you -- would you say in the
22     litigation where you don't directly make
23     appearances you still direct that litigation as
24     general counsel?
25 A.  No, I -- well, again, that's a question related

11

1      in my personal capacity, not as a corporate
2      designee, but there are varying degrees of
3      involvement in particular cases.
4  Q.  Okay.  So some cases you're more involved than
5      others?
6  A.  I think that's correct.
7  Q.  Okay, all right.
8  A.  Again, that is a question related to my personal
9      capacity.
10 Q.  Yeah, understood.  I'm just trying to establish
11     some -- I'm trying to get a basic understanding
12     of what you do at the organization, that's all.
13 A.  Right.
14 Q.  Are you involved in authoring the various reports
15     that PILF issues?
16 A.  It depends.
17 Q.  Okay.  So some of them you are and some of them
18     you aren't?
19 A.  Well, in none of them am I an author.
20 Q.  Okay.
21 A.  So again, that's a question related to my
22     personal capacity.
23 Q.  Okay.
24 A.  But to answer your question, in none of them I'm
25     an author.

12

1  Q.  Okay, all right.  All right, so PILF is a
2      501(c)(3) organization, is that correct?
3  A.  That is correct.
4  Q.  Okay, and it's incorporated in Indiana?
5  A.  Correct.
6  Q.  And is PILF also based in Indiana?
7  A.  Yes.
8  Q.  Do you have offices anywhere else other than
9      Indiana?
10 A.  PILF does not maintain an office other than
11     Indiana.
12 Q.  Okay, all right.  So there's no offices in Maine?
13 A.  No, there are not.
14 Q.  Okay, all right.  Other than the current suit,
15     does PILF do any work that's specific to Maine?
16 A.  Yes.
17 Q.  And what would that be?
18 A.  Are you referring to currently?
19 Q.  Currently, yeah, let's start with currently.
20 A.  Well, PILF does work that is specific to Maine
21     that's not part of this suit.
22 Q.  That's what I'm asking.
23 A.  Yes.
24 Q.  And what is that work?
25 A.  PILF analyzes your election processes.

13

1  Q.  Okay.  Are there any specific reports that PILF
2      has issued concerning the election processes in
3      Maine?
4  A.  No.
5  Q.  Okay.  Are there any reports that are in progress
6      that are going to be issued?
7  A.  I don't know.
8  Q.  Okay, all right.  What specifically has PILF done
9      to analyze elections in Maine?
10 A.  Well, I mean, you're looking at a lot of work
11     product now.  You're asking about work product
12     that hasn't been released but generally speaking,
13     the organization is constantly monitoring what
14     election officials are doing around the country
15     and in Maine as it relates to election
16     administration, conducting the vote, various
17     other legal issues associated with how elections
18     are conducted in Maine.
19 Q.  Okay.  So you do similar activities in all 50
20     states, is that correct?
21 A.  Yes.
22 Q.  Okay, all right.  Anything else -- any specific
23     projects that PILF has worked on that are
24     specific to Maine that you can think of?
25 A.  Well, yes, there are some that I can think of

14

1      that I'm not going to tell you because it's
2      confidential.
3  Q.  Confidential how?
4  A.  Well, it might have been potential litigation
5      discussed with clients or potential clients in
6      Maine who wanted hypothetically to sue the State
7      of Maine for a variety of things but those are
8      matters that are confidential and not subject to
9      disclosure in this 30(b)(6) deposition for a
10     variety of reasons, not the least of which is
11     that it is literally confidential and, number
12     two, it's not in the Schedule A.
13 Q.  Okay.  Well, let me -- let me rephrase the
14     question then.  Other than potential litigation
15     that might be protected by a privilege or work
16     product protection, are there any projects that
17     PILF has worked on in the past that are specific
18     to Maine?
19 A.  I've asked and answered that question.
20 Q.  No, you actually refused to answer it.
21 A.  I refused to answer the part regarding potential
22     litigation but I also testified that there were
23     projects in monitoring and analysis of Maine's
24     election processes.  That's the second time I've
25     answered that question now.

15

1  Q.  Well, I guess my question is, what are those
2      specific projects other than the ones that might
3      be privileged?
4  A.  And -- well, there are none that wouldn't be
5      privileged so I will stand on my answer that I've
6      given twice.
7  Q.  Okay, all right.  How much of PILF's work is
8      litigation?
9  A.  I don't understand the question.
10     MR. JOHNSON:  I'm going to object as to the
11     form.
12 BY MR. BOLTON:
13 Q.  Well, what percentage of your funding would you
14     say goes towards litigation matters?
15 A.  I still don't understand the question because
16     you're making assumptions that funding is somehow
17     earmarked and so I don't understand how I can
18     answer that question.
19 Q.  Okay, all right.  Well, let's try and get at it a
20     different way.  How many people are employed by
21     PILF?
22 A.  Well, what time period?
23 Q.  Currently.
24 A.  Seven.
25 Q.  Okay, and actually I'm going to show you a

16

1      document here.  Okay, can you see that document?
2      It says menu in the top left corner.
3  A.  Yes, I can see the document.  I see one page of
4      this document.
5  Q.  Okay.  Yeah, this is the first page I'm showing
6      you, and I'll represent that this is downloaded
7      from the PILF's website which appeared to show
8      the team and I'll just -- that's you on the first
9      page, correct, J. Christian Adams?
10 A.  Yup.
11 Q.  And then on the next page we have Kaylan Phillips
12     and Noel Johnson who are both, I believe, present
13     in this deposition, correct?
14 A.  I don't know if they're both present but it shows
15     that right now.
16 Q.  Okay, fair enough, and then we have Sue Becker on
17     the -- on the third page?
18 A.  The document shows that.
19 Q.  Okay.  Now, all three of these individuals are
20     designated as litigation counsel, correct?
21 A.  That's what the document says.
22 Q.  Okay, and is that actually the position of those
23     three people at PILF?
24 A.  Yes.
25 Q.  Okay.  So this is -- and these three people

17

1  currently are employed by PILF?
2  A.  Yes.
3  Q.  Okay, and you are also employed by PILF?
4  A.  I am the 30(b)(6) designee for the corporation
5      for this deposition.
6  Q.  Okay.  So do you include yourself among the seven
7      people that you just testified to that work for
8      PILF?
9  A.  Let me check again.  Yes.
10 Q.  Okay.  So who are the other three people?
11 A.  Who are the other three people that what?
12 Q.  That work for PILF.
13 A.  Shawna Powell, Maureen Reardon, Logan Churchwell.
14 Q.  Okay.  Logan Churchwell is the communications
15      director, is that correct?
16 A.  That is one of his functions, yes.
17 Q.  Okay.  What else does he do?
18 A.  Well, I think his actual title, which if you
19      showed me the document could refresh my
20      recollection, is different from what you have
21      described to me.
22 Q.  Okay.  What's your understanding of what his
23      position is?
24 A.  That he has more than communications as part of
25      his --

18

1  Q.  And what else --
2  A.  -- as part of his job.
3  Q.  And what else does he have?
4  A.  Research.
5  Q.  Okay, all right, and what kind of research does
6      he do?
7  A.  All kinds, everything, he reads newspapers, he
8      looks at data.  Anything that involves the
9      accumulation of information Logan works on.
10 Q.  Okay.  Does he author some of the reports that
11      PILF issues?
12 A.  He has worked on reports this PILF issues.
13 Q.  Okay, and I'm sorry, refresh my memory, who are
14      the other two people that are employed by PILF?
15 A.  Shawna Powell, Maureen Reardon.
16 Q.  And what does Shawna Powell do?
17 A.  She is the secretary of the board.
18 Q.  Okay.  So what do her duties entail?
19 A.  A variety of things, planning --
20 Q.  Such as?
21 A.  -- planning, payroll, paying bills, anything
22      associated with the management or running of the
23      business.
24 Q.  Okay, and how about Maureen Reardon, what does
25      she do?

19

1  A.  She's an attorney.
2  Q.  Okay.  Is she a litigation attorney?
3  A.  She does not carry that designation.
4  Q.  Okay.  Does she appear on behalf of PILF in
5      litigation?
6  A.  No.
7  Q.  Okay.  So what are her duties?
8  A.  She's an attorney.  I've answered that now twice.
9  Q.  Sure, but what sort of law does she practice for
10      PILF, if she practices law at all?
11 A.  I don't understand the question.
12 Q.  So she doesn't appear in litigation so my
13      question is, what are her duties, what does she
14      do as an attorney for PILF?
15 A.  She is an attorney and anything related to what
16      in particular she does for PILF would be
17      confidential.
18 Q.  So you're saying her job description is
19      confidential?
20 A.  No, I've already answered that now three times.
21      Her job description is an attorney.
22 Q.  And I'm asking me to be more specific about what
23      she does for the organization.
24 A.  You're asking me to tell you what sorts of
25      particular work product this particular attorney

20

1      has produced for the clients and I'm not going to
2      do that.
3  Q.  No, no, I'm asking generally, not specifically.
4  A.  She is a general attorney.  She is an attorney.
5      I don't know -- that's the fourth time I've said
6      it.
7  Q.  Okay.  Does she author reports?
8  A.  No.
9  Q.  Okay.  Does she communicate with the press?
10 A.  No.
11 Q.  Does she author legal briefs?
12 A.  No.
13 Q.  Okay.  Is there anything else you can tell me
14      about what she does with PILF other than that
15      she's an attorney?
16 A.  No.
17 Q.  Okay.  Is there any reason she's not shown on
18      PILF's website?
19 A.  Because she hasn't been put on the website.
20 Q.  Is she newly hired?
21 A.  She's recently hired.
22 Q.  Okay.  PILF has a board of directors?
23 A.  That's not in your Schedule A.
24 Q.  I think this has to do with topic number 1 so I'm
25      going to go ahead and ask about it.

**21**

1  A.  I don't see anything in topic number 1 about the
2      board of directors, sorry.
3  Q.  Okay, hang on just a second.
4          MR. JOHNSON:  We'll object that it's not
5      listed on Schedule A.
6  BY MR. BOLTON:
7  Q.  There we go.  All right, can you see that
8      document?  Again, it has menu at the top.  It
9      looks very similar to the last document actually.
10 A.  It's the last document you sent me I think.
11 Q.  Let me scroll down.  I'm going to scroll to page
12     2 here.  Can you tell that's a different document
13     now?
14 A.  It is a different document.
15 Q.  Okay, all right.  I'll represent to you I
16     downloaded this from PILF's website as well, and
17     this is -- my understanding is this is what the
18     website lists as PILF's board.  So you're listed
19     as the president, correct?
20 A.  The document speaks for itself.
21 Q.  Okay, all right.  The next person listed is Cleta
22     Mitchell, and she's the chairman of the board, is
23     that right?
24 A.  The document says that.
25 Q.  Is that correct?

**22**

1  A.  I'm not here to testify about the board because
2      you did not list it in Schedule A anywhere.  I'm
3      not going to answer questions about the board
4      unless you properly notice a 30(b)(6) deposition
5      about that and we have the opportunity to lodge
6      proper objections.
7  Q.  Okay.  I understand that you feel that way.
8  A.  I don't just feel that way.  That's how it is.
9  Q.  Well, sir, you're the witness, correct?
10 A.  I'm a 30(b)(6) deposition --
11 Q.  You're not --
12 A.  Let me answer the question.
13 Q.  I understand --
14 A.  Let me answer the question you've just asked.
15     There's a live question.  I am the 30(b)(6)
16     deponent/designee, you have issued a Schedule A
17     with topics that I prepared for and I am subject
18     to answer questions about.  Nowhere in the
19     Schedule A was anything touching on the board of
20     directors of PILF.  You have a document that
21     speaks for itself and you're entitled to draw all
22     inferences and usages you find appropriate from
23     that document but I am not here to testify about
24     that document.
25 Q.  Okay.  I don't hear -- there's -- if your

**23**

1      attorney instructs you not to answer the
2      question, then that's fine and I can have a
3      discussion with your attorney about whether --
4      whether that's appropriate or not; but sir, in
5      this case, you're testifying as -- you are a
6      witness, okay, so you don't have the ability to
7      refuse to answer my questions.  That's not how
8      the process works.
9  A.  Is there a question or is that a lecture?
10 Q.  The question is, is Cleta Mitchell the chairman
11     of your board?
12 A.  The document so states.
13 Q.  Okay, and is that -- is the document accurate?
14 A.  I'm not here to answer any questions not related
15     to Schedule A topics which were noticed in
16     advance.  That is a topic that you have not
17     noticed.  The document speaks for itself.  I will
18     confirm that the PILF website has that document
19     on it.
20 Q.  Okay, and is the document accurate?
21 A.  You've asked that question once.
22 Q.  And you're refusing to answer it?
23 A.  That's correct, I am refusing to answer because
24     it was not part of the Schedule A notice topics.
25     So there will be no answers from me regarding our

**24**

1      board members beyond this document which speaks
2      for itself.
3          MR. BOLTON:  Noah, are you instructing your
4      client not to answer this question?
5          MR. JOHNSON:  My objection was that the
6      Schedule A does not list the present topic.
7          MR. BOLTON:  Okay.  I understand that and
8      certainly your objection is noted for the record.  My
9      question is, are you instructing your client not to
10     answer the question?
11         THE DEPONENT:  He is not a deponent in this,
12     he doesn't have to answer that question.
13         MR. BOLTON:  I'm not asking him the
14     question.  I'm asking him if he's instructing you not
15     to answer the question.
16         MR. JOHNSON:  Can we -- can I conference
17     with my client for a moment?
18         MR. BOLTON:  Sure.
19         MR. JOHNSON:  Can we go off record?
20         MR. BOLTON:  Yes.
21         (OFF RECORD)
22         MR. JOHNSON:  We are back and ready, if you
23     are.
24         MR. BOLTON:  Okay.
25 BY MR. BOLTON:

25

1  Q.  Okay, my question, Mr. Adams, is, is Cleta
2      Mitchell the chairman of the PILF board?
3          MR. JOHNSON:  And I'm objecting and
4      instructing my client not to answer questions
5      regarding board members because it is not listed on
6      Schedule A.  He would be happy to answer questions
7      to the extent he can authenticate that this is a
8      document on our website.
9          MR. BOLTON:  Okay.  Mr. Adams, I'm going to
10     scroll through this document, and before I ask you a
11     question, I'll just put on the record that I -- I
12     disagree that this line of questioning is outside the
13     30(b)(6).  I think it's within the scope of topic
14     one, and we're reserving all our rights with that
15     regard, including the right to seek relief from the
16     court to compel an answer to these questions, but for
17     now I'm going to move on.
18  BY MR. BOLTON:
19  Q.  Other than -- let me just -- again, I'll scroll
20     through this.  For some reason some of the
21     photographs aren't showing up.  So Mr. Adams,
22     does this appear to be a page from your website?
23  A.  Well, in substantial measure yes, but in
24     substantial measure no, because it seems to be
25     missing information.  You indicated a problem

26

1      with photographs.  I would concur that that
2      information is missing.
3  Q.  Okay.
4  A.  And I suspect the reason it's missing has to do
5      with the download process, not what's actually at
6      the website but I have no particular basis for
7      that.
8  Q.  Okay, all right.  Is PILF a membership
9      organization?
10  A.  I'm reasonably certain the answer is no.
11  Q.  Okay.
12  A.  Though I could add to that answer that I'm not
13     exactly positive what you're asking; in other
14     words, the form of the question is a bit unclear
15     to me.
16  Q.  Okay.  Is it possible for a member of the public
17     to join PILF as a member?
18  A.  Maybe.
19  Q.  Why do you say maybe?
20  A.  Because your question related to a nonspecific
21     and rather generalized opportunity and I thought,
22     well, maybe they could.
23  Q.  Do you offer to members of the public the
24     opportunity to become a member?
25  A.  Possibly.

27

1  Q.  And how might you possibly do that?
2  A.  Well, I have some recollection of a letter at
3      some point going to members of the public
4      offering them to become a member, but I don't
5      have a specific recollection of that.  If you
6      have a document that you could show me to refresh
7      my recollection, perhaps that would help.
8  Q.  Okay.  Are you aware of PILF having any members
9      from the State of Maine?
10  A.  Not as -- not specific but that wasn't in your
11     Schedule A for me to have time to prepare to look
12     that sort of thing up to see if we might.
13  Q.  Okay, all right.  Let me show you another
14     document here.  Okay, can you see the document?
15  A.  I see the document on the screen entitled
16     Complaint for Declaratory and Injunctive Relief.
17  Q.  And does this appear to be the complaint that
18     PILF filed in this matter?
19  A.  I believe it is.  I don't think there was an
20     amended complaint but that would -- so I think
21     that probably is it.
22  Q.  Okay, and I just want to scroll down to -- can
23     you see paragraph 3 on the screen under
24     "parties?"
25  A.  Yes, I can see it.

28

1  Q.  Okay.  I'm just going to read it.  "The Public
2      Interest Legal Foundation, Inc., the Foundation,
3      is a nonpartisan public interest organization
4      incorporated and based in Indianapolis, Indiana.
5      The Foundation seeks to promote the integrity of
6      elections nationwide through research, education,
7      remedial programs and litigation.  The Foundation
8      regularly utilizes the NVRA's public disclosure
9      provision and state and federal open records laws
10     that require government records to be made
11     available to the public.  Using records and data
12     compiled through these open records laws, the
13     Foundation analyzes the programs and activities
14     of state and local election officials in order to
15     determine whether lawful efforts are being made
16     to keep voter rolls current and accurate.  The
17     Foundation also uses records and data to produce
18     and disseminate reports, articles, blog and
19     social media posts and newsletters in order to
20     advance the public education aspect of its
21     organizational mission."  Did I read all that
22     correctly?
23  A.  Yes.
24  Q.  Is that all accurate in terms of PILF's mission?
25  A.  Yes.

29

1  Q. Okay. When it says in this paragraph 3 that PILF
2     "seeks to promote the integrity of elections
3     nationwide," is it fair to say that one of PILF's
4     primary concerns is the possibility of voter
5     fraud?
6  A. No.
7  Q. Okay.
8  A. I would not say it's fair to say that.
9  Q. Okay. What would you say the primary concern of
10    PILF is?
11 A. States doing the best job they can to keep the
12    rolls and the election process clean and legal.
13 Q. And why is PILF concerned about keeping the rolls
14    clean and legal?
15 A. Because having faith in our election system is
16    important and proper election administration,
17    which includes not hiding information like the
18    State of Maine has done, is important for
19    confidence in the system and transparency is part
20    of that and allowing the public to assess the job
21    that election officials do is what gives the
22    public confidence in the election officials, and
23    when election officials hide information, then
24    the public has less confidence in the election
25    process.

30

1  Q. So is the concern that the public might believe
2     that voter fraud is occurring?
3  A. The public might believe that an election
4     official is trying to hide what they do. That is
5     a much more serious problem than voter fraud when
6     you have an election official, as is occurring in
7     this state in this case, hiding their work.
8  Q. Is it fair to say that PILF is concerned about
9     voter fraud as an issue?
10 A. It's fair to say that voter fraud occurs and that
11    PILF is concerned about it, yes.
12 Q. Okay, all right, and PILF would like to make it
13    more difficult to commit voter fraud, correct?
14 A. I've never thought of it that way. I don't think
15    that's how the organization views it. I think
16    the organization wants election officials to do
17    their job, including following public information
18    disclosure provisions.
19 Q. Okay. Well, turning back to the issue of voter
20    fraud though, isn't the reason why you would want
21    the rolls to be clean and legal, I think as you
22    put it, because that would make it more difficult
23    for a person to commit voter fraud?
24 A. No. The reason I want the rolls clean and
25    legal -- the reason we want this information is

31

1     to see, first of all, if your client is doing
2     their job; and secondly, if they're not doing
3     their job, what can be done to fix what they're
4     not doing. Those are the primary objectives.
5  Q. Okay. I'll show you another document here. Do
6     you see that document?
7  A. Yes.
8  Q. Okay, and do you recognize what it is?
9  A. No, not right off the top of my head I don't.
10 Q. Okay.
11 A. I don't think -- that is certainly not a document
12    I reviewed in preparation for this deposition.
13 Q. Okay. Do you recall being counsel of record for
14    the Public Interest Legal Foundation in this
15    case, Department of Commerce, et al., versus
16    United States District Court for the Southern
17    District of New York?
18 A. No, in fact, I was not counsel of record.
19 Q. Okay. So if you look on the first -- this page
20    that we're looking at, it says J. Christian Adams
21    about two-thirds of the way down and then counsel
22    of record underneath, do you see that?
23 A. You don't know -- have you ever filed briefs in
24    the Supreme Court? The counsel of record refers
25    to the name immediately above.

32

1  Q. Okay, all right. Were you involved in filing
2     this amicus brief?
3  A. Yes.
4  Q. Okay, all right, and this is the case over
5     whether the Department of Commerce could add a
6     question on the decennial census asking about
7     citizenship, correct?
8  A. Well, I'm not -- I think so but I'd like to
9     see -- the description of --
10 Q. All right.
11 A. -- the question presented might help.
12 Q. Okay. Why don't you take a look at that.
13 A. Okay. It appears to me that the question we
14    presented and that may be the question the court
15    accepted cert on -- and I'm not sure if this is a
16    cert petition request or not, I can't remember
17    the previous page -- appears to be something
18    amerce to the Administrative Procedures Act.
19 Q. Okay. Concerning the addition of a question
20    about citizenship on the U.S. Census, correct?
21 A. Yeah, ultimately that's what this case was
22    factually involved with.
23 Q. Okay.
24 A. Correct.
25 Q. Okay, and let me just -- we're on page 1 of this

33

1  brief under interest of amicus curiae, and I'll
2  just read, this will be the second sentence, "the
3  Foundation's mission is to promote the integrity
4  of elections nationwide through research,
5  education, remedial programs and litigation.  The
6  Foundation also seeks to ensure that voter
7  qualification laws and election administration
8  procedures are followed.  Specifically the
9  Foundation seeks to ensure that the nation's
10  voter rolls are accurate and current working with
11  election administrators nationwide and educating
12  the public about the same."  Is that an accurate
13  statement of the Foundation's mission?
14  A.  Not only accurate but consistent with my
15  testimony thus far in the 30(b)(6) deposition.
16  Q.  Okay, all right, and in this case, PILF's view is
17  that the Supreme Court should allow a citizenship
18  question to be added to the decennial census, is
19  that correct?
20  A.  I think the question oversimplifies things to the
21  degree that I have a problem with its form in
22  answering it.  My understanding of this
23  particular brief related to following the
24  Administrative Procedures Act, and if you scroll
25  up, I think there's two other topics in our

34

1  brief.
2  Q.  The table of contents you're talking about?
3  A.  Right, that are addressed and it is also -- ah,
4  there's three other topics.  The other one
5  relates to a case in which I was involved in my
6  personal capacity where citizenship data were
7  used to find a violation of the Voting Rights
8  Act.  The third one relates to the use of
9  citizenship data being used in Section 2 cases
10  under the Voting Rights Act and that "citizenship
11  data," it says, "will assist in the private
12  enforcement of federal law."  I don't recall what
13  that relates to but I do recall the other topics.
14  Q.  Okay.  Why don't we scroll down to page 14, which
15  is the private enforcement of federal law.
16  A.  That's the fourth of the three?
17  Q.  The last one, yup.
18  A.  Ah, right.
19  Q.  So can you -- can you explain what this means
20  that "citizenship data will assist in the private
21  enforcement of federal law?"
22  A.  Sure.  One can find relevant information which
23  courts have held to be relevant in looking at the
24  ratio between registered -- the number of
25  registrants in a given jurisdiction and the

35

1  number of eligible voters in a given
2  jurisdiction.  One way to make that data more
3  robust and more weighty, beyond being relevant,
4  is to factor out the citizenship numbers from
5  that ratio.  No, I should say -- strike that.
6  The noncitizens from that ratio, because
7  noncitizens will have the effect of bloating the
8  population enumerator I believe -- no, it's the
9  denominator.  So if you can take out noncitizens
10  from this ratio, you get a more accurate and
11  useful number.  So being able to -- to obtain
12  accurate citizenship data for every jurisdiction
13  based on the census would assist in the process
14  of determining whether or not a given election
15  official in a county, for example, has an
16  implausible number of registered registrants on
17  the rolls as compared to their citizen
18  population.  It's rather elementary actually.
19  Q.  Okay.  So if you look most of the way down in
20  this section there's a CEG cite and it's through
21  a press release.  It says, "248 counties have
22  more registered voters than live adults."  Do you
23  see that?
24  A.  I don't see that.  I'm looking -- oh, CEG, right,
25  yup, I see that.

36

1  Q.  Okay.  So the idea would be that if PILF had
2  access to this data, it would be able to do
3  analyses similar to this press release but with
4  more specificity?
5  A.  Well --
6          MR. JOHNSON:  Objection.
7          THE DEPONENT:  I think there was an
8  objection.
9          MR. JOHNSON:  I objected to the form.
10  BY MR. BOLTON:
11  A.  Yeah, I mean, could you maybe zero in on what
12  you're asking?  I'm sorry, there was a couple of
13  things in that question I didn't understand.
14  Q.  So my -- the brief cites this press release which
15  apparently involves a study that compared
16  registered voters to -- number of registered
17  voters to number of live adults, and my question
18  is, is the reason why the census data would be
19  helpful would be because you could do similar
20  analyses using I guess citizens rather than just
21  live adults?
22  A.  Well, okay, yeah, I think I understand your
23  question.  If you had census data with
24  citizenship components and you were looking at a
25  county, for example, in areas with high levels of

**37**

1  noncitizens versus areas of the country that do
2  not have high citizenship -- excuse me -- areas
3  of the country that do not have high noncitizen
4  rates such as West Virginia and Maine, then you
5  will get better data and you will frankly absolve
6  a number of jurisdictions from having seemingly
7  implausible rates of registration because you
8  have accurate noncitizen data.  It allows you to
9  make better assessments as to registration rates
10 of citizens.  It's rather simple.  Well, it might
11 not sound simple but it is simple.
12 Q.  Okay.  We'll look at another document here.
13     Okay.  Do you see the document here?
14 A.  Right.
15 Q.  And do you recognize what this is?
16 A.  I do.
17 Q.  And what's this?
18 A.  It is Public Interest Legal Foundation's Motion
19     for Leave to file amicus curiae brief.
20 Q.  Okay, and this is in a case that was in the
21     Supreme Court of New Mexico, right?
22 A.  That's what it says.
23 Q.  Okay, and this was a -- if you recall, this was a
24     lawsuit that was concerning New Mexico's plan to
25     mail ballots to all registered voters, is that

**38**

1  right?
2  A.  That is not accurate.
3  Q.  Okay.  What was this about?
4  A.  Well, it was not New Mexico's plan.  It was a
5      case brought by a variety of county clerks in the
6      original jurisdiction of the New Mexico Supreme
7      Court asking the New Mexico Supreme Court to
8      rewrite state law and order mail ballots.  It
9      wasn't a -- it wasn't as you described in your
10     question.
11 Q.  Okay.  I'm going to scroll down here, and number
12     1 here lists or describes PILF, which is defined
13     as the Foundation in the paragraph above, and
14     paragraph 1 says, "the Foundation is a
15     nonpartisan 501(c)(3) public interest
16     organization that is dedicated entirely to
17     promoting the integrity of elections nationwide
18     through research, education, remedial programs
19     and litigation," and is that -- is that sentence
20     accurate?
21 A.  Yup.
22 Q.  Okay.
23 A.  Yes.
24 Q.  And then the next sentence says, "this matter
25     presents issues that are at the core of the

**39**

1  Foundation's election integrity mission; namely,
2  the problems and risks attendant to mandatory
3  vote by mail."  Is that accurate that --
4  A.  That's what it says.
5  Q.  But is that accurate?
6  A.  Of course it is.
7  Q.  Okay.  So the problems and risks attendant to
8      mandatory vote by mail are at the core of the
9      Foundation's election integrity mission?
10 A.  No, you're exaggerating what it says.  It doesn't
11     say that.
12 Q.  Okay, well, how would you put it?
13 A.  That vote by mail is an important issue and as --
14     I mean, it says what it says.  I can't put it any
15     differently but I'm not going to exaggerate what
16     it says.  Vote by mail is not the core of the
17     Foundation's election integrity mission.
18 Q.  So you're drawing a distinction between the core
19     versus at the core?  Am I understanding that
20     correctly?
21 A.  I mean, I'm not going to debate.  I find that
22     kind of argumentative.  I'm not going to debate
23     the -- you know, it says what it says.
24 Q.  Okay, all right, and can you explain why it is
25     that vote by mail raises issues that are at the

**40**

1  core of the Foundation's election integrity
2  mission?
3  A.  I'm not sure what this has to do with Maine and
4      whether or not you're going to disclose public
5      information.
6  Q.  Well, it's related to the topics in the 30(b)(6).
7  A.  Right, okay, well, we can play the game then.
8      And what was the question, please?
9  Q.  Can you explain why the problems and risks
10     attendant to mandatory vote by mail present
11     issues that are at the core of the Foundation's
12     election integrity mission?
13 A.  I will wager a significant amount of money that
14     Maine's voter rolls have serious problems.  They
15     have dead people on the rolls, they have
16     duplications unless, of course, you all have
17     scampered to fix them before you disclose the
18     data, and they have people who no longer live at
19     the address that the Maine voter rolls say they
20     do.  If Maine were to mail out all ballots to
21     your existing list of voters which you are hiding
22     from the public, then you would be sending
23     ballots to people who are no longer alive, no
24     longer live where they say they do on your rolls,
25     probably duplicate ballot, but we don't know yet

41

1   because you've been hiding your voter rolls, and
2   other problems.  So the state of your voter rolls
3   are relevant to the question as to whether or not
4   vote by mail would be a good idea.  The fact that
5   you are hiding your voter rolls makes it harder
6   for us to conclude, as we did in New Mexico
7   because they did not hide their voter rolls like
8   Maine is, that vote by mail would be a problem in
9   New Mexico.
10  Q.  Okay.  Can you look at paragraph 3, and I'm
11      interested in the second sentence there,
12      "considerable expense, the Foundation compares
13      voter roll data against federal and other public
14      or commercial databases to flag registrations
15      that may be incomplete, outdated or no longer
16      valid."  What are the -- well, let's take it one
17      at a time.  What are the public databases that
18      the Foundation uses for this purpose?
19  A.  Well, there's a lot of them.  Some of them
20      include public obituaries, merely looking at
21      commercial addresses.  There's a variety of
22      public databases or commercial databases that are
23      used to do this.
24  Q.  Okay.  You said public obituaries.  Is that a --
25      who publishes the database of public obituaries?

42

1   A.  Well, a variety of sources do, Legacy,
2       newspapers, among others.
3   Q.  And which sources does PILF use for looking at
4       analyzing public obituaries?
5   A.  The ones I've told you, among others.  I've
6       answered the question.
7   Q.  What are the others that you haven't told me?
8   A.  Commercial credit data, commercial data related
9       to whether or not somebody is still alive or
10      lives at the location where they say they do on
11      the voter rolls which, of course, you are hiding
12      so we can't determine whether or not somebody is
13      still at an address unless we actually have the
14      registration list.
15  Q.  What are the names of the companies that provide
16      these commercial databases?
17  A.  Experian, all of the credit agencies, there's a
18      lot of them.  There's -- there's a variety of
19      information sources that can help one.  I
20      certainly hope Maine is using them because if
21      they're not, then one questions whether or not
22      they're doing everything they can to keep the
23      rolls clean.  So your client may have some other
24      insights as to who has this information about
25      where people still live.

43

1   Q.  So other than Experian, what other databases
2       do --
3   A.  I've answered a lot of them.  It's not just
4       Experian.  There's -- there's a lot of different
5       data sources that can go into determining whether
6       or not somebody is still alive.
7   Q.  Okay.  Experian is the only one you can actually
8       name though?
9   A.  Well, that's not an accurate statement of my
10      testimony.  I don't think you're going to start
11      mischaracterizing my testimony.
12  Q.  So what are the other ones then?
13  A.  I've already answered that question.  The record
14      has it.
15  Q.  I'm asking -- let me rephrase it a different way.
16      Other than Experian, what are the specific
17      companies that you use, that have databases that
18      you use?
19  A.  I've answered that question.
20  Q.  I think the only name you've given me is
21      Experian.
22  A.  Well, I think that the record reflects other
23      names that I've said.  Maybe you can ask the
24      court reporter to read back some answers.
25  Q.  So you can't give me any names other than

44

1   Experian?
2   A.  You have now asked that question three times
3       mischaracterizing my testimony and I'm not going
4       to -- I view that to be abusive.  You know very
5       well that I said something other than Experian.
6   Q.  What did you say other than Experian?
7   A.  Let the record be read back to you if you've
8       forgotten.
9   Q.  Is Legacy -- you mentioned Legacy.  Is that a
10      company or is that a type of database?
11  A.  Don't know the answer to that.
12  Q.  Okay.  Any other sources that you haven't
13      mentioned yet?
14  A.  That's not a complete sentence.
15  Q.  Okay.
16  A.  "Any other sources," I don't understand the
17      question.  Any other sources that I haven't --
18  Q.  Can you name any other sources of data that you
19      use to conduct your analyses that you haven't
20      mentioned yet?
21  A.  Oh, yes, there's lots more that I could name and
22      lots more I probably can't.  For example, one can
23      look at, for example, a Google map or you could
24      visit a property.  There's ways to determine
25      whether or not you're dealing with an abandoned

45

1    mine or a vacant lot, and so there's all kinds of
2    data sources as it relates to what is physically
3    at an address.  You can look at tax information,
4    you can look at all of the other credit reporting
5    agencies.  This isn't just a single location for
6    answers.  You look at a lot of places.  I assume
7    Maine is doing this.  That's one of the things
8    we're going to find out in this case is whether
9    or not Maine is doing everything they can.  We
10   certainly do everything we can.
11  Q.  Does PILF visit properties --
12  A.  Yes.
13  Q.  -- as part of their --
14  A.  Yes.
15  Q.  -- analyses?  And does PILF consult tax
16      information?
17  A.  On occasion, yes.
18  Q.  How does -- how do you go about consulting tax
19      information?
20  A.  You look at property records.
21  Q.  And that's something it sounds like you do less
22      commonly than some of the other methods?
23  A.  I don't understand the question.  "Less
24      commonly," what do you mean by that?
25  Q.  You said on occasion you look at tax information,

46

1    so you don't commonly do that?
2    A.  Yeah, I don't know how to describe that.  I mean,
3        it happens, if you're asking, and how to weight
4        or grade the frequency, I cannot do as I sit here
5        right now.
6    Q.  Okay, and going back to paragraph 3, it says you
7        also use the Social Security Death Index, is that
8        correct?
9    A.  Yes.
10   Q.  Is it correct that that index only goes back to
11       1936?
12   A.  I don't know, maybe.  Yeah, it would seem to only
13       go back to 1936 for the -- the -- the fact that
14       there wasn't a Social Security Act prior to that.
15   Q.  Okay.
16   A.  How about that?
17   Q.  And do you know what information is contained in
18       the Social Security Death Index?
19   A.  Yup.
20   Q.  What's contained in it?
21   A.  The names of individuals who have obtained
22       benefits, death benefits for dying.
23   Q.  And what pieces of data are publicly available
24       from that database?
25   A.  I can't parse out what's public and not public.

47

1    I know you buy it.
2    Q.  Okay.  Let's scroll down here.  Now, we're on
3        page 4 now of the amicus brief that was attached
4        to this motion, and you describe -- the
5        Foundation describes its methodology in this
6        paragraph.  It says, "the Foundation matched
7        voter roll data against the federally-maintained
8        Social Security Death Index and where possible,
9        against the SSDI and printed obituaries and other
10       public notices."  Did I read that accurately?
11   A.  I'll let the document speak for itself.  I don't
12       know whether you did or not.
13   Q.  Okay.  The -- so in this case, this analysis you
14       did in New Mexico, you relied on the Death Index
15       and printed obituaries, correct?
16   A.  Again, I'll let the document speak for itself.
17   Q.  Okay.  You have no reason to believe that's not
18       accurate, right?
19   A.  Not as I sit here right now.
20   Q.  Okay, and typically when PILF submits legal
21       briefs, I assume you make every effort to make
22       sure they're accurate, right?
23   A.  Yup.
24   Q.  And can you explain, in this paragraph it uses
25       the qualifier "where possible you match the data

48

1    against SSDI and printed obituaries."  What does
2    that mean, "where possible?"  When is it possible
3    and when is it not possible to do that?
4    A.  Not everybody buys an obituary.  Poor people
5        frequently don't because they cost a lot of
6        money.  Obituaries are more common in some
7        communities than others.  They aren't free.
8    Q.  So not everybody who dies has a printed obituary?
9    A.  But everybody who has a printed obituary is
10       usually dead.
11   Q.  Okay, all right.  All right, I'm just going down
12       to the bottom here.  This is a letter that's
13       attached to this brief.  Do you recognize this?
14   A.  Could you scroll through a little more, please?
15   Q.  Sure.
16   A.  Okay.
17   Q.  Do you recognize what this is?
18   A.  More or less.
19   Q.  Okay, what is it?
20   A.  It says, "Statutory Notice of Violation of
21       National Voter Registration Act, Request for a
22       Meeting."
23   Q.  Okay.  Is this the kind of letter that PILF
24       typically sends after they've done an analysis of
25       a state's voter file?

49

1  A.  No.

2  Q.  Okay.  This is something specific to New Mexico?

3  A.  Yes.

4  Q.  Okay.  Do you -- when PILF conducts analyses of

5      voter data, do you typically follow up with a

6      letter to the state?

7  A.  Sometimes.

8  Q.  Okay.  So this is an example where you did that?

9  A.  Correct.

10 Q.  Okay.

11 A.  This is an example in New Mexico where we did

12     that.

13 Q.  Okay, all right, and if you were to conduct an

14     analysis of Maine's voter file, you might send a

15     similar letter to Maine?

16 A.  It all depends on what Maine's attitude is about

17     fixing problems.  If they had a very good

18     attitude about fixing the problems we found, we

19     might not even send a letter.  We might call and

20     say we'd like to come up and fly up and show you

21     all the information we found that you might find

22     useful in doing follow up.  If you all had a bad

23     attitude about the work we did, we might send a

24     notice letter getting ready to sue you.  It would

25     all depend on the attitude and the willingness to

50

1      fix the problems that we found.

2  Q.  Got it, okay.  So in this letter, you cite some

3      evidence of inadequate list maintenance, correct?

4  A.  Well, this letter speaks for itself.

5  Q.  Okay, well, I guess my question is, and we can

6      scroll through the letter, are these the same

7      types of issues that you'd be looking for if you

8      were to have access to Maine's voter data?

9  A.  No, I would -- I would say we don't know what

10     we're going to be doing because you haven't given

11     us the voter data, but I can tell you that one of

12     the things we will look at is whether or not you

13     have dead people on your rolls and if you, in

14     fact, have dead people on your rolls, which could

15     well be a violation of federal law depending on

16     why they're still there, that one of the things

17     we will do is contact you and say we found

18     hypothetically 10,000 dead people on your rolls

19     that you've never fixed.  One would presume that

20     the election officials in Maine would be happy to

21     hear from us and say, oh, please bring that to

22     our attention so we can start the process of

23     looking at it and fixing it.  That's one

24     possibility of what we would do upon finding dead

25     people active on your voter rolls.  There are

51

1      other possibilities but that's one.

2  Q.  Okay.  Do you know if New Mexico took any steps

3      as a result of this notice?

4  A.  I don't know for certain but I do have some

5      indication that they began to clean the list

6      based on the problems we brought to their

7      attention.

8  Q.  Okay.

9  A.  We have a record of success doing this in other

10     states but the first step in doing it is getting

11     your voter rolls.  Let us do your work for you.

12 Q.  And what's the -- you said you had some evidence

13     that they -- that they may have acted.  What is

14     that evidence?

15 A.  I can't recall as I sit here.

16 Q.  Okay.

17 A.  Most states usually do.  They want to get this

18     information.  They enjoy by and large when

19     citizens help them do their job.  They recognize

20     that they can't always get everything done with

21     the limited resources they have so our work has

22     been welcomed in many states as a way to do what

23     that state is trying to do and that's keep clean

24     rolls.

25 Q.  Okay, and in this letter, you provide some

52

1      numbers in terms of I guess potential issues,

2      right, for different problems with the rolls

3      like, for instance, on the page we're looking at

4      here, you say "the statewide roll currently

5      contains at least 1,681 registrants who are

6      matched against the SSDI or published obituaries

7      with corresponding dates of death on file at

8      various credit reporting bureaus," correct?

9  A.  You appear to have read that accurately.

10 Q.  Okay, but in general, PILF when it reports back

11     to states about its analysis, you're going to

12     give numbers of how many problems you found in

13     particular categories, is that fair?

14 A.  We're going to do more than that.  We're going to

15     make available to you all of our findings.  We're

16     going to make available to you the spreadsheets

17     of the names that you can then do follow-up work

18     to see if, in fact, our work is accurate.  We're

19     a resource.  We're not just going to give you a

20     scoreboard, we're going to give you more than

21     that if you're cooperative.

22 Q.  Okay, and does PILF do any -- well, backing up, I

23     guess these are potential -- potential problems,

24     right?  The numbers reflect potential problems

25     not confirmed problems?

53

1   **A.** Of course they do because we can't be perfect.
2   **Q.** Sure.
3   **A.** And there's always going to be false positives
4        but that's your job, not ours, to follow up and
5        do the statutory procedures that you have in your
6        state to ascertain whether or not the
7        registration should remain active.  That's not
8        our job, that's the state's.
9   **Q.** Does PILF do anything to assess whether there are
10       false positives in these numbers?
11  **A.** Yeah.
12  **Q.** And let me -- let me back up.  So if -- if you
13       report this to a state, the state takes action
14       to, you know, investigate these numbers and it
15       finds that a lot of them are false positives --
16       some of them are false positives, does -- do you
17       try to seek that information from state
18       officials, how many false positives there
19       actually were?
20  **A.** Well, first of all, you had two questions in
21       there.  You had a question initially -- I mean,
22       you -- I don't understand the question because
23       you asked a compound question.  So you had two
24       but you kind of moved away from the first, so
25       what do you want me to answer?

54

1   **Q.** So my question is, does PILF look at the results
2        of any state activities that follow from your
3        letters or reports in order to assess how many
4        false positives you might have had in your
5        analysis?
6   **A.** Well, first of all, we're doing the best we
7        possibly can.  So we're doing everything we can
8        do to whittle down the list to what appears to be
9        the most accurate list possible; and secondly, we
10       have already weeded out false positives from
11       early runs, from initial runs, from other things.
12       False positives are weeded out before anything is
13       sent to the state; thirdly, states aren't very
14       interested in making it easy for us to assess
15       what they have done with that list, and
16       frequently we have to rely on historic voter
17       rolls, meaning what were the voter rolls on one
18       day, what are the voter rolls two years later,
19       for us to assess that.  So without a cooperative
20       state giving us feedback, which doesn't occur to
21       my knowledge ever, and a cooperative state in
22       giving us their voter rolls on a timely basis,
23       which certainly isn't occurring in this case, it
24       is difficult to assess that data set that you're
25       referring to.

55

1   **Q.** Well, you have a cause of action under the NVRA,
2        right, if states don't turn over data that you
3        think you're entitled to?
4   **A.** Yeah, and here I am in a 30(b)(6) because you
5        won't give us public information.  So spare me
6        the you have a cause of action answer because
7        you're -- you're not -- you're sitting here doing
8        a four-hour so-called -- around a four-hour depo
9        because you don't comply with that.  So yeah,
10       that's a cold comfort that we have a cause of
11       action to get that information.
12  **Q.** But presumably in the states where you've done
13       this analysis, you've already either successfully
14       litigated a case or they've voluntarily given you
15       the information, right?
16  **A.** Which information is your question referring to?
17  **Q.** The information about the voter rolls, correct?
18  **A.** Everybody gives us that information except two
19       states, you being one of them.  Other states that
20       have been sued have capitulated because they
21       realize it's public information.  So there aren't
22       many examples to the contrary of us running up
23       against a state that won't give us the voter
24       rolls apart from yours.
25  **Q.** I guess my question is, if almost all the states

56

1        are giving you this data, why can't you go to the
2        states after they've done their, you know, fixing
3        or analysis and ask to see how many false
4        positives there were?
5   **A.** We have in some instances.
6   **Q.** When have you done that?
7   **A.** Well, we haven't just asked for false positives,
8        we've asked for actions taken and we have gotten
9        back that information.  It's not a false positive
10       inquiry, it's show us what you did to fix the
11       problem.
12  **Q.** Okay, but does PILF conduct any analysis once
13       they get that information to --
14  **A.** Yes.
15  **Q.** -- see how many false positives you have?
16  **A.** Right, and it's usually not a very high number to
17       the extent we look at it.  In other words, we're
18       not wasting our time or your time deliberately.
19       We want to get the correct answers.  We use every
20       available resource that we have, which is fewer
21       resources than your client has, to ascertain
22       whether or not those individuals should be
23       removed from the list of active registrants.  So
24       you are in the best position as a state election
25       official to act on these problems, not PILF.

57

1  Q.  Does PILF keep track of that information in any
2      way?
3  A.  I've asked and answered that.
4  Q.  I think you've -- well, are there any -- are
5      there any reports that you've issued that show
6      how many false positives there were as a result
7      of --
8  A.  Okay, you're missing -- you didn't hear my
9      answer.  We don't do analysis of false positives,
10     okay?  We do analysis from time to time of
11     actions taken by states.  This is a relatively --
12     relatively new process where the voter roll data
13     is not yet cycled; in other words, we started
14     doing this a number of years ago and we have not
15     gotten enough voter roll history to determine
16     what was done with particular referrals, and we
17     certainly have gotten no voter roll history from
18     Maine period.  Your -- the states are in the best
19     position to fix this if they want to.
20 Q.  Okay.  Let me show you another document.  Okay,
21     can you see this document?  It's another page
22     from your website.
23 A.  Oh, I see the document, yes.
24 Q.  Okay.  I'm just going to scroll down.  I just
25     have one question or a couple questions about

58

1      what's at the bottom here.  In italics, it says,
2      "Public Interest Legal Foundation" and there's a
3      web address, "PILF is a 501(c)(3) public interest
4      law firm dedicated to election integrity.  The
5      Foundation exists to assist states and others to
6      aid the cause of election integrity and fight
7      against lawlessness in American elections."  Is
8      that also an accurate statement of PILF's
9      mission?
10 A.  That's what the document says.
11 Q.  And is it an accurate statement of PILF's
12     mission?
13 A.  Yes.
14 Q.  Okay.  What are some examples of lawlessness in
15     American elections that PILF is concerned about?
16 A.  Well, we're very concerned, for example, about
17     states that have obligations under the National
18     Voter Registration Act to disclose public voter
19     roll information, and when they lawlessly refuse
20     to disclose that information to PILF, that is of
21     deep concern because it does not allow us to
22     analyze the voter rolls when those states
23     lawlessly refuse to comply with federal law and
24     disclose those voter rolls.  Maine is in that
25     category.

59

1  A.  Illinois is in that category.  Illinois has also
2      lawlessly refused to disclose their -- their
3      voter roll data.
4  Q.  Other than failure to disclose voter roll data,
5      what are some other examples of lawlessness?
6  A.  How many do you want?
7  Q.  Why don't you give me a couple.
8  A.  Okay.  Well, I'll give you another lawless
9      example in American elections.  The Virginia
10     State Board of Elections acted lawlessly in
11     giving instructions to county election officials
12     in Virginia in the 2020 election to lawlessly
13     accept late ballots that arrived by mail without
14     a postmark.  How do I know that they were
15     lawlessly giving these instructions is because I
16     was the attorney of record and PILF sued the
17     Virginia State Board of Elections for lawlessly
18     issuing instructions to accept late ballots
19     without postmarks.  It is not PILF's opinion that
20     the Virginia State Board of Elections engaged in
21     lawlessness.  It was the opinion of a Virginia
22     judge in that case in issuing a preliminary
23     injunction as well as a permanent injunction
24     against the Virginia State Board of Elections for

*Note: line 1 begins "And what are some other examples?" / line labels*

1  Q.  And what are some other examples?
2  A.  Illinois is in that category.  Illinois has also
3      lawlessly refused to disclose their -- their
4      voter roll data.
5  Q.  Other than failure to disclose voter roll data,
6      what are some other examples of lawlessness?
7  A.  How many do you want?
8  Q.  Why don't you give me a couple.
9  A.  Okay.  Well, I'll give you another lawless
10     example in American elections.  The Virginia
11     State Board of Elections acted lawlessly in
12     giving instructions to county election officials
13     in Virginia in the 2020 election to lawlessly
14     accept late ballots that arrived by mail without
15     a postmark.  How do I know that they were
16     lawlessly giving these instructions is because I
17     was the attorney of record and PILF sued the
18     Virginia State Board of Elections for lawlessly
19     issuing instructions to accept late ballots
20     without postmarks.  It is not PILF's opinion that
21     the Virginia State Board of Elections engaged in
22     lawlessness.  It was the opinion of a Virginia
23     judge in that case in issuing a preliminary
24     injunction as well as a permanent injunction
25     against the Virginia State Board of Elections for

60

1      lawlessly issuing instructions to county election
2      officials to disregard state law as it relates to
3      postmarks and late-arriving ballots.
4  Q.  Okay.  Do you know what the name of that case is?
5  A.  Reed versus State Board of Elections.
6  Q.  Okay, and was -- and was that resolved by a
7      consent decree?  Is that right?
8  A.  No, it's not right.  It was resolved by the
9      issuance of a preliminary injunction.
10 Q.  Okay.
11 A.  A consent decree incorporated the decision in the
12     preliminary injunction which found that the
13     Virginia State Board of Elections lawlessly
14     issued instructions to county election officials
15     to disregard state law relating to the postmarks
16     being on absentee ballots that arrive within
17     three days late after the election.
18 Q.  Okay.  You said you had one more I think or you
19     were going to give me one more.
20 A.  No, there's plenty more.  I mean, if you want to
21     -- I mean, I've given you three examples.  Since
22     you want to probe whether or not that's an
23     accurate statement or hyperbole, we can keep
24     going if you want to, but that's up to you.  It's
25     your deposition.

61

1  Q.  Okay.  Let's look at another case.  Okay, do you
2      recognize this document?
3  A.  Let's scroll to the bottom, please.
4  Q.  All the way to the end?
5  A.  Please.
6  Q.  Okay.
7  A.  All right.
8  Q.  Okay, and what is this document?
9  A.  Can you go to the top, please?
10 Q.  Yes.
11 A.  It is an amicus curiae brief for the Public
12     Interest Legal Foundation and Landmark Legal
13     Foundation in opposition of Plaintiff's motion
14     for preliminary injunction.
15 Q.  Okay, and this is in Texas Democratic Party
16     versus Greg Abbott?
17 A.  That's the caption.
18 Q.  And do you recall what this case is about?
19 A.  Not as I sit here right now other than -- I don't
20     know the factual predicate that gave rise to the
21     case.  It might have -- I just don't remember
22     right now as we sit here.
23 Q.  Sure.  Well, I'll tell you my understanding and
24     you tell me if it's consistent with yours or not.
25 A.  Why don't we scroll down.  I'm sure that we

62

1      recite the facts in the document.
2  Q.  Okay, why don't we do that.
3  A.  It might refresh my recollection.  All right, "an
4      informal letter of legal advice from the Texas
5      Attorney General's office in a response to
6      guidance from a legal request from a state
7      legislator."  Could you scroll down to the first
8      bullet -- first Roman numeral?  Thank you.  Okay,
9      I'm not sure that fully refreshes my
10     recollection.
11 Q.  Okay, but you would agree that this case involved
12     a challenge to communications by the Attorney
13     General of Texas on a claim that the
14     communication constituted intimidation under the
15     Voting Rights Act?
16 A.  I don't remember what the communication was.
17     That's the important part of this.
18 Q.  Okay.  Could it have been a letter -- well, let's
19     see if it's in here first.
20 A.  Last paragraph right there.  You went by it.
21     Plaintiff allegation that attorney general --
22     okay, I've read that paragraph but I'm still not
23     refreshed as to what the content of the guidance
24     was.
25 Q.  Okay.  Could it have been a reference to criminal

63

1      penalties if people requested absentee ballots
2      out of fear of COVID?
3  A.  Oh, I think that what it may have been was
4      characterization of what constituted a valid
5      disability under Texas law.
6  Q.  All right, and so PILF took the position in this
7      case that the letter by the Texas Attorney
8      General did not violate the Voting Rights Act,
9      correct?
10 A.  Can you please show me where that occurs in the
11     brief?  Because that's not my recollection.
12 Q.  All right.  How about --
13 A.  Okay.
14 Q.  Number 1 here, "Plaintiff's allegations are
15     insufficient under Section 11(b)" --
16 A.  Right.
17 Q.  " -- of the VRA?"
18 A.  Section 11(b) would not encompass an attorney
19     general of a state truthfully providing guidance
20     to election officials about state law, that is
21     correct.
22 Q.  Okay, all right, including guidance that certain
23     conduct might be subject to criminal penalties?
24 A.  That's right, because that's an accurate
25     statement of state law.  There's a defense of

64

1      truth and the 11(b) provision, which incidentally
2      I have gone to trial with before when I was an
3      attorney with the Justice Department, I have
4      intimate familiarity with the statute, would not
5      constitute a violation of 11(b) under even a
6      strained interpretation of the federal law.
7  Q.  Okay, and PILF's ultimate concern here was that
8      it didn't want people obtaining absentee ballots
9      based on nothing more than fear of COVID,
10     correct?
11 A.  No, that's not correct.
12 Q.  Well, isn't that the outcome that would occur if
13     you're successful in this case?
14 A.  Well, that's different from saying this is what
15     the concern was.  This isn't some -- we still
16     live by -- language means something and you asked
17     me what our concern was and I said no, that is
18     not correct and then you then presented a
19     plausible factual scenario that may have occurred
20     but had nothing to do with our concern.
21 Q.  Was it PILF's view that in fact, a
22     violation of Texas law for somebody to ask for an
23     absentee ballot out of fear of COVID?
24 A.  I'm not sure where the brief says that.  If you
25     could point me to that part of the brief.

65

1 Q. Well, no, I'm asking whether that was PILF's
2    position, not whether --
3 A. Why?  Why are you asking that?  What does that
4    have to do with this case?
5 Q. It has to do with I think the purposes and
6    mission of PILF which is in the 30(b)(6) topics.
7 A. Okay.  What document do you see that says one of
8    the purposes and missions of PILF is to stop
9    people who have fear of COVID from asking for an
10   absentee ballot?
11 Q. I'm just asking the question, if that was
12   PILF's -- if that was PILF's view?
13 A. I view that as abusive and argumentative because
14   nowhere do you have a document to substantiate
15   that.  You can ask me a lot of other questions
16   that are outlandish but in this particular
17   outlandish question, I'm telling you what the
18   pleading says in front of us relates to an
19   interpretation of 11(b) of the Voting Rights Act
20   and what occurs in Texas after -- regarding the
21   ballots was nowhere in this brief a concern of
22   ours.
23 Q. So you're refusing to answer the question?
24 A. No, I'm refusing to subject myself to your
25   abusive questions that relate to some fabricated

66

1    concern that is --
2 Q. Are you --
3 A. -- some fever swamp --
4 Q. You won't disagree --
5        THE REPORTER:  Excuse me.
6 BY MR. BOLTON:
7 A. Can I answer the question?  You're talking over
8    me.
9 Q. Go ahead.
10 A. That's related to some sort of paranoid fever
11   swamp interpretation of our litigation that has
12   nothing to do with what the pleading says.
13 Q. Okay, but you're not disagreeing?
14 A. I am disagreeing.  I told you that when I said
15   that's not what this pleading says.
16 Q. Well, right, but I wasn't asking about the
17   pleading.
18 A. Well, maybe you should renew your question.
19 Q. But that's fine, we can move on.  All right.  All
20   right, I have one more to show you.  Okay, do you
21   recognize this document?  I'm happy to scroll
22   through if you'd like.
23 A. It says "Public Interest Legal Foundation's
24   Motion for Leave to File Amicus Curiae Brief in
25   Support of Defendants-Appellant's Petition for

67

1    Rehearing En Banc."  It looks to me like it's
2    from the 11th Circuit Court of Appeals.
3 Q. Correct.  So do you -- do you have any
4    recollection of this case, Jones versus DeSantis?
5 A. Yes, I remember that the 11th Circuit Court of
6    Appeals adopted our position as the law in this
7    case.
8 Q. And what was your position?
9 A. Our position was that states have the power to
10   impose conditions upon re-enfranchisement of
11   felons.  Now, it may come as news to folks in
12   Maine who put voting machines in prisons, as I
13   understand it, that in some states they have
14   exercised their state prerogatives to not do that
15   and in this particular case, there was a
16   constitutional amendment to change those rules
17   subject to the conditions imposed by the Florida
18   Legislature.  In this particular case, we filed a
19   brief that says that the Florida Legislature
20   indeed has those powers under the federalist
21   arrangement to run their own elections and the
22   11th Circuit Court of Appeals agreed with PILF's
23   position that that was the law.
24 Q. Okay, and is it correct to say that PILF's
25   position was that the felons in Florida who had

68

1    outstanding restitution should not be permitted
2    to vote until they paid off that restitution?
3 A. No, that is not correct.
4 Q. How would you characterize it?
5 A. Well, I'll characterize it again.  I've answered
6    this once, I'll do it twice.  The position that
7    the 11th Circuit -- the ruling of the 11th
8    Circuit Court of Appeals was consistent with our
9    position which was that states have the power to
10   attach conditions to re-enfranchisement plans,
11   and in this particular instance, the State
12   Legislature of Florida said that felons who
13   previously could not vote will be given the right
14   to vote if -- and this was statute -- if they pay
15   all fines and restitutions associated with their
16   crimes, including restitution to the victims, and
17   that is the condition upon which they will gain
18   their civil right to vote and that that is a
19   valid exercise of Florida's powers and our brief
20   said that it is a valid exercise of Florida's
21   powers under the Constitution to attach that type
22   of condition and the 11th Circuit Court of
23   Appeals so held.
24 Q. Okay, and can you explain how your -- the views
25   that you put forth in this case are consistent

69

1   with PILF's overall mission?
2   A.  Look, you can -- you can continue to probe
3       everything we do in this deposition to find
4       things that will be disagreeable to people in
5       Maine, including the Defendant, that they would
6       take a different approach on, but the facts are
7       that state officials, including in Maine, have to
8       follow the law and you have to disclose list
9       maintenance documents and you are refusing to do
10      so; and in this case in Florida, the felons had
11      to follow the law, and just like you were not
12      following the law, in Florida these individuals
13      did not want to follow the law and made their
14      victims whole before they were re-enfranchised,
15      and so it's almost identical where you have
16      people who aren't following the law as passed by
17      legislatures or passed by Congress breaking the
18      law and so it's consistent with PILF's mission to
19      encourage election officials or others, whether
20      it's the State of Maine, whether it's the
21      Virginia State Board of Elections, whether it's
22      the felons in Florida, whether it's a variety of
23      Texas county officials who are going to execute
24      the law in Texas for individuals to follow the
25      law and so this relates to the mission of PILF

70

1       that way.
2   Q.  Okay.
3           MR. BOLTON:  Why don't we take a short break
4       if that's all right with everybody.
5           THE DEPONENT:  All righty.  How short?
6           MR. BOLTON:  Well, I would say ten minutes
7       if nobody has any different preferences.  Is that
8       okay with you, Noel?
9           MR. JOHNSON:  Yeah, come back at 11:50?
10          MR. BOLTON:  Sounds good.
11          (OFF RECORD)
12  BY MR. BOLTON:
13  Q.  We are back on the record after a short break.
14      Mr. Adams, is there any work that PILF is doing
15      that you would say is aimed at increasing voter
16      registration?
17  A.  Oh, yes.
18  Q.  And what type of work is that?
19  A.  Well, there's a variety of things.  We are always
20      trying to make it easier for state officials to
21      register people to vote, for example, online
22      voter registration, getting those systems working
23      properly is a priority, ensuring that people have
24      the opportunity to register to vote is one of
25      those areas.

71

1   Q.  And so that would be -- the efforts to do online
2       voter registration would be one of those efforts.
3       Anything else?
4   A.  Well, there are.  I just don't remember that
5       being in your Schedule A, the mission and
6       objectives of PILF.  I mean, of course there are.
7   Q.  Nothing that you can remember now though?
8   A.  What is your question?
9   Q.  What are some other -- other than online voter
10      registration, what are some other efforts that
11      PILF has been involved in?
12  A.  Oh, the right to vote.  We are working on the
13      right to vote all the time.  We have litigation
14      that I suspect will be coming up very shortly
15      related to that.  I've been involved in the right
16      to vote, looking at election systems.  There's a
17      variety of cases.
18  Q.  Okay.  What specific issues with regard to the
19      right to vote are you talking about?
20  A.  Vote dilution, redistricting, ensuring that
21      people are properly represented.  Enforcement of
22      federal law and state law relating to elections
23      is what we're interested in.
24  Q.  Okay.  What is vote dilution?
25  A.  Well, it's a broad term related to having a

72

1       system of election that dilutes the votes of an
2       individual voter.
3   Q.  And what would -- what would cause a vote to be
4       diluted?
5   A.  Well, for example, if you had -- if you had
6       districts that, for example, for county counsel
7       and one district had 15,000 people, the next
8       district had 5,000 people, the next one had
9       10,000 people, the next one had 20,000 people,
10      that would result in a violation of the 14th
11      Amendment by diluting the votes of the individual
12      in the district of 20,000 people.
13  Q.  Okay.  People voting illegally, would that also
14      be vote dilution?
15  A.  I don't think that has been a theory that has
16      been accepted by courts and you will not find any
17      PILF cases that cite a 14th Amendment vote
18      dilution case in that context.
19  Q.  Okay.  Okay, and with online voting, what
20      specifically is PILF doing to promote online
21      voting -- I'm sorry -- online registration?
22  A.  Right.  Providing broad guidance to election
23      officials in various places related to best
24      practices for implementation of those plans.
25  Q.  So is PILF -- is PILF promoting the online voting

73

1  or are you -- are you trying to help officials
2  make it, you know, secure?
3  A. No, I mean, that's a distinction without a
4  difference. I mean, it's both.
5  Q. Okay, but are you going to states that don't have
6  online voting and maintaining that they should --
7  that they should start -- online registration,
8  I'm sorry, that they should start engaging in
9  online registration?
10 A. That has happened.
11 Q. Okay. When has that happened?
12 A. I'm not going to get into the particulars of our
13 program. This has nothing to do with the Maine
14 case.
15 Q. Okay.
16 A. I mean, if you're interested in probing all of
17 our activities around the country, then let's say
18 so and call it that and get into that and file
19 discovery requests broadly about our activities
20 but this is a case that relates to public
21 information, not how often I talk to state
22 election or county election officials about
23 online voting.
24 Q. So you're refusing to answer that question?
25 A. No, I'm not. I'm explaining to you why I

74

1  consider your question to be abusive in a probe
2  into our broader activities having nothing to do
3  with this case.
4  Q. Okay, but that wasn't my question, but that's
5  fine.
6  A. No, your question related to more details and
7  specifics about our nonpublic conversations with
8  election officials. I understand what your
9  question was.
10 Q. Okay, and you're refusing to answer it?
11 A. Yes, I am.
12 Q. Okay.
13 A. Because it was an abusive question. It had
14 nothing to do with this case.
15 Q. PILF hasn't engaged in any work intended to
16 increase registration by racial minorities, has
17 it?
18 A. Absolutely not. Wait, my answer is we are. It
19 might not be the conventional work that you're
20 interested in doing or your client is interested
21 in doing. We absolutely are. As a matter of
22 fact, I strongly disagree with that.
23 Q. Okay. What is PILF doing?
24 A. What does that have to do with this case? What's
25 your factual predicate for relevance?

75

1  Q. Sir, you're the witness, you're not the lawyer.
2  If your lawyer wants to instruct you not to
3  answer the question, he can do that and we can go
4  to court if we have to.
5  A. So you want to go to court over you probing my
6  organization's activities as it relates to racial
7  minority registration? Really, that's where you
8  want to be?
9  Q. I just want an answer to the question, that's
10 all.
11 A. We will go to court with those questions.
12 Q. I'd just like an answer to the question, sir.
13 A. I've answered it. The answer is yes.
14 Q. And what are those activities?
15 A. And I'm telling you that this has nothing to do
16 with the case and I'm not going to entertain an
17 inventory for you to release a deposition to the
18 public or otherwise that gets into your
19 cataloguing of our activities regarding racial
20 issues. I'm not going to do it. I know what
21 you're doing. This has nothing to do with an NVR
22 public records claim.
23       MR. JOHNSON: I'm going to object. The
24 question was asked and answered as well.
25       THE DEPONENT: I consider the question to be

76

1  abusive and not relevant.
2  BY MR. BOLTON:
3  Q. Sir, it's not your call whether a question is
4  abusive or not. Your attorney can make that
5  determination. You're acting as a witness here,
6  not as a lawyer.
7  A. Right, and the witness can say that they consider
8  your question to be harassing and abusive, and I
9  do so consider it.
10 Q. Okay. Well, now can you please tell me what
11 specific activities PILF is involved in?
12 A. Asked and answered.
13       MR. JOHNSON: Objection.
14 BY MR. BOLTON:
15 A. Abusive, harassing, and we reserve the right to
16 go to court for these kind of ridiculous
17 questions that have nothing to do with the case.
18 Q. So you're not going to answer my question?
19 A. Next question, please.
20       MR. BOLTON: Okay. I'm just going to note
21 again an objection on the record. The witness is
22 refusing to answer questions which is in violation of
23 the Rules of Civil Procedure and we reserve all our
24 rights to seek a court remedy for that.
25       THE DEPONENT: And the witness is going to

77

1 note for the record that he considers the question to
2 be abusive, harassing, repetitive, wholly unrelated
3 to this litigation and designed for the purpose of an
4 embarrassment through the release of irrelevant
5 information to the public or other improper uses of
6 the deposition transcript.
7 BY MR. BOLTON:
8 Q. All right. Your website, the PILF website, keeps
9     a list of cases that PILF is involved in,
10     correct?
11 A. I don't know.
12 Q. Okay. It was -- it was cited in your response to
13     our document request. Were you aware of that?
14 A. I mean, it has a list of cases. You've already
15     asked me a question about that.
16 Q. Okay. My question is, is that list -- do you
17     keep it up to date?
18 A. What does that mean, do we keep it up to date?
19 Q. Do you include all your cases on that list?
20 A. No.
21 Q. Okay. How do you decide which cases to put on
22     that list?
23 A. I don't know. There's no criteria.
24 Q. Okay. Who makes that decision?
25 A. A variety of individuals but there is no criteria

78

1     related to what to put on the list.
2 Q. Okay. So there could be cases that PILF has been
3     involved in that aren't on the list that's on
4     your website?
5 A. There could be matters that PILF is involved in
6     that are not on the website.
7 Q. Okay, all right. Now, you've brought a number of
8     suits against various secretaries of state under
9     the NVRA, correct?
10     MR. JOHNSON: Objection to form.
11 BY MR. BOLTON:
12 A. Yeah, I'm not sure that that is an accurate --
13     no, I don't think that is correct.
14 Q. Why don't you think that's correct?
15 A. Because it isn't. Now, I'm willing to be
16     corrected in that but I think that your -- well,
17     that's not true. There is Maine, Pennsylvania,
18     Illinois. There's three.
19 Q. Okay. Those are cases that are currently
20     pending?
21 A. Well, yes.
22 Q. Okay, all right, and there are also -- and those
23     are all cases where you're seeking disclosure of
24     voter data, correct?
25 A. No.

79

1 Q. Okay. Which cases involve you seeking disclosure
2     of voter data?
3 A. Maine. Which cases brought against secretaries
4     of state -- could you rephrase the question,
5     please?
6 Q. Yes. How many cases do you currently have
7     pending in which you are seeking the disclosure
8     of voter data?
9 A. Okay, that's a different question than the one
10     you asked earlier.
11 Q. Okay. Well, why don't you answer the current
12     question?
13 A. I believe the number is three.
14 Q. Okay?
15     MR. JOHNSON: Cases in which the secretary
16     of state is a defendant for the purposes of this
17     question?
18     MR. BOLTON: No, I'm just asking any --
19 BY MR. BOLTON:
20 Q. Any lawsuit where you're seeking disclosure of
21     voter data.
22 A. When you say voter data, what do you mean?
23 Q. Any data -- let me put it a different way. Are
24     you familiar with a statutory provision 52 U.S.C
25     20507(i)?

80

1 A. Can we call that the Public Information
2     Provision?
3 Q. Why don't we do that, the Public Information
4     Provision.
5 A. I am familiar with that.
6 Q. Okay. How many suits do you currently have
7     pending in which you're seeking information
8     under the -- what is it, the Public Information
9     Provision?
10 A. Right. So your question -- your question is how
11     many suits do we have pending against a secretary
12     of state under the Public Information Provision
13     of the NVRA, is that your question?
14 Q. Not necessarily a secretary of state, anybody.
15 A. Okay, so it's anybody?
16 Q. Correct.
17 A. I think five.
18 Q. Okay, and where are those suits?
19 A. Maine, Maryland, Illinois, Pennsylvania and North
20     Carolina.
21 Q. And which ones of those are against secretaries
22     of state?
23 A. Well, that's another way of asking which ones of
24     those have secretaries of state. Is that your
25     question? Do you want to know which ones are

81

1   secretaries of state --
2   Q.  Which ones name a secretary of state as a
3       defendant?
4   A.  Well, that's probably Maine, Pennsylvania and
5       Illinois.
6   Q.  Okay.  Okay, and am I correct that you've also
7       brought lawsuits under the NVRA that seek to have
8       states make changes to their voter rolls?
9            MR. JOHNSON:  Objection as to form.
10  BY MR. BOLTON:
11  A.  Yeah, I don't think that's an accurate --
12  Q.  You've brought other suits against states to
13      enforce the NVRA, correct, other than the ones
14      we've just talked about?
15  A.  There have been other -- you asked me -- yeah,
16      there have been other cases using the NVRA to
17      bring cases.
18  Q.  Okay, and what provision of the NVRA do those
19      cases involve?
20  A.  Section 8.
21  Q.  Okay, and what do those suits generally allege?
22  A.  Well, generally allege standing, relief
23      requested, failure to maintain a program that
24      reasonably maintains the voter rolls free of
25      death and individuals who do not live there,

82

1       parties involved.  That's about all I can think
2       of right now.
3   Q.  Okay.  What's the relief that you're asking for
4       in those cases?
5   A.  To implement a system that adequately and
6       reasonably maintains the voter rolls.  There has
7       never been relief requested, if that's where
8       you're going, asking individual records to be
9       altered.  To the best of my recollection, that is
10      not relief requested.
11  Q.  Okay, all right.  Are there any other categories
12      of suits that you've brought -- let's keep it
13      with suits that are currently pending under the
14      NVRA other than the two categories we just talked
15      about?
16  A.  That are currently pending, no.
17  Q.  Okay.  Have you brought suits in the past under
18      the NVRA under theories different than the ones
19      we've just discussed?
20  A.  Yes, but I can't recall which ones.
21  Q.  Okay.  Do you recall what the theory was in those
22      past suits?
23  A.  Well, I would be discussing other parts of the
24      NVRA, but I don't have a specific recollection
25      right now.

83

1   Q.  Okay, all right, and I think you mentioned in
2       your testimony before that there are other states
3       that have voluntarily provided this data to you?
4   A.  Everybody does except for Maine and Maryland and
5       Illinois.  You are an outlier.
6   Q.  Okay.  Have you gone to all the 50 states and
7       asked for this data?
8   A.  No, we've gone to almost all of them.
9   Q.  Okay.  Are there other states you haven't gone
10      to?
11  A.  Yes.
12  Q.  Which ones are those?
13  A.  Massachusetts.
14  Q.  Okay.  Any particular reason?
15  A.  Yup, because Massachusetts Secretary of State
16      there's custodial issues as to who is the proper
17      party in Massachusetts for the -- for this data.
18  Q.  Okay.  Have you gone to anybody else in
19      Massachusetts to get the data?
20  A.  Maybe.  I don't know.
21  Q.  Any other states that you haven't gone to?
22  A.  I don't know as I sit here right now.
23  Q.  Okay, all right.  The North Carolina case that
24      you brought to get voter information, that case
25      is still ongoing, is that right?

84

1   A.  Look, I'm not going to discuss pending cases with
2       you.  You can go on the ECF dockets and find
3       these answers yourself.  I'm not going to discuss
4       what's going on in any particular case.
5   Q.  And why is that?
6   A.  Because it's not relevant to this case for
7       starters; secondly, it's public information.
8   Q.  Okay.
9   A.  Thirdly, you can get it yourself; and fourthly,
10      I'm not going to inadvertently reveal
11      confidential information.
12  Q.  Okay.
13  A.  So you've got four reasons.
14           MR. JOHNSON:  Yeah, I will object that any
15      case not in this particular action is irrelevant,
16      your questions about those cases.
17  BY MR. BOLTON:
18  Q.  Have you settled any cases involving the public
19      disclosure provision of the NVRA?
20  A.  I think so but I don't remember which ones.
21  Q.  Okay.  Did you settle a case in Michigan?
22  A.  I don't know.
23  Q.  Okay.  How about Maryland?
24  A.  You know what, again, that's a matter of public
25      record.  You can look at the --

85

1  Q.  Well, I have a follow-up question about the
2      Maryland suit.  So my question is, what data were
3      you provided in Maryland?
4  A.  Go look at the settlement documents to the extent
5      they're listed on PACER.  I'm not going to get
6      into that.
7  Q.  Do you know the answer?
8  A.  No, I don't.
9  Q.  Okay.
10 A.  I mean, look, this is a very simple case.  You
11     guys aren't turning over information.  If you
12     want to get into a big, sweeping probe of our
13     organization for whatever purpose that might be
14     contemplated with your team, you go ahead and do
15     it but we're not going to cooperate with that
16     sort of behavior in a 30(b)(6).  You guys can
17     look this information up.  This case is about you
18     not disclosing public information that you have
19     to disclose under the law, and I'm happy to
20     answer all the questions you ask me about this
21     case.
22 Q.  In the states where you've been able to get
23     information voluntarily from the states, do you
24     know whether in those states the data that you
25     were asking for were public records under state

86

1      law?
2  A.  They're all public records.
3  Q.  Under state law?
4  A.  Well, that doesn't matter, does it?
5  Q.  Well, that fact --
6  A.  You know the supremacy clause.  I mean, we can
7      talk about all sorts of other irrelevant
8      hypotheticals.
9  Q.  Well, let me ask it a different way.  Is there
10     any state that's given you voter data where the
11     state makes that data confidential under state
12     law?
13 A.  Yes, as did Virginia in the case of Project Vote
14     v Long.  I mean, you are apparently unaware of
15     the long history in this area related to public
16     information requests under NVRA.  States complain
17     all the time that there's a state law exception
18     but most of the lawyers who work for those states
19     have realized there's something involving the
20     supremacy clause and that they have to give the
21     information up because it's required under
22     federal law.
23 Q.  So Virginia has given up that information even
24     through there's a state law that makes it
25     confidential?

87

1  A.  Absolutely.
2  Q.  Are there any other states?
3  A.  Texas.
4  Q.  Anyone else?
5  A.  Yeah, I'm sure there are.  I just can't recite
6      this.  This has nothing to do with your case.
7  Q.  Okay.
8  A.  Whether or not a state offers a meritless claim
9      of state law exception has nothing to do with
10     this case we have now, if another state offers
11     those meritless claims that were later rejected
12     by courts or whether the attorneys for those
13     other states realized how meritless their initial
14     positions were.
15 Q.  Has PILF ever brought a case arguing that states
16     were making it too difficult for people to
17     register to vote?
18 A.  What relevance does that have?  I don't
19     understand the factual predicate to our case.
20 Q.  It's relevant to the 30(b)(6) notice which you
21     didn't object to.
22 A.  I don't think it is actually.
23         MR. JOHNSON:  We'll object to its relevance
24     now.
25 BY MR. BOLTON:

88

1  Q.  You can still answer the question.
2  A.  Our case -- you know, because you've asked it a
3      number of times, that our case list is on our
4      website.  I believe that the cases we bring make
5      it easier to register to vote because we are
6      facilitating good government.  When people are
7      registered with a variety of bad data in the
8      records, as we have found in other states, it
9      interferes with the whole process.  In some
10     states -- and we don't know if Maine does because
11     you're hiding the information, but some states
12     are registering people with improper birth dates
13     or placeholders.  Other places are kicking out
14     registrations because the data are matching
15     improperly registered records, records that have
16     errors in them.  So when you clean up the system,
17     you make it better for the system to work for
18     everybody, so I would say yes.
19 Q.  Okay.  So by -- by requiring state officials to
20     clean up the voter rolls, the theory is at the
21     end of the day that will make it easier for
22     everyone to vote?
23 A.  It does.  There's no question about it.
24 Q.  And it will make it easier for everyone to
25     register to vote?

89

1  A.  Absolutely, because there aren't errors in the
2     system and errors can cause people to not get
3     registered.  If there's bad information in the
4     system and somebody tries to register on top of
5     that bad information, it can knock people out of
6     the registration process.  It could also result
7     like what's happening in New York.  If you look
8     at what's going on in New York, you have cases in
9     New York in 2020 where people registered to vote
10    and because of a back end sloppy process in the
11    counties in New York, they didn't register those
12    individuals for weeks because they weren't doing
13    their job right and those people showed up to
14    vote and they weren't registered.  This just
15    happened in New York 22nd Congressional District,
16    and so when you have a system in place that is
17    failing, the failures metastasize into other
18    areas.
19  Q.  PILF doesn't have any litigation involving that
20     situation in New York, does it, that you
21     described?
22  A.  There are no litigation documents that you will
23     find filed related to that case in New York.
24  Q.  All right.  Has PILF ever brought a case against
25     election officials claiming that they're being

90

1     too aggressive in culling people from the voter
2     rolls?
3  A.  I don't understand what you mean by "being too
4     aggressive culling people from the voter rolls."
5     That's not a legal term.
6          MR. JOHNSON:  I'll object on relevance.
7  BY MR. BOLTON:
8  Q.  Has PILF ever brought a case against state
9     officials arguing that they are removing people
10    from the voter rolls that they shouldn't?
11  A.  We can't.  We don't have standing.
12  Q.  Okay.
13  A.  That's a case that requires an individual victim.
14  Q.  Okay.  With regard to the request that -- you
15     made a request of the State of Maine for certain
16     voter data, correct?
17  A.  The request speaks for itself.
18  Q.  And what information are you specifically
19     seeking?
20  A.  Your list maintenance records related to the
21     voter list.
22  Q.  Okay.  Would you agree you're seeking access to
23     the party/campaign use file that's described
24     under 21-A MRS 196-A?
25  A.  I don't understand the question.

91

1  Q.  All right.  Let's look at the complaint real
2     quick.  I apologize, I'm having some technical
3     problems here.  I have too many PDFs open.
4     Actually, before we get to that, what do you mean
5     by list maintenance records?
6  A.  I'm sorry, in what context?
7  Q.  You said that you're looking to receive list
8     maintenance records.  What do you understand that
9     to mean?
10  A.  Well, list maintenance records refers to any
11    document or data that is used in the process of
12    maintaining lists, and that could include a birth
13    date, that could include an address, because you
14    can't do list maintenance without birth dates and
15    addresses.  It could involve date of last action
16    taken.  There's a variety of list maintenance
17    records.  It could include -- generally speaking,
18    it could include the original federal form, it
19    could include notices that went to people.
20    There's a variety of things that fall under the
21    category of list maintenance records generally.
22  Q.  Okay.  Just bear with me one second, I apologize
23     for the delay.  Okay, do you see this document?
24  A.  I see a document you've put on the screen.
25  Q.  Okay.

92

1  A.  196-A.
2  Q.  Correct.  I'll represent to you this is a statute
3     -- a Maine statute that I downloaded from the
4     Maine dot gov website.  Is this, if you know, the
5     statutory provision under which you're seeking
6     the voter data?
7  A.  First of all, I've never seen this document
8     before.
9  Q.  Okay.
10  A.  I've never read anything about this, but my
11    understanding is that if you're asking me what
12    does our complaint say -- is that essentially
13    what you're asking?
14  Q.  I'm just wondering what your information request
15     is from the state.
16  A.  Well, it speaks for itself.  It's a document that
17    was sent and anything I say in this deposition is
18    not going to alter what that document says.
19  Q.  Okay.  If you look at 196-A(1)(b), and you look
20    about halfway down, there are a number of data
21    fields that are listed starting with voter's
22    name?
23  A.  I see that.
24  Q.  Okay, and that's -- those are the individual
25    pieces of data that you're requesting from the

93

1      state, right?

2 **A.** Well, again, the document speaks for itself and

3      if I were to say yes to that question and then

4      you find a discrepancy between the document and

5      this list, we're not going to be held to that

6      discrepancy because I haphazardly said yes. What

7      I'm telling you is the document speaks for

8      itself. I do not have a side by side right now

9      of the document and this list, but if you care

10     based on your knowledge of some distinction

11     between the two to ask me about that, I'm happy

12     to try to answer you.

13 **Q.** Okay.

14 **A.** I mean, generally I understand what these terms

15     mean. I would be surprised, for example, to find

16     that our request included electoral districts. I

17     would be surprised to learn that our request

18     included special designations indicating UOCAVA

19     status. Perhaps you have a document that could

20     refresh my recollection as relates to those two.

21 **Q.** Let me try this one more time to bring your

22     complaint up. All right, does that appear to be

23     a copy of your complaint?

24 **A.** Right. Is it marked as an exhibit?

25 **Q.** Yeah, we should mark it as an exhibit.

94

1 **A.** I think we should too.

2 **Q.** Yup, let's mark that as an exhibit.

3 **A.** And just for the record, there's been a number of

4     documents presented to me in this deposition that

5     have not been marked as exhibits so there's going

6     to be problems with this transcript.

7 **Q.** Yeah, why don't we go through and mark those

8     exhibits that we've looked at so far. That's a

9     good point.

10 **A.** I'm not going to be in a position now to remember

11    which was which, which was presented when.

12 **Q.** Yeah, I think there's sufficient information in

13    the transcript that we can deal with that. Let's

14    take a look here. All right, so here's the

15    notice to take deposition of the Public Interest

16    Legal Foundation. This is a document you

17    testified about earlier, correct?

18 **A.** Could you scroll down, please? Yes.

19 **Q.** Okay. We'll mark this as Exhibit 1.

20     (Exhibit No. 1 marked for identification.)

21     MR. BOLTON: And Joanne, I'll provide you

22    these exhibits by e-mail.

23 BY MR. BOLTON:

24 **Q.** Okay, and this is the -- I'll scroll through

25    this -- the PILF website showing some of PILF's

95

1     employees, correct, that you testified about

2     earlier?

3 **A.** Yes.

4 **Q.** Okay. We'll mark this as Exhibit 2.

5     (Exhibit No. 2 marked for identification.)

6 BY MR. BOLTON:

7 **Q.** Okay, I'm going to scroll through this one, and

8     this is the document you testified about before

9     concerning the board where we had the dispute

10    about whether it was proper for me to ask about

11    this document, correct?

12 **A.** That is a website shot which I think you're going

13    to label as Exhibit 3.

14 **Q.** Correct, yup.

15     (Exhibit No. 3 marked for identification.)

16 BY MR. BOLTON:

17 **Q.** Okay, and then we'll mark the complaint as

18    Exhibit 4, which I'm going to talk to you about

19    again in a second but just to keep that in order

20    because I think I referred to that next.

21     (Exhibit No. 4 marked for identification.)

22 BY MR. BOLTON:

23 **Q.** So this next one will be Exhibit 5. Would you

24    agree that -- I mean, I can scroll through it if

25    you'd like but that this is the amicus brief of

96

1     PILF in the Department of Commerce versus United

2     States District Court for the Southern District

3     of New York case?

4 **A.** Right.

5 **Q.** Okay.

6 **A.** Wait. Could you scroll down, please, on that?

7 **Q.** Of course.

8 **A.** Right, okay.

9 **Q.** So that will be Exhibit 5.

10     (Exhibit No. 5 marked for identification.)

11 BY MR. BOLTON:

12 **Q.** Okay, and do you agree that this is the motion

13    for leave to file amicus brief in the Supreme

14    Court of New Mexico that we discussed earlier?

15 **A.** Correct. 5?

16 **Q.** I think this is Exhibit 6, right?

17 **A.** 6, okay.

18     (Exhibit No. 6 marked for identification.)

19 BY MR. BOLTON:

20 **Q.** Okay. I think I solved the mystery of why some

21    of these weren't showing up, so this might go a

22    little faster here, and this is also a printout

23    from your website. Do you agree this is the

24    printout we discussed earlier where I asked you

25    about the fight against lawlessness in American

97

1    elections?
2    A.   Right.
3    Q.   Okay.  We'll mark that as Exhibit 7.
4         (Exhibit No. 7 marked for identification.)
5    BY MR. BOLTON:
6    Q.   Okay, here's the next one.  It's an amicus curiae
7         brief, Public Interest Legal Foundation and
8         Landmark Legal Foundation in opposition of
9         plaintiffs' motion for preliminary injunction in
10        the Western District of Texas, San Antonio
11        Division.  Do you agree this is the document I
12        asked you about concerning this case?
13   A.   Could you scroll down, please?
14   Q.   Yes.
15   A.   To the sig line, please?
16   Q.   Sure.
17   A.   Yes.
18   Q.   Okay.  That will be Exhibit 8.
19        (Exhibit No. 8 marked for identification.)
20   BY MR. BOLTON:
21   Q.   Okay, next we have a brief in the 11th Circuit in
22        Jones v Desantis, Public Interest Legal
23        Foundation's motion for leave to file a brief as
24        amicus curiae in support of defendant-appellants'
25        position for rehearing en banc.  Do you agree

98

1         this is the document I asked you about concerning
2         this case?
3    A.   Yes.
4    Q.   Okay.  That will be -- that was 9 I think.
5         (Exhibit No. 9 marked for identification.)
6    BY MR. BOLTON:
7    Q.   Okay, and I think that's it.  All right, thank
8         you for bearing with me on that.  Let me bring
9         the complaint back up here.  Okay, so this is the
10        complaint again -- oh, my colleague has reminded
11        me there is one more exhibit, which I think I'm
12        going to show you again so we can mark it then,
13        which is the statute 196-A.  So you agree this is
14        your complaint, correct?
15   A.   Could you scroll, please, just a bit?  Right,
16        yes.
17   Q.   Okay, all right.  Are you aware there's documents
18        that were attached to this complaint?
19   A.   I would hope, yes.
20   Q.   Okay, and Exhibit A, this is your initial request
21        for the data?
22   A.   Almost two years ago, a year and a half.
23   Q.   Okay, and then attached is a response or an
24        e-mail chain I guess with an e-mail from Logan
25        Churchwell and a response by Kristin Muszynski.

99

1    Q.   Do you see that?
2    A.   I see Exhibit B marked inside what you're going
3         to mark as exhibit something else.  I see it.
4    Q.   Okay, all right.  Exhibit C is additional
5         correspondence of October 29th, 2019 and I can
6         actually skip to the last -- I believe it's the
7         last exhibit.  All right, this is Exhibit F to
8         the complaint.  Do you know why this is redacted,
9         this page, or why it's blue?
10   A.   I don't.
11   Q.   Okay.  If we scroll down to the last page -- the
12        second page of this exhibit, you have this,
13        "however in the interest of resolving this
14        amicably, we ask that you confirm by 2 p.m.
15        Eastern on February 4th, 2020 whether you will
16        permit us to inspect and duplicate or otherwise
17        purchase and receive the, quote, party/campaign
18        use voter file for the data fields described by
19        21-A MRS 196-A(1)(B)."  Did I read that
20        correctly?
21   A.   You read that correctly.
22   Q.   Okay.  So does this refresh your memory as to
23        what PILF is requesting from the State of Maine?
24   A.   Well, no.  It would refresh my memory if I saw
25        the actual list.  I -- as I said in my earlier

100

1         testimony, it is inconceivable that we would want
2         UOCAVA -- for the reporter that's U-O-C-A-V-A --
3         it is inconceivable to me that we would want
4         UOCAVA data and the party/campaign voter file
5         contained UOCAVA data.
6    Q.   Okay.
7    A.   So I'm reserving the right to say there's got to
8         be a difference between the party/campaign voter
9         file and the actual list of things we requested.
10        Now, it may well be that for purposes of
11        linguistic ease that we adopted your local term
12        party/campaign use voter file in order to allow
13        better communications regarding the data.  I
14        don't know exactly what happened here but I can
15        tell you that your party/campaign use voter file
16        with the data fields described by a Maine statute
17        that I think you showed me a sort of summary of,
18        although that might have been the codified
19        language itself, contained information that we
20        would have never asked for.
21   Q.   Okay.  So let's drill down on that a little bit.
22        I'm going to bring that statute back up, and this
23        I believe we're going to mark this as Exhibit 10.
24        (Exhibit No. 10 marked for identification.)
25   BY MR. BOLTON:

101

1  Q.  This is again a statute I'll represent I
2      downloaded from Maine dot gov.  It's 21-A MRS
3      196-A.  So my question for you going back to that
4      section we discussed earlier, Subsection 1(B), do
5      you see the list of various data that's listed in
6      1(B) about in the middle of the paragraph
7      starting with voter's name?
8  A.  What is the exhibit number on this?
9  Q.  This is Exhibit 10.
10 A.  Okay.  You previously showed me Exhibit 10 and we
11     looked at the list of materials in 196-A(1)(B)
12     before, correct.
13 Q.  Yes, and maybe we should just go through them,
14     these different pieces of data that are listed in
15     the statute, and can you tell me which ones PILF
16     would be -- or is seeking in order to conduct the
17     analysis you plan to conduct.  Does that make
18     sense?
19 A.  Well, what makes the most sense is to refer to
20     the document that was seeking the information.
21     That is the document that governs this request,
22     not my inadvertent deviations in an oral
23     deposition from that document, but I'm happy to
24     entertain what you want to try.
25 Q.  Okay.  Let me ask it in a different way.

102

1  A.  All right.
2  Q.  PILF plans to use this data if it receives it to
3      conduct analyses of Maine's voter rolls, correct?
4  A.  I don't know.  We don't even know what your data
5      look like.  That's part of the problem.  I can't
6      answer questions about exactly what we're going
7      to do with it until we see it.
8  Q.  Okay.  In other states you've received this data
9      and you've conducted analyses?
10 A.  That's a different question, one that's been
11     asked and answered repeatedly.
12 Q.  All right.  I agree it's a different question.
13     I'm just trying to get us on the same page here.
14     So in the event that you conduct an analysis of
15     this data similar to what you've done in other
16     states, I would like to know which fields you
17     would use to conduct that analysis.  Does that
18     make sense?
19 A.  No, it doesn't because I -- first of all, if
20     you're asking me which fields -- what the utility
21     is of each field, that's a different question I
22     can answer, but I can't answer exactly what we're
23     going to do with each field as it relates to
24     Maine.
25 Q.  Okay, all right, let's try that.  Let's go

103

1      through each field and you can tell me whether it
2      has any utility to the types of analyses that
3      PILF typically performs on this sort of data.
4      How about voter name, would that have any
5      utility?
6  A.  Utility?  Okay, that is a vague question.  Would
7      that have any utility?  Of course it would.  It's
8      inconceivable that a voter name would not have
9      any utility.
10 Q.  Okay, and what would the utility be?
11 A.  It would identify the record.
12 Q.  Okay.  How about the residence address?
13 A.  Of course it would have utility.
14 Q.  Okay, and what would PILF use residence address
15     for?
16 A.  Well, I can give you one example where PILF has
17     used residence address.
18 Q.  Okay.
19 A.  And that's sorting the entire list by residence
20     address and when you sort by residence address,
21     it allows you to very easily in some cases
22     ascertain the state election official has been
23     screwing up and registering the exact same
24     person, at the exact same address, with the exact
25     same birth date multiple times and that's one of

104

1      the reasons why transparency is a good thing
2      because we can check to see if the state election
3      official is making a colossal mistake, as they
4      often do, and register the exact same person
5      multiple times.
6  Q.  Okay.  How about mailing address?
7  A.  Well, that's the same -- well, okay, mailing
8      address has utility because you have to do a
9      holistic look at the rolls.  It probably has less
10     utility than the name but you didn't ask me that
11     and I should behave.
12 Q.  Why would you say it has less utility than the
13     name?
14 A.  Because a mailing address is not a residence
15     address and a name is a name.  A name is a more
16     significant piece of data when analyzing a voter
17     roll than somebody's secondary address.
18 Q.  Okay.  How about year of birth?
19 A.  What is the question?
20 Q.  Does that have utility to the analyses that PILF
21     performs on this data?
22 A.  It's essential.
23 Q.  And why is that?
24 A.  A lot of reasons.  Year of birth is a key data
25     point to understanding whether you're dealing

105

1  with the same person.  You asked a lot about
2  false positives.  You've got a lot more false
3  positives if you don't have year of birth.  Year
4  of birth is also important because we have found
5  in other states that states are messing up the
6  data entry side, something that you would think
7  that the Maine Secretary of State would be happy
8  for someone to help clean up and we have found
9  the transposition of numbers frequently occurs in
10  the year of birth data entry and you guys will
11  never catch that because no one is looking and
12  when we depose you, we'll ask those questions,
13  and no one is looking at your office for
14  transposition of numbers and you probably don't
15  have procedures in place even to detect them but
16  transposition of year birth numbers can result in
17  individuals being registered twice because you're
18  getting motor voter applications from a variety
19  of agencies and if the year of birth gets
20  transposed, you guys aren't going to balance that
21  second application.  You might, I'll be stunned,
22  but I've seen it all over the country where a
23  transposition of date of birth in the numbers
24  results in a second application being accepted,
25  but you're hiding all that information from the

106

1  public so we don't have the ability to do sorts
2  by names or by residence or a variety of other
3  data points that are listed in 196-A to see if
4  there's transposition of numbers of date of
5  birth.  In fact, it works the opposite.  We can
6  do sorts based on date of birth and see if you've
7  transposed numbers in the residence address.
8  Something I'm quite certain nobody in the
9  secretary of state's office has ever thought of
10  doing because every time we ask that question in
11  deposition and other places, they never say yes.
12  So maybe Maine is ahead of the curve but I have a
13  feeling they aren't, and you're hiding that
14  information when you don't provide dates of birth
15  or residence addresses.  They both can reflect
16  backwards on each other when you do sorts.
17  Q.  With the analyses that you do, would you use year
18      of birth to confirm somebody's identity?
19  A.  We don't confirm identities.  I don't know what
20      that means.
21  Q.  So if you were trying to determine whether a
22      voter on Maine's roll was the same as a voter on
23      somebody else's roll, would you use the year of
24      birth to do that?
25  A.  Well, let's make it even simpler.  If I'm trying

107

1  to find out if John C. Smith on Maine's roll,
2  let's assume there's a John C. Smith, I can
3  pretty much promise you there is, is the same as
4  another John C. Smith on Maine's roll, same exact
5  name, might even have the same address because it
6  might be father and son, a year of birth would be
7  critical in the first step of deciding whether
8  those were the same John C. Smiths or father and
9  son.  So the year of birth is essential.
10  Q.  You would agree it's less useful than a date of
11      birth though, right?
12  A.  Significantly because there's going to be more
13      than one -- I can promise if you had disclosed
14      this public information and we had the
15      opportunity to sort, I have a high degree of
16      certainty that there are going to be multiple
17      John C. Smiths on the Maine voter roll with the
18      same year of birth.  Now, the question is, are
19      they John Charles or are they John Christian or
20      are they John something else and whether or not
21      those data points are there is something that we
22      would be able to ascertain and again, based on
23      past experience, I'm quite certain that nobody in
24      the Defendant's office is engaged in this sort of
25      behavior prior to 2020.

108

1  Q.  Okay, and when you issue your letters, you
2      provide your information to the state, you had
3      flagged those records as potential duplicates,
4      right?
5  A.  Which records?
6  Q.  If somebody has the same name and the same date
7      of birth, that would be flagged as a potential
8      duplicate?
9  A.  Same exact name and same date of birth may be
10      flagged.  It depends on the context.  There's
11      more data.
12  Q.  Okay.  What other data would you use?
13  A.  What other data do you want?  I mean, this is a
14      partnership in other places.
15  Q.  What other data have you used in other places?
16  A.  Well, you look at the residence address.
17  Q.  Okay.
18  A.  If -- if one individual is -- if one matches the
19      same address, then it increases the likelihood
20      that you're dealing with the same person if you
21      have multiple John C. Smiths with the same birth
22      date and the same address.  I've seen those exact
23      kind of records in other states with different
24      voter ID numbers.
25  Q.  So it would help you determine whether a person

109

1   is registered twice?

2   A.  Or three times or seven times.

3   Q.  Okay, all right, but it wouldn't -- the residence
4       address wouldn't help you determine whether
5       someone is registered in multiple states?

6   A.  Who would say that it would?

7   Q.  I'm just trying to understand how you would use
8       this data.

9   A.  Oh, actually it absolutely would aid; it
10      absolutely would aid.

11  Q.  How so?

12  A.  Well, multiple ways but I'll give you one
13      example.  If an individual -- let's just assume
14      that John C. Smith is indeed registered in
15      multiple states, let's say Maine and North
16      Carolina, and John C. Smith's Maine registration
17      says 123 Main Street, Portland, has a date of
18      birth of Christmas day, 1940, and there's a John
19      C. Smith in North Carolina with Christmas day
20      1940 who lists on their mailing address in the
21      North Carolina record 123 Main Street, Portland,
22      Maine, it's going to aid our ability to determine
23      that that is indeed the same John C. Smith who
24      lives in Maine and it may, in fact, be that the
25      Maine record has a North Carolina address in the

110

1       North Carolina record.  So the fact that you have
2       the mailing address in addition to the residence
3       address assists in determining whether or not
4       you're dealing with the same person registered in
5       another state simultaneously because they will
6       often, and I've seen records that do so, send the
7       mailing address back to the other state where
8       there's a match.  So it's an additional piece of
9       evidence to show that you're dealing with the
10      same person.

11  Q.  Okay, let's move on.  How about enrollment
12      status, is that used in your analysis in any way?

13  A.  Well, I'm not sure -- that's a Maine term.
14      That's not a term that other states use.  I'm
15      going to take a guess at what it is but if you
16      know what it means, tell me so I can not waste
17      anyone's time.

18  Q.  You can go ahead and guess.

19  A.  No, I'm not going to.

20  Q.  You just said you would.

21  A.  That's speculation.  My lawyer will object for
22      speculation.  So why don't you tell me what it
23      means so we don't waste anyone's time.

24  Q.  It means party affiliation.

25  A.  Oh, well, I would never have guessed that.  So

111

1       totally irrelevant to the question.

2   Q.  Okay.  So that's not data that PILF would be --
3       would be interested in?

4   A.  Not in the slightest.

5   Q.  Okay.  How about electoral districts?

6   A.  Totally uninterested.

7   Q.  Okay, and why is that?

8   A.  Because that's a governmental determination that
9       I could figure out by looking at the residence
10      address.  I can derive the electoral district,
11      it's going to be a pain in the neck to do, but
12      you can give me your home address and I'll tell
13      you who every single electoral district you're
14      in, state house, state senate, congress, school
15      board, everything.  All I need is your residence
16      address.  Now, if electoral district means
17      something else than what I just described, let me
18      know, but that's my understanding of what
19      electoral district means.

20  Q.  Okay.  How about voter status?

21  A.  I don't know what that means.  That's a Maine
22      term.

23  Q.  Okay.  So that's whether the voter is active or
24      inactive.

25  A.  Well, yeah, that has some relevance.

112

1   Q.  Okay, and how is that relevant?

2   A.  Well, okay, I'll give you one of many, many
3       hypotheticals where that's relevant.  Let's
4       suppose that John C. Smith who we've used in
5       previous examples, without any of the factual
6       assumptions I've made previously, this is clean
7       slate on John C. Smith, let's suppose that you
8       show John C. Smith as an active voter instead of
9       inactive, and let's also suppose that we discover
10      that this exact John C. Smith died in 1990, 31
11      years ago, and has been on the Social Security
12      Death Cumulative Index all that time and you
13      still list him in Maine as an active voter and I
14      find a lot more examples like that, the Public
15      Interest Legal Foundation will consider suing you
16      or suing Maine for failure to reasonably maintain
17      their lists because they have active registrants
18      who died 30 years ago, and so whether or not it's
19      active or inactive will speak to the
20      reasonableness of your list maintenance program.
21      If, in fact, that individual is inactive on your,
22      you call it voter status I think, then that will
23      lessen the potential liability of Maine as it
24      relates to your reasonable list maintenance
25      program.  It might not lessen it very much.

113

1   Q.   Why is that?
2   A.   Because they can still vote.  The individual can
3        still vote and you still haven't figured out they
4        died during the Bush administration, Bush one.
5        So that's how it's relevant.  I can determine how
6        good of a job you're doing based on how many
7        people you're moving to inactive status who died
8        30 years ago.
9   Q.   Okay.  Now, let's just go through the rest of
10       these.  Date of registration, is that something
11       PILF uses in their analyses?
12  A.   Yes.
13  Q.   Okay, and how do you use that?
14  A.   Well, I will give you one of many other examples.
15       In some places we have found that individuals
16       have been getting registered to vote multiple
17       times in close proximity temporally with each
18       other; in other words, they will register to vote
19       on day one, on day four, on day 10 and day 12,
20       four registrations, for example, all within the
21       space of two weeks.  That tells me that the
22       election official does not have a setup designed
23       to catch this.  One example of how they may be
24       doing it is multiple people simultaneously
25       registering applicants as opposed to one

114

1        individual pipeline going into the centralized
2        database.  So the date of registration will in
3        that instance, which is one of many, highlight a
4        failure in the list maintenance system that is
5        allowing simultaneous registrations to occur.
6   Q.   Okay.  Any other examples?
7   A.   Yes, there's many but this is a time-limited
8        deposition.  I'm quite certain you don't want to
9        hear all of them.
10  Q.   Why don't you humor me.  What are the other ones?
11  A.   Well, if you have somebody who is registered to
12       vote before the NVRA, that could -- that is a
13       different situation that someone who is
14       registered before HAVA, who is registered after
15       HAVA.  So the date of registration is very
16       relevant to determining basically the legal
17       standards and the system that should have been in
18       place at the date of registration.
19  Q.   Okay.
20  A.   Do you want more?
21  Q.   No, that's fine, that's fine, let's move on.
22  A.   Because I can give you more.
23  Q.   All right.  How about voter participation
24       history, is that something that PILF uses?
25  A.   Absolutely.  That's a very important data point.

115

1   Q.   Okay, and what do you use that for?
2   A.   Well, let me caveat that.  What is the voter
3        participation history in Maine?  I don't know
4        with absolute certainty what that is.
5   Q.   I believe it's participation in elections.
6   A.   Okay, in most places that's just referred to as
7        the voter history file, and I'm going to answer
8        your question assuming it's what I consider to be
9        the voter history file.  This is an incredibly
10       important piece of information and I would direct
11       your attention to the Supreme Court case called
12       -- it changed names a number of times but I
13       always call it Husted versus A. Philip Randolph
14       Institute, but it had a bunch of other parties
15       and that party may be it, but if you read that
16       case, you will very quickly see what voter
17       history -- the relevance and importance of voter
18       history to list maintenance, and that is because
19       under the National Voter Registration Act and
20       usually under various state laws, you cannot
21       remove anybody from the voter rolls until they
22       have not participated in two federal elections,
23       and so having accurate voter history data is very
24       important for ascertaining whether reasonable
25       list maintenance is occurring.

116

1   Q.   Okay, and PILF performs that analysis?
2   A.   Where?  In Maine?  We can't.
3   Q.   No, in cases where you've gotten the voter data
4        from states.
5   A.   Again, the voter history data is relevant for
6        determining whether or not a state is properly
7        keeping their rolls clean.  If, for example,
8        somebody was registered to vote 20 years ago,
9        never voted, nobody -- and then there was no list
10       maintenance that occurred, that's a problem in a
11       state in particular that requires list
12       maintenance to occur in that circumstance.
13  Q.   Okay.  So that's something you would flag to
14       state officials if you saw that in a voter file?
15  A.   And have done so.
16  Q.   Okay, all right, and then I think -- well, voter
17       record number, is that something you use in your
18       analysis?
19  A.   Yes.
20  Q.   And what do you use that for?
21  A.   To ascertain if we're talking about different
22       registrations.  If you don't give us the voter
23       record number, then we can't tell whether these
24       are actually duplicate or merged files.
25       Duplicate or merged, that's a term that will help

117

1   you understand how this works and frequently
2   records are merged and if you don't see the voter
3   registration number, you wouldn't be able to tell
4   it was merged.  For example, that would create
5   those false positives that none of us want, and
6   if you sent us a file that said John C. Smith and
7   you had everything, date of birth, residence,
8   everything in it except the voter registration
9   number, it may well be that that's a false
10  positive because you've already merged that file.
11  So here we go and alert you to John C. Smith's
12  multiple registrations and you say uh-huh, it's
13  one of those infamous false positives, and we
14  say, well, you should have given us the voter
15  registration number and we would have not wasted
16  your time.  So that's what the voter registration
17  number does, is it allows you to know that it's a
18  discrete record on the statewide database.
19  Q.  Okay, and that's an analysis that PILF performs
20      that you check the voter record number to make
21      sure it's not a duplicate?
22  A.  Absolutely.
23  Q.  Okay.
24  A.  For a merged file.  Again, I -- that's not
25      accurate what you said with your question.  Not

118

1       that it's not a duplicate, that it's not a merged
2       file.  It allows us to see that these are not
3       merged files, that these are indeed duplicates.
4   Q.  Okay, and I think you indicated before that you
5       would not be interested in special designations
6       indicating uniformed service voters, is that
7       correct?
8   A.  Well, I -- I may be -- I may learn in the future
9       that I'm -- I can't imagine a circumstance where
10      we would want UOCAVA data.
11  Q.  How about overseas voters or township voters?
12  A.  Those are UOCAVA -- and I don't have any idea
13      what township voters are.  That's a Maine term
14      because you guys have townships there but
15      overseas voters are UOCAVA voters.
16  Q.  All right.  So I have a question about the use of
17      this data if Maine were to provide it.  Is it
18      PILF's contention that any state restrictions on
19      sales or distribution of voter data are
20      inapplicable to them?
21  A.  No.
22  Q.  Okay.  So if -- if Maine statute had limitations
23      on, say, selling the data, you would agree that
24      those limitations would bind PILF if PILF were
25      able to get access to this data?

119

1   A.  I can't even imagine contemplating selling the
2       data, nor have we told you we planned on selling
3       the data, nor is there any indication we've ever
4       sold data.  So if that's the reason you guys
5       don't comply with federal law, that's pretty
6       amazing because you have no factual basis for
7       that.
8   Q.  How about further dissemination of the data?
9   A.  Well, we absolutely will further disseminate it.
10      For example, if we find somebody who is
11      registered to vote in Maine and registered to
12      vote in Florida and are quite certain that it's
13      the same exact person, we'll further disseminate
14      that to law enforcement authorities in Maine who
15      could prosecute them for violating Maine statute.
16  Q.  Okay, and when you find those people, you might
17      publicize their name in a report too, right?
18  A.  Nope, that's not accurate.
19  Q.  You don't publicize voter names in reports?
20  A.  No, that's absolutely false and harassing to say
21      that we have publicized duplicate registrations
22      who have double vote credits.  That's never been
23      done.  Now, maybe you're doing it for the
24      purposes of harassment but it's factually
25      inaccurate and has no basis in fact.  That's the

120

1       other reason why I conclude that that's harassing
2       because no one has ever contemplated doing that,
3       and I would ask you to stop.
4   Q.  All right.  You do put voter names in your
5       reports sometimes though, correct?
6   A.  No, we don't put -- when you're saying reports
7       like a law enforcement authority?
8   Q.  No, no.
9   A.  Which report are you referring to?
10  Q.  Your public reports that you issue on your
11      website, you sometimes include the names of
12      specific voters in those reports, correct?
13  A.  Give me an example.
14  Q.  All right.  Well, let's look at -- what are we
15      marking here -- this would be Exhibit 11 I think.
16      (Exhibit No. 11 marked for identification.)
17  BY MR. BOLTON:
18  Q.  Okay, do you recognize this document?
19  A.  Go ahead, yes.
20  Q.  And what is this?
21  A.  It says, Calm Before the Storm.  Where are the
22      names in this report, please?
23  Q.  This is a report that PILF has issued, right?
24  A.  I understand.  Where are the names?
25  Q.  You agree with that?

121

1   A.   I've answered that question, yes.  Where are the
2        names?
3   Q.   Aren't these names of voters?
4   A.   Yeah, but this is not something that they did.
5        You asked me about people who double voted.
6   Q.   Okay.
7   A.   These are records.  You can't -- you can't
8        possibly analyze whether or not there's
9        duplications unless you have the names.  These
10       are public records in Florida.
11  Q.   Okay, but you don't dispute that these are names
12       of individual voters with their addresses,
13       correct?
14  A.   Your question was when we found people who
15       potentially double voted in multiple states then
16       we publicize their names.  I said no.  These are
17       duplicate sets.
18  Q.   Understood, but you would agree -- understanding
19       that you dispute my previous question, my current
20       question is, you don't dispute that these are
21       names and addresses of Florida voters?
22  A.   Look at the names.  This shows you -- the names
23       themselves are relevant to the inquiry if the
24       government official is screwing up, which might
25       explain your reluctance to reveal this

122

1        information.  Look at the name, for example, of
2        the third one, Ali Feldman, Ali Schosheim or
3        Bradley Straka with different middle names.  The
4        names are essential to illustrate to the public
5        how you guys, or I should say your client, messed
6        this up; and if you would prefer to restrict that
7        sort of speech, then say so, but you cannot do
8        this kind of report without showing the names and
9        how the government officials have blown it.  The
10       names are essential to telling the story of
11       government mismanagement.  You can't tell the
12       story otherwise.
13  Q.   Okay.  So if you were to make a report on any
14       issues you found with Maine's list, it would be
15       essential for you to include the names of
16       individual voters in that report, correct?
17  A.   We've had settlement discussions with you where
18       we're willing to make some compromises so we can
19       quit wasting everybody's time here.  This is an
20       attorney fee statute that shifts, and these names
21       are subject to negotiation whether or not we want
22       to revolve this or keep running the clock, and
23       we've made an offer to you, as you know, which
24       would resolve this without your concern.
25  Q.   Okay.  I don't think you ever answered my

123

1        question confirming that these are names of
2        actual voters in Florida and addresses.
3   A.   I don't know if they're voters.  I don't know.
4        These were on the registration rolls.  That's
5        different than a voter.
6   Q.   Well, these are names of individuals that -- that
7        are on the registration lists in Florida,
8        correct?
9   A.   No, I don't -- I don't know if that's accurate.
10       These could have been old registration lists.
11  Q.   Okay.  These are names of individual people,
12       correct; in other words, they're not fictional,
13       they're not pseudonyms, these are real people as
14       far as you know?
15  A.   These are real examples of government election
16       officials messing up their voter rolls by not
17       detecting duplicates.  The names -- the names are
18       an important part of that story to show the
19       public how badly the election officials screwed
20       up and that may be one of the motivations for why
21       you all are not disclosing this information or if
22       you do disclose it, you want conditions attached
23       that we don't tell anybody how badly you're
24       messing up the voter rolls.  That's my answer.
25  Q.   So they are --

124

1   A.   That's my answer.
2   Q.   They are not pseudonyms?
3   A.   I'm not going to play that game.  I've answered
4        you.  They're not pseudonyms and what I've told
5        you and I'll tell you again, is the names
6        themselves are important in order to ascertain
7        how badly your client is messing up the voter
8        rolls and to inform the public in Maine as to why
9        you were hiding this information for almost two
10       years.  Now, we can reach a reasonable settlement
11       where the mistakes and malfeasance of your client
12       are not disclosed to the public.  If that's what
13       you guys want in a settlement, then we can talk
14       about it.
15  Q.   Okay.  Actually while we're looking at that
16       document, I wanted to ask you something else
17       about it.  Here we go.  All right, I'm showing
18       the same report again Calm Before the Storm and
19       I'm scrolling through here to the end.  Okay, I'm
20       on page 33 of this document, it is labeled
21       Process and Methodology.  Do you see that?
22  A.   Yes.
23  Q.   Okay.
24  A.   Well, I don't actually.  I see the lion's share
25       of it but I -- there we go, now I can see it.

125

1  Q.  Okay, all right, and you mention in this -- the
2      report mentions that you use various queries and
3      audit strategies -- or "various queries and audit
4      strategies leveraged access to the Social
5      Security Death Index and for higher-quality
6      matching purposes commercially available
7      databases containing living Social Security
8      data."  What is "living Social Security data?"
9  A.  I don't see that.  Hold on, there we are, living
10     Social Security data.  Well, I don't know in this
11     particular context and I do know that some
12     methodologies were improved.  This report is from
13     I think two years ago, and we've improved based
14     on that but my guess is living Social Security
15     data gets into the commercial -- commercial
16     vendors; in other words, the credit reporting
17     bureaus and so forth; in other words, if somebody
18     shows is alive based on Social Security
19     matches inside those commercial databases is
20     probably what this is.
21  Q.  Okay.  Do any of the states that provide you data
22     give you Social Security numbers?
23  A.  Yeah, I think some do actually or a portion of
24     it.
25  Q.  The last four digits maybe?

126

1  A.  Maybe, but I can't tell you right now, A, for
2     sure; B, which ones.
3  Q.  Okay.  So can you tell me more about the process
4     by which you take one of these voter files and
5     match it to these databases; in other words, I'm
6     interested in the sort of logistics behind it.
7     Is a file uploaded to a different company who
8     does this match for you?  Is it done in-house?
9  A.  That's a compound question.
10         MR. JOHNSON:  Objection, form.
11  BY MR. BOLTON:
12  Q.  Okay, let's take it one step at a time.  You
13     perform -- you perform matching, correct, when
14     you do these analyses between the data you get
15     from a state and these various databases,
16     correct?
17         MR. JOHNSON:  Objection to form again,
18     vague.
19  BY MR. BOLTON:
20  A.  Was your question -- I think your question is --
21     your question was we perform matching?  Is
22     that --
23  Q.  Yes.
24  A.  Could it get read back to me?  Okay.
25  Q.  We can have the reporter read it back if you'd

127

1     like.
2  A.  I'll leave that up to you.
3  Q.  If you think you understand it, you can go ahead
4     and answer.
5  A.  Well, I've already said whether or not I think I
6     understand it.  I'm leaving the remedy up to you.
7  Q.  No, go ahead and answer the question.
8  A.  Well, I've answered you.  I don't think I
9     understand the question.  I'm leaving what you
10     want to do, whether rephrase it or ask for read
11     back, up to you.
12  Q.  I understand, okay.  All right, let me rephrase
13     it.
14  A.  Okay.
15  Q.  To do your analysis -- your analyses that you do
16     when you receive state data, you have to match
17     the state data against data in some sort of
18     database, correct?
19  A.  Yeah, I think that's -- I think that's the most
20     elementary and simplified description of it, yes.
21  Q.  I'm trying to -- that's on purpose.
22  A.  Okay.
23  Q.  So my question -- my first question is, is that
24     matching done within PILF or is there some sort
25     of outside vendor that does that for you?

128

1  A.  Well, you have to normalize it all and it's not
2     easy to do in the sense you can't just like load
3     all this up to an Excel spreadsheet because Maine
4     will have different columns and terms and
5     definitions than other states will.  So you have
6     to normalize the data and we use outside vendors
7     to help with the normalization process.
8  Q.  Okay.
9  A.  That way all the columns line up correctly where
10     dates of birth or whatever -- whatever the data
11     point is will line up across state lines, if you
12     will.  Let the record reflect the deponent was
13     moving his hands to try to show an alignment of
14     hands.
15  Q.  Okay, and so you have to transfer the data to
16     this outside vendor to do that normalization?
17  A.  Well, not really.  We have a difference -- I
18     mean, if you're looking for a -- a very sloppy
19     argument that we are giving the data away to
20     third parties, you're not going to get it here
21     because we have a variety of protocols in place
22     that the data are our data, they're not the
23     vendor's data and so -- but yeah, we bring people
24     on who work on this data to align the columns;
25     otherwise you would accuse us of not normalizing

**129**

1     the data and, therefore, can't draw accurate
2     conclusions because it's not properly normalized.
3  Q.  Okay.  Is there one specific vendor that you use?
4  A.  Un-un, no.
5  Q.  Okay.  How many vendors do you use?
6  A.  I don't know how many.
7  Q.  Okay.  What are the names of the vendors?
8  A.  Simpatico.  There's others that assist in this
9     but that's one of them.
10  Q.  Okay, and that's an Indiana-based firm?
11  A.  Nope.
12  Q.  Where are they based?
13  A.  Rhode Island.
14  Q.  And when you transfer the data to them, how is
15     that done exactly?  Do you just e-mail it to
16     them?
17  A.  You're putting words in my mouth.  I tried to
18     make clear we don't transfer the data to them.
19     We have a system in place and it's our data and
20     so once again, you cannot make the assertion that
21     we're selling or disseminating this data in ways
22     that would implicate your statutes.  So we use --
23     we use things that move big files around that I
24     probably am not capable of talking about, but
25     they allow you to move large amounts of files to

**130**

1     places they need to go in order to normalize.
2  Q.  Okay.  So you have agreements in place that say
3     that the data remains yours but you do have to
4     transfer the data electronically to Simpatico,
5     whatever company is working on this?
6  A.  No.  What I said is we put the data in a place
7     under our control that allows third parties to
8     work on it.
9  Q.  Okay.  So you put it on a server and they are
10     able to access the server and interact with the
11     data?
12  A.  I think that's probably a fair statement.
13  Q.  Okay, and is the server a PILF server?
14  A.  Yes.
15  Q.  Okay, all right.  Other than the normalization
16     process, is there -- are there outside vendors
17     involved with the analyses that PILF does?
18  A.  I've already answered that.  I answered that
19     probably an hour ago about commercial vendors.
20  Q.  Okay.  So the credit unions and the other --
21     credit agencies and the other commercially-
22     available databases are vendors that you work
23     with?
24  A.  I have answered the question as to what other
25     data is used in the validation process.

**131**

1  Q.  Right, okay.  My question here is what other
2     vendors are you working with to create these
3     analyses?
4  A.  I don't have an answer for you.
5  Q.  Is it because you don't work with any other
6     vendors or because you don't understand the
7     question?
8          MR. JOHNSON:  I'll object to the relevance
9     of the question.
10  BY MR. BOLTON:
11  A.  Yeah, I don't see this in your Schedule C list --
12  Q.  This is methodologies that --
13  A.  -- that we -- we utilize or conduct with respect
14     to Maine's file, methodologies or PILF's plans to
15     utilize or conduct.  So I can talk to you about
16     our plans all we want, plans to utilize or
17     conduct, it's a Maine-specific #6.
18  Q.  I think it's actually vendors -- let's look at
19     the notice here.
20  A.  Well, I've answered #5.
21  Q.  "Vendors that PILF has used to conduct any
22     analyses of voter registration data obtained from
23     state or county election officials."
24  A.  I've answered that question.
25  Q.  You've given me the name of one firm.

**132**

1  A.  Well, I -- you have accurately to a large extent
2     summarized my testimony that has already been
3     given.
4  Q.  So my question is, other than the one firm that
5     you named and the commercial databases that you
6     named an hour earlier, are there any other
7     vendors that PILF works with that you can recall?
8  A.  No.
9  Q.  Okay.  So can you explain to me if you are given
10     access to Maine's data, what kinds of analyses
11     would you perform on that data?
12  A.  I've answered that question 40 different times
13     different ways.
14          MR. JOHNSON:  Objection.
15  BY MR. BOLTON:
16  Q.  Would you look for double registrations?
17  A.  I've answered that question.
18  Q.  Would you look for registrations of people that
19     are deceased?
20  A.  I've answered that question.
21  Q.  Would you look for registrations of people who
22     are not citizens?
23  A.  What data would you be providing that would make
24     that possible?
25  Q.  That's what I was wondering.  So you wouldn't be

133

1 able to do that, would you?
2 A. Well, again, I haven't seen your data so it's
3 hard for me to speculate.  That question calls
4 for speculation.
5 Q. Well, assuming --
6 A. I haven't seen your data.
7 Q. Assume that the data you would get would be the
8 data that we went over in Section 196-A, none of
9 that data would allow you to do that analysis,
10 right?
11 A. I am not familiar with anything about Maine in
12 that, what did you say, 167-A or the Maine
13 statute.
14 Q. 196-A, the one that we went through.
15 A. Yeah, I don't recall anything in that but again,
16 it goes back to our question.  I mean, I don't
17 remember and I don't think we have asked for your
18 citizenship processing.  I thought we were just
19 asking for the voter file.  Correct me if I'm
20 wrong or if it's your understanding that I'm
21 wrong, but --
22 Q. My understanding is you're asking for the voter
23 files.
24 A. Yeah, and there's nothing --
25 Q. Okay, go ahead.

134

1 A. I don't think there's anything in that but if you
2 want to direct me to something in the voter file
3 that contradicts my answer, I'd be happy to
4 address it but I'm not familiar with anything in
5 that list of materials that we went through that
6 would include information that would allow
7 anybody to do any citizenship analysis.
8 Q. Okay, and would PILF also be looking at the
9 possibility of double voting or is your analysis
10 focused on registration?
11 A. Well, look, I don't even know if your data is
12 good enough to do anything because we haven't
13 seen it.  A double voting analysis is something
14 five steps down the line and goes back to the
15 question that I vehemently insisted we don't
16 publish names of that, and if you have John Smith
17 -- if you have a John C. Smith that is clearly
18 the same John C. Smith and both are showing voter
19 history files that show a vote in 2019 federal,
20 yeah, we're going to see that.  Wouldn't you want
21 us to and point it out to your client or is that
22 some sort of information that in your settlement
23 discussions you don't want us to have?
24 Q. Okay, I think you described that once you do
25 these analyses, you usually contact the states

135

1 afterwards and see if they'll work with you?
2 A. Asked and answered.
3 Q. So the idea would be if Maine didn't work with
4 you that you would then file suit against them
5 for failure to reasonably maintain the voter
6 list, is that --
7     MR. JOHNSON:  Objection, form, that's not
8 his testimony.
9 BY MR. BOLTON:
10 Q. -- what would happen?
11 A. Whose idea would it be?  You said your idea or
12 the idea would be.  That's not a sentence
13 directed to a deponent.  That's sort of idle
14 speculation by the attorney asking the question.
15 Were you asking me a different question that just
16 came out differently?
17 Q. If -- is PILF's general practice that if states
18 refuse to work with them on whatever issues they
19 believe they found in voter rolls that you then
20 file suit against them?
21 A. Nope.
22 Q. Okay.  You've done that in the past though,
23 correct?
24 A. I don't think so but --
25 Q. You did that in Pennsylvania?

136

1 A. You talked over my answer.
2 Q. No, go ahead, finish your answer, please.
3 A. What happens after you disclose your voter file
4 data that you've been hiding from us for years is
5 a fact-specific question and we can talk about
6 what happens next in the context of a settlement
7 to this case or you could keep digging in and
8 hiding public information about your possible
9 mistakes as an election official and run that
10 clock up and then we'll have to assess what the
11 most reasonable course of action is once we
12 obtain the requested information by a court
13 order.  So I don't know what the next step is
14 after that.
15 Q. Okay.  Who on your staff -- when you do these
16 analyses of voter data, who on your staff does
17 the actual number crunching, for lack of a better
18 term?
19 A. I don't understand the question.
20     MR. JOHNSON:  Objection to form, ambiguous.
21 BY MR. BOLTON:
22 Q. Who actually does the comparison -- who on your
23 staff does the comparison between the state voter
24 file and the commercial databases or other
25 databases that you're using?

137

1  **A.** I still don't understand. Who on our staff does
2  what?
3  **Q.** So I think you agreed that your analysis involves
4  running a comparison between the state voter data
5  and the data that you have access to in a
6  commercial database or some other database,
7  right?
8  **A.** Right. At some point everybody will be involved
9  in that process with the possible exception of
10  Shawna Powell but I can imagine even Shawna
11  Powell being involved.
12  **Q.** Okay. Do any of your -- are any of your
13  employees political scientists?
14  **A.** I don't understand the question. Are any of our
15  employees political scientists? I'd say broadly
16  speaking, yes.
17  **Q.** Do they have doctorates in political science?
18  **A.** No, but I have -- I have as much experience in
19  this area as pretty much everybody in the United
20  States, and when it comes to deciding what is a
21  relevant versus irrelevant piece of information
22  when it comes to these issues, a political
23  scientist is of minimal value compared to the
24  experience of people who have been working in
25  this area. You don't need a political scientist

138

1  to determine whether or not a voter file is the
2  same file.
3  **Q.** Is there anyone on your staff that has an
4  advanced degree in statistics?
5  **A.** Nor would I want one. It's not relevant to the
6  inquiry, in my view.
7  **Q.** Okay, but the answer is no?
8  **A.** That's correct, the answer is no. Now, there are
9  people who have taken advanced statistics but
10  that doesn't mean they have a degree in it.
11  **Q.** Okay, all right. In what context -- well, who on
12  your staff has taken advanced statistics?
13  **A.** Me, and I've had advanced statistical training
14  with my time at the Justice Department to do
15  regression analysis and other analysis under
16  Gingles v Thornburg to ascertain whether or not
17  the statistics support a cause of action.
18  **Q.** Okay.
19  **A.** And so I'm very familiar with regression analysis
20  and all the statistical modeling that goes into
21  political issues.
22  **Q.** The statistics training you had, other than the
23  Justice Department training, what context did you
24  get that in?
25  **A.** Academic, as well as Justice Department training,

139

1  both. We had special statistical training by
2  political scientists, by statisticians because
3  the cases were so complex, and so I went through
4  that regularly and I have a working knowledge of
5  it now.
6  **Q.** Is that -- the academic training, is that
7  undergraduate?
8  **A.** That's correct.
9  **Q.** Okay, all right.
10  **A.** As well as a bit in law school.
11  **Q.** Okay, and do you use that statistical knowledge
12  when you do your analyses?
13  **A.** How would you possibly? Give me a hypothetical
14  how you would use it.
15  **Q.** Would you -- for instance, you could use
16  statistical methods to determine whether you
17  might be getting a lot of false positives, right?
18  **A.** That's not true. That's not true at all. Your
19  question is built on a false premise that
20  statistical methods have any relevance to
21  determining whether or not you're getting false
22  positives. That is a false and untrue opinion
23  that I'm sure you will go out and try to purchase
24  somewhere but that is not accurate because this
25  is about who is who, who lives at this address,

140

1  who died. That's not statistical, that's fact.
2  **Q.** Okay. So the answer to that is it's not an area
3  of expertise that you use in preparing these
4  analyses?
5  **A.** Asked and answered.
6  **Q.** Okay, all right. PILF at one point published a
7  series of reports on noncitizen voting in
8  Virginia, correct?
9  **A.** Correct.
10  **Q.** That's --
11      MR. JOHNSON: Object on relevance.
12  BY MR. BOLTON:
13  **Q.** -- Alien Invasion and Alien Invasion II, is that
14  right, those are the names of the reports?
15  **A.** I think there was an objection.
16      MR. JOHNSON: Yes, I objected on relevance
17  grounds.
18  BY MR. BOLTON:
19  **A.** That may have been the name but I think the name
20  was more complicated than that.
21  **Q.** Okay, and the purpose of the reports was to
22  determine or to present evidence on whether
23  noncitizens might have been registered or might
24  have voted in Virginia, correct?
25  **A.** No, that was not.

141

1  Q.  What was the purpose?
2  A.  I don't know, but that wasn't it.
3  Q.  Okay.  Let me -- all right, I'm showing you a
4      document that I'm going to scroll down to the
5      second page.  Does this look familiar?
6  A.  There's your title.
7  Q.  Alien Invasion II, the Sequel to the Discovery
8      and Coverup of Noncitizen Registration and Voting
9      in Virginia.  Did I read that accurately?
10 A.  That's what it says.  You did read that
11     accurately.
12 Q.  Okay, all right, and this is a report that PILF
13     published at some point?
14 A.  Yes.
15 Q.  Okay, and there is a picture of a UFO?  Is that
16     what this is supposed to be on the top?
17 A.  It's called satire in humor.
18 Q.  Okay, and it has a sign that says, "welcome to
19     Virginia," and then "Virginia is for" and it
20     looks like a word is covered up and "aliens" is
21     stamped on the top?
22 A.  Again, it speaks for itself.  It's satirical and
23     meant to be funny.
24 Q.  Okay, and by the way, we'll mark this as Exhibit
25     12.

142

1      (Exhibit No. 12 marked for identification.)
2  BY MR. BOLTON:
3  Q.  And is it accurate that this report accuses
4      Virginia officials of essentially having a number
5      of noncitizens on the voter registration rolls?
6  A.  It doesn't accuse them of that.  That's what the
7      Virginia officials said they did.
8  Q.  Okay, all right.  Let's look at -- scroll up a
9      page and this is the first page of the report and
10     there's a blurb at the bottom.  I'll just read
11     it, it says, "PILF has removed Exhibits 1 and 12
12     to this report, reproducing records provided by
13     the Virginia election officials that named
14     Virginia registrants and voters and provided
15     personal contact information for those
16     registrants and voters.  The records in Exhibit 1
17     show voters whose registrations had been canceled
18     based on a declaration of noncitizenship on a
19     Department of Motor Vehicles form and who failed
20     to affirm citizenship within two weeks of being
21     sent a notice from election officials.  PILF
22     recognizes that the individuals in Exhibits 1 and
23     12 were, in fact, citizens and that these
24     citizens did not commit felonies.  PILF
25     profoundly regrets any characterization of those

143

1      registrants as felons or instances of
2      registration or voting as felonies.  We believe
3      voter registration laws should be enforced so
4      that noncitizens are not permitted to vote and
5      that citizens remain on the voter rolls."  Did I
6      read that correctly?
7  A.  It says that.
8  Q.  Okay, all right.  So this is a second version of
9      this report that was put out?
10 A.  I'm not sure I understand the question.
11 Q.  So --
12 A.  On the front page it says Alien II.  Is that what
13     you're referring to?
14 Q.  I guess what I'm getting at is this blurb at the
15     bottom, I'm going to call it a blurb, was added
16     after the publication -- the original publication
17     of this Alien Invasion II report?
18 A.  Yes.
19 Q.  Okay, all right, and the original version of this
20     report that did not have the blurb also had
21     exhibits attached to it that had voter
22     registration forms, correct?
23 A.  Actually I don't think so but they might have.
24     What they were, were government records from the
25     Commonwealth of Virginia saying these individuals

144

1      were declared noncitizens by -- in the voter list
2      maintenance process that they were declared
3      noncitizens.  Those were the exhibits attached.
4      There may have been some federal voter reg forms
5      where they marked or left blank the noncitizen
6      file, but at a minimum, it included government
7      records of declared noncitizens.
8  Q.  Okay.  So those -- those exhibits would have
9      listed the names of specific individuals, right?
10 A.  The government records that were published by the
11     government listed the names of the specific
12     individuals, correct.
13 Q.  Okay, and it would have had -- how does it put it
14     in here -- personal contact information as well,
15     correct?
16 A.  It had the registration address.
17 Q.  Okay, all right.  How about phone number, did it
18     have phone number?
19 A.  No.
20 Q.  Okay.  If the voter reg cards -- the registration
21     cards had been attached as exhibits, they would
22     have the phone number, right?
23 A.  Speculation.  Show me one that did.
24 Q.  Okay, all right.  Let's do this.  Okay, we'll
25     mark this as I think Exhibit 13.

145

1   (Exhibit No. 13 marked for identification.)
2   BY MR. BOLTON:
3   Q.  And this is a complaint, Docket #18-CV-423 in the
4       Eastern District of Virginia, League of United
5       Latin American Citizens versus Public Interest
6       Legal Foundation.  Do you recognize this
7       complaint?
8   A.  This isn't in Schedule A.
9           MR. JOHNSON:  I'm going to object on
10      relevance grounds and that Schedule A does not
11      list -- does not include any indication of lawsuits
12      filed against my client.
13          MR. BOLTON:  Actually I think it just says
14      lawsuits that PILF has participated in that relate
15      directly or indirectly to voter registration, So this
16      is a lawsuit that PILF has participated in.
17  BY MR. BOLTON:
18  A.  It didn't participate in this.
19  Q.  It's named as a defendant, is it not?
20  A.  I'm not going to answer questions about it.
21  Q.  I actually don't have any questions about the
22      lawsuit itself, so I don't think we have a real
23      dispute here.  I just have a question about an
24      exhibit to this complaint.  Okay, so this is
25      Exhibit -- I'm not sure which number it is but it

146

1       is an exhibit to the complaint and it appears to
2       be the same Alien Invasion II report, correct?
3   A.  I don't know.  What's your question?  I mean,
4       you're showing me the exhibit.  I'm not disputing
5       that that's what the exhibit you've shown me is.
6   Q.  Okay.  Okay, so is this -- this is included in
7       the exhibit that was attached to the complaint.
8       It says Commonwealth of Virginia, Department of
9       Elections, cancelation, declared noncitizen.  Is
10      this the list you were talking about in your
11      previous testimony?
12  A.  I don't know but this is what -- it speaks for
13      itself.  This is a government document that was
14      produced by the Department of Elections listing
15      all of the individual registrants that they
16      cancelled from the voter rolls as declared
17      noncitizen.
18  Q.  Okay, and this was attached to your Alien
19      Invasion II report?
20  A.  No.  It was made available to the public so they
21      could see the veracity of the statements in the
22      report.
23  Q.  Okay.  It was an exhibit to the report, correct?
24  A.  That's closer but it wasn't attached.
25  Q.  Okay.

147

1   A.  Your question was attached.
2   Q.  Yes.  Well, I am rephrasing the question.  It was
3       an exhibit to the report, correct?
4   A.  Correct.
5   Q.  Okay.
6   A.  It was a government document.
7   Q.  Understood, and I'm just going to the next page
8       here.  This appears to be a voter registration
9       card, correct?
10  A.  That is.
11  Q.  And that was attached as an exhibit to the report
12      as well, correct?
13  A.  It's a public record.
14  Q.  Okay, but the answer is yes?
15  A.  It was attached because it is a public record.
16  Q.  Understood, okay.  All right, and on this
17      version, there are -- there are places where it
18      says redacted and there's also a gray box which I
19      believe is where the Social Security number would
20      go.  When PILF published this is the -- in the
21      Alien Invasion II report, the only thing that was
22      redacted was the Social Security number, correct?
23  A.  I don't know.
24  Q.  Okay.  You don't have any recollection one way or
25      the other as to whether --

148

1   A.  No, I didn't prepare for this because this wasn't
2       in Schedule A.  It has nothing to do with the
3       case either.  Under what circumstance could this
4       be relevant and I'll answer your question.
5       Provide me any circumstance where this could be
6       relevant and I'll answer your question.
7   Q.  I'm not going to debate with you on the record --
8   A.  Well, just give me a predicate why this is
9       relevant.
10  Q.  No, I'm not going to play that game with you.
11  A.  Well, then you don't get an answer.
12  Q.  You can answer the question.
13  A.  It's not relevant and if you can offer me a
14      question with a predicate where this is relevant,
15      I'll answer you.
16  Q.  My only question is, is whether or not these
17      redacted labels were on the original version of
18      this report?
19  A.  Asked and answered.
20  Q.  It was not answered.  You did not answer the
21      question.
22  A.  I did.  I told you I don't know.  I'm not going
23      to give an answer a third time.
24  Q.  All right.
25          MR. JOHNSON:  Can you show me in Schedule A

149

1    where reports are listed?
2        MR. BOLTON: This is a document that was
3    attached to an analysis that PILF conducted on voter
4    registration data so I think it's within 2.
5   BY MR. BOLTON:
6   A. No, it wasn't. That is a false statement what
7    you just said. It was not conducted on voter
8    registration data. That is false. It's not
9    voter registration data and you know that's not
10    an accurate statement.
11   Q. What are we looking at on the screen right now?
12    What is that document?
13   A. That's a voter registrations form.
14   Q. Okay, all right. We can move on from this form.
15    Okay, so going back to the -- this is the report
16    with what I've been calling the blurb. Why did
17    PILF say it profoundly regrets any
18    characterization of those registrants as felons?
19   A. It never occurred to PILF that the government
20    would be so brazenly screwing this up, and at the
21    time years ago, I think was three or four years
22    ago this report was issued, we had confidence
23    that the government was producing accurate data
24    regarding the steps they were taking. We will
25    never again rely on the statements of a

150

1    government election official that they remove
2    someone as a declared noncitizen because they
3    found three false positives out of thousands of
4    declared noncitizen removals, out of those
5    those three out of over, I want to say, 3,000 or
6    5,000 of potential declared noncitizens there
7    were three false positives, and never again will
8    we rely on government statements about someone
9    not being a citizen.
10   Q. Were you aware before you issued this report that
11    being placed on that list simply meant that the
12    person hadn't returned a -- responded to a notice
13    that the government had sent?
14   A. You're oversimplifying the facts. That is not
15    the only thing that occurred. That is absolutely
16    false what you just said and I would appreciate
17    if this deposition is going to take place in an
18    efficient way if your questions would not be
19    based on false information and that's another
20    example. Let's correct your question and maybe
21    you can re-ask it. It was not based only on the
22    failure to return a card. It was based on an
23    under oath -- under oath statement by an
24    individual that they were not a citizen of the
25    United States, under oath. So it's a false

151

1    statement in this deposition for you to assert
2    contrary facts that didn't exist.
3   Q. So as I understand it, you would get this notice
4    from Virginia if you either checked no, I'm not a
5    citizen on the registration card or if you
6    checked nothing at all, is that correct?
7   A. I don't know, but I know that if you checked no,
8    you got the notice from Virginia. You left that
9    out of your question. Now, whether you did it
10    deliberately or in an effort to score points in
11    the transcript, I don't know, but you left it
12    out.
13   Q. So you don't know if this notice would be
14    generated if somebody just didn't answer the
15    citizenship question at all?
16   A. Look, I didn't prepare for this because you
17    didn't list this in the Schedule A and this is
18    not even remotely close to what we do or cases we
19    bring. So, you know, you can do this all day
20    long about this case but I didn't prepare for it
21    because it's not part of this case. It's not on
22    the Schedule A, it's not relevant to whether or
23    not you guys are hiding information. If you can
24    give me a circumstance where it might be
25    relevant, I can try to answer the question as

152

1    best I can.
2   Q. So my --
3   A. You didn't disclose this.
4   Q. My question is -- we did disclose this because
5    this is relevant to other analyses. This is
6    another analysis that you --
7   A. We didn't do an analysis here. This is not our
8    analysis. This was the government's analysis.
9    This was the government doing this. All we did
10    was republish government data. All we did is
11    republish what a government said. It's not our
12    analysis.
13   Q. So your testimony is that this report, Alien
14    Invasion II, is not an analysis?
15   A. Look, I'm not going to play the game.
16   Q. That's your testimony?
17   A. It is not a voter roll analysis of the sort that
18    we do now. We don't do anything like this now.
19   Q. This is not an analysis conducted by or on behalf
20    of PILF regarding voter registration data?
21   A. No. It results in -- in list maintenance
22    processing of noncitizens. It's totally
23    different than voter registration data. This is
24    a report that merely republishes government
25    decisions to cancel people from the voter rolls

153

1   as declared noncitizens. This is the government
2   doing this and we're a pass through of looking at
3   what the government did. This is not us doing
4   this. This is the government of Virginia
5   canceling people as noncitizens.
6  Q. All right. So my only -- my only question about
7   this is whether when you issued this report you
8   knew at the time that some of these people could
9   be false positives?
10 A. No. We absolutely did not. As a matter of fact,
11   we called the Virginia election officials, the
12   head of elections in Virginia, and said, are you
13   sure that none of these people ever reregistered,
14   and he wrote back and in writing said none of
15   them reregistered. That was an assertion by the
16   Commonwealth of Virginia after they had made the
17   determination that they were noncitizens and only
18   three out of over 3,000, maybe 5,000, I can't
19   remember the exact number, that they had canceled
20   as noncitizens. There were three bad
21   cancelations that Virginia did that we didn't
22   know about these three cancelations as
23   noncitizens because it never dreamed -- occurred
24   to us that there would have been government
25   officials canceling citizens. It's outrageous.

154

1  Q. So you didn't conduct at the time before you
2   issued this report any further analysis of why
3   those people might have been taken off the rolls
4   as noncitizens?
5  A. Well, it's not in dispute why they were taken off
6   the rolls as noncitizens. It all started with an
7   under oath attestation they were not a citizen.
8   That's where this starts, and so somebody under
9   oath makes a statement against interest, namely,
10   that they're on the voter rolls illegally which
11   could subject them to felony prosecution, and so
12   then the government of Virginia determines that
13   they should be removed from the voter rolls as
14   noncitizens. We asked for the paper that records
15   these actions and put it on as an exhibit to this
16   report. That's what we did, but the wrongdoer
17   here was the government of Virginia. They
18   shouldn't have been canceling any citizens and so
19   far we know they canceled three out of thousands
20   that they published as noncitizens.
21 Q. So you object to the process of issuing the
22   notice from election officials asking for
23   affirmation of citizenship? I'm just trying to
24   understand your testimony.
25 A. My testimony is very clear. The government

155

1   screwed this up. They should have never been
2   canceling individuals as noncitizens that were
3   citizens and in fact, we sued them in an effort
4   to have that remedied and they still haven't
5   remedied it.
6  Q. The government didn't apologize, right?
7  A. They should have.
8  Q. But PILF did apologize, correct?
9  A. No. The government should have apologized for
10   this. PILF apologized for relying on the
11   government data. Never do it again. I assume
12   Maine doesn't have the same sort of mistakes but
13   we don't know that because you haven't disclosed
14   public information. We'll have an opportunity to
15   determine whether or not you're also making
16   mistakes like Virginia made, and I can assure you
17   if you have been making ridiculous mistakes, that
18   that's something the public deserves to know
19   about.
20 Q. Do you agree that the Alien Invasion II had
21   characterizations of those registrants as felons?
22 A. I don't know. Point me to a particular clause.
23 Q. No, I'm just asking you generally because it says
24   that in the blurb?
25 A. I can't -- where?

156

1  Q. "PILF profoundly regrets any characterization of
2   those registrants as felons."
3  A. Yeah, but show me the characterization it refers
4   to. It says "any characterization." I'm asking
5   you which one are you referring to.
6  Q. Well, why did -- why did PILF make that statement
7   if there were no characterizations of the
8   registrants as felons?
9  A. I can't answer that. I don't know.
10 Q. You don't know why PILF made this statement?
11 A. Asked and answered.
12 Q. Okay.
13 A. Is there a question, I'm sorry, I didn't hear?
14 Q. No, no question.
15      MR. BOLTON: Why don't we take -- if
16   everyone is up for that, I think I'm close to done.
17   Maybe we could take another ten-minute break.
18      MR. JOHNSON: Do you have some idea of how
19   close you might be?
20      MR. BOLTON: I think I'm very close. I just
21   want to consult with my colleague here.
22      MR. JOHNSON: Okay. We'll go --
23      MR. BOLTON: 2:05?
24      MR. JOHNSON: 2:05 is fine.
25      MR. BOLTON: Okay.

157

1         (OFF RECORD)

2    BY MR. BOLTON:

3    Q.   Mr. Adams, we're back on the record after a ten-

4         minute break and I think I just have a few more

5         questions for you. Going back to the process

6         that PILF uses to analyze state voter data when

7         they get it, is part of that process to match or

8         compare the data with data that you've also

9         gotten from other states?

10   A.   That's a second -- secondary step but the initial

11        step is to look at only the state data itself.

12        Like I said, you can quickly determine a number

13        of things regarding duplicates and possible

14        problems without ever comparing it to other

15        states.

16   Q.   Does PILF -- but PILF does that comparison to

17        data from other states, is that right?

18   A.   Well, eventually, yes.

19   Q.   Okay. In every case or just some --

20   A.   I don't know. There could be exceptions. There

21        could be exceptions that are appropriate in a

22        given circumstance, but in many cases it's done

23        and in some cases it might not be. It all

24        determines -- it all depends on the

25        circumstances.

158

1    Q.   Okay, and do you maintain updated data on all the

2         states that you collect data from?

3    A.   Well, generally speaking, yes.

4    Q.   So you make records requests on a regular basis

5         to get that data?

6    A.   Generally speaking, yes. That's the second time

7         I've answered that.

8    Q.   Okay, and do you keep that in one big global

9         database?

10             MR. JOHNSON: Objection as to form.

11   BY MR. BOLTON:

12   A.   Yeah, I don't understand what you're talking

13        about, one big global database.

14   Q.   So do you have a single database that contains

15        the voting records for all the states that you

16        collect data from?

17   A.   All of the stuff we get does not necessarily go

18        into one big global database.

19   Q.   Okay, all right. So if you were to get Maine's

20        data, are there particular states' data that you

21        would be comparing the Maine data to?

22   A.   I don't know because I haven't seen your data.

23        This gets back to the problem that I don't know

24        what you have because you're hiding it. So, for

25        example, if you were to give us data and there's

159

1         a bunch of mailing address entries, thousands of

2         mailing address entries that we obtained by

3         sorting by mailing address all going to a PO box

4         in Tennessee, we might look at Tennessee data. I

5         don't know because -- I can't answer that

6         question because I don't know what your data show

7         and you won't reveal it.

8    Q.   So it's a -- it's sort of an ad hoc process in

9         terms of which data sources you might look at for

10        a particular state's data?

11   A.   Right. We're not going to waste our time with

12        irrelevant inquiries. If the Maine data show,

13        like I said, circumstances that warrant a

14        particularized cross reference, then that's

15        something we'd consider. We don't know what your

16        data shows so we don't know the answer to these

17        questions because you aren't revealing it.

18   Q.   And how much of the process -- putting aside the

19        internal comparisons that I understand you can do

20        just by sorting the table in various ways, but

21        when you get to the stage of comparing, say,

22        Maine's data, were you to get it, with other data

23        sources, commercial data bases, other states'

24        data, what have you, is that an automated process

25        or is it a manual process that a person, you

160

1         know, looks up particular bits of data that

2         you're interested in?

3    A.   Well, it absolutely requires people to normalize

4         the database. There's no automation, there's

5         nobody that produces a drag-and-drop software to

6         drop the state data file into this, you know,

7         bucket and it pops out results. It doesn't work

8         that way. You have to carefully normalize

9         things, and I've already told you that. I've

10        already answered that question.

11   Q.   So I guess my question, once the data -- I'm

12        talking about once the data has been normalized,

13        is -- the process that you use to compare Maine's

14        data, were you to get it, with another database,

15        is that a human being that goes and looks up a

16        specific voter record in both of those databases

17        or is there some sort of software that you use to

18        do those kinds of matches?

19   A.   Well, it's a little bit of both. I mean, there's

20        software you use because you can't -- this stuff

21        is not reduced to paper so you're necessarily

22        using software. As to the comparison, you do

23        sorts and there's outputs; in other words, you

24        say show me all outputs that match this field.

25        This field might be mailing address -- I'm sorry,

161

1   residence address, and -- or -- or full name,
2   date of birth, produce an output that does a
3   field match, and the matching process is software
4   and looking at the results is human.  So there's
5   a mixture of the two, but that goes without
6   saying with almost any endeavor like this.
7   Q.  What software do you use for the matching, do you
8       know?
9   A.  It's proprietary software.
10  Q.  Proprietary to PILF?
11  A.  Correct.
12  Q.  Okay.  Hopefully we won't have to bring this
13      document back up again but I will if I have to.
14      In the Florida report, the Palm Beach County
15      report, there was a reference in the methodology
16      to Crosscheck and ERIC.  Are you familiar with
17      those systems?
18  A.  Yes.
19  Q.  Okay, and those are both systems that states use
20      to check the accuracy of their registration
21      rolls, correct?
22  A.  Incorrect.
23  Q.  Okay.  What -- what is your understanding of what
24      those systems are for?
25  A.  Which systems?

162

1   Q.  Well, let's start with Crosscheck.
2   A.  Crosscheck is to ascertain whether or not a
3       particular person is registered simultaneously in
4       more than one state.
5   Q.  Okay, and that's done through comparing -- it's
6       done by basically querying the data from a bunch
7       of states that are part of that system, right?
8   A.  Voluntary participation in the Crosscheck program
9       is a prerequisite to doing the comparison.
10  Q.  Okay, and ERIC is similar?
11  A.  No, it's very different.
12  Q.  And how is ERIC different?
13  A.  Well, for starters, ERIC does more than
14      Crosscheck.
15  Q.  Okay.  I guess when I say it's similar, my
16      specific question was the purposes are similar,
17      the states are trying to accomplish similar
18      things, correct?
19  A.  Incorrect.
20  Q.  What's the difference in terms of what states are
21      trying to accomplish?
22  A.  The only thing that Crosscheck is trying to
23      accomplish is the ascertainment of individuals
24      who have moved away from the state who are
25      registered in multiple states simultaneously and

163

1   to ascertain which registrants may have moved
2   away.  ERIC's purpose, among many, many others,
3   is to ascertain who may have moved away, who may
4   have died, who may -- I think those are probably
5   the two big issues.
6   Q.  Okay, and PILF doesn't have direct access to
7       either of those systems, right?
8   A.  Well, I would --
9   Q.  They don't have any access to those systems, not
10      a direct or indirect, correct?
11  A.  No, that's not entirely true.  With Crosscheck --
12      look, I have some recollection of seeing data
13      related to Crosscheck so I'm not going to answer
14      that question in the affirmative that you are
15      correct in your assertion.
16  Q.  Has PILF ever used the Crosscheck system to do
17      any of its analyses?
18  A.  When you say the Crosscheck system, you actually
19      mean the system itself, not the general
20      methodologies?
21  Q.  The system itself.
22  A.  We can't.
23  Q.  Okay, and you haven't used the ERIC system?
24  A.  That's a closed system.
25  Q.  Okay, and as is Crosscheck, right?

164

1   A.  Right, but what is causing my trepidation is I
2       worked on a case related to Crosscheck and I
3       don't remember when or -- I remember where, I
4       don't remember what or who, but in working on
5       that case related to Crosscheck, I had access to
6       a lot of data that almost certainly was not
7       public.
8   Q.  Okay.
9   A.  And, therefore, I'm not going to answer anymore
10      questions because I think you can understand the
11      issues involved.
12  Q.  All right.  I guess what I'm -- what I'm getting
13      at, and I can bring up the methodology -- maybe
14      we should do that just so we're clear about what
15      we're talking about here, the methodology section
16      of this Palm Beach report.
17  A.  Well, let me -- if you want to talk about that,
18      let me add this and this is important.  We don't
19      use that methodology anymore --
20  Q.  Okay.
21  A.  -- that's described in that document.  So to the
22      extent you are making a presumption, I want to
23      make sure you realize it's inaccurate.
24  Q.  Okay.  Well, I'm glad I asked this question then.
25      Well, first, why don't you use that methodology

165

1    anymore?

2  A.  Because Crosscheck doesn't exist anymore.

3  Q.  Okay.  It was shut down because of litigation,

4      correct?

5  A.  I mean, that's an interpretation that one would

6      draw if they were hostile to Crosscheck, which

7      perhaps you are, but I think there's alternative

8      explanations as to why Crosscheck doesn't exist

9      that does not reflect the hostility to the

10     program that you just exhibited.

11 Q.  All right.  Well, why don't you tell us your

12     explanation.

13 A.  I'm not going to explain because it's not in your

14     Schedule A and I want to get this over with, so

15     let's move along.

16 Q.  All right.  Can you explain to me then since you

17     don't use those methodologies anymore what

18     methodologies do you use currently instead?

19 A.  Better ones.

20 Q.  Okay.  Can you elaborate?

21 A.  New and improved, lessons of experience, refining

22     our current usage.

23 Q.  Can you elaborate?

24 A.  No, I can't.

25 Q.  And why is that?

166

1  A.  Because I just don't remember right now because

2      it wasn't on something that I thought I would

3      have to answer three or four different ways.

4      We've spent the better part of this deposition

5      going over those methodologies.

6  Q.  So you would agree that your current methodology

7      is -- that the new and improved methodology is

8      consistent with your prior testimony that you've

9      already given?

10 A.  Yes, and better than your focus on a at least

11     two-year-old I believe report out of Florida.

12 Q.  Okay.

13 A.  So in other words, all the questions you asked

14     about Florida are largely irrelevant except to

15     the extent that it exhibits our ability to adapt

16     and improve.

17 Q.  Okay.  The ERIC system, Electronic Registration

18     Information Center, that still exists, right?

19 A.  Yes, it does.

20 Q.  But you've moved on from methodologies that you

21     adapted from that as well?

22 A.  No.  I would say that there's a lot of

23     similarities between what PILF does and what ERIC

24     does.

25 Q.  Okay, all right, and is that that it's matching

167

1      data from various different sources?

2  A.  Correct.  Crosscheck did no such thing, by the

3      way, if you're looking for an easy contrast

4      between the two.

5  Q.  Okay.  Crosscheck was a more simple approach,

6      right, that just looked at a couple of data

7      points?

8  A.  Well, I wouldn't characterize it as simple but I

9      would characterize it as not relying on third

10     party or commercial data.

11 Q.  Okay.

12 A.  That's the big difference, is Crosscheck was

13     closed.  It was a closed system with only the

14     voter roll data pumped into a central database

15     and analyzed.  ERIC, in contrast, looks outward

16     and receives information from outside.

17 Q.  Okay.

18 A.  I don't know -- well, is Maine a member of ERIC?

19     I don't know.  I can't tell you sitting here

20     right now.  I'd have to look it up.

21         MR. BOLTON:  Okay.  I think those are all my

22     questions, Mr. Adams.

23         THE DEPONENT:  All right, thank you.

24         MR. BOLTON:  Unless your lawyer has anything

25     for you.

168

1         MR. JOHNSON:  I have just one question, Mr.

2      Adams.

3             E X A M I N A T I O N

4  BY MR. JOHNSON:

5  Q.  Counsel showed you the Alien Invasion report from

6      Virginia, do you recall that?

7  A.  Yes.

8  Q.  After publishing those reports, did the

9      Foundation change anything that it does with

10     respect to citizenship verification records?

11 A.  Well, right, I mean, for starters, as I

12     previously testified, we would never rely on a

13     government's assertion that somebody was a

14     noncitizen again.  You know, even if they had to

15     go through the process of testifying under oath

16     or marking under oath that they are not a

17     citizen and then the followup process of the

18     government, that's not something that PILF would

19     look at and ever use that methodology again

20     because of the shocking unreliability of the

21     government's review.  What we did do is start to

22     look at self-confessions of noncitizenship; in

23     other words, all of the individuals who write in

24     to their election offices that they are indeed

25     not a citizen and please remove me from the

169

1  rolls, those sorts of things have replaced
2  reliance on the government.  We look at what the
3  individual registrants have said about their
4  citizenship status in letters.  Stealing the Vote
5  is a report about Pittsburgh, Garden State Gotcha
6  is a report about New Jersey where noncitizens
7  who are registered to vote write in and say I'm
8  not a citizen, please take me off the voter
9  rolls.  That's what we did differently.
10        MR. JOHNSON:  Okay.  I have no further
11  questions.
12        MR. BOLTON:  Nothing more from me.
13  (Deposition was concluded at 2:25 p.m.)
14  (Deponent does not waive reading and signing.)
15
16
17
18
19
20
21
22
23
24
25

170

1              CERTIFICATE
2
3        I, Joanne P. Alley, a Notary Public in and for
4  the State of Maine, hereby certify that on the 8th day
5  of February, 2021, N. CHRISTIAN ADAMS, appeared via ZOOM
6  VIDEO CONFERENCE and was sworn to testify to the truth,
7  the whole truth, and nothing but the truth in the
8  aforementioned cause of action and that the foregoing is
9  a true and accurate record as taken by me by means of
10  computer-aided machine shorthand.
11
12        I further certify that I am a disinterested
13  person in the event or outcome of the aforementioned
14  cause of action.
15
16        IN WITNESS WHEREOF, I have hereunto set my hand
17  this 23rd day of February, 2021.
18
19        _____
20              Joanne P. Alley
21        Court Reporter/Notary Public
22
23  My commission expires:  July 17, 2022
24
25

171

1         ALLEY & MORRISETTE REPORTING SERVICE
2              1203 Augusta Road
3             Belgrade, ME  04917
4
5              February 23, 2021
6
7  Mr. N. Christian Adams
   c/o Noel H. Johnson, Esq.
8  Public Interest Legal Foundation
   32 East Washington Street, Suite 1675
9  Indianapolis, IN 46204-3594
10
   RE: PILF v Shenna Bellows
11
   Enclosed please find a copy of your deposition taken in
12 the above-mentioned action.  Also enclosed is the
   original signature page and a sheet for corrections.
13 Please read the copy of the deposition and sign the
   original signature page before a Notary Public.  If
14 there are any corrections you wish to make, they should
   be made on the enclosed correction sheet.  Do not mark
15 on the deposition.
16 Please return the signed original signature page and
   correction sheet to Alley & Morrisette at the above
17 address within 30 days.
18 Thank you.
19
20
21
22
23
24
25

172

1  THE ORIGINAL DEPOSITION OF N. CHRISTIAN ADAMS SHOULD
2  INCLUDE THE FOLLOWING CORRECTIONS:
3
4  Page Line     Change from this     To this
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1          TO BE COMPLETED BY THE DEPONENT:
 2       I, _____, have read the
 3   foregoing pages and have noted any stenographic errors
 4   of my testimony together with their respective
 5   corrections and the reasons therefore on the following
 6   Errata Sheet.
 7
 8          (SIGNATURE) _____
 9          (DATE) _____
10          **********
11   TO BE COMPLETED BY THE NOTARY PUBLIC/ATTORNEY
12       I, _____, a Notary Public/Attorney,
13   hereby acknowledge that the above-named deponent
14   personally appeared before me and affixed his/her
15   signature as his/her own true act and deed.
16
17          (SIGNATURE) _____
18          (DATE) _____
19   TITLE:  PILF v Shenna Bellows
20   DEPOSITION OF:  N. Christian Adams
21   DATE OF DEPOSITION:  February 8, 2021
22   NOTICING PARTY:  Jonathan R. Bolton, Esq.
23   REPORTER:  Joanne P. Alley
24
25
```

## #

**#18-CV-423** [1] - 145:3
**#5** [1] - 131:20
**#6** [1] - 131:17

## 0

**04333-0006** [1] - 2:4
**04917** [1] - 171:3

## 1

**1** [11] - 20:24, 21:1, 32:25, 38:12, 38:14, 63:14, 94:19, 94:20, 142:11, 142:16, 142:22
**1(B** [2] - 101:4, 101:6
**1,681** [1] - 52:5
**10** [5] - 100:23, 100:24, 101:9, 101:10, 113:19
**10,000** [2] - 50:18, 72:9
**10:00** [2] - 1:18, 4:3
**11** [2] - 120:15, 120:16
**11(b** [5] - 63:15, 63:18, 64:1, 64:5, 65:19
**11:50** [1] - 70:9
**11th** [7] - 67:2, 67:5, 67:22, 68:7, 68:22, 97:21
**12** [5] - 113:19, 141:25, 142:1, 142:11, 142:23
**1203** [1] - 171:2
**123** [2] - 109:17, 109:21
**13** [2] - 144:25, 145:1
**14** [1] - 34:14
**14th** [2] - 72:10, 72:17
**15,000** [1] - 72:7
**167-A** [1] - 133:12
**1675** [2] - 2:9, 171:8
**17** [1] - 170:23
**1936** [2] - 46:11, 46:13
**1940** [2] - 109:18, 109:20
**196-A** [7] - 90:24, 92:1, 98:13, 101:3, 106:3, 133:8, 133:14
**196-A(1)(b** [1] - 92:19
**196-A(1)(B** [1] - 101:11
**196-A(1)(B)** [1] - 99:19
**1990** [1] - 112:10
**1:20-cv-00061-GZS** [1] - 1:4

## 2

**2** [6] - 21:12, 34:9, 95:4, 95:5, 99:14, 149:4
**20** [1] - 116:8
**20,000** [2] - 72:9, 72:12
**2015** [1] - 10:8
**2019** [2] - 99:5, 134:19
**2020** [4] - 59:13, 89:9, 99:15, 107:25
**2021** [6] - 1:18, 4:3, 170:5, 170:17, 171:4, 173:21
**2022** [1] - 170:23
**20507(i** [1] - 79:25
**207-616-8551** [1] - 2:4
**21-A** [3] - 90:24, 99:19, 101:2
**22nd** [1] - 89:15
**23** [1] - 171:4
**23rd** [1] - 170:17
**248** [1] - 35:21
**29th** [1] - 99:5
**2:05** [2] - 156:23, 156:24
**2:25** [1] - 169:13

## 3

**3** [6] - 27:23, 29:1, 41:10, 46:6, 95:13, 95:15
**3,000** [2] - 150:5, 153:18
**30** [3] - 112:18, 113:8, 171:17
**30(b)(6** [19] - 4:16, 4:17, 4:19, 4:21, 6:25, 7:6, 7:9, 9:13, 9:17, 10:3, 14:9, 17:4, 22:4, 22:10, 22:15, 33:15, 55:4, 65:6, 87:20
**30(b)(6)** [1] - 25:13, 40:6, 85:16
**31** [1] - 112:10
**317-203-5599** [1] - 2:10
**32** [2] - 2:8, 171:8
**33** [1] - 124:20
**39** [1] - 3:10

## 4

**4** [7] - 3:4, 3:10, 3:11, 3:12, 47:3, 95:18, 95:21
**40** [2] - 3:11, 132:12

**41** [1] - 3:12
**46204-3594** [2] - 2:9, 171:9
**4th** [1] - 99:15

## 5

**5** [4] - 95:23, 96:9, 96:10, 96:15
**5,000** [3] - 72:8, 150:6, 153:18
**50** [2] - 13:19, 83:6
**501(c)(3** [3] - 12:2, 38:15, 58:3
**52** [1] - 79:24

## 6

**6** [4] - 2:3, 96:16, 96:17, 96:18

## 7

**7** [2] - 97:3, 97:4

## 8

**8** [6] - 1:18, 4:2, 81:20, 97:18, 97:19, 173:21
**8th** [1] - 170:4

## 9

**9** [2] - 98:4, 98:5

## A

**a.m** [2] - 1:18, 4:3
**abandoned** [1] - 44:25
**Abbott** [1] - 61:16
**ability** [4] - 23:6, 106:1, 109:22, 166:15
**able** [9] - 7:15, 35:11, 36:2, 85:22, 107:22, 117:3, 118:25, 130:10, 133:1
**above-mentioned** [1] - 171:12
**above-named** [1] - 173:13
**absentee** [5] - 60:16, 63:1, 64:8, 64:23, 65:10
**absolute** [1] - 115:4
**absolutely** [13] - 74:18, 74:21, 87:1, 89:1, 109:9, 109:10, 114:25, 117:22, 119:9, 119:20, 150:15, 153:10,

160:3
**absolve** [1] - 37:5
**abusive** [10] - 44:4, 65:13, 65:25, 74:1, 74:13, 76:1, 76:4, 76:8, 76:15, 77:2
**academic** [2] - 138:25, 139:6
**accept** [2] - 59:14, 59:19
**accepted** [3] - 32:15, 72:16, 105:24
**access** [11] - 36:2, 50:8, 90:22, 118:25, 125:4, 130:10, 132:10, 137:5, 163:6, 163:9, 164:5
**accomplish** [3] - 162:17, 162:21, 162:23
**accumulation** [1] - 18:9
**accuracy** [1] - 161:20
**accurate** [35] - 23:13, 23:20, 28:16, 28:24, 33:10, 33:12, 33:14, 35:10, 35:12, 37:8, 38:2, 38:20, 39:3, 39:5, 43:9, 47:18, 47:22, 52:18, 54:9, 58:8, 58:11, 60:23, 63:24, 78:12, 81:11, 115:23, 117:25, 119:18, 123:9, 129:1, 139:24, 142:3, 149:10, 149:23, 170:9
**accurately** [6] - 6:19, 47:10, 52:9, 132:1, 141:9, 141:11
**accuse** [2] - 128:25, 142:6
**accuses** [1] - 142:3
**acknowledge** [1] - 173:13
**act** [2] - 56:25, 173:15
**Act** [11] - 32:18, 33:24, 34:8, 34:10, 46:14, 48:21, 58:18, 62:15, 63:8, 65:19, 115:19
**acted** [2] - 51:13, 59:11
**acting** [1] - 76:5
**action** [11] - 53:13, 55:1, 55:6, 55:11, 84:15, 91:15, 136:11, 138:17, 170:8, 170:14, 171:12
**actions** [3] - 56:8,

57:11, 154:15
**active** [8] - 50:25, 53:7, 56:23, 111:23, 112:8, 112:13, 112:17, 112:19
**activities** [11] - 10:10, 13:19, 28:13, 54:2, 73:17, 73:19, 74:2, 75:6, 75:14, 75:19, 76:11
**actual** [5] - 17:18, 99:25, 100:9, 123:2, 136:17
**ad** [1] - 159:8
**adams** [2] - 4:11, 7:15
**Adams** [16] - 16:9, 25:1, 25:9, 25:21, 31:20, 70:14, 157:3, 167:22, 168:2, 171:7, 173:20
**ADAMS** [5] - 1:16, 3:3, 4:6, 170:5, 172:1
**adapt** [1] - 166:15
**adapted** [1] - 166:21
**add** [3] - 26:12, 32:5, 164:18
**added** [2] - 33:18, 143:15
**addition** [2] - 32:19, 110:2
**additional** [4] - 9:2, 9:5, 99:4, 110:8
**address** [39] - 40:19, 42:13, 45:3, 58:3, 91:13, 103:12, 103:14, 103:17, 103:20, 103:24, 104:6, 104:8, 104:14, 104:15, 104:17, 106:7, 107:5, 108:16, 108:19, 108:22, 109:4, 109:20, 109:25, 110:2, 110:3, 110:7, 110:10, 111:12, 111:16, 134:4, 139:25, 144:16, 159:1, 159:2, 159:3, 160:25, 161:1, 171:17
**addressed** [1] - 34:3
**addresses** [6] - 41:21, 91:15, 106:15, 121:12, 121:21, 123:2
**adequate** [1] - 5:4
**adequately** [2] - 7:17, 82:5
**administered** [1] - 4:4

administration [4] -
13:16, 29:16, 33:7,
113:4
Administrative [2] -
32:18, 33:24
administrators [1] -
33:11
adopted [2] - 67:6,
100:11
adults [3] - 35:22,
36:17, 36:21
advance [2] - 23:16,
28:20
advanced [4] - 138:4,
138:9, 138:12,
138:13
advice [1] - 62:4
affiliation [1] - 110:24
affirm [1] - 142:20
affirmation [1] -
154:23
affixed [1] - 173:14
aforementioned [2] -
170:8, 170:13
afterwards [1] - 135:1
agencies [4] - 42:17,
45:5, 105:19, 130:21
aggressive [2] - 90:1,
90:4
ago [10] - 57:14,
98:22, 112:11,
112:18, 113:8,
116:8, 125:13,
130:19, 149:21,
149:22
agree [15] - 62:11,
90:22, 95:24, 96:12,
96:23, 97:11, 97:25,
98:13, 102:12,
107:10, 118:23,
120:25, 121:18,
155:20, 166:6
agreed [2] - 67:22,
137:3
agreements [1] -
130:2
ahead [10] - 20:25,
66:9, 85:14, 106:12,
110:18, 120:19,
127:3, 127:7,
133:25, 136:2
aid [4] - 58:6, 109:9,
109:10, 109:22
aided [1] - 170:10
aimed [1] - 70:15
al [1] - 31:15
alert [1] - 117:11
Ali [2] - 122:2
Alien [11] - 140:13,
141:7, 143:12,

143:17, 146:2,
146:18, 147:21,
152:13, 155:20,
168:5
aliens [1] - 141:20
align [1] - 128:24
alignment [1] - 128:13
alive [4] - 40:23, 42:9,
43:6, 125:18
allegation [1] - 62:21
allegations [1] - 63:14
allege [2] - 81:21,
81:22
Alley [6] - 1:18, 4:2,
170:3, 170:20,
171:16, 173:23
ALLEY [1] - 171:1
allow [6] - 33:17,
58:21, 100:12,
129:25, 133:9, 134:6
allowing [2] - 29:20,
114:5
allows [5] - 37:8,
103:21, 117:17,
118:2, 130:7
almost [7] - 55:25,
69:15, 83:8, 98:22,
124:9, 161:6, 164:6
alter [1] - 92:18
altered [1] - 82:9
alternative [1] - 165:7
amazing [1] - 119:6
ambiguous [1] -
136:20
amended [1] - 27:20
Amendment [2] -
72:11, 72:17
amendment [1] -
67:16
amerce [1] - 32:18
American [5] - 58:7,
58:15, 59:10, 96:25,
145:5
amicably [1] - 99:14
amicus [9] - 32:2,
33:1, 37:19, 47:3,
61:11, 95:25, 96:13,
97:6, 97:24
Amicus [1] - 66:24
amount [1] - 40:13
amounts [1] - 129:25
analyses [23] - 36:3,
36:20, 44:19, 45:15,
49:4, 102:3, 102:9,
103:2, 104:20,
106:17, 113:11,
126:14, 127:15,
130:17, 131:3,
131:22, 132:10,
134:25, 136:16,

139:12, 140:4,
152:5, 163:17
analysis [37] - 14:23,
47:13, 48:24, 49:14,
52:11, 54:5, 55:13,
56:3, 56:12, 57:9,
57:10, 101:17,
102:14, 102:17,
110:12, 116:1,
116:18, 117:19,
127:15, 133:9,
134:7, 134:9,
134:13, 137:3,
138:15, 138:19,
149:3, 152:6, 152:7,
152:8, 152:12,
152:14, 152:17,
152:19, 154:2
analyze [4] - 13:9,
58:22, 121:8, 157:6
analyzed [1] - 167:15
analyzes [2] - 12:25,
28:13
analyzing [2] - 42:4,
104:16
answer [76] - 10:5,
11:24, 14:20, 14:21,
15:5, 15:18, 22:3,
22:12, 22:14, 22:18,
23:1, 23:7, 23:14,
23:22, 23:23, 24:4,
24:10, 24:12, 24:15,
25:4, 25:6, 25:16,
26:10, 26:12, 44:11,
53:25, 55:6, 57:9,
65:23, 66:7, 73:24,
74:10, 74:18, 75:3,
75:9, 75:12, 75:13,
76:18, 76:22, 79:11,
85:7, 85:20, 88:1,
93:12, 102:6,
102:22, 115:7,
123:24, 124:1,
127:4, 127:7, 131:4,
134:3, 136:1, 136:2,
138:7, 138:8, 140:2,
145:20, 147:14,
148:4, 148:6,
148:11, 148:12,
148:15, 148:20,
148:23, 151:14,
151:25, 156:9,
159:5, 159:16,
163:13, 164:9, 166:3
answered [33] - 14:19,
14:25, 19:8, 19:20,
42:6, 43:3, 43:13,
43:19, 57:3, 68:5,
75:13, 75:24, 76:12,
102:11, 121:1,

122:25, 124:3,
127:8, 130:18,
130:24, 131:20,
131:24, 132:12,
132:17, 132:20,
135:2, 140:5,
148:19, 148:20,
156:11, 158:7,
160:10
answering [2] - 5:12,
33:22
answers [5] - 23:25,
43:24, 45:6, 56:19,
84:3
Antonio [1] - 97:10
apart [1] - 55:24
apologize [4] - 91:2,
91:22, 155:6, 155:8
apologized [2] -
155:9, 155:10
Appeals [5] - 67:2,
67:6, 67:22, 68:8,
68:23
appear [7] - 10:12,
19:4, 19:12, 25:22,
27:17, 52:9, 93:22
APPEARANCES [1] -
2:1
appearances [1] -
10:23
appeared [4] - 10:14,
16:7, 170:5, 173:14
Appellant's [1] - 66:25
appellants' [1] - 97:24
applicants [1] -
113:25
application [2] -
105:21, 105:24
applications [1] -
105:18
appreciate [1] -
150:16
approach [2] - 69:6,
167:5
appropriate [3] -
22:22, 23:4, 157:21
area [4] - 86:15,
137:19, 137:25,
140:2
areas [5] - 36:25, 37:1,
37:2, 70:25, 89:18
arguing [2] - 87:15,
90:9
argument [1] - 128:19
argumentative [2] -
39:22, 65:13
arrangement [1] -
67:21
arrive [1] - 60:16
arrived [1] - 59:14

arriving [1] - 60:3
articles [1] - 28:18
ascertain [10] - 53:6,
56:21, 103:22,
107:22, 116:21,
124:6, 138:16,
162:2, 163:1, 163:3
ascertaining [1] -
115:24
ascertainment [1] -
162:23
aside [1] - 159:18
aspect [1] - 28:20
assert [1] - 151:1
assertion [4] - 129:20,
153:15, 163:15,
168:13
assess [7] - 29:20,
53:9, 54:3, 54:14,
54:19, 54:24, 136:10
assessments [1] -
37:9
assist [5] - 34:11,
34:20, 35:13, 58:5,
129:8
assistant [1] - 4:12
assists [1] - 110:3
associated [3] -
13:17, 18:22, 68:15
assume [6] - 45:6,
47:21, 107:2,
109:13, 133:7,
155:11
assuming [2] - 115:8,
133:5
assumptions [2] -
15:16, 112:6
assure [1] - 155:16
attach [2] - 68:10,
68:21
attached [15] - 47:3,
48:13, 98:18, 98:23,
123:22, 143:21,
144:3, 144:21,
146:7, 146:18,
146:24, 147:1,
147:11, 147:15,
149:3
attendant [3] - 39:2,
39:7, 40:10
attention [3] - 50:22,
51:7, 115:11
attestation [1] - 154:7
attitude [4] - 49:16,
49:18, 49:23, 49:25
Attorney [4] - 3:4,
62:5, 62:12, 63:7
ATTORNEY [1] - 2:2
attorney [21] - 4:12,
10:15, 19:1, 19:2,

19:8, 19:14, 19:15, 19:21, 19:25, 20:4, 20:15, 23:1, 23:3, 59:17, 62:21, 63:18, 64:3, 76:4, 122:20, 135:14
**attorneys** [1] - 87:13
**Attorneys** [2] - 2:6, 2:11
**audit** [2] - 125:3
**Augusta** [2] - 2:4, 171:2
**authenticate** [1] - 25:7
**author** [5] - 11:19, 11:25, 18:10, 20:7, 20:11
**authoring** [1] - 11:14
**authorities** [1] - 119:14
**authority** [1] - 120:7
**authorized** [1] - 9:13
**automated** [1] - 159:24
**automation** [1] - 160:4
**available** [8] - 28:11, 46:23, 52:15, 52:16, 56:20, 125:6, 130:22, 146:20
**avoid** [1] - 5:16
**aware** [4] - 27:8, 77:13, 98:17, 150:10

## B

**backing** [1] - 52:22
**backwards** [1] - 106:16
**bad** [5] - 49:22, 88:7, 89:3, 89:5, 153:20
**badly** [3] - 123:19, 123:23, 124:7
**balance** [1] - 105:20
**ballot** [3] - 40:25, 64:23, 65:10
**ballots** [11] - 37:25, 38:8, 40:20, 40:23, 59:14, 59:19, 60:3, 60:16, 63:1, 64:8, 65:21
**Banc** [1] - 67:1
**banc** [1] - 97:25
**based** [17] - 12:6, 28:4, 35:13, 51:6, 64:9, 93:10, 106:6, 107:22, 113:6, 125:13, 125:18, 129:10, 129:12, 142:18, 150:19, 150:21, 150:22
**bases** [1] - 159:23

**basic** [2] - 9:20, 11:11
**basis** [5] - 26:6, 54:22, 119:6, 119:25, 158:4
**BE** [2] - 173:1, 173:11
**Beach** [2] - 161:14, 164:16
**bear** [1] - 91:22
**bearing** [1] - 98:8
**Becker** [1] - 16:16
**become** [2] - 26:24, 27:4
**began** [1] - 51:5
**beginning** [2] - 1:18, 4:3
**behalf** [9] - 4:22, 5:12, 6:23, 7:4, 9:18, 10:13, 10:15, 19:4, 152:19
**behave** [1] - 104:11
**behavior** [2] - 85:16, 107:25
**behind** [1] - 126:6
**Belgrade** [1] - 171:3
**BELLOWS** [1] - 1:11
**Bellows** [2] - 171:10, 173:19
**benefits** [2] - 46:22
**best** [7] - 29:11, 54:6, 56:24, 57:18, 72:23, 82:9, 152:1
**better** [9] - 8:25, 37:5, 37:9, 88:17, 100:13, 136:17, 165:19, 166:4, 166:10
**between** [11] - 5:20, 34:24, 39:18, 93:4, 93:11, 100:8, 126:14, 136:23, 137:4, 166:23, 167:4
**beyond** [3] - 9:6, 24:1, 35:3
**big** [7] - 85:12, 129:23, 158:8, 158:13, 158:18, 163:5, 167:12
**bills** [1] - 18:21
**bind** [1] - 118:24
**birth** [28] - 88:12, 91:12, 91:14, 103:25, 104:18, 104:24, 105:3, 105:4, 105:10, 105:16, 105:19, 105:23, 106:5, 106:6, 106:14, 106:18, 106:24, 107:6, 107:9, 107:11, 107:18, 108:7, 108:9, 108:21, 109:18,

117:7, 128:10, 161:2
**bit** [6] - 5:20, 26:14, 98:15, 100:21, 130:10, 160:19
**bits** [1] - 160:1
**blank** [1] - 144:5
**bloating** [1] - 35:7
**blog** [1] - 28:18
**blown** [1] - 122:9
**blue** [1] - 99:9
**blurb** [6] - 142:10, 143:14, 143:15, 143:20, 149:16, 155:24
**Board** [7] - 59:11, 59:18, 59:21, 59:25, 60:5, 60:13, 69:21
**board** [14] - 18:17, 20:22, 21:2, 21:18, 21:22, 22:1, 22:3, 22:19, 23:11, 24:1, 25:2, 25:5, 95:9, 111:15
**Bolton** [3] - 3:4, 4:11, 173:22
**bolton** [1] - 2:2
**BOLTON** [66] - 4:10, 7:11, 7:14, 15:12, 21:6, 24:3, 24:7, 24:13, 24:18, 24:20, 24:24, 24:25, 25:9, 25:18, 36:10, 66:6, 70:3, 70:6, 70:10, 70:12, 76:2, 76:14, 76:20, 77:7, 78:11, 79:18, 79:19, 81:10, 84:17, 87:25, 90:7, 94:21, 94:23, 95:6, 95:16, 95:22, 96:11, 96:19, 97:5, 97:20, 98:6, 100:25, 120:17, 126:11, 126:19, 131:10, 132:15, 135:9, 136:21, 140:12, 140:18, 142:2, 145:2, 145:13, 145:17, 149:2, 149:5, 156:15, 156:20, 156:23, 156:25, 157:2, 158:11, 167:21, 167:24, 169:12
**bottom** [5] - 48:12, 58:1, 61:3, 142:10, 143:15
**box** [2] - 147:18, 159:3
**Bradley** [1] - 122:3
**brazenly** [1] - 149:20
**break** [4] - 70:3,

70:13, 156:17, 157:4
**breaking** [1] - 69:17
**Brief** [1] - 66:24
**brief** [20] - 32:2, 33:1, 33:23, 34:1, 36:14, 37:19, 47:3, 48:13, 61:11, 63:11, 64:24, 64:25, 65:21, 67:19, 68:19, 95:25, 96:13, 97:7, 97:21, 97:23
**briefs** [3] - 20:11, 31:23, 47:21
**bring** [10] - 50:21, 81:17, 88:4, 93:21, 98:8, 100:22, 128:23, 151:19, 161:12, 164:13
**broad** [2] - 71:25, 72:22
**broader** [1] - 74:2
**broadly** [2] - 73:19, 137:15
**brought** [12] - 38:5, 51:6, 78:7, 79:3, 81:7, 81:12, 82:12, 82:17, 83:24, 87:15, 89:24, 90:8
**bucket** [1] - 160:7
**built** [1] - 139:19
**bullet** [1] - 62:8
**bunch** [3] - 115:14, 159:1, 162:6
**bureaus** [2] - 52:8, 125:17
**Bush** [2] - 113:4
**business** [1] - 18:23
**buy** [1] - 47:1
**buys** [1] - 48:4
**BY** [48] - 2:2, 2:7, 4:10, 7:14, 15:12, 21:6, 24:25, 25:18, 36:10, 66:6, 70:12, 76:2, 76:14, 77:7, 78:11, 79:19, 81:10, 84:17, 87:25, 90:7, 94:23, 95:6, 95:16, 95:22, 96:11, 96:19, 97:5, 97:20, 98:6, 100:25, 120:17, 126:11, 126:19, 131:10, 132:15, 135:9, 136:21, 140:12, 140:18, 142:2, 145:2, 145:17, 149:5, 157:2, 158:11, 168:4, 173:1, 173:11

## C

**c/o** [1] - 171:7
**Calm** [2] - 120:21, 124:18
**cancel** [1] - 152:25
**cancelation** [1] - 146:9
**cancelations** [2] - 153:21, 153:22
**canceled** [3] - 142:17, 153:19, 154:19
**canceling** [4] - 153:5, 153:25, 154:18, 155:2
**cancelled** [1] - 146:16
**cannot** [4] - 46:4, 115:20, 122:7, 129:20
**capable** [1] - 129:24
**capacity** [7] - 1:11, 9:16, 10:1, 11:1, 11:9, 11:22, 34:6
**capitulated** [1] - 55:20
**caption** [1] - 61:17
**card** [3] - 147:9, 150:22, 151:5
**cards** [2] - 144:20, 144:21
**care** [1] - 93:9
**carefully** [1] - 160:8
**Carolina** [7] - 80:20, 83:23, 109:16, 109:19, 109:21, 109:25, 110:1
**carry** [1] - 19:3
**case** [71] - 4:15, 7:22, 10:16, 23:5, 30:7, 31:15, 32:4, 32:21, 33:16, 34:5, 37:20, 38:5, 45:8, 47:13, 54:23, 55:14, 59:23, 60:4, 61:1, 61:18, 61:21, 62:11, 63:7, 64:13, 65:4, 67:4, 67:7, 67:15, 67:18, 68:25, 69:10, 72:18, 73:14, 73:20, 74:3, 74:14, 74:24, 75:16, 76:17, 83:23, 83:24, 84:4, 84:6, 84:15, 84:21, 85:10, 85:17, 87:10, 87:15, 87:19, 88:2, 88:3, 89:23, 89:24, 90:8, 90:13, 96:3, 97:12, 98:2, 115:11, 115:16, 136:7, 148:3, 151:20, 151:21,

157:19, 164:2, 164:5
**cases** [31] - 11:3, 11:4,
34:9, 71:17, 72:17,
77:9, 77:14, 77:19,
77:21, 78:2, 78:19,
78:23, 79:1, 79:3,
79:6, 79:15, 81:16,
81:17, 81:19, 82:4,
84:1, 84:16, 84:18,
88:4, 89:8, 103:21,
116:3, 139:3,
151:18, 157:22,
157:23
**cataloguing** [1] -
75:19
**catch** [2] - 105:11,
113:23
**categories** [3] - 52:13,
82:11, 82:14
**category** [3] - 58:25,
59:2, 91:21
**causing** [1] - 164:1
**caveat** [1] - 115:2
**CEG** [2] - 35:20, 35:24
**census** [5] - 32:6,
33:18, 35:13, 36:18,
36:23
**Census** [1] - 32:20
**Center** [1] - 166:18
**central** [1] - 167:14
**centralized** [1] - 114:1
**cert** [2] - 32:15, 32:16
**certain** [8] - 26:10,
51:4, 63:22, 90:15,
106:8, 107:23,
114:8, 119:12
**certainly** [7] - 24:8,
31:11, 42:20, 45:10,
54:23, 57:17, 164:6
**certainty** [2] - 107:16,
115:4
**CERTIFICATE** [1] -
170:1
**certify** [2] - 170:4,
170:12
**chain** [1] - 98:24
**chairman** [3] - 21:22,
23:10, 25:2
**challenge** [1] - 62:12
**change** [2] - 67:16,
168:9
**Change** [1] - 172:4
**changed** [1] - 115:12
**changes** [1] - 81:8
**characterization** [6] -
63:4, 142:25,
149:18, 156:1,
156:3, 156:4
**characterizations** [2] -
155:21, 156:7

**characterize** [4] -
68:4, 68:5, 167:8,
167:9
**Charles** [1] - 107:19
**chat** [2] - 6:8, 6:10
**check** [4] - 17:9,
104:2, 117:20,
161:20
**checked** [3] - 151:4,
151:6, 151:7
**Christian** [5] - 16:9,
31:20, 107:19,
171:7, 173:20
**CHRISTIAN** [5] - 1:16,
3:3, 4:6, 170:5,
172:1
**Christmas** [2] -
109:18, 109:19
**Churchwell** [3] -
17:13, 17:14, 98:25
**Circuit** [7] - 67:2, 67:5,
67:22, 68:7, 68:8,
68:22, 97:21
**circumstance** [6] -
116:12, 118:9,
148:3, 148:5,
151:24, 157:22
**circumstances** [2] -
157:25, 159:13
**cite** [3] - 35:20, 50:2,
72:17
**cited** [1] - 77:12
**cites** [1] - 36:14
**citizen** [8] - 35:17,
150:9, 150:24,
151:5, 154:7,
168:17, 168:25,
169:8
**Citizens** [1] - 145:5
**citizens** [10] - 36:20,
37:10, 51:19,
132:22, 142:23,
142:24, 143:5,
153:25, 154:18,
155:3
**citizenship** [18] - 32:7,
32:20, 33:17, 34:6,
34:9, 34:10, 34:20,
35:4, 35:12, 36:24,
37:2, 133:18, 134:7,
142:20, 151:15,
154:23, 168:10,
169:4
**civil** [1] - 68:18
**Civil** [3] - 1:4, 7:1,
76:23
**claim** [3] - 62:13,
75:22, 87:8
**claiming** [1] - 89:25
**claims** [1] - 87:11

**clause** [3] - 86:6,
86:20, 155:22
**clean** [12] - 29:12,
29:14, 30:21, 30:24,
42:23, 51:5, 51:23,
88:16, 88:20, 105:8,
112:6, 116:7
**clear** [3] - 129:18,
154:25, 164:14
**clearly** [1] - 134:17
**clerks** [1] - 38:5
**Cleta** [3] - 21:21,
23:10, 25:1
**client** [13] - 24:4, 24:9,
24:17, 25:4, 31:1,
42:23, 56:21, 74:20,
122:5, 124:7,
124:11, 134:21,
145:12
**clients** [3] - 14:5, 20:1
**clock** [2] - 122:22,
136:10
**close** [5] - 113:17,
151:18, 156:16,
156:19, 156:20
**closed** [3] - 163:24,
167:13
**closer** [1] - 146:24
**codified** [1] - 100:18
**cold** [1] - 55:10
**colleague** [2] - 98:10,
156:21
**collect** [2] - 158:2,
158:16
**colossal** [1] - 104:3
**columns** [3] - 128:4,
128:9, 128:24
**comfort** [1] - 55:10
**coming** [1] - 71:14
**Commerce** [3] - 31:15,
32:5, 96:1
**commercial** [15] -
41:14, 41:21, 41:22,
42:8, 42:16, 125:15,
125:19, 130:19,
132:5, 136:24,
137:6, 159:23,
167:10
**commercially** [2] -
125:6, 130:21
**commission** [1] -
170:23
**commit** [3] - 30:13,
30:23, 142:24
**common** [1] - 48:6
**commonly** [5] - 45:22,
45:24, 46:1
**Commonwealth** [3] -
143:25, 146:8,
153:16

**communicate** [1] -
20:9
**communication** [2] -
62:14, 62:16
**communications** [4] -
17:14, 17:24, 62:12,
100:13
**communities** [1] -
48:7
**companies** [2] -
42:15, 43:17
**company** [3] - 44:10,
126:7, 130:5
**compare** [2] - 157:8,
160:13
**compared** [3] - 35:17,
36:15, 137:23
**compares** [1] - 41:12
**comparing** [4] -
157:14, 158:21,
159:21, 162:5
**comparison** [6] -
136:22, 136:23,
137:4, 157:16,
160:22, 162:9
**comparisons** [1] -
159:19
**compel** [1] - 25:16
**compiled** [1] - 28:12
**complain** [1] - 86:16
**Complaint** [1] - 27:16
**complaint** [17] - 27:17,
27:20, 91:1, 92:12,
93:22, 93:23, 95:17,
98:9, 98:10, 98:14,
98:18, 99:8, 145:3,
145:7, 145:24,
146:1, 146:7
**complete** [1] - 44:14
**COMPLETED** [2] -
173:1, 173:11
**complex** [1] - 139:3
**complicated** [1] -
140:20
**comply** [3] - 55:9,
58:23, 119:5
**components** [1] -
36:24
**compound** [2] - 53:23,
126:9
**compromises** [1] -
122:18
**computer** [1] - 170:10
**computer-aided** [1] -
170:10
**concern** [10] - 29:9,
30:1, 58:21, 64:7,
64:15, 64:17, 64:20,
65:21, 66:1, 122:24
**concerned** [5] - 29:13,

30:8, 30:11, 58:15,
58:16
**concerning** [7] - 5:11,
13:2, 32:19, 37:24,
95:9, 97:12, 98:1
**concerns** [1] - 29:4
**conclude** [2] - 41:6,
120:1
**concluded** [1] -
169:13
**conclusions** [1] -
129:2
**concur** [1] - 26:1
**condition** [2] - 68:17,
68:22
**conditions** [4] - 67:10,
67:17, 68:10, 123:22
**conduct** [14] - 44:19,
49:13, 56:12, 63:23,
101:16, 101:17,
102:3, 102:14,
102:17, 131:13,
131:15, 131:17,
131:21, 154:1
**conducted** [6] - 6:25,
13:18, 102:9, 149:3,
149:7, 152:19
**conducting** [1] - 13:16
**conducts** [1] - 49:4
**conference** [1] - 24:16
**CONFERENCE** [1] -
170:6
**confessions** [1] -
168:22
**confidence** [4] -
29:19, 29:22, 29:24,
149:22
**confidential** [9] - 14:2,
14:3, 14:8, 14:11,
19:17, 19:19, 84:11,
86:11, 86:25
**confirm** [4] - 23:18,
99:14, 106:18,
106:19
**confirmed** [1] - 52:25
**confirming** [1] - 123:1
**congress** [1] - 111:14
**Congress** [1] - 69:17
**Congressional** [1] -
89:15
**consent** [2] - 60:7,
60:11
**consider** [7] - 74:1,
75:25, 76:7, 76:9,
112:15, 115:8,
159:15
**considerable** [1] -
41:12
**considers** [1] - 77:1
**consistent** [6] - 33:14,

61:24, 68:8, 68:25, 69:18, 166:8
**constantly** [1] - 13:13
**constitute** [1] - 64:5
**constituted** [2] - 62:14, 63:4
**Constitution** [1] - 68:21
**constitutional** [1] - 67:16
**consult** [2] - 45:15, 156:21
**consulting** [1] - 45:18
**contact** [4] - 50:17, 134:25, 142:15, 144:14
**contained** [4] - 46:17, 46:20, 100:5, 100:19
**containing** [1] - 125:7
**contains** [2] - 52:5, 158:14
**contemplated** [2] - 85:14, 120:2
**contemplating** [1] - 119:1
**content** [1] - 62:23
**contention** [1] - 118:18
**contents** [1] - 34:2
**context** [7] - 72:18, 91:6, 108:10, 125:11, 136:6, 138:11, 138:23
**continue** [1] - 69:2
**contradicts** [1] - 134:3
**contrary** [2] - 55:22, 151:2
**contrast** [2] - 167:3, 167:15
**control** [1] - 130:7
**conventional** [1] - 74:19
**conversations** [1] - 74:7
**cooperate** [1] - 85:15
**cooperative** [3] - 52:21, 54:19, 54:21
**copy** [3] - 93:23, 171:11, 171:13
**core** [7] - 38:25, 39:8, 39:16, 39:18, 39:19, 40:1, 40:11
**corner** [1] - 16:2
**corporate** [1] - 11:1
**corporation** [4] - 9:18, 10:3, 10:11, 17:4
**correct** [92] - 7:5, 7:8, 10:13, 11:6, 12:2, 12:3, 12:5, 13:20, 16:9, 16:13, 16:20,

17:15, 21:19, 21:25, 22:9, 23:23, 30:13, 32:7, 32:20, 32:24, 33:19, 46:8, 46:10, 47:15, 49:9, 50:3, 52:8, 55:17, 56:19, 63:9, 63:21, 64:10, 64:11, 64:18, 67:3, 67:24, 68:3, 77:10, 78:9, 78:13, 78:14, 78:24, 80:16, 81:6, 81:13, 90:16, 92:2, 94:17, 95:1, 95:11, 95:14, 96:15, 98:14, 101:12, 102:3, 118:7, 120:5, 120:12, 121:13, 122:16, 123:8, 123:12, 126:13, 126:16, 127:18, 133:19, 135:23, 138:8, 139:8, 140:8, 140:9, 140:24, 143:22, 144:12, 144:15, 146:2, 146:23, 147:3, 147:4, 147:9, 147:12, 147:22, 150:20, 151:6, 155:8, 161:11, 161:21, 162:18, 163:10, 163:15, 165:4, 167:2
**corrected** [1] - 78:16
**correction** [2] - 171:14, 171:16
**corrections** [3] - 171:12, 171:14, 173:5
**CORRECTIONS** [1] - 172:2
**correctly** [6] - 28:22, 39:20, 99:20, 99:21, 128:9, 143:6
**correspondence** [1] - 99:5
**corresponding** [1] - 52:7
**cost** [1] - 48:5
**counsel** [13] - 8:24, 9:2, 9:6, 9:12, 10:18, 10:24, 16:20, 31:13, 31:18, 31:21, 31:24, 72:6, 168:5
**counties** [2] - 35:21, 89:11
**country** [5] - 13:14, 37:1, 37:3, 73:17, 105:22
**county** [10] - 35:15,

36:25, 38:5, 59:12, 60:1, 60:14, 69:23, 72:6, 73:22, 131:23
**County** [1] - 161:14
**couple** [4] - 36:12, 57:25, 59:8, 167:6
**course** [9] - 39:6, 40:16, 42:11, 53:1, 71:6, 96:7, 103:7, 103:13, 136:11
**COURT** [1] - 1:1
**Court** [15] - 31:16, 31:24, 33:17, 37:21, 38:7, 67:2, 67:5, 67:22, 68:8, 68:22, 96:2, 96:14, 115:11, 170:21
**court** [10] - 5:16, 25:16, 32:14, 43:24, 75:4, 75:5, 75:11, 76:16, 76:24, 136:12
**courts** [3] - 34:23, 72:16, 87:12
**covered** [1] - 141:20
**Coverup** [1] - 141:8
**COVID** [4] - 63:2, 64:9, 64:23, 65:9
**create** [2] - 117:4, 131:2
**credit** [7] - 42:8, 42:17, 45:4, 52:8, 125:16, 130:20, 130:21
**credits** [1] - 119:22
**crimes** [1] - 68:16
**criminal** [2] - 62:25, 63:23
**criteria** [2] - 77:23, 77:25
**critical** [1] - 107:7
**cross** [2] - 5:16, 159:14
**Crosscheck** [19] - 161:16, 162:1, 162:2, 162:8, 162:14, 162:22, 163:11, 163:13, 163:16, 163:18, 163:25, 164:2, 164:5, 165:2, 165:6, 165:8, 167:2, 167:5, 167:12
**crunching** [1] - 136:17
**culling** [2] - 90:1, 90:4
**Cumulative** [1] - 112:12
**Curiae** [1] - 66:24
**curiae** [5] - 33:1, 37:19, 61:11, 97:6, 97:24

**current** [7] - 12:14, 28:16, 33:10, 79:11, 121:19, 165:22, 166:6
**curve** [1] - 106:12
**custodial** [1] - 83:16
**customary** [1] - 10:19
**cycled** [1] - 57:13

# D

**data** [178] - 18:8, 28:11, 28:17, 34:6, 34:9, 34:11, 34:20, 35:2, 35:12, 36:2, 36:18, 36:23, 37:5, 37:8, 40:18, 41:13, 42:8, 43:5, 44:18, 45:2, 46:23, 47:7, 47:25, 49:5, 50:8, 50:11, 54:24, 55:2, 56:1, 57:12, 59:4, 59:5, 78:24, 79:2, 79:8, 79:21, 79:22, 79:23, 83:3, 83:7, 83:17, 83:19, 85:2, 85:24, 86:10, 86:11, 88:7, 88:14, 90:16, 91:11, 92:6, 92:20, 92:25, 98:21, 99:18, 100:4, 100:5, 100:13, 100:16, 101:5, 101:14, 102:2, 102:4, 102:8, 102:15, 103:3, 104:16, 104:21, 104:24, 105:6, 105:10, 106:3, 107:21, 108:11, 108:12, 108:13, 108:15, 109:8, 111:2, 114:25, 115:23, 116:3, 116:5, 118:10, 118:17, 118:19, 118:23, 118:25, 119:2, 119:3, 119:4, 119:8, 125:8, 125:10, 125:15, 125:21, 126:14, 127:16, 127:17, 128:6, 128:10, 128:15, 128:19, 128:22, 128:23, 128:24, 129:1, 129:14, 129:18, 129:19, 129:21, 130:3, 130:4, 130:6, 130:11, 130:25, 131:22, 132:10, 132:11, 132:23,

133:2, 133:6, 133:7, 133:8, 133:9, 134:11, 136:4, 136:16, 137:4, 137:5, 149:4, 149:8, 149:9, 149:23, 152:10, 152:20, 152:23, 155:11, 157:6, 157:8, 157:11, 157:17, 158:1, 158:2, 158:5, 158:16, 158:20, 158:21, 158:22, 158:25, 159:4, 159:6, 159:9, 159:10, 159:12, 159:16, 159:22, 159:23, 159:24, 160:1, 160:6, 160:11, 160:12, 160:14, 162:6, 163:12, 164:6, 167:1, 167:6, 167:10, 167:14
**database** [15] - 41:25, 44:10, 46:24, 114:2, 117:18, 127:18, 137:6, 158:9, 158:13, 158:14, 158:18, 160:4, 160:14, 167:14
**databases** [16] - 41:14, 41:17, 41:22, 42:16, 43:1, 43:17, 125:7, 125:19, 126:5, 126:15, 130:22, 132:5, 136:24, 136:25, 160:16
**date** [19] - 77:17, 77:18, 91:13, 91:15, 103:25, 105:23, 106:4, 106:6, 107:10, 108:6, 108:9, 108:22, 109:17, 113:10, 114:2, 114:15, 114:18, 117:7, 161:2
**DATE** [3] - 173:9, 173:18, 173:21
**dates** [5] - 52:7, 88:12, 91:14, 106:14, 128:10
**days** [2] - 60:17, 171:17
**dead** [6] - 40:15, 48:10, 50:13, 50:14, 50:18, 50:24
**deal** [1] - 94:13
**dealing** [5] - 44:25,

104:25, 108:20, 110:4, 110:9
**Death** [6] - 46:7, 46:18, 47:8, 47:14, 112:12, 125:5
**death** [3] - 46:22, 52:7, 81:25
**debate** [3] - 39:21, 39:22, 148:7
**deceased** [1] - 132:19
**decennial** [2] - 32:6, 33:18
**decide** [1] - 77:21
**deciding** [2] - 107:7, 137:20
**decision** [2] - 60:11, 77:24
**decisions** [1] - 152:25
**declaration** [1] - 142:18
**Declaratory** [1] - 27:16
**declared** [9] - 144:1, 144:2, 144:7, 146:9, 146:16, 150:2, 150:4, 150:6, 153:1
**decree** [2] - 60:7, 60:11
**dedicated** [2] - 38:16, 58:4
**deed** [1] - 173:15
**deep** [1] - 58:21
**Defendant** [3] - 1:13, 2:6, 69:5
**defendant** [4] - 79:16, 81:3, 97:24, 145:19
**Defendant's** [1] - 107:24
**defendant-appellants'** [1] - 97:24
**Defendants** [1] - 66:25
**Defendants-Appellant's** [1] - 66:25
**defense** [1] - 63:25
**defined** [1] - 38:12
**definition** [1] - 5:3
**definitions** [1] - 128:5
**degree** [4] - 33:21, 107:15, 138:4, 138:10
**degrees** [1] - 11:2
**delay** [1] - 91:23
**deliberately** [2] - 56:18, 151:10
**Democratic** [1] - 61:15
**denominator** [1] - 35:9

**Department** [10] - 31:15, 32:5, 64:3, 96:1, 138:14, 138:23, 138:25, 142:19, 146:8, 146:14
**depo** [1] - 55:8
**DEPONENT** [9] - 1:16, 3:2, 24:11, 36:7, 70:5, 75:25, 76:25, 167:23, 173:1
**deponent** [6] - 4:4, 24:11, 128:12, 135:13, 169:14, 173:13
**deponent/designee** [1] - 22:16
**depose** [1] - 105:12
**deposed** [2] - 4:7, 4:15
**DEPOSITION** [5] - 1:17, 4:1, 172:1, 173:20, 173:21
**Deposition** [1] - 169:13
**deposition** [33] - 4:14, 4:16, 4:17, 4:22, 5:4, 6:25, 7:20, 9:14, 9:17, 10:7, 14:9, 16:13, 17:5, 22:4, 22:10, 31:12, 33:15, 60:25, 69:3, 75:17, 77:6, 92:17, 94:4, 94:15, 101:23, 106:11, 114:8, 150:17, 151:1, 166:4, 171:11, 171:13, 171:15
**depositions** [2] - 4:19, 5:8
**derive** [1] - 111:10
**Desantis** [2] - 67:4, 97:22
**describe** [2] - 46:2, 47:4
**described** [9] - 17:21, 38:9, 89:21, 90:23, 99:18, 100:16, 111:17, 134:24, 164:21
**describes** [2] - 38:12, 47:5
**description** [4] - 19:18, 19:21, 32:9, 127:20
**deserves** [1] - 155:18
**designated** [3] - 6:22, 7:3, 16:20
**designation** [2] - 10:2, 19:3

**designations** [2] - 93:18, 118:5
**designed** [2] - 77:3, 113:22
**designee** [5] - 7:6, 9:17, 10:3, 11:2, 17:4
**details** [1] - 74:6
**detect** [1] - 105:15
**detecting** [1] - 123:17
**determination** [3] - 76:5, 111:8, 153:17
**determine** [14] - 28:15, 42:12, 44:24, 57:15, 106:21, 108:25, 109:4, 109:22, 113:5, 138:1, 139:16, 140:22, 155:15, 157:12
**determines** [2] - 154:12, 157:24
**determining** [6] - 35:14, 43:5, 110:3, 114:16, 116:6, 139:21
**deviations** [1] - 101:22
**died** [6] - 112:10, 112:18, 113:4, 113:7, 140:1, 163:4
**dies** [1] - 48:8
**difference** [5] - 73:4, 100:8, 128:17, 162:20, 167:12
**different** [35] - 6:2, 15:20, 17:20, 21:12, 21:14, 43:4, 43:15, 52:2, 64:14, 69:6, 70:7, 79:9, 79:23, 82:18, 86:9, 101:14, 101:25, 102:10, 102:12, 102:21, 108:23, 114:13, 116:21, 122:3, 123:5, 126:7, 128:4, 132:12, 132:13, 135:15, 152:23, 162:11, 162:12, 166:3, 167:1
**differently** [3] - 39:15, 135:16, 169:9
**difficult** [4] - 30:13, 30:22, 54:24, 87:16
**digging** [1] - 136:7
**digits** [1] - 125:25
**diluted** [1] - 72:4
**dilutes** [1] - 72:1
**diluting** [1] - 72:11
**dilution** [4] - 71:20,

71:24, 72:14, 72:18
**direct** [5] - 10:23, 115:10, 134:2, 163:6, 163:10
**directed** [1] - 135:13
**directly** [2] - 10:22, 145:15
**director** [1] - 17:15
**directors** [3] - 20:22, 21:2, 22:20
**disability** [1] - 63:5
**disabled** [1] - 7:12
**disagree** [3] - 25:12, 66:4, 74:22
**disagreeable** [1] - 69:4
**disagreeing** [2] - 66:13, 66:14
**disclose** [13] - 40:4, 40:17, 58:18, 58:20, 58:24, 59:3, 59:5, 69:8, 85:19, 123:22, 136:3, 152:3, 152:4
**disclosed** [3] - 107:13, 124:12, 155:13
**disclosing** [2] - 85:18, 123:21
**disclosure** [8] - 14:9, 28:8, 30:18, 78:23, 79:1, 79:7, 79:20, 84:19
**discover** [1] - 112:9
**Discovery** [1] - 141:7
**discovery** [1] - 73:19
**discrepancy** [2] - 93:4, 93:6
**discrete** [1] - 117:18
**discuss** [2] - 84:1, 84:3
**discussed** [5] - 14:5, 82:19, 96:14, 96:24, 101:4
**discussing** [1] - 82:23
**DISCUSSION** [1] - 7:13
**discussion** [1] - 23:3
**discussions** [2] - 122:17, 134:23
**disinterested** [1] - 170:12
**dispute** [6] - 95:9, 121:11, 121:19, 121:20, 145:23, 154:5
**disputing** [1] - 146:4
**disregard** [2] - 60:2, 60:15
**disseminate** [3] - 28:18, 119:9, 119:13

**disseminating** [1] - 129:21
**dissemination** [1] - 119:8
**distinction** [3] - 39:18, 73:3, 93:10
**distribution** [1] - 118:19
**district** [7] - 72:7, 72:8, 72:12, 111:10, 111:13, 111:16, 111:19
**DISTRICT** [2] - 1:1, 1:1
**District** [7] - 31:16, 31:17, 89:15, 96:2, 97:10, 145:4
**districts** [3] - 72:6, 93:16, 111:5
**Division** [1] - 97:11
**Docket** [1] - 145:3
**dockets** [1] - 84:2
**doctorates** [1] - 137:17
**document** [78] - 7:16, 8:18, 16:1, 16:3, 16:4, 16:18, 16:21, 17:19, 21:8, 21:9, 21:10, 21:12, 21:14, 21:20, 21:24, 22:20, 22:23, 22:24, 23:12, 23:13, 23:17, 23:18, 23:20, 24:1, 25:8, 25:10, 27:6, 27:14, 27:15, 31:5, 31:6, 31:11, 37:12, 37:13, 47:11, 47:16, 57:20, 57:21, 57:23, 58:10, 61:2, 61:8, 62:1, 65:7, 65:14, 66:21, 77:13, 91:11, 91:23, 91:24, 92:7, 92:16, 92:18, 93:2, 93:4, 93:7, 93:9, 93:19, 94:16, 95:8, 95:11, 97:11, 98:1, 101:20, 101:21, 101:23, 120:18, 124:16, 124:20, 141:4, 146:13, 147:6, 149:2, 149:12, 161:13, 164:21
**documents** [8] - 8:22, 9:3, 9:5, 69:9, 85:4, 89:22, 94:4, 98:17
**done** [25] - 4:16, 4:18, 5:9, 6:13, 13:8, 29:18, 31:3, 48:24, 51:20, 54:15, 55:12, 56:2, 56:6, 57:16, 102:15, 116:15,

119:23, 126:8,
127:24, 129:15,
135:22, 156:16,
157:22, 162:5, 162:6
**dot** [2] - 92:4, 101:2
**double** [6] - 119:22,
121:5, 121:15,
132:16, 134:9,
134:13
**down** [23] - 5:17, 7:22,
21:11, 27:22, 31:21,
34:14, 35:19, 38:11,
47:2, 48:11, 54:8,
57:24, 61:25, 62:7,
92:20, 94:18, 96:6,
97:13, 99:11,
100:21, 134:14,
141:4, 165:3
**download** [1] - 26:5
**downloaded** [4] -
16:6, 21:16, 92:3,
101:2
**drag** [1] - 160:5
**drag-and-drop** [1] -
160:5
**draw** [3] - 22:21,
129:1, 165:6
**drawing** [1] - 39:18
**dreamed** [1] - 153:23
**drill** [1] - 100:21
**drop** [2] - 160:5, 160:6
**duly** [1] - 4:6
**duplicate** [9] - 40:25,
99:16, 108:8,
116:24, 116:25,
117:21, 118:1,
119:21, 121:17
**duplicates** [4] - 108:3,
118:3, 123:17,
157:13
**duplications** [2] -
40:16, 121:9
**during** [2] - 9:22,
113:4
**duties** [5] - 10:9,
10:17, 18:18, 19:7,
19:13
**dying** [1] - 46:22

## E

**e-mail** [4] - 94:22,
98:24, 129:15
**early** [1] - 54:11
**earmarked** [1] - 15:17
**ease** [1] - 100:11
**easier** [4] - 70:20,
88:5, 88:21, 88:24
**easily** [1] - 103:21
**East** [2] - 2:8, 171:8

**Eastern** [2] - 99:15,
145:4
**easy** [3] - 54:14,
128:2, 167:3
**ECF** [1] - 84:2
**educating** [1] - 33:11
**education** [4] - 28:6,
28:20, 33:5, 38:18
**effect** [1] - 35:7
**efficient** [1] - 150:18
**effort** [4] - 47:21,
151:10, 155:3
**efforts** [4] - 28:15,
71:1, 71:2, 71:10
**either** [4] - 55:13,
148:3, 151:4, 163:7
**elaborate** [2] - 165:20,
165:23
**election** [55] - 12:25,
13:2, 13:14, 13:15,
14:24, 28:14, 29:12,
29:15, 29:16, 29:21,
29:22, 29:23, 29:24,
30:3, 30:6, 30:16,
33:7, 33:11, 35:14,
39:1, 39:9, 39:17,
40:1, 40:12, 50:20,
56:24, 58:4, 58:6,
59:12, 59:13, 60:1,
60:14, 60:17, 63:20,
69:19, 71:16, 72:1,
72:22, 73:22, 74:8,
89:25, 103:22,
104:2, 113:22,
123:15, 123:19,
131:23, 136:9,
142:13, 142:21,
150:1, 153:11,
154:22, 168:24
**Elections** [9] - 59:11,
59:18, 59:21, 59:25,
60:5, 60:13, 69:21,
146:9, 146:14
**elections** [15] - 13:9,
13:17, 28:6, 29:2,
33:4, 38:17, 58:7,
58:15, 59:10, 67:21,
71:22, 97:1, 115:5,
115:22, 153:12
**electoral** [6] - 93:16,
111:5, 111:10,
111:13, 111:16,
111:19
**Electronic** [1] - 166:17
**electronically** [1] -
130:4
**elementary** [2] -
35:18, 127:20
**eligible** [1] - 35:1
**embarrassment** [1] -

77:4
**employed** [4] - 15:20,
17:1, 17:3, 18:14
**employees** [3] - 95:1,
137:13, 137:15
**En** [1] - 67:1
**en** [1] - 97:25
**Enclosed** [1] - 171:11
**enclosed** [2] - 171:12,
171:14
**encompass** [1] -
63:18
**encourage** [1] - 69:19
**end** [4] - 61:4, 88:21,
89:10, 124:19
**endeavor** [1] - 161:6
**enforce** [1] - 81:13
**enforced** [1] - 143:3
**enforcement** [6] -
34:12, 34:15, 34:21,
71:21, 119:14, 120:7
**enfranchised** [1] -
69:14
**enfranchisement** [2] -
67:10, 68:10
**engaged** [3] - 59:21,
74:15, 107:24
**engaging** [1] - 73:8
**enjoy** [1] - 51:18
**enrollment** [1] -
110:11
**ensure** [2] - 33:6, 33:9
**ensuring** [2] - 70:23,
71:20
**entail** [1] - 18:18
**entertain** [2] - 75:16,
101:24
**entire** [4] - 6:7, 6:9,
9:23, 103:19
**entirely** [2] - 38:16,
163:11
**entitled** [3] - 22:21,
27:15, 55:3
**entries** [2] - 159:1,
159:2
**entry** [2] - 105:6,
105:10
**enumerator** [1] - 35:8
**era** [1] - 5:15
**ERIC** [9] - 161:16,
162:10, 162:12,
162:13, 163:23,
166:17, 166:23,
167:15, 167:18
**ERIC's** [1] - 163:2
**Errata** [1] - 173:6
**errors** [4] - 88:16,
89:1, 89:2, 173:3
**Esq** [6] - 2:2, 2:3, 2:7,
2:8, 171:7, 173:22

**essential** [6] - 8:9,
104:22, 107:9,
122:4, 122:10,
122:15
**essentially** [2] - 92:12,
142:4
**establish** [2] - 9:19,
11:10
**et** [1] - 31:15
**event** [2] - 102:14,
170:13
**eventually** [1] - 157:18
**evidence** [5] - 50:3,
51:12, 51:14, 110:9,
140:22
**exact** [10] - 103:23,
103:24, 104:4,
107:4, 108:9,
108:22, 112:10,
119:13, 153:19
**exactly** [5] - 26:13,
100:14, 102:6,
102:22, 129:15
**exaggerate** [1] - 39:15
**exaggerating** [1] -
39:10
**EXAMINATION** [2] -
4:9, 168:3
**example** [23] - 35:15,
36:25, 44:22, 44:23,
49:8, 49:11, 58:16,
59:10, 70:21, 72:5,
72:6, 93:15, 103:16,
109:13, 113:20,
113:23, 116:7,
117:4, 119:10,
120:13, 122:1,
150:20, 158:25
**examples** [10] - 55:22,
58:14, 59:1, 59:6,
60:21, 112:5,
112:14, 113:14,
114:6, 123:15
**Excel** [1] - 128:3
**except** [4] - 55:18,
83:4, 117:8, 166:14
**exception** [2] - 86:17,
87:9, 137:9
**exceptions** [2] -
157:20, 157:21
**Excuse** [1] - 66:5
**excuse** [1] - 37:2
**execute** [1] - 69:23
**exercise** [2] - 68:19,
68:20
**exercised** [1] - 67:14
**Exhibit** [37] - 3:10,
3:11, 3:12, 94:19,
94:20, 95:4, 95:5,
95:13, 95:15, 95:18,

95:21, 95:23, 96:9,
96:10, 96:16, 96:18,
97:3, 97:4, 97:18,
97:19, 98:5, 98:20,
99:2, 99:4, 99:7,
100:23, 100:24,
101:9, 101:10,
120:15, 120:16,
141:24, 142:1,
142:16, 144:25,
145:1, 145:25
**exhibit** [22] - 5:24, 6:4,
6:7, 6:9, 6:12, 93:24,
93:25, 94:2, 98:11,
99:3, 99:7, 99:12,
101:8, 145:24,
146:1, 146:4, 146:5,
146:7, 146:23,
147:3, 147:11,
154:15
**exhibited** [1] - 165:10
**exhibits** [10] - 5:22,
5:23, 94:5, 94:8,
94:22, 143:21,
144:3, 144:8,
144:21, 166:15
**Exhibits** [2] - 142:11,
142:22
**exist** [3] - 151:2,
165:2, 165:8
**existing** [1] - 40:21
**exists** [2] - 58:5,
166:18
**expense** [1] - 41:12
**Experian** [9] - 42:17,
43:1, 43:4, 43:7,
43:16, 43:21, 44:1,
44:5, 44:6
**experience** [4] -
107:23, 137:18,
137:24, 165:21
**expertise** [1] - 140:3
**expires** [1] - 170:23
**explain** [9] - 34:19,
39:24, 40:9, 47:24,
68:24, 121:25,
132:9, 165:13,
165:16
**explaining** [1] - 73:25
**explanation** [1] -
165:12
**explanations** [1] -
165:8
**extent** [6] - 25:7,
56:17, 85:4, 132:1,
164:22, 166:15

## F

**fabricated** [1] - 65:25

**facilitating** [1] - 88:6
**fact** [18] - 31:18, 41:4, 46:13, 50:14, 52:18, 64:21, 74:22, 86:5, 106:5, 109:24, 110:1, 112:21, 119:25, 136:5, 140:1, 142:23, 153:10, 155:3
**fact-specific** [1] - 136:5
**factor** [1] - 35:4
**facts** [5] - 9:20, 62:1, 69:6, 150:14, 151:2
**factual** [6] - 61:20, 64:19, 74:25, 87:19, 112:5, 119:6
**factually** [2] - 32:22, 119:24
**failed** [1] - 142:19
**failing** [1] - 89:17
**failure** [6] - 59:5, 81:23, 112:16, 114:4, 135:5, 150:22
**failures** [1] - 89:17
**fair** [7] - 16:16, 29:3, 29:8, 30:8, 30:10, 52:13, 130:12
**faith** [1] - 29:15
**fall** [1] - 91:20
**false** [32] - 53:3, 53:10, 53:15, 53:16, 53:18, 54:4, 54:10, 54:12, 56:3, 56:7, 56:9, 56:15, 57:6, 57:9, 105:2, 117:5, 117:9, 117:13, 119:20, 139:17, 139:19, 139:21, 139:22, 149:6, 149:8, 150:3, 150:7, 150:16, 150:19, 150:25, 153:9
**familiar** [7] - 79:24, 80:5, 133:11, 134:4, 138:19, 141:5, 161:16
**familiarity** [1] - 64:4
**far** [4] - 33:15, 94:8, 123:14, 154:19
**faster** [1] - 96:22
**father** [2] - 107:6, 107:8
**fear** [4] - 63:2, 64:9, 64:23, 65:9
**February** [7] - 1:18, 4:2, 99:15, 170:5, 170:17, 171:4, 173:21
**Federal** [1] - 7:1

**federal** [15] - 28:9, 34:12, 34:15, 34:21, 41:13, 50:15, 58:23, 64:6, 71:22, 86:22, 91:18, 115:22, 119:5, 134:19, 144:4
**federalist** [1] - 67:20
**federally** [1] - 47:7
**federally-maintained** [1] - 47:7
**fee** [1] - 122:20
**feedback** [1] - 54:20
**Feldman** [1] - 122:2
**felonies** [2] - 142:24, 143:2
**felons** [10] - 67:11, 67:25, 68:12, 69:10, 69:22, 143:1, 149:18, 155:21, 156:2, 156:8
**felony** [1] - 154:11
**fever** [2] - 66:3, 66:10
**few** [1] - 157:4
**fewer** [1] - 56:20
**fictional** [1] - 123:12
**field** [6] - 102:21, 102:23, 103:1, 160:24, 160:25, 161:3
**fields** [5] - 92:21, 99:18, 100:16, 102:16, 102:20
**fight** [2] - 58:6, 96:25
**figure** [1] - 111:9
**figured** [1] - 113:3
**file** [32] - 37:19, 48:25, 49:14, 52:7, 73:18, 90:23, 96:13, 97:23, 99:18, 100:4, 100:9, 100:12, 100:15, 115:7, 115:9, 116:14, 117:6, 117:10, 117:24, 118:2, 126:7, 131:14, 133:19, 134:2, 135:4, 135:20, 136:3, 136:24, 138:1, 138:2, 144:6, 160:6
**File** [1] - 66:24
**filed** [5] - 27:18, 31:23, 67:18, 89:23, 145:12
**files** [7] - 116:24, 118:3, 126:4, 129:23, 129:25, 133:23, 134:19
**filing** [1] - 32:1
**findings** [1] - 52:15
**fine** [6] - 23:2, 66:19, 74:5, 114:21, 156:24

**fines** [1] - 68:15
**finish** [1] - 136:2
**firm** [4] - 58:4, 129:10, 131:25, 132:4
**first** [17] - 16:5, 16:8, 31:1, 31:19, 51:10, 53:20, 53:24, 54:6, 62:7, 62:8, 62:19, 92:7, 102:19, 107:7, 127:23, 142:9, 142:25
**five** [2] - 80:17, 134:14
**fix** [5] - 31:3, 40:17, 50:1, 56:10, 57:19
**fixed** [1] - 50:19
**fixing** [4] - 49:17, 49:18, 50:23, 56:2
**flag** [2] - 41:14, 116:13
**flagged** [3] - 108:3, 108:7, 108:10
**Florida** [15] - 67:17, 67:19, 67:25, 68:12, 69:10, 69:12, 69:22, 119:12, 121:10, 121:21, 123:2, 123:7, 161:14, 166:11, 166:14
**Florida's** [2] - 68:19, 68:20
**fly** [1] - 49:20
**focus** [1] - 166:10
**focused** [1] - 134:10
**folks** [1] - 67:11
**follow** [10] - 49:5, 49:22, 52:17, 53:4, 54:2, 69:8, 69:11, 69:13, 69:24, 85:1
**follow-up** [2] - 52:17, 85:1
**followed** [1] - 33:8
**FOLLOWING** [1] - 172:2
**following** [5] - 30:17, 33:23, 69:12, 69:16, 173:5
**follows** [1] - 4:8
**followup** [1] - 168:17
**foregoing** [2] - 170:8, 173:3
**forgotten** [1] - 44:8
**form** [15] - 15:11, 26:14, 33:21, 36:9, 78:10, 81:9, 91:18, 126:10, 126:17, 135:7, 136:20, 142:19, 149:13, 149:14, 158:10
**forms** [2] - 143:22, 144:4
**forth** [2] - 68:25,

125:17
**Foundation** [31] - 4:23, 5:1, 6:24, 7:5, 7:21, 28:2, 28:5, 28:7, 28:13, 28:17, 31:14, 33:6, 33:9, 38:13, 38:14, 41:12, 41:18, 47:5, 47:6, 58:2, 58:5, 61:12, 61:13, 94:16, 97:7, 97:8, 112:15, 145:6, 168:9, 171:8
**FOUNDATION** [2] - 1:8, 2:7
**Foundation's** [10] - 33:3, 33:13, 37:18, 39:1, 39:9, 39:17, 40:1, 40:11, 66:23, 97:23
**four** [8] - 55:8, 84:13, 113:19, 113:20, 125:25, 149:21, 166:3
**four-hour** [2] - 55:8
**fourth** [2] - 20:5, 34:16
**fourthly** [1] - 84:9
**frankly** [1] - 37:5
**fraud** [8] - 29:5, 30:2, 30:5, 30:9, 30:10, 30:13, 30:20, 30:23
**free** [4] - 48:7, 81:24
**frequency** [1] - 46:4
**frequently** [4] - 48:5, 54:16, 105:9, 117:1
**front** [2] - 65:18, 143:12
**full** [1] - 161:1
**fully** [1] - 62:9
**function** [1] - 6:8
**functions** [1] - 17:16
**funding** [2] - 15:13, 15:16
**funny** [1] - 141:23
**future** [1] - 118:8

## G

**gain** [1] - 68:17
**game** [4] - 40:7, 124:3, 148:10, 152:15
**Garden** [1] - 169:5
**Gardiner** [1] - 2:3
**General** [2] - 62:13, 63:8
**general** [10] - 4:12, 9:12, 10:18, 10:24, 20:4, 52:10, 62:21, 63:19, 135:17, 163:19
**GENERAL** [1] - 2:2

**General's** [1] - 62:5
**generalized** [1] - 26:21
**generally** [10] - 13:12, 20:3, 81:21, 81:22, 91:17, 91:21, 93:14, 155:23, 158:3, 158:6
**generated** [1] - 151:14
**Gingles** [1] - 138:16
**given** [20] - 1:19, 5:9, 5:14, 15:6, 34:25, 35:1, 35:14, 43:20, 50:10, 55:14, 60:21, 68:13, 86:10, 86:23, 117:14, 131:25, 132:3, 132:9, 157:22, 166:9
**glad** [1] - 164:24
**global** [3] - 158:8, 158:13, 158:18
**Google** [1] - 44:23
**Gotcha** [1] - 169:5
**gov** [2] - 92:4, 101:2
**government** [33] - 28:10, 88:6, 121:24, 122:9, 122:11, 123:15, 143:24, 144:6, 144:10, 144:11, 146:13, 147:6, 149:19, 149:23, 150:1, 150:8, 150:13, 152:9, 152:10, 152:9, 152:10, 152:11, 152:24, 153:1, 153:3, 153:4, 153:24, 154:12, 154:17, 154:25, 155:6, 155:9, 155:11, 168:18, 169:2
**government's** [3] - 152:8, 168:13, 168:21
**governmental** [1] - 111:8
**governs** [1] - 101:21
**grade** [1] - 46:4
**gray** [1] - 147:18
**Greg** [1] - 61:16
**ground** [1] - 5:8
**grounds** [2] - 140:17, 145:10
**guess** [14] - 15:1, 36:20, 50:5, 52:1, 52:23, 55:25, 98:24, 110:15, 110:18, 125:14, 143:14, 160:11, 162:15, 146:12
**guessed** [1] - 110:25

**guidance** [5] - 62:6, 62:23, 63:19, 63:22, 72:22
**guys** [9] - 85:11, 85:16, 105:10, 105:20, 118:14, 119:4, 122:5, 124:13, 151:23

## H

**half** [1] - 98:22
**halfway** [1] - 92:20
**hand** [1] - 170:16
**hands** [2] - 128:13, 128:14
**hang** [1] - 21:3
**haphazardly** [1] - 93:6
**happy** [8] - 25:6, 50:20, 66:21, 85:19, 93:11, 101:23, 105:7, 134:3
**harassing** [5] - 76:8, 76:15, 77:2, 119:20, 120:1
**harassment** [1] - 119:24
**hard** [1] - 133:3
**harder** [1] - 41:5
**HAVA** [2] - 114:14, 114:15
**head** [3] - 4:25, 31:9, 153:12
**hear** [5] - 22:25, 50:21, 57:8, 114:9, 156:13
**held** [3] - 34:23, 68:23, 93:5
**help** [10] - 27:7, 32:11, 42:19, 51:19, 73:1, 105:8, 108:25, 109:4, 116:25, 128:7
**helpful** [1] - 36:19
**hereby** [2] - 170:4, 173:13
**hereunto** [1] - 170:16
**hide** [3] - 29:23, 30:4, 41:7
**hiding** [14] - 29:17, 30:7, 40:21, 41:1, 41:5, 42:11, 88:11, 105:25, 106:13, 124:9, 136:4, 136:8, 151:23, 158:24
**high** [5] - 36:25, 37:2, 37:3, 56:16, 107:15
**higher** [1] - 125:5
**higher-quality** [1] - 125:5
**highlight** [1] - 114:3

**hired** [2] - 20:20, 20:21
**his/her** [2] - 173:14, 173:15
**historic** [1] - 54:16
**history** [12] - 57:15, 57:17, 86:15, 114:24, 115:3, 115:7, 115:9, 115:17, 115:18, 115:23, 116:5, 134:19
**hoc** [1] - 159:8
**hold** [1] - 125:9
**holistic** [1] - 104:9
**home** [1] - 111:12
**hope** [2] - 42:20, 98:19
**hopefully** [1] - 161:12
**host** [1] - 7:11
**hostile** [1] - 165:6
**hostility** [1] - 165:9
**hour** [4] - 55:8, 130:19, 132:6
**House** [1] - 2:3
**house** [2] - 111:14, 126:8
**human** [2] - 160:15, 161:4
**humor** [2] - 114:10, 141:17
**Husted** [1] - 115:13
**hyperbole** [1] - 60:23
**hypothetical** [1] - 139:13
**hypothetically** [2] - 14:6, 50:18
**hypotheticals** [2] - 86:8, 112:3

## I

**ID** [1] - 108:24
**idea** [8] - 36:1, 41:4, 118:12, 135:3, 135:11, 135:12, 156:18
**identical** [1] - 69:15
**identification** [13] - 94:20, 95:5, 95:15, 95:21, 96:10, 96:18, 97:4, 97:19, 98:5, 100:24, 120:16, 142:1, 145:1
**identify** [1] - 103:11
**identities** [1] - 106:19
**identity** [1] - 106:18
**idle** [1] - 135:13
**Il** [9] - 140:13, 141:7, 143:12, 143:17,

146:2, 146:19, 147:21, 152:14, 155:20
**illegally** [2] - 72:13, 154:10
**Illinois** [6] - 59:2, 78:18, 80:19, 81:5, 83:5
**illustrate** [1] - 122:4
**imagine** [3] - 118:9, 119:1, 137:10
**immediately** [1] - 31:25
**implausible** [2] - 35:16, 37:7
**implement** [1] - 82:5
**implementation** [1] - 72:24
**implicate** [1] - 129:22
**importance** [1] - 115:17
**important** [11] - 29:16, 29:18, 39:13, 62:17, 105:4, 114:25, 115:10, 115:24, 123:18, 124:6, 164:18
**impose** [1] - 67:10
**imposed** [1] - 67:17
**improper** [2] - 77:5, 88:12
**improperly** [1] - 88:15
**improve** [1] - 166:16
**improved** [4] - 125:12, 125:13, 165:21, 166:7
**IN** [2] - 2:9, 170:16, 171:9
**in-house** [1] - 126:8
**inaccurate** [2] - 119:25, 164:23
**inactive** [5] - 111:24, 112:9, 112:19, 112:21, 113:7
**inadequate** [1] - 50:3
**inadvertent** [1] - 101:22
**inadvertently** [1] - 84:10
**inapplicable** [1] - 118:20
**Inc** [1] - 28:2
**INC** [2] - 1:8, 2:7
**incidentally** [1] - 64:1
**INCLUDE** [1] - 172:2
**include** [12] - 17:6, 41:20, 77:19, 91:12, 91:13, 91:17, 91:18, 91:19, 120:11, 122:15, 134:6,

145:11
**included** [4] - 93:16, 93:18, 144:6, 146:6
**includes** [1] - 29:17
**including** [6] - 25:15, 30:17, 63:22, 68:16, 69:5, 69:7
**incomplete** [1] - 41:15
**inconceivable** [3] - 100:1, 100:3, 103:8
**incorporated** [3] - 12:4, 28:4, 60:11
**incorrect** [2] - 161:22, 162:19
**increase** [1] - 74:16
**increases** [1] - 108:19
**increasing** [1] - 70:15
**incredibly** [1] - 115:9
**indeed** [5] - 67:20, 109:14, 109:23, 118:3, 168:24
**Index** [6] - 46:7, 46:18, 47:8, 47:14, 112:12, 125:5
**index** [1] - 46:10
**Indiana** [6] - 12:4, 12:6, 12:9, 12:11, 28:4, 129:10
**Indiana-based** [1] - 129:10
**Indianapolis** [3] - 2:9, 28:4, 171:9
**indicated** [2] - 25:25, 118:4
**indicating** [2] - 93:18, 118:6
**indication** [3] - 51:5, 119:3, 145:11
**indirect** [1] - 163:10
**indirectly** [1] - 145:15
**individual** [16] - 72:2, 72:11, 82:8, 90:13, 92:24, 108:18, 109:13, 112:21, 113:2, 114:1, 121:12, 122:16, 123:11, 146:15, 150:24, 169:3
**individuals** [18] - 16:19, 46:21, 56:22, 69:12, 69:24, 77:25, 81:25, 89:12, 105:17, 113:15, 123:6, 142:22, 143:25, 144:9, 144:12, 155:2, 162:23, 168:23
**infamous** [1] - 117:13
**inferences** [1] - 22:22
**inform** [1] - 124:8

**informal** [1] - 62:4
**information** [71] - 18:9, 25:25, 26:2, 29:17, 29:23, 30:17, 30:25, 34:22, 40:5, 42:19, 42:24, 45:3, 45:16, 45:19, 45:25, 46:17, 49:21, 51:18, 53:17, 55:5, 55:11, 55:15, 55:16, 55:17, 55:18, 55:21, 56:9, 56:13, 57:1, 58:19, 58:20, 73:21, 77:5, 80:7, 83:24, 84:7, 84:11, 85:11, 85:17, 85:18, 85:23, 86:16, 86:21, 86:23, 88:11, 89:3, 89:5, 90:18, 92:14, 94:12, 100:19, 101:20, 105:25, 106:14, 107:14, 108:2, 115:10, 122:1, 123:21, 124:9, 134:6, 134:22, 136:8, 136:12, 137:21, 142:15, 144:14, 150:19, 151:23, 155:14, 167:16
**Information** [5] - 80:1, 80:3, 80:8, 80:12, 166:18
**initial** [4] - 54:11, 87:13, 98:20, 157:10
**injunction** [6] - 59:24, 60:9, 60:12, 61:14, 97:9
**Injunctive** [1] - 27:16
**inquiries** [1] - 159:12
**inquiry** [3] - 56:10, 121:23, 138:6
**inside** [2] - 99:2, 125:19
**insights** [1] - 42:24
**insisted** [1] - 134:15
**inspect** [1] - 99:16
**instance** [4] - 52:3, 68:11, 114:3, 139:15
**instances** [2] - 56:5, 143:1
**instead** [2] - 112:8, 165:18
**Institute** [1] - 115:14
**instruct** [1] - 75:2
**instructing** [4] - 24:3, 24:9, 24:14, 25:4
**instructions** [5] - 59:12, 59:16, 59:19, 60:1, 60:14

**instructs** [1] - 23:1
**insufficient** [1] - 63:15
**integrity** [11] - 28:5,
  29:2, 33:3, 38:17,
  39:1, 39:9, 39:17,
  40:1, 40:12, 58:4,
  58:6
**intended** [1] - 74:15
**interact** [1] - 130:10
**Interest** [17] - 4:23,
  5:1, 6:23, 7:5, 7:21,
  28:2, 31:14, 37:18,
  58:2, 61:12, 66:23,
  94:15, 97:7, 97:22,
  112:15, 145:5, 171:8
**interest** [6] - 28:3,
  33:1, 38:15, 58:3,
  99:13, 154:9
**INTEREST** [2] - 1:8,
  2:7
**interested** [10] -
  41:11, 54:14, 71:23,
  73:16, 74:20, 111:3,
  118:5, 126:6, 160:2
**interferes** [1] - 88:9
**internal** [1] - 159:19
**interpretation** [4] -
  64:6, 65:19, 66:11,
  165:5
**intimate** [1] - 64:4
**intimidation** [1] -
  62:14
**Invasion** [10] - 140:13,
  141:7, 143:17,
  146:2, 146:19,
  147:21, 152:14,
  155:20, 168:5
**inventory** [1] - 75:17
**investigate** [1] - 53:14
**involve** [3] - 79:1,
  81:19, 91:15
**involved** [17] - 11:4,
  11:14, 32:1, 32:22,
  34:5, 62:11, 71:11,
  71:15, 76:11, 77:9,
  78:3, 78:5, 82:1,
  130:17, 137:8,
  137:11, 164:11
**involvement** [1] - 11:3
**involves** [3] - 18:8,
  36:15, 137:3
**involving** [3] - 84:18,
  86:19, 89:19
**irrelevant** [7] - 77:4,
  84:15, 86:7, 111:1,
  137:21, 159:12,
  166:14
**Island** [1] - 129:13
**issuance** [1] - 60:9
**issue** [5] - 30:9, 30:19,

39:13, 108:1, 120:10
**issued** [10] - 13:2,
  13:6, 22:16, 57:5,
  60:14, 120:23,
  149:22, 150:10,
  153:7, 154:2
**issues** [18] - 11:15,
  13:17, 18:11, 18:12,
  38:25, 39:25, 40:11,
  50:7, 52:1, 71:18,
  75:20, 83:16,
  122:14, 135:18,
  137:22, 138:21,
  163:5, 164:11
**issuing** [4] - 59:19,
  59:23, 60:1, 154:21
**italics** [1] - 58:1
**itself** [18] - 21:20,
  22:21, 23:17, 24:2,
  47:11, 47:16, 50:4,
  90:17, 92:16, 93:2,
  93:8, 100:19,
  141:22, 145:22,
  146:13, 157:11,
  163:19, 163:21

## J

**Jersey** [1] - 169:6
**Joanne** [7] - 1:17, 4:2,
  7:11, 94:21, 170:3,
  170:20, 173:23
**job** [13] - 18:2, 19:18,
  19:21, 29:11, 29:20,
  30:17, 31:2, 31:3,
  51:19, 53:4, 53:8,
  89:13, 113:6
**John** [22] - 107:1,
  107:2, 107:4, 107:8,
  107:17, 107:19,
  107:20, 108:21,
  109:14, 109:16,
  109:18, 109:23,
  112:4, 112:7, 112:8,
  112:10, 117:6,
  117:11, 134:16,
  134:17, 134:18
**JOHNSON** [35] -
  15:10, 21:4, 24:5,
  24:16, 24:19, 24:22,
  25:3, 36:6, 36:9,
  70:9, 75:23, 76:13,
  78:10, 79:15, 81:9,
  84:14, 87:23, 90:6,
  126:10, 126:17,
  131:8, 132:14,
  135:7, 136:20,
  140:11, 140:16,
  145:9, 148:25,
  156:18, 156:22,

156:24, 158:10,
  168:1, 168:4, 169:10
**Johnson** [3] - 2:7,
  16:12, 171:7
**join** [1] - 26:17
**Jon** [1] - 4:11
**Jonathan** [2] - 2:2,
  173:22
**Jonathan.Bolton@
  maine.gov** [1] - 2:5
**Jones** [2] - 67:4, 97:22
**judge** [1] - 59:23
**July** [1] - 170:23
**jurisdiction** [4] -
  34:25, 35:2, 35:12,
  38:6
**jurisdictions** [1] - 37:6
**Justice** [4] - 64:3,
  138:14, 138:23,
  138:25

## K

**Kaylan** [2] - 2:8, 16:11
**keep** [13] - 28:16,
  29:11, 42:22, 51:23,
  57:1, 60:23, 77:17,
  77:18, 82:12, 95:19,
  122:22, 136:7, 158:8
**keeping** [2] - 29:13,
  116:7
**keeps** [1] - 77:8
**key** [1] - 104:24
**kicking** [1] - 88:13
**kind** [7] - 18:5, 39:22,
  48:23, 53:24, 76:16,
  108:23, 122:8
**kinds** [4] - 18:7, 45:1,
  52:10, 160:18
**knock** [1] - 89:5
**knowledge** [5] - 9:20,
  54:21, 93:10, 139:4,
  139:11
**kPhillips@
  publicinterestlegal.
  org** [1] - 2:11
**Kristin** [1] - 98:25

## L

**label** [1] - 95:13
**labeled** [1] - 124:20
**labels** [1] - 148:17
**lack** [1] - 136:17
**Landmark** [2] - 61:12,
  97:8
**language** [2] - 64:16,
  100:19
**large** [3] - 51:18,
  129:25, 132:1

**largely** [1] - 166:14
**last** [9] - 21:9, 21:10,
  34:17, 62:20, 91:15,
  99:6, 99:7, 99:11,
  125:25
**late** [4] - 59:14, 59:19,
  60:3, 60:17
**late-arriving** [1] - 60:3
**Latin** [1] - 145:5
**law** [40] - 19:9, 19:10,
  34:12, 34:15, 34:21,
  38:8, 50:15, 58:4,
  58:23, 60:2, 60:15,
  63:5, 63:20, 63:25,
  64:6, 64:22, 67:6,
  67:23, 69:8, 69:11,
  69:12, 69:13, 69:16,
  69:18, 69:24, 69:25,
  71:22, 85:19, 86:1,
  86:3, 86:12, 86:17,
  86:22, 86:24, 87:9,
  119:5, 119:14,
  120:7, 139:10
**lawful** [1] - 28:15
**lawless** [1] - 59:9
**lawlessly** [9] - 58:19,
  58:23, 59:3, 59:11,
  59:13, 59:16, 59:18,
  60:1, 60:13
**lawlessness** [5] -
  58:7, 58:14, 59:6,
  59:22, 96:25
**laws** [5] - 28:9, 28:12,
  33:7, 115:20, 143:3
**lawsuit** [4] - 37:24,
  79:20, 145:16,
  145:22
**lawsuits** [3] - 81:7,
  145:11, 145:14
**lawyer** [5] - 75:1, 75:2,
  76:6, 110:21, 167:24
**lawyers** [1] - 86:18
**League** [1] - 145:4
**learn** [2] - 93:17,
  118:8
**least** [5] - 4:20, 14:10,
  52:5, 166:10
**Leave** [2] - 37:19,
  66:24
**leave** [3] - 96:13,
  97:23, 127:2
**leaving** [2] - 127:6,
  127:9
**lecture** [1] - 23:9
**left** [4] - 16:2, 144:5,
  151:8, 151:11
**Legacy** [3] - 42:1, 44:9
**legal** [11] - 13:17,
  20:11, 29:12, 29:14,
  30:21, 30:25, 47:20,

62:4, 62:6, 90:5,
  114:16
**LEGAL** [2] - 1:8, 2:7
**Legal** [19] - 4:23, 5:1,
  6:24, 7:5, 7:21, 28:2,
  31:14, 37:18, 58:2,
  61:12, 66:23, 94:16,
  97:7, 97:8, 97:22,
  112:15, 145:6, 171:8
**legislator** [1] - 62:7
**Legislature** [3] -
  67:18, 67:19, 68:12
**legislatures** [1] -
  69:17
**Less** [1] - 45:23
**less** [6] - 29:24, 45:21,
  48:18, 104:9,
  104:12, 107:10
**lessen** [2] - 112:23,
  112:25
**lessons** [1] - 165:21
**letter** [14] - 27:2,
  48:12, 48:23, 49:6,
  49:15, 49:19, 49:24,
  50:2, 50:4, 50:6,
  51:25, 62:4, 62:18,
  63:7
**letters** [3] - 54:3,
  108:1, 169:4
**levels** [1] - 36:25
**leveraged** [1] - 125:4
**liability** [1] - 112:23
**likelihood** [1] - 108:19
**limitations** [2] -
  118:22, 118:24
**limited** [2] - 51:21,
  114:7
**line** [5] - 25:12, 97:15,
  128:9, 128:11,
  134:14
**Line** [1] - 172:4
**lines** [1] - 128:11
**linguistic** [1] - 100:11
**lion's** [1] - 124:24
**list** [54] - 7:23, 7:24,
  22:2, 24:6, 40:21,
  42:14, 50:3, 51:5,
  54:8, 54:9, 54:15,
  56:23, 69:8, 77:9,
  77:14, 77:16, 77:19,
  77:22, 78:1, 78:3,
  88:3, 90:20, 90:21,
  91:5, 91:7, 91:10,
  91:14, 91:16, 91:21,
  93:5, 93:9, 99:25,
  100:9, 101:5,
  101:11, 103:19,
  112:13, 112:20,
  112:24, 114:4,
  115:18, 115:25,

116:9, 116:11, 122:14, 131:11, 134:5, 135:6, 144:1, 145:11, 146:10, 150:11, 151:17, 152:21
**listed** [13] - 8:2, 21:5, 21:18, 21:21, 25:5, 85:5, 92:21, 101:5, 101:14, 106:3, 144:9, 144:11, 149:1
**listing** [1] - 146:14
**lists** [7] - 21:18, 38:12, 91:12, 109:20, 112:17, 123:7, 123:10
**literally** [1] - 14:11
**litigated** [1] - 55:14
**litigation** [25] - 5:11, 9:23, 10:13, 10:14, 10:20, 10:22, 10:23, 14:4, 14:14, 14:22, 15:8, 15:14, 16:20, 19:2, 19:5, 19:12, 28:7, 33:5, 38:19, 66:11, 71:13, 77:3, 89:19, 89:22, 165:3
**live** [9] - 22:15, 35:22, 36:17, 36:21, 40:18, 40:24, 42:25, 64:16, 81:25
**lives** [3] - 42:10, 109:24, 139:25
**living** [4] - 125:7, 125:8, 125:9, 125:14
**load** [1] - 128:2
**local** [2] - 28:14, 100:11
**location** [2] - 42:10, 45:5
**lodge** [1] - 22:5
**Logan** [4] - 17:13, 17:14, 18:9, 98:24
**logistics** [1] - 126:6
**look** [55] - 6:1, 6:9, 7:9, 8:11, 8:20, 27:11, 31:19, 32:12, 35:19, 37:12, 41:10, 44:23, 45:3, 45:4, 45:6, 45:20, 45:25, 50:12, 54:1, 56:17, 61:1, 69:2, 84:1, 84:25, 85:4, 85:10, 85:17, 89:7, 91:1, 92:19, 94:14, 102:5, 104:9, 108:16, 120:14, 121:22, 122:1, 131:18, 132:16, 132:18, 132:21, 134:11,

141:5, 142:8, 151:16, 152:15, 157:11, 159:4, 159:9, 163:12, 167:20, 168:19, 168:22, 169:2
**looked** [5] - 8:7, 8:15, 94:8, 101:11, 167:6
**looking** [23] - 5:24, 13:10, 31:20, 34:23, 35:24, 36:24, 41:20, 42:3, 50:7, 50:23, 52:3, 71:16, 91:7, 105:11, 105:13, 111:9, 124:15, 128:18, 134:8, 149:11, 153:2, 161:4, 167:3
**looks** [7] - 18:8, 21:9, 67:1, 141:20, 160:1, 160:15, 167:15

---

# M

**machine** [1] - 170:10
**machines** [1] - 67:12
**mail** [16] - 37:25, 38:8, 39:3, 39:8, 39:13, 39:16, 39:25, 40:10, 40:20, 41:4, 41:8, 59:14, 94:22, 98:24, 129:15
**mailing** [10] - 104:6, 104:7, 104:14, 109:20, 110:2, 110:7, 159:1, 159:2, 159:3, 160:25
**Main** [2] - 109:17, 109:21
**MAINE** [1] - 1:1
**Maine** [77] - 1:12, 1:18, 12:12, 12:15, 12:20, 13:3, 13:9, 13:15, 13:18, 13:24, 14:6, 14:7, 14:18, 27:9, 29:18, 37:4, 40:3, 40:19, 40:20, 41:8, 42:20, 45:7, 45:9, 49:15, 50:20, 57:18, 58:24, 67:12, 69:5, 69:7, 69:20, 73:13, 78:17, 79:3, 80:19, 81:4, 83:4, 88:10, 90:15, 92:3, 92:4, 99:23, 100:16, 101:2, 102:24, 105:7, 106:12, 107:17, 109:15, 109:16, 109:22, 109:24, 109:25,

110:13, 111:21, 112:13, 112:16, 112:23, 115:3, 116:2, 118:13, 118:17, 118:22, 119:11, 119:14, 119:15, 124:8, 128:3, 131:17, 133:11, 133:12, 135:3, 155:12, 158:21, 159:12, 167:18, 170:4
**Maine's** [15] - 14:23, 40:14, 49:14, 49:16, 50:8, 102:3, 106:22, 107:1, 107:4, 122:14, 131:14, 132:10, 158:19, 159:22, 160:13
**Maine-specific** [1] - 131:17
**maintain** [5] - 12:10, 81:23, 112:16, 135:5, 158:1
**maintained** [1] - 47:7
**maintaining** [2] - 73:6, 91:12
**maintains** [2] - 81:24, 82:6
**maintenance** [18] - 50:3, 69:9, 90:20, 91:5, 91:8, 91:10, 91:14, 91:16, 91:21, 112:20, 112:24, 114:4, 115:18, 115:25, 116:10, 116:12, 144:2, 152:21
**malfeasance** [1] - 124:11
**manage** [1] - 10:10
**management** [2] - 10:20, 18:22
**mandatory** [3] - 39:2, 39:8, 40:10
**manual** [1] - 159:25
**map** [1] - 44:23
**mark** [13] - 93:25, 94:2, 94:7, 94:19, 95:4, 95:17, 97:3, 98:12, 99:3, 100:23, 141:24, 144:25, 171:14
**marked** [17] - 93:24, 94:5, 94:20, 95:5, 95:15, 95:21, 96:10, 96:18, 97:4, 97:19, 98:5, 99:2, 100:24, 120:16, 142:1, 144:5, 145:1

**marking** [2] - 120:15, 168:16
**Maryland** [5] - 80:19, 83:4, 84:23, 85:2, 85:3
**Massachusetts** [4] - 83:13, 83:15, 83:17, 83:19
**match** [8] - 47:25, 110:8, 126:5, 126:8, 127:16, 157:7, 160:24, 161:3
**matched** [2] - 47:6, 52:6
**matches** [3] - 108:18, 125:19, 160:18
**matching** [8] - 88:14, 125:6, 126:13, 126:21, 127:24, 161:3, 161:7, 166:25
**materials** [2] - 101:11, 134:5
**matter** [7] - 4:14, 27:18, 38:24, 74:21, 84:24, 86:4, 153:10
**matters** [3] - 14:8, 15:14, 78:5
**Maureen** [3] - 17:13, 18:15, 18:24
**ME** [2] - 2:4, 171:3
**mean** [35] - 13:10, 36:11, 39:14, 39:21, 45:24, 46:2, 48:2, 53:21, 60:20, 60:21, 71:6, 73:3, 73:4, 73:16, 77:14, 77:18, 79:22, 85:10, 86:6, 86:14, 90:3, 91:4, 91:9, 93:14, 93:15, 95:24, 108:13, 128:18, 133:16, 138:10, 146:3, 160:19, 163:19, 165:5, 168:11
**meaning** [1] - 54:17
**means** [10] - 34:19, 64:16, 106:20, 110:16, 110:23, 110:24, 111:16, 111:19, 111:21, 170:9
**meant** [2] - 141:23, 150:11
**measure** [2] - 25:23, 25:24
**media** [1] - 28:19
**Meeting** [1] - 48:22
**member** [5] - 26:16, 26:17, 26:24, 27:4, 167:18

**members** [5] - 24:1, 25:5, 26:23, 27:3, 27:8
**membership** [1] - 26:8
**memory** [3] - 18:13, 99:22, 99:24
**mention** [1] - 125:1
**mentioned** [5] - 44:9, 44:13, 44:20, 83:1, 171:12
**mentions** [1] - 125:2
**menu** [2] - 16:2, 21:8
**merely** [2] - 41:20, 152:24
**merged** [8] - 116:24, 116:25, 117:2, 117:4, 117:10, 117:24, 118:1, 118:3
**meritless** [3] - 87:8, 87:11, 87:13
**messed** [1] - 122:5
**messing** [4] - 105:5, 123:16, 123:24, 124:7
**metastasize** [1] - 89:17
**methodologies** [8] - 125:12, 131:12, 131:14, 163:20, 165:17, 165:18, 166:5, 166:20
**methodology** [9] - 47:5, 161:15, 164:13, 164:15, 164:19, 164:25, 166:6, 166:7, 168:19
**Methodology** [1] - 124:21
**methods** [3] - 45:22, 139:16, 139:20
**Mexico** [10] - 37:21, 38:6, 38:7, 41:6, 41:9, 47:14, 49:2, 49:11, 51:2, 96:14
**Mexico's** [2] - 37:24, 38:4
**Michigan** [1] - 84:21
**middle** [2] - 101:6, 122:3
**might** [40] - 5:20, 14:4, 14:15, 15:2, 27:1, 27:12, 30:1, 30:3, 32:11, 37:10, 49:14, 49:19, 49:21, 49:23, 54:4, 61:21, 62:3, 63:23, 74:19, 85:13, 96:21, 100:18, 105:21, 107:5, 107:6, 112:25, 119:16, 121:24,

139:17, 140:23,
143:23, 151:24,
154:3, 156:19,
157:23, 159:4,
159:9, 160:25
**mine** [1] - 45:1
**minimal** [1] - 137:23
**minimum** [1] - 144:6
**minorities** [1] - 74:16
**minority** [1] - 75:7
**minute** [2] - 156:17,
157:4
**minutes** [1] - 70:6
**mischaracterizing** [2]
- 43:11, 44:3
**mismanagement** [1] -
122:11
**missing** [4] - 25:25,
26:2, 26:4, 57:8
**mission** [16] - 28:21,
28:24, 33:3, 33:13,
39:1, 39:9, 39:17,
40:2, 40:12, 58:9,
58:12, 65:6, 69:1,
69:18, 69:25, 71:5
**missions** [1] - 65:8
**mistake** [1] - 104:3
**mistakes** [5] - 124:11,
136:9, 155:12,
155:16, 155:17
**Mitchell** [3] - 21:22,
23:10, 25:2
**mixture** [1] - 161:5
**modeling** [1] - 138:20
**moment** [1] - 24:17
**money** [2] - 40:13,
48:6
**monitoring** [2] -
13:13, 14:23
**morning** [2] - 4:11,
6:19
**MORRISETTE** [1] -
171:1
**Morrisette** [1] - 171:16
**most** [8] - 35:19,
51:17, 54:9, 86:18,
101:19, 115:6,
127:19, 136:11
**motion** [5] - 47:4,
61:13, 96:12, 97:9,
97:23
**Motion** [2] - 37:18,
66:24
**motivations** [1] -
123:20
**motor** [1] - 105:18
**Motor** [1] - 142:19
**mouth** [1] - 129:17
**move** [8] - 25:17,
66:19, 110:11,

114:21, 129:23,
129:25, 149:14,
165:15
**moved** [5] - 53:24,
162:24, 163:1,
163:3, 166:20
**moving** [2] - 113:7,
128:13
**MR** [101] - 4:10, 7:11,
7:14, 15:10, 15:12,
21:4, 21:6, 24:3,
24:5, 24:7, 24:13,
24:16, 24:18, 24:19,
24:20, 24:22, 24:24,
24:25, 25:3, 25:9,
25:18, 36:6, 36:9,
36:10, 66:6, 70:3,
70:6, 70:9, 70:10,
70:12, 75:23, 76:2,
76:13, 76:14, 76:20,
77:7, 78:10, 78:11,
79:15, 79:18, 79:19,
81:9, 81:10, 84:14,
84:17, 87:23, 87:25,
90:6, 90:7, 94:21,
94:23, 95:6, 95:16,
95:22, 96:11, 96:19,
97:5, 97:20, 98:6,
100:25, 120:17,
126:10, 126:11,
126:17, 126:19,
131:8, 131:10,
132:14, 132:15,
135:7, 135:9,
136:20, 136:21,
140:11, 140:12,
140:16, 140:18,
142:2, 145:2, 145:9,
145:13, 145:17,
148:25, 149:2,
149:5, 156:15,
156:18, 156:20,
156:22, 156:23,
156:24, 156:25,
157:2, 158:10,
158:11, 167:21,
167:24, 168:1,
168:4, 169:10,
169:12
**MRS** [3] - 90:24,
99:19, 101:2
**multiple** [12] - 103:25,
104:5, 107:16,
108:21, 109:5,
109:12, 109:15,
113:16, 113:24,
117:12, 121:15,
162:25
**Muszynski** [1] - 98:25
**mystery** [1] - 96:20

**N**

**name** [26] - 4:11,
31:25, 43:8, 43:20,
44:18, 44:21, 60:4,
81:2, 92:22, 101:7,
103:4, 103:8,
104:10, 104:13,
104:15, 107:5,
108:6, 108:9,
119:17, 122:1,
131:25, 140:19,
161:1
**named** [5] - 132:5,
132:6, 142:13,
145:19, 173:13
**namely** [2] - 39:1,
154:9
**names** [37] - 42:15,
43:23, 43:25, 46:21,
52:17, 106:2,
115:12, 119:19,
120:4, 120:11,
120:22, 120:24,
121:2, 121:3, 121:9,
121:11, 121:16,
121:21, 121:22,
122:3, 122:4, 122:8,
122:10, 122:15,
122:20, 123:1,
123:6, 123:11,
123:17, 124:5,
129:7, 134:16,
140:14, 144:9,
144:11
**nation's** [1] - 33:9
**National** [3] - 48:21,
58:17, 115:19
**nationwide** [5] - 28:6,
29:3, 33:4, 33:11,
38:17
**necessarily** [3] -
80:14, 158:17,
160:21
**neck** [1] - 111:11
**need** [6] - 5:7, 6:9,
10:4, 111:15, 130:1,
137:25
**negotiation** [1] -
122:21
**never** [19] - 6:13,
30:14, 50:19, 82:7,
92:7, 92:10, 100:20,
105:11, 106:11,
110:25, 116:9,
119:22, 149:19,
149:25, 150:7,
153:23, 155:1,
155:11, 168:12
**New** [22] - 31:17,

37:21, 37:24, 38:4,
38:6, 38:7, 41:6,
41:9, 47:14, 49:2,
49:11, 51:2, 89:7,
89:8, 89:9, 89:11,
89:15, 89:20, 89:23,
96:3, 96:14, 169:6
**new** [4] - 5:14, 57:12,
165:21, 166:7
**newly** [1] - 20:20
**news** [1] - 67:11
**newsletters** [1] -
28:19
**newspapers** [2] -
18:7, 42:2
**next** [15] - 5:21, 16:11,
21:21, 38:24, 72:7,
72:8, 72:9, 76:19,
95:20, 95:23, 97:6,
97:21, 136:6,
136:13, 147:7
**NJohnson@**
**publicinterestlegal.**
**org** [1] - 2:10
**Noah** [1] - 24:3
**nobody** [5] - 70:7,
106:8, 107:23,
116:9, 160:5
**Noel** [4] - 2:7, 16:12,
70:8, 171:7
**noncitizen** [9] - 37:3,
37:8, 140:7, 144:5,
146:9, 146:17,
150:2, 150:4, 168:14
**Noncitizen** [1] - 141:8
**noncitizens** [23] -
35:6, 35:7, 35:9,
37:1, 140:23, 142:5,
143:4, 144:1, 144:3,
144:7, 150:6,
152:22, 153:1,
153:5, 153:17,
153:20, 153:23,
154:4, 154:6,
154:14, 154:20,
155:2, 169:6
**noncitizenship** [2] -
142:18, 168:22
**none** [8] - 6:20, 11:19,
11:24, 15:4, 117:5,
133:8, 153:13,
153:14
**nonpartisan** [2] -
28:3, 38:15
**nonpublic** [1] - 74:7
**nonspecific** [1] -
26:20
**normalization** [3] -
128:7, 128:16,
130:15

**normalize** [5] - 128:1,
128:6, 130:1, 160:3,
160:8
**normalized** [2] -
129:2, 160:12
**normalizing** [1] -
128:25
**North** [7] - 80:19,
83:23, 109:15,
109:19, 109:21,
109:25, 110:1
**Notary** [7] - 1:18, 4:2,
4:5, 4:7, 170:3,
171:13, 173:12
**NOTARY** [1] - 173:11
**note** [2] - 76:20, 77:1
**noted** [2] - 24:8, 173:3
**nothing** [16] - 64:9,
64:20, 66:12, 71:7,
73:13, 74:2, 74:14,
75:15, 75:21, 76:17,
87:6, 87:9, 133:24,
148:2, 151:6, 170:7
**Nothing** [1] - 169:12
**Notice** [1] - 48:20
**notice** [16] - 1:19, 7:9,
7:20, 22:4, 23:24,
49:24, 51:3, 87:20,
94:15, 131:19,
142:21, 150:12,
151:3, 151:8,
151:13, 154:22
**noticed** [2] - 23:15,
23:17
**notices** [2] - 47:10,
91:19
**NOTICING** [1] -
173:22
**nowhere** [3] - 22:18,
65:14, 65:21
**number** [37] - 14:11,
20:24, 21:1, 34:24,
35:1, 35:11, 35:16,
36:16, 36:17, 37:6,
38:11, 56:16, 57:14,
78:7, 79:13, 88:3,
92:20, 94:3, 101:8,
115:12, 116:17,
116:23, 117:3,
117:9, 117:15,
117:17, 117:20,
136:17, 142:4,
144:17, 144:18,
144:22, 145:25,
147:19, 147:22,
153:19, 157:12
**Number** [1] - 63:14
**numbers** [14] - 35:4,
52:1, 52:12, 52:24,
53:10, 53:14, 105:9,

105:14, 105:16, 105:23, 106:4, 106:7, 108:24, 125:22

**numeral** [1] - 62:8

**NVR** [1] - 75:21

**NVRA** [13] - 55:1, 78:9, 80:13, 81:7, 81:13, 81:16, 81:18, 82:14, 82:18, 82:24, 84:19, 86:16, 114:12

**NVRA's** [1] - 28:8

## O

**oath** [8] - 4:4, 150:23, 150:25, 154:7, 154:9, 168:15, 168:16

**obituaries** [9] - 41:20, 41:24, 41:25, 42:4, 47:9, 47:15, 48:1, 48:6, 52:6

**obituary** [3] - 48:4, 48:8, 48:9

**object** [12] - 15:10, 21:4, 75:23, 84:14, 87:21, 87:23, 90:6, 110:21, 131:8, 140:11, 145:9, 154:21

**objected** [2] - 36:9, 140:16

**objecting** [1] - 25:3

**objection** [15] - 24:5, 24:8, 36:6, 36:8, 76:13, 76:21, 78:10, 81:9, 126:10, 126:17, 132:14, 135:7, 136:20, 140:15, 158:10

**objections** [1] - 22:6

**objectives** [2] - 31:4, 71:6

**obligations** [1] - 58:17

**obtain** [2] - 35:11, 136:12

**obtained** [3] - 46:21, 131:22, 159:2

**obtaining** [1] - 64:8

**occasion** [2] - 45:17, 45:25

**occasionally** [1] - 10:14

**occur** [4] - 54:20, 64:12, 114:5, 116:12

**occurred** [5] - 64:19, 116:10, 149:19, 150:15, 153:23

**occurring** [4] - 30:2,

30:6, 54:23, 115:25

**occurs** [4] - 30:10, 63:10, 65:20, 105:9

**October** [1] - 99:5

**OF** [5] - 1:1, 2:2, 172:1, 173:20, 173:21

**OFF** [4] - 7:13, 24:21, 70:11, 157:1

**offer** [6] - 6:23, 8:25, 26:23, 122:23, 148:13

**offering** [1] - 27:4

**offers** [2] - 87:8, 87:10

**office** [5] - 12:10, 62:5, 105:13, 106:9, 107:24

**OFFICE** [1] - 2:2

**offices** [3] - 12:8, 12:12, 168:24

**official** [11] - 1:11, 30:4, 30:6, 35:15, 56:25, 103:22, 104:3, 113:22, 121:24, 136:9, 150:1

**officials** [5] - 13:14, 28:14, 29:21, 29:22, 29:23, 30:16, 50:20, 53:18, 59:12, 60:2, 60:14, 63:20, 69:7, 69:19, 69:23, 70:20, 72:23, 73:1, 73:22, 74:8, 88:19, 89:25, 90:9, 116:14, 122:9, 123:16, 123:19, 131:23, 142:4, 142:7, 142:13, 142:21, 153:11, 153:25, 154:22

**often** [3] - 73:21, 104:4, 110:6

**old** [2] - 123:10, 166:11

**once** [9] - 4:20, 23:21, 56:12, 68:6, 129:20, 134:24, 136:11, 160:11, 160:12

**one** [78] - 5:21, 16:3, 17:16, 25:14, 29:3, 34:4, 34:8, 34:17, 34:22, 35:2, 41:16, 42:19, 42:21, 43:7, 44:22, 45:7, 50:11, 50:16, 50:19, 50:23, 51:1, 54:17, 55:19, 57:25, 60:18, 60:19, 65:7, 66:20, 70:24, 71:2, 72:7, 72:8, 72:9, 79:9, 91:22, 93:21, 95:7, 95:23,

97:6, 98:11, 102:10, 103:16, 103:25, 105:11, 105:13, 107:13, 108:18, 109:12, 112:2, 113:4, 113:14, 113:19, 113:23, 113:25, 114:3, 117:13, 120:2, 122:2, 123:20, 126:4, 126:12, 129:3, 129:9, 131:25, 132:4, 133:14, 138:5, 140:6, 144:23, 147:24, 156:5, 158:8, 158:13, 158:18, 162:4, 165:5, 168:1

**ones** [16] - 15:2, 42:5, 43:12, 80:21, 80:23, 80:25, 81:2, 81:13, 82:18, 82:20, 83:12, 84:20, 101:15, 114:10, 126:2, 165:19

**ongoing** [1] - 83:25

**online** [11] - 70:21, 71:1, 71:9, 72:19, 72:20, 72:21, 72:25, 73:6, 73:7, 73:9, 73:23

**open** [3] - 28:9, 28:12, 91:3

**opinion** [3] - 59:20, 59:22, 139:22

**opportunity** [6] - 22:5, 26:21, 26:24, 70:24, 107:15, 155:14

**opposed** [1] - 113:25

**opposite** [1] - 106:5

**opposition** [2] - 61:13, 97:8

**option** [1] - 6:7

**oral** [1] - 101:22

**order** [10] - 28:14, 28:19, 38:8, 54:3, 95:19, 100:12, 101:16, 124:6, 130:1, 136:13

**organization** [13] - 5:12, 7:4, 7:7, 11:12, 12:2, 13:13, 19:23, 26:9, 28:3, 30:15, 30:16, 38:16, 85:13

**organization's** [1] - 75:6

**organizational** [1] - 28:21

**ORIGINAL** [1] - 172:1

**original** [8] - 38:6, 91:18, 143:16, 143:19, 148:17, 171:12, 171:13, 171:16

**otherwise** [4] - 75:18, 99:16, 122:12, 128:25

**outcome** [2] - 64:12, 170:13

**outdated** [1] - 41:15

**outlandish** [2] - 65:16, 65:17

**outlier** [1] - 83:5

**output** [1] - 161:2

**outputs** [2] - 160:23, 160:24

**outrageous** [1] - 153:25

**outside** [6] - 25:12, 127:25, 128:6, 128:16, 130:16, 167:16

**outstanding** [1] - 68:1

**outward** [1] - 167:15

**overall** [1] - 69:1

**overseas** [2] - 118:11, 118:15

**oversee** [1] - 10:10

**oversimplifies** [1] - 33:20

**oversimplifying** [1] - 150:14

**own** [2] - 67:21, 173:15

## P

**p.m** [2] - 99:14, 169:13

**PACER** [1] - 85:5

**PAGE** [1] - 3:9

**page** [30] - 5:25, 6:1, 6:2, 16:3, 16:5, 16:9, 16:11, 16:17, 21:11, 25:22, 31:19, 32:17, 32:25, 34:14, 47:3, 52:3, 57:21, 99:9, 99:11, 99:12, 102:13, 124:20, 141:5, 142:9, 143:12, 147:7, 171:12, 171:13, 171:16

**Page** [1] - 172:4

**pages** [1] - 173:3

**paid** [1] - 68:2

**pain** [1] - 111:11

**Palm** [2] - 161:14, 164:16

**paper** [2] - 154:14,

160:21

**paragraph** [11] - 27:23, 29:1, 38:13, 38:14, 41:10, 46:6, 47:6, 47:24, 62:20, 62:22, 101:6

**paranoid** [1] - 66:10

**parse** [1] - 46:25

**part** [15] - 12:21, 14:21, 17:24, 18:2, 23:24, 29:19, 45:13, 62:17, 64:25, 102:5, 123:18, 151:21, 157:7, 162:7, 166:4

**participant** [1] - 7:12

**participate** [1] - 145:18

**participated** [3] - 115:22, 145:14, 145:16

**participation** [4] - 114:23, 115:3, 115:5, 162:8

**particular** [24] - 6:12, 10:16, 11:3, 19:16, 19:25, 26:6, 33:23, 52:13, 57:16, 65:16, 67:15, 67:18, 68:11, 83:14, 84:4, 84:15, 116:11, 125:11, 155:22, 158:20, 159:10, 160:1, 162:3

**particularized** [1] - 159:14

**particulars** [1] - 73:12

**parties** [5] - 27:24, 82:1, 115:14, 128:20, 130:7

**partnership** [1] - 108:14

**parts** [1] - 82:23

**PARTY** [1] - 173:22

**party** [4] - 83:17, 110:24, 115:15, 167:10

**Party** [1] - 61:15

**party/campaign** [6] - 90:23, 99:17, 100:4, 100:8, 100:12, 100:15

**pass** [1] - 153:2

**passed** [2] - 69:16, 69:17

**past** [5] - 14:17, 82:17, 82:22, 107:23, 135:22

**pause** [1] - 5:20

**pay** [1] - 68:14

**paying** [1] - 18:21

**payroll** [1] - 18:21

**PDFs** [1] - 91:3
**penalties** [2] - 63:1, 63:23
**pending** [7] - 78:20, 79:7, 80:7, 80:11, 82:13, 82:16, 84:1
**Pennsylvania** [4] - 78:17, 80:19, 81:4, 135:25
**people** [59] - 15:20, 16:23, 16:25, 17:7, 17:10, 17:11, 18:14, 40:15, 40:18, 40:23, 42:25, 48:4, 50:13, 50:14, 50:18, 50:25, 63:1, 64:8, 65:9, 69:4, 69:16, 70:21, 70:23, 71:21, 72:7, 72:8, 72:9, 72:12, 72:13, 87:16, 88:6, 88:12, 89:2, 89:5, 89:9, 89:13, 90:1, 90:4, 90:9, 91:19, 113:7, 113:24, 119:16, 121:5, 121:14, 123:11, 123:13, 128:23, 132:18, 132:21, 137:24, 138:9, 152:25, 153:5, 153:8, 153:13, 154:3, 160:3
**percentage** [1] - 15:13
**perfect** [1] - 53:1
**perfectly** [1] - 5:4
**perform** [4] - 126:13, 126:21, 132:11
**performs** [4] - 103:3, 104:21, 116:1, 117:19
**perhaps** [3] - 27:7, 93:19, 165:7
**period** [2] - 15:22, 57:18
**permanent** [1] - 59:24
**permit** [1] - 99:16
**permitted** [2] - 68:1, 143:4
**person** [15] - 5:21, 21:21, 30:23, 103:24, 104:4, 105:1, 108:20, 108:25, 110:4, 110:10, 119:13, 150:12, 159:25, 162:3, 170:13
**personal** [9] - 9:16, 10:1, 10:6, 11:1, 11:8, 11:22, 34:6, 142:15, 144:14

**personally** [1] - 173:14
**petition** [1] - 32:16
**Petition** [1] - 66:25
**Philip** [1] - 115:13
**Phillips** [2] - 2:8, 16:11
**phone** [3] - 144:17, 144:18, 144:22
**photographs** [2] - 25:21, 26:1
**Phyllis** [1] - 2:3
**Phyllis.Gardiner@ maine.gov** [1] - 2:5
**physically** [1] - 45:2
**picture** [1] - 141:15
**piece** [4] - 104:16, 110:8, 115:10, 137:21
**pieces** [3] - 46:23, 92:25, 101:14
**PILF** [139] - 5:2, 5:6, 5:12, 9:8, 9:9, 9:21, 10:7, 10:13, 10:15, 11:15, 12:1, 12:6, 12:10, 12:15, 12:20, 12:25, 13:1, 13:8, 13:23, 14:17, 15:21, 16:23, 17:1, 17:3, 17:8, 17:12, 18:11, 18:12, 18:14, 19:4, 19:10, 19:14, 19:16, 20:14, 20:22, 22:20, 23:18, 25:2, 26:8, 26:17, 27:8, 27:18, 29:1, 29:10, 29:13, 30:8, 30:11, 30:12, 36:1, 38:12, 42:3, 45:11, 45:15, 47:20, 48:23, 49:4, 52:10, 52:22, 53:9, 54:1, 56:12, 56:25, 57:1, 58:3, 58:15, 58:20, 59:17, 63:6, 65:6, 65:8, 69:25, 70:14, 71:6, 71:11, 72:17, 72:20, 72:25, 74:15, 74:23, 76:11, 77:8, 77:9, 78:2, 78:5, 87:15, 89:19, 89:24, 90:8, 94:25, 96:1, 99:23, 101:15, 102:2, 103:3, 103:14, 103:16, 104:20, 111:2, 113:11, 114:24, 116:1, 117:19, 118:24, 120:23, 127:24, 130:13, 130:17, 131:21,

132:7, 134:8, 140:6, 141:12, 142:11, 142:21, 142:24, 145:14, 145:16, 147:20, 149:3, 149:17, 149:19, 152:20, 155:8, 155:10, 156:1, 156:6, 156:10, 157:6, 157:16, 161:10, 163:6, 163:16, 166:23, 168:18, 171:10, 173:19
**PILF's** [24] - 15:7, 16:7, 20:18, 21:16, 21:18, 28:24, 29:3, 33:16, 58:8, 58:11, 59:20, 64:7, 64:21, 65:1, 65:12, 67:22, 67:24, 69:1, 69:18, 94:25, 118:18, 131:14, 135:17
**pipeline** [1] - 114:1
**Pittsburgh** [1] - 169:5
**place** [8] - 89:16, 105:15, 114:18, 128:21, 129:19, 130:2, 130:6, 150:17
**placed** [1] - 150:11
**placeholders** [1] - 88:13
**places** [10] - 45:6, 72:23, 88:13, 106:11, 108:14, 108:15, 113:15, 115:6, 130:1, 147:17
**plaintiff** [1] - 62:21
**Plaintiff** [2] - 1:9, 2:11
**Plaintiff's** [2] - 61:13, 63:14
**plaintiffs'** [1] - 97:9
**plan** [4] - 5:22, 37:24, 38:4, 101:17
**planned** [1] - 119:2
**planning** [2] - 18:19, 18:21
**plans** [6] - 68:10, 72:24, 102:2, 131:14, 131:16
**plausible** [1] - 64:19
**play** [4] - 40:7, 124:3, 148:10, 152:15
**pleading** [4] - 65:18, 66:12, 66:15, 66:17
**plenty** [1] - 60:20
**PO** [1] - 159:3
**point** [13] - 5:24, 6:8, 27:3, 64:25, 94:9, 104:25, 114:25,

128:11, 134:21, 137:8, 140:6, 141:13, 155:22
**points** [4] - 106:3, 107:21, 151:10, 167:7
**political** [7] - 137:13, 137:15, 137:17, 137:22, 137:25, 138:21, 139:2
**Poor** [1] - 48:4
**pops** [1] - 160:7
**population** [2] - 35:8, 35:18
**portion** [1] - 125:23
**portions** [1] - 5:25
**Portland** [2] - 109:17, 109:21
**position** [16] - 9:8, 16:22, 17:23, 56:24, 57:19, 63:6, 65:2, 67:6, 67:8, 67:9, 67:23, 67:25, 68:6, 68:9, 94:10, 97:25
**positions** [2] - 9:10, 87:14
**positive** [3] - 26:13, 56:9, 117:10
**positives** [22] - 53:3, 53:10, 53:15, 53:16, 53:18, 54:4, 54:10, 54:12, 56:4, 56:7, 56:15, 57:6, 57:9, 105:2, 105:3, 117:5, 117:13, 139:17, 139:22, 150:3, 150:7, 153:9
**possibilities** [1] - 51:1
**possibility** [3] - 29:4, 50:24, 134:9
**possible** [11] - 26:16, 47:8, 47:25, 48:2, 48:3, 54:9, 132:24, 136:8, 137:9, 157:13
**possibly** [5] - 26:25, 27:1, 54:7, 121:8, 139:13
**postmark** [1] - 59:15
**postmarks** [3] - 59:20, 60:3, 60:15
**posts** [1] - 28:19
**potential** [12] - 14:4, 14:5, 14:14, 14:21, 52:1, 52:23, 52:24, 108:3, 108:7, 112:23, 150:6
**potentially** [1] - 121:15
**Powell** [5] - 17:13, 18:15, 18:16,

137:10, 137:11
**power** [2] - 67:9, 68:9
**powers** [3] - 67:20, 68:19, 68:21
**practice** [2] - 19:9, 135:17
**practices** [2] - 19:10, 72:24
**predicate** [5] - 61:20, 74:25, 87:19, 148:8, 148:14
**prefer** [1] - 122:6
**preferences** [1] - 70:7
**preliminary** [1] - 59:23, 60:9, 60:12, 61:14, 97:9
**premise** [1] - 139:19
**preparation** [1] - 31:12
**prepare** [5] - 8:5, 27:11, 148:1, 151:16, 151:20
**prepared** [2] - 8:1, 22:17
**preparing** [1] - 140:3
**prerequisite** [1] - 162:9
**prerogatives** [1] - 67:14
**present** [5] - 16:12, 16:14, 24:6, 40:10, 140:22
**presented** [5] - 32:11, 32:14, 64:18, 94:4, 94:11
**presents** [1] - 38:25
**president** [8] - 9:9, 9:11, 9:15, 9:22, 9:25, 10:7, 10:9, 21:19
**press** [4] - 20:9, 35:21, 36:3, 36:14
**presumably** [1] - 55:12
**presume** [1] - 50:19
**presumption** [1] - 164:22
**pretty** [3] - 107:3, 119:5, 137:19
**previous** [4] - 32:17, 112:5, 121:19, 146:11
**previously** [4] - 68:13, 101:10, 112:6, 168:12
**primary** [3] - 29:4, 29:9, 31:4
**printed** [5] - 47:9, 47:15, 48:1, 48:8, 48:9

**printout** [2] - 96:22, 96:24
**priority** [1] - 70:23
**prisons** [1] - 67:12
**private** [3] - 34:11, 34:15, 34:20
**privilege** [1] - 14:15
**privileged** [2] - 15:3, 15:5
**probe** [4] - 60:22, 69:2, 74:1, 85:12
**probing** [2] - 73:16, 75:5
**problem** [8] - 25:25, 30:5, 33:21, 41:8, 56:11, 102:5, 116:10, 158:23
**problems** [18] - 39:2, 39:7, 40:9, 40:14, 41:2, 49:17, 49:18, 50:1, 51:6, 52:2, 52:12, 52:23, 52:24, 52:25, 56:25, 91:3, 94:6, 157:14
**Procedure** [2] - 7:1, 76:23
**Procedures** [2] - 32:18, 33:24
**procedures** [3] - 33:8, 53:5, 105:15
**Process** [1] - 124:21
**process** [28] - 23:8, 26:5, 29:12, 29:25, 35:13, 50:22, 57:12, 88:9, 89:6, 89:10, 91:11, 126:3, 128:7, 130:16, 130:25, 137:9, 144:2, 154:21, 157:5, 157:7, 159:8, 159:18, 159:24, 159:25, 160:13, 161:3, 168:15, 168:17
**processes** [3] - 12:25, 13:2, 14:24
**processing** [2] - 133:18, 152:22
**produce** [2] - 28:17, 161:2
**produced** [2] - 20:1, 146:14
**produces** [1] - 160:5
**producing** [3] - 8:22, 9:3, 149:23
**product** [4] - 13:11, 14:16, 19:25
**profoundly** [3] - 142:25, 149:17, 156:1

**program** [6] - 73:13, 81:23, 112:20, 112:25, 162:8, 165:10
**programs** [4] - 28:7, 28:13, 33:5, 38:18
**progress** [1] - 13:5
**Project** [1] - 86:13
**projects** [4] - 13:23, 14:16, 14:23, 15:2
**promise** [2] - 107:3, 107:13
**promote** [4] - 28:5, 29:2, 33:3, 72:20
**promoting** [2] - 38:17, 72:25
**proper** [4] - 22:6, 29:16, 83:16, 95:10
**properly** [5] - 22:4, 70:23, 71:21, 116:6, 129:2
**properties** [1] - 45:11
**property** [2] - 44:24, 45:20
**proprietary** [2] - 161:9, 161:10
**prosecute** [1] - 119:15
**prosecution** [1] - 154:11
**protected** [1] - 14:15
**protection** [1] - 14:16
**protocols** [1] - 128:21
**provide** [8] - 42:15, 51:25, 94:21, 106:14, 108:2, 118:17, 125:21, 148:5
**provided** [6] - 9:2, 9:7, 83:3, 85:3, 142:12, 142:14
**providing** [3] - 63:19, 72:22, 132:23
**provision** [6] - 28:9, 64:1, 79:24, 81:18, 84:19, 92:5
**Provision** [4] - 80:2, 80:4, 80:9, 80:12
**provisions** [1] - 30:18
**proximity** [1] - 113:17
**pseudonyms** [3] - 123:13, 124:2, 124:4
**PUBLIC** [2] - 1:8, 2:7
**public** [57] - 26:16, 26:23, 27:3, 28:3, 28:8, 28:11, 28:20, 29:20, 29:22, 29:24, 30:1, 30:3, 30:17, 33:12, 38:15, 40:4, 40:22, 41:13, 41:17, 41:20, 41:22, 41:24,

41:25, 42:4, 46:25, 47:10, 55:5, 55:21, 58:3, 58:18, 73:20, 75:18, 75:22, 75:7, 84:7, 84:18, 84:24, 85:18, 85:25, 86:2, 86:15, 106:1, 107:14, 120:10, 121:10, 122:4, 123:19, 124:8, 124:12, 136:8, 146:20, 147:13, 147:15, 155:14, 155:18, 164:7
**Public** [28] - 1:18, 4:2, 4:5, 4:7, 4:23, 5:1, 6:23, 7:4, 7:21, 28:1, 31:14, 37:18, 58:2, 61:11, 66:23, 80:1, 80:3, 80:8, 80:12, 94:15, 97:7, 97:22, 112:14, 145:5, 170:3, 170:21, 171:8, 171:13
**PUBLIC/ATTORNEY** [1] - 173:11
**Public/Attorney** [1] - 173:12
**publication** [2] - 143:16
**publicize** [3] - 119:17, 119:19, 121:16
**publicized** [1] - 119:21
**publicly** [1] - 46:23
**publish** [1] - 134:16
**published** [6] - 52:6, 140:6, 141:13, 144:10, 147:20, 154:20
**publishes** [1] - 41:25
**publishing** [1] - 168:8
**pumped** [1] - 167:14
**purchase** [2] - 99:17, 139:23
**purpose** [7] - 41:18, 77:3, 85:13, 127:21, 140:21, 141:1, 163:2
**purposes** [8] - 5:3, 65:5, 65:8, 79:16, 100:10, 119:24, 125:6, 162:16
**pursuant** [1] - 1:18
**put** [18] - 20:19, 25:11, 30:22, 39:12, 39:14, 67:12, 68:25, 77:21, 78:1, 79:23, 91:24, 120:4, 120:6, 130:6, 130:9, 143:9, 144:13, 154:15

**putting** [2] - 129:17, 159:18

## Q

**qualification** [1] - 33:7
**qualifier** [1] - 47:25
**quality** [1] - 125:5
**queries** [2] - 125:2, 125:3
**querying** [1] - 162:6
**questioning** [1] - 25:12
**questions** [29] - 5:10, 22:3, 22:18, 23:7, 23:14, 25:4, 25:6, 25:16, 42:21, 53:20, 57:25, 65:15, 65:25, 75:11, 76:17, 76:22, 84:16, 85:20, 102:6, 105:12, 145:20, 145:21, 150:18, 157:5, 159:17, 164:10, 166:13, 167:22, 169:11
**quick** [1] - 91:2
**quickly** [2] - 115:16, 157:12
**quit** [1] - 122:19
**quite** [4] - 106:8, 107:23, 114:8, 119:12
**quote** [1] - 99:17

## R

**racial** [3] - 74:16, 75:6, 75:19
**raises** [1] - 39:25
**Randolph** [1] - 115:13
**rates** [3] - 37:4, 37:7, 37:9
**rather** [4] - 26:21, 35:18, 36:20, 37:10
**ratio** [4] - 34:24, 35:5, 35:6, 35:10
**RE** [1] - 171:10
**re** [4] - 67:10, 68:10, 69:14, 150:21
**re-ask** [1] - 150:21
**re-enfranchised** [1] - 69:14
**re-enfranchisement** [2] - 67:10, 68:10
**reach** [1] - 124:10
**read** [22] - 8:7, 28:1, 28:21, 33:2, 43:24, 44:7, 47:10, 52:9, 62:22, 92:10, 99:19, 99:21, 115:15,

126:24, 126:25, 127:10, 141:9, 141:10, 142:10, 143:6, 171:13, 173:2
**reading** [1] - 169:14
**reads** [1] - 18:7
**ready** [2] - 24:22, 49:24
**real** [4] - 91:1, 123:13, 123:15, 145:22
**realize** [2] - 55:21, 164:23
**realized** [2] - 86:19, 87:13
**really** [1] - 128:17
**Really** [1] - 75:7
**Reardon** [3] - 17:13, 18:15, 18:24
**reason** [12] - 6:17, 20:17, 25:20, 26:4, 30:20, 30:24, 30:25, 36:18, 47:17, 83:14, 119:4, 120:1
**reasonable** [4] - 112:24, 115:24, 124:10, 136:11
**reasonableness** [1] - 112:20
**reasonably** [5] - 26:10, 81:24, 82:6, 112:16, 135:5
**reasons** [5] - 14:10, 84:13, 104:1, 104:24, 173:5
**receive** [3] - 91:7, 99:17, 127:16
**received** [1] - 102:8
**receives** [2] - 102:2, 167:16
**recently** [1] - 20:21
**recite** [2] - 62:1, 87:5
**recognize** [9] - 31:8, 37:15, 48:13, 48:17, 51:19, 61:2, 66:21, 120:18, 145:6
**recognizes** [1] - 142:22
**recollection** [13] - 17:20, 27:2, 27:5, 27:7, 62:3, 62:10, 63:11, 67:4, 82:9, 82:24, 93:20, 147:24, 163:12
**record** [33] - 10:16, 24:8, 24:19, 25:11, 31:13, 31:18, 31:22, 31:24, 43:13, 43:22, 44:7, 51:9, 59:17, 70:13, 76:21, 77:1, 84:25, 94:3, 103:11,

109:21, 109:25,
110:1, 116:17,
116:23, 117:18,
117:20, 128:12,
147:13, 147:15,
148:7, 157:3,
160:16, 170:9
**RECORD** [4] - 7:13,
24:21, 70:11, 157:1
**records** [40] - 8:8,
8:11, 8:12, 8:15,
28:9, 28:10, 28:11,
28:12, 28:17, 45:20,
75:22, 82:8, 85:25,
86:2, 88:8, 88:15,
90:20, 91:5, 91:8,
91:10, 91:17, 91:21,
108:3, 108:5,
108:23, 110:6,
117:2, 121:7,
121:10, 142:12,
142:16, 143:24,
144:7, 144:10,
154:14, 158:4,
158:15, 168:10
**redacted** [4] - 99:8,
147:18, 147:22,
148:17
**redistricting** [1] -
71:20
**reduced** [1] - 160:21
**Reed** [1] - 60:5
**refer** [4] - 4:25, 5:2,
5:6, 101:19
**reference** [3] - 62:25,
159:14, 161:15
**referrals** [1] - 57:16
**referred** [2] - 95:20,
115:6
**referring** [7] - 5:1,
12:18, 54:25, 55:16,
120:9, 143:13, 156:5
**refers** [3] - 31:24,
91:10, 156:3
**refining** [1] - 165:21
**reflect** [4] - 52:24,
106:15, 128:12,
165:9
**reflects** [1] - 43:22
**refresh** [7] - 17:19,
18:13, 27:6, 62:3,
93:20, 99:22, 99:24
**refreshed** [1] - 62:23
**refreshes** [1] - 62:9
**refuse** [4] - 23:7,
58:19, 58:23, 135:18
**refused** [3] - 14:20,
14:21, 59:3
**refusing** [8] - 23:22,
23:23, 65:23, 65:24,

69:9, 73:24, 74:10,
76:22
**reg** [2] - 144:4, 144:20
**regard** [3] - 25:15,
71:18, 90:14
**regarding** [11] - 8:2,
8:24, 14:21, 23:25,
25:5, 65:20, 75:19,
100:13, 149:24,
152:20, 157:13
**register** [9] - 70:21,
70:24, 87:17, 88:5,
88:25, 89:4, 89:11,
100:4, 113:18
**registered** [27] -
34:24, 35:16, 35:22,
36:16, 37:25, 88:7,
88:15, 89:3, 89:9,
89:14, 105:17,
109:1, 109:5,
109:14, 110:4,
113:16, 114:11,
114:14, 116:8,
119:11, 140:23,
162:3, 162:25, 169:7
**registering** [1] -
88:12, 103:23,
113:25
**registrants** [15] -
34:25, 35:16, 52:5,
56:23, 112:17,
142:14, 142:16,
143:1, 146:15,
149:18, 155:21,
156:2, 156:8, 163:1,
169:3
**Registration** [5] -
48:21, 58:18,
115:19, 141:8,
166:17
**registration** [43] -
37:7, 37:9, 42:14,
53:7, 70:16, 70:22,
71:2, 71:10, 72:21,
73:7, 73:9, 74:16,
75:7, 89:6, 109:16,
113:10, 114:2,
114:15, 114:18,
117:3, 117:8,
117:15, 117:16,
123:4, 123:7,
123:10, 131:22,
134:10, 142:5,
143:2, 143:3,
143:22, 144:16,
144:20, 145:15,
147:8, 149:4, 149:8,
149:9, 151:5,
152:20, 152:23,
161:20

**registrations** [12] -
41:14, 88:14,
113:20, 114:5,
116:22, 117:12,
119:21, 132:16,
132:18, 132:21,
142:17, 149:13
**regression** [2] -
138:15, 138:19
**regrets** [3] - 142:25,
149:17, 156:1
**regular** [1] - 158:4
**regularly** [2] - 28:8,
139:4
**Rehearing** [1] - 67:1
**rehearing** [1] - 97:25
**rejected** [1] - 87:11
**relate** [2] - 65:25,
145:14
**related** [22] - 8:8,
10:25, 11:8, 11:21,
19:15, 23:14, 26:20,
33:23, 40:6, 42:8,
66:10, 71:15, 71:25,
72:23, 74:6, 78:1,
86:15, 89:23, 90:20,
163:13, 164:2, 164:5
**relates** [14] - 9:6,
13:15, 34:5, 34:8,
34:13, 45:2, 60:2,
65:18, 69:25, 73:20,
75:6, 93:20, 102:23,
112:24
**relating** [2] - 60:15,
71:22
**relation** [1] - 10:2
**relatively** [2] - 57:11,
57:12
**release** [5] - 35:21,
36:3, 36:14, 75:17,
77:4
**released** [1] - 13:12
**relevance** [11] - 74:25,
87:18, 87:23, 90:6,
111:25, 115:17,
131:8, 139:20,
140:11, 140:16,
145:10
**relevant** [25] - 8:13,
8:16, 34:22, 34:23,
35:3, 41:3, 76:1,
84:6, 87:20, 112:1,
112:3, 113:5,
114:16, 116:5,
121:23, 137:21,
138:5, 148:4, 148:6,
148:9, 148:13,
148:14, 151:22,
151:25, 152:5
**reliance** [1] - 169:2

**relied** [1] - 47:14
**relief** [5] - 25:15,
81:22, 82:3, 82:7,
82:10
**Relief** [1] - 27:16
**reluctance** [1] -
121:25
**rely** [4] - 54:16,
149:25, 150:8,
168:12
**relying** [2] - 155:10,
167:9
**remain** [2] - 53:7,
143:5
**remains** [1] - 130:3
**remedial** [3] - 28:7,
33:5, 38:18
**remedied** [2] - 155:4,
155:5
**remedy** [2] - 76:24,
127:6
**remember** [15] - 4:20,
32:16, 61:21, 62:16,
67:5, 71:4, 71:7,
84:20, 94:10,
133:17, 153:19,
164:3, 164:4, 166:1
**reminded** [1] - 98:10
**remotely** [1] - 151:18
**removals** [1] - 150:4
**remove** [3] - 115:21,
150:1, 168:25
**removed** [3] - 56:23,
142:11, 154:13
**removing** [1] - 90:9
**renew** [1] - 66:18
**repeatedly** [1] -
102:11
**repetitive** [1] - 77:2
**rephrase** [5] - 14:13,
43:15, 79:4, 127:10,
127:12
**rephrasing** [1] - 147:2
**replaced** [1] - 169:1
**report** [41] - 53:13,
119:17, 120:9,
120:22, 120:23,
122:8, 122:13,
122:16, 124:18,
125:2, 125:12,
141:12, 142:3,
142:9, 142:12,
143:9, 143:17,
143:20, 146:2,
146:19, 146:22,
146:23, 147:3,
147:11, 147:21,
148:18, 149:15,
149:22, 150:10,
152:13, 152:24,

153:7, 154:2,
154:16, 161:14,
161:15, 164:16,
166:11, 168:5,
169:5, 169:6
**REPORTER** [2] - 66:5,
173:23
**reporter** [4] - 5:16,
43:24, 100:2, 126:25
**Reporter/Notary** [1] -
170:21
**reporting** [3] - 45:4,
52:8, 125:16
**REPORTING** [1] -
171:1
**reports** [20] - 11:14,
13:1, 13:5, 18:10,
18:12, 20:7, 28:18,
52:10, 54:3, 57:5,
119:19, 120:5,
120:6, 120:10,
120:12, 140:7,
140:14, 140:21,
149:1, 168:8
**represent** [4] - 16:6,
21:15, 92:2, 101:1
**representative** [1] -
9:13
**represented** [1] -
71:21
**representing** [1] -
4:13
**reproducing** [1] -
142:12
**republish** [2] - 152:10,
152:11
**republishes** [1] -
152:24
**Request** [1] - 48:21
**request** [11] - 32:16,
62:6, 77:13, 90:14,
90:15, 90:17, 92:14,
93:16, 93:17, 98:20,
101:21
**requested** [6] - 63:1,
81:23, 82:7, 82:10,
100:9, 136:12
**requesting** [2] - 92:25,
99:23
**requests** [5] - 8:18,
8:20, 73:19, 86:16,
158:4
**require** [2] - 5:20,
28:10
**required** [1] - 86:21
**requires** [3] - 90:13,
116:11, 160:3
**requiring** [1] - 88:19
**reregistered** [2] -
153:13, 153:15

**research** [5] - 18:4, 18:5, 28:6, 33:4, 38:18
**reserve** [2] - 76:15, 76:23
**reserving** [2] - 25:14, 100:7
**residence** [16] - 103:12, 103:14, 103:17, 103:19, 103:20, 104:14, 106:2, 106:7, 106:15, 108:16, 109:3, 110:2, 111:9, 111:15, 117:7, 161:1
**resolve** [1] - 122:24
**resolved** [2] - 60:6, 60:8
**resolving** [1] - 99:13
**resource** [2] - 52:19, 56:20
**resources** [2] - 51:21, 56:21
**respect** [2] - 131:13, 168:10
**respective** [1] - 173:4
**responded** [1] - 150:12
**response** [7] - 8:23, 9:1, 9:3, 62:5, 77:12, 98:23, 98:25
**responses** [1] - 9:5
**responsive** [2] - 8:12, 8:22
**rest** [1] - 113:9
**restitution** [3] - 68:1, 68:2, 68:16
**restitutions** [1] - 68:15
**restrict** [1] - 122:6
**restrictions** [1] - 118:18
**result** [5] - 51:3, 57:6, 72:10, 89:6, 105:16
**results** [5] - 54:1, 105:24, 152:21, 160:7, 161:4
**return** [2] - 150:22, 171:16
**returned** [1] - 150:12
**reveal** [3] - 84:10, 121:25, 159:7
**revealing** [1] - 159:17
**review** [2] - 8:18, 168:21
**reviewed** [2] - 7:24, 31:12
**revolve** [1] - 122:22
**rewrite** [1] - 38:8
**Rhode** [1] - 129:13

**ridiculous** [2] - 76:16, 155:17
**rights** [2] - 25:14, 76:24
**Rights** [5] - 34:7, 34:10, 62:15, 63:8, 65:19
**righty** [1] - 70:5
**rise** [1] - 61:20
**risks** [3] - 39:2, 39:7, 40:9
**Road** [1] - 171:2
**robust** [1] - 35:3
**roll** [17] - 41:13, 47:7, 52:4, 57:12, 57:15, 57:17, 58:19, 59:4, 59:5, 104:17, 106:22, 106:23, 107:1, 107:4, 107:17, 152:17, 167:14
**rolls** [59] - 28:16, 29:12, 29:13, 30:21, 30:24, 33:10, 35:17, 40:14, 40:15, 40:19, 40:24, 41:1, 41:2, 41:5, 41:7, 42:11, 42:23, 50:13, 50:14, 50:18, 50:25, 51:11, 51:24, 52:2, 54:17, 54:18, 54:22, 55:17, 55:24, 58:22, 58:24, 81:8, 81:24, 82:6, 88:20, 90:2, 90:4, 90:10, 102:3, 104:9, 115:21, 116:7, 123:4, 123:16, 123:24, 124:8, 135:19, 142:5, 143:5, 146:16, 152:25, 154:3, 154:6, 154:10, 154:13, 161:21, 169:1, 169:9
**Roman** [1] - 62:8
**rules** [2] - 5:8, 67:16
**Rules** [2] - 7:1, 76:23
**ruling** [1] - 68:7
**run** [2] - 67:21, 136:9
**running** [4] - 18:22, 55:22, 122:22, 137:4
**runs** [2] - 54:11

## S

**sales** [1] - 118:19
**San** [1] - 97:10
**satire** [1] - 141:17
**satirical** [1] - 141:22
**saw** [2] - 99:24,

116:14
**scampered** [1] - 40:17
**scenario** [1] - 64:19
**Schedule** [26] - 7:22, 7:24, 8:17, 8:20, 8:22, 9:6, 14:12, 20:23, 21:5, 22:2, 22:16, 22:19, 23:15, 23:24, 24:6, 25:6, 27:11, 71:5, 131:11, 145:8, 145:10, 148:2, 148:25, 151:17, 151:22, 165:14
**school** [2] - 111:14, 139:10
**Schosheim** [1] - 122:2
**science** [1] - 137:17
**scientist** [2] - 137:23, 137:25
**scientists** [3] - 137:13, 137:15, 139:2
**scope** [1] - 25:13
**score** [1] - 151:10
**scoreboard** [1] - 52:20
**screen** [8] - 5:23, 7:10, 7:12, 27:15, 27:23, 91:24, 149:11
**screwed** [2] - 123:19, 155:1
**screwing** [1] - 103:23, 121:24, 149:20
**scroll** [28] - 6:7, 7:22, 21:11, 25:10, 25:19, 27:22, 33:24, 34:14, 38:11, 47:2, 48:14, 50:6, 57:24, 61:3, 61:25, 62:7, 66:21, 94:18, 94:24, 95:7, 95:24, 96:6, 97:13, 98:15, 99:11, 141:4, 142:8
**scrolling** [1] - 124:19
**second** [13] - 14:24, 21:3, 33:2, 41:11, 91:22, 95:19, 99:12, 105:21, 105:24, 141:5, 143:8, 157:10, 158:6
**secondary** [2] - 104:17, 157:10
**secondly** [3] - 31:2, 54:9, 84:7
**secretaries** [5] - 78:8, 79:3, 80:21, 80:24, 81:1
**Secretary** [4] - 1:11, 4:13, 83:15, 105:7
**secretary** [6] - 18:17,

79:15, 80:11, 80:14, 81:2, 106:9
**Section** [4] - 34:9, 63:15, 81:20, 133:8
**section** [4] - 35:20, 63:18, 101:4, 164:15
**secure** [1] - 73:2
**Security** [14] - 46:7, 46:14, 46:18, 47:8, 112:11, 125:5, 125:7, 125:8, 125:10, 125:14, 125:18, 125:22, 147:19, 147:22
**see** [52] - 5:25, 6:13, 6:16, 7:15, 7:17, 16:1, 16:3, 21:1, 21:7, 27:12, 27:14, 27:15, 27:23, 27:25, 31:1, 31:6, 31:22, 32:9, 35:23, 35:24, 35:25, 37:13, 52:18, 56:3, 56:15, 57:21, 57:23, 62:19, 65:7, 91:23, 91:24, 92:23, 99:1, 99:2, 99:3, 101:5, 102:7, 104:2, 106:3, 106:6, 115:16, 117:2, 118:2, 124:21, 124:24, 124:25, 125:9, 131:11, 134:20, 135:1, 146:21
**seeing** [1] - 163:12
**seek** [4] - 25:15, 53:17, 76:24, 81:7
**seeking** [10] - 78:23, 79:1, 79:7, 79:20, 80:7, 90:19, 90:22, 92:5, 101:16, 101:20
**seeks** [4] - 28:5, 29:2, 33:6, 33:9
**seem** [1] - 46:12
**seemingly** [1] - 37:6
**self** [1] - 168:22
**self-confessions** [1] - 168:22
**selling** [4] - 118:23, 119:1, 119:2, 129:21
**senate** [1] - 111:14
**send** [4] - 49:14, 49:19, 49:23, 110:6
**sending** [1] - 40:22
**sends** [1] - 48:24
**sense** [8] - 5:18, 6:4, 6:12, 6:16, 101:18, 101:19, 102:18, 128:2
**sent** [6] - 21:10, 54:13,

92:17, 117:6, 142:21, 150:13
**sentence** [6] - 33:2, 38:19, 38:24, 41:11, 44:14, 135:12
**Sequel** [1] - 141:7
**series** [1] - 140:7
**serious** [2] - 30:5, 40:14
**server** [4] - 130:9, 130:10, 130:13
**SERVICE** [1] - 171:1
**service** [1] - 118:6
**set** [2] - 54:24, 170:16
**sets** [1] - 121:17
**settle** [1] - 84:21
**settled** [1] - 84:18
**settlement** [6] - 85:4, 122:17, 124:10, 124:13, 134:22, 136:6
**setup** [1] - 113:22
**seven** [3] - 15:24, 17:6, 109:2
**share** [4] - 6:7, 6:10, 7:10, 124:24
**sharing** [2] - 5:23, 7:12
**Shawna** [5] - 17:13, 18:15, 18:16, 137:10
**sheet** [3] - 171:12, 171:14, 171:16
**Sheet** [1] - 173:6
**SHENNA** [1] - 1:11
**Shenna** [2] - 171:10, 173:19
**shifts** [1] - 122:20
**shocking** [1] - 168:20
**short** [3] - 70:3, 70:5, 70:13
**shorthand** [1] - 170:10
**shortly** [1] - 71:14
**shot** [1] - 95:12
**SHOULD** [1] - 172:1
**show** [5] - 5:22, 15:25, 16:7, 27:6, 27:13, 31:5, 49:20, 56:10, 57:5, 57:20, 63:10, 66:20, 98:12, 110:9, 112:8, 123:18, 128:13, 134:19, 142:17, 144:23, 148:25, 156:3, 159:6, 159:12, 160:24
**showed** [5] - 17:19, 89:13, 100:17, 101:10, 168:5
**showing** [1] - 6:1,

16:5, 25:21, 94:25, 96:21, 122:8, 124:17, 134:18, 141:3, 146:4
**shown** [2] - 20:17, 146:5
**shows** [5] - 16:14, 16:18, 121:22, 125:18, 159:16
**shut** [1] - 165:3
**side** [3] - 93:8, 105:6
**sig** [1] - 97:15
**sign** [2] - 141:18, 171:13
**signature** [4] - 171:12, 171:13, 171:16, 173:15
**SIGNATURE** [2] - 173:8, 173:17
**signed** [1] - 171:16
**significant** [2] - 40:13, 104:16
**significantly** [1] - 107:12
**signing** [1] - 169:14
**similar** [10] - 13:19, 21:9, 36:3, 36:19, 49:15, 102:15, 162:10, 162:15, 162:16, 162:17
**similarities** [1] - 166:23
**Simpatico** [2] - 129:8, 130:4
**simple** [6] - 37:10, 37:11, 85:10, 167:5, 167:8
**simpler** [1] - 106:25
**simplified** [1] - 127:20
**simply** [1] - 150:11
**simultaneous** [1] - 114:5
**simultaneously** [4] - 110:5, 113:24, 162:3, 162:25
**single** [3] - 45:5, 111:13, 158:14
**sit** [6] - 46:4, 47:19, 51:15, 61:19, 61:22, 83:22
**sitting** [2] - 55:7, 167:19
**situation** [2] - 89:20, 114:13
**six** [6] - 8:2, 8:6, 8:7, 8:8, 8:13, 8:16
**skip** [1] - 99:6
**slate** [1] - 112:7
**slightest** [1] - 111:4
**sloppy** [2] - 89:10,

128:18
**Smith** [14] - 107:1, 107:2, 107:4, 109:14, 109:19, 109:23, 112:4, 112:7, 112:8, 112:10, 117:6, 134:16, 134:17, 134:18
**Smith's** [2] - 109:16, 117:11
**Smiths** [3] - 107:8, 107:17, 108:21
**so-called** [1] - 55:8
**social** [1] - 28:19
**Social** [14] - 46:7, 46:14, 46:18, 47:8, 112:11, 125:4, 125:7, 125:8, 125:10, 125:14, 125:18, 125:22, 147:19, 147:22
**software** [7] - 160:5, 160:17, 160:20, 160:22, 161:3, 161:7, 161:9
**sold** [1] - 119:4
**solved** [1] - 96:20
**someone** [5] - 105:8, 109:5, 114:13, 150:2, 150:8
**sometimes** [3] - 49:7, 120:5, 120:11
**somewhere** [1] - 139:24
**son** [2] - 107:6, 107:9
**sorry** [8] - 18:13, 21:2, 36:12, 72:21, 73:8, 91:6, 156:13, 160:25
**sort** [20] - 8:11, 19:9, 27:12, 66:10, 85:16, 100:17, 103:3, 103:20, 107:15, 107:24, 122:7, 126:6, 127:17, 127:24, 134:22, 135:13, 152:17, 155:12, 159:8, 160:17
**sorting** [3] - 103:19, 159:3, 159:20
**sorts** [7] - 19:24, 86:7, 106:1, 106:6, 106:16, 160:23, 169:1
**sound** [1] - 37:11
**sounds** [2] - 45:21, 70:10
**sources** [12] - 42:1, 42:3, 42:19, 43:5,

44:12, 44:16, 44:17, 44:18, 45:2, 159:9, 159:23, 167:1
**Southern** [2] - 31:16, 96:2
**space** [1] - 113:21
**spare** [1] - 55:5
**speaking** [5] - 13:12, 91:17, 137:16, 158:3, 158:6
**speaks** [11] - 21:20, 22:21, 23:17, 24:1, 50:4, 90:17, 92:16, 93:2, 93:7, 141:22, 146:12
**special** [3] - 93:18, 118:5, 139:1
**specific** [24] - 8:14, 12:15, 12:20, 13:1, 13:22, 13:24, 14:17, 15:2, 19:22, 27:5, 27:10, 43:16, 49:2, 71:18, 76:11, 82:24, 120:12, 129:3, 131:17, 136:5, 144:9, 144:11, 160:16, 162:16
**specifically** [6] - 7:3, 13:8, 20:3, 33:8, 72:20, 90:18
**specificity** [1] - 36:4
**specifics** [1] - 74:7
**speculate** [1] - 133:3
**speculation** [5] - 110:21, 110:22, 133:4, 135:14, 144:23
**speech** [1] - 122:7
**spent** [1] - 166:4
**spreadsheet** [1] - 128:3
**spreadsheets** [1] - 52:16
**SSDI** [3] - 47:9, 48:1, 52:6
**staff** [6] - 136:15, 136:16, 136:23, 137:1, 138:3, 138:12
**stage** [1] - 159:21
**stamped** [1] - 141:21
**stand** [1] - 15:5
**standards** [1] - 114:17
**standing** [2] - 81:22, 90:11
**start** [7] - 12:19, 43:10, 50:22, 73:7, 73:8, 162:1, 168:21
**started** [2] - 57:13, 154:6
**starters** [3] - 84:7,

162:13, 168:11
**starting** [2] - 92:21, 101:7
**starts** [1] - 154:8
**state** [75] - 28:9, 28:14, 30:7, 38:8, 41:2, 49:6, 51:23, 53:6, 53:13, 53:17, 54:2, 54:13, 54:20, 54:21, 55:23, 56:24, 60:2, 60:15, 62:6, 63:19, 63:20, 63:25, 67:14, 69:7, 70:20, 71:22, 73:21, 78:8, 79:4, 79:16, 80:12, 80:14, 80:22, 80:24, 81:1, 81:2, 85:25, 86:3, 86:10, 86:11, 86:17, 86:24, 87:8, 87:9, 87:10, 88:19, 90:8, 92:15, 93:1, 103:22, 104:2, 108:2, 110:5, 110:7, 111:14, 115:20, 116:6, 116:11, 116:14, 118:18, 126:15, 127:16, 127:17, 128:11, 131:23, 136:23, 137:4, 157:6, 157:11, 160:6, 162:4, 162:24
**State** [23] - 1:11, 1:12, 1:18, 2:3, 4:13, 14:6, 27:9, 29:18, 59:11, 59:18, 59:21, 59:25, 60:5, 60:13, 68:11, 69:20, 69:21, 83:15, 90:15, 99:23, 105:7, 169:5, 170:4
**state's** [4] - 48:25, 53:8, 106:9, 159:10
**statement** [14] - 33:13, 43:9, 58:8, 58:11, 60:23, 63:25, 130:12, 149:6, 149:10, 150:23, 151:1, 154:9, 156:6, 156:10
**statements** [4] - 5:17, 146:21, 149:25, 150:8
**States** [4] - 31:16, 96:2, 137:20, 150:25
**states** [64] - 13:20, 23:12, 29:11, 51:10, 51:17, 51:22, 52:11, 54:13, 55:2, 55:12, 55:19, 55:25, 56:2, 57:11, 57:18, 58:5,

58:17, 58:22, 67:9, 67:13, 68:9, 73:5, 81:8, 81:12, 83:2, 83:6, 83:9, 83:21, 85:22, 85:23, 85:24, 86:16, 86:18, 87:2, 87:13, 87:15, 88:8, 88:10, 88:11, 102:8, 102:16, 105:5, 108:23, 109:5, 109:15, 110:14, 116:4, 121:15, 125:21, 128:5, 134:25, 135:17, 157:9, 157:15, 157:17, 158:2, 158:15, 161:19, 162:7, 162:17, 162:20, 162:25
**STATES** [1] - 1:1
**states'** [2] - 158:20, 159:23
**statewide** [2] - 52:4, 117:18
**Station** [1] - 2:3
**statistical** [7] - 138:13, 138:20, 139:1, 139:11, 139:16, 139:20, 140:1
**statisticians** [1] - 139:2
**statistics** [5] - 138:4, 138:9, 138:12, 138:17, 138:22
**status** [6] - 93:19, 110:12, 111:20, 112:22, 113:7, 169:4
**statute** [13] - 64:4, 68:14, 92:2, 92:3, 98:13, 100:16, 100:22, 101:1, 101:15, 118:22, 119:15, 122:20, 133:13
**statutes** [1] - 129:22
**Statutory** [1] - 48:20
**statutory** [3] - 53:5, 79:24, 92:5
**stealing** [1] - 169:4
**stenographic** [1] - 173:3
**step** [6] - 51:10, 107:7, 126:12, 136:13, 157:10, 157:11
**steps** [3] - 51:2, 134:14, 149:24
**still** [19] - 10:4, 10:23, 15:15, 42:9, 42:13, 42:25, 43:6, 50:16,

62:22, 64:15, 83:25, 88:1, 112:13, 113:2, 113:3, 137:1, 155:4, 166:18

**stop** [2] - 65:8, 120:3

**Storm** [2] - 120:21, 124:18

**story** [3] - 122:10, 122:12, 123:18

**strained** [1] - 64:6

**Straka** [1] - 122:3

**strategies** [2] - 125:3, 125:4

**Street** [4] - 2:8, 109:17, 109:21, 171:8

**strike** [1] - 35:5

**strongly** [1] - 74:22

**study** [1] - 36:15

**stuff** [2] - 158:17, 160:20

**stunned** [1] - 105:21

**subject** [7] - 14:8, 22:17, 63:23, 65:24, 67:17, 122:21, 154:11

**submits** [1] - 47:20

**Subsection** [1] - 101:4

**substantial** [2] - 25:23, 25:24

**substantiate** [1] - 65:14

**success** [1] - 51:9

**successful** [1] - 64:13

**successfully** [1] - 55:13

**sue** [2] - 14:6, 49:24

**Sue** [1] - 16:16

**sued** [3] - 55:20, 59:17, 155:3

**sufficient** [1] - 94:12

**suing** [2] - 112:15, 112:16

**suit** [5] - 12:14, 12:21, 85:2, 135:4, 135:20

**Suite** [2] - 2:9, 171:8

**suits** [10] - 78:8, 80:6, 80:11, 80:18, 81:12, 81:21, 82:12, 82:13, 82:17, 82:22

**summarized** [1] - 132:2

**summary** [1] - 100:17

**support** [2] - 97:24, 138:17

**Support** [1] - 66:25

**suppose** [3] - 112:4, 112:7, 112:9

**supposed** [1] - 141:16

**supremacy** [1] - 86:6,

86:20

**Supreme** [7] - 31:24, 33:17, 37:21, 38:6, 38:7, 96:13, 115:11

**surprised** [2] - 93:15, 93:17

**suspect** [2] - 26:4, 71:14

**swamp** [2] - 66:3, 66:11

**sweeping** [1] - 85:12

**sworn** [2] - 4:7, 170:6

**system** [21] - 29:15, 29:19, 72:1, 82:5, 88:16, 88:17, 89:2, 89:4, 89:16, 114:4, 114:17, 129:19, 162:7, 163:16, 163:18, 163:19, 163:21, 163:23, 163:24, 166:17, 167:13

**systems** [8] - 70:22, 71:16, 161:17, 161:19, 161:24, 161:25, 163:7, 163:9

### T

**table** [2] - 34:2, 159:20

**tax** [4] - 45:3, 45:15, 45:18, 45:25

**team** [2] - 16:8, 85:14

**technical** [1] - 91:2

**temporally** [1] - 113:17

**ten** [3] - 70:6, 156:17, 157:3

**ten-minute** [1] - 156:17

**Tennessee** [2] - 159:4

**term** [9] - 71:25, 90:5, 100:11, 110:13, 110:14, 111:22, 116:25, 118:13, 136:18

**terms** [7] - 5:21, 28:24, 52:1, 93:14, 128:4, 159:9, 162:20

**testified** [7] - 4:7, 14:22, 17:7, 94:17, 95:1, 95:8, 168:12

**testify** [7] - 6:18, 7:4, 8:2, 8:5, 22:1, 22:23, 170:6

**testifying** [6] - 4:22, 9:16, 10:1, 10:2, 23:5, 168:15

**testimony** [16] - 6:23, 33:15, 43:10, 43:11,

44:3, 83:2, 100:1, 132:2, 135:8, 146:11, 152:13, 152:16, 154:24, 154:25, 166:8, 173:4

**Texas** [11] - 61:15, 62:4, 62:13, 63:5, 63:7, 64:22, 65:20, 69:23, 69:24, 87:3, 97:10

**THE** [11] - 24:11, 36:7, 66:5, 70:5, 75:25, 76:25, 167:23, 172:1, 172:2, 173:1, 173:11

**themselves** [2] - 121:23, 124:6

**theories** [1] - 82:18

**theory** [3] - 72:15, 82:21, 88:20

**therefore** [2] - 129:1, 164:9, 173:5

**they've** [3] - 48:24, 55:14, 56:2

**third** [7] - 16:17, 34:8, 122:2, 128:20, 130:7, 148:23, 167:9

**thirdly** [2] - 54:13, 84:9

**thirds** [1] - 31:21

**Thornburg** [1] - 138:16

**thousands** [3] - 150:3, 154:19, 159:1

**three** [23] - 16:19, 16:23, 16:25, 17:10, 17:11, 19:20, 34:4, 34:16, 44:2, 60:17, 60:21, 78:18, 79:13, 109:2, 149:21, 150:3, 150:5, 150:7, 153:18, 153:20, 153:22, 154:19, 166:3

**time-limited** [1] - 114:7

**timely** [1] - 54:22

**TITLE** [1] - 173:19

**title** [2] - 17:18, 141:6

**TO** [2] - 173:1, 173:11

**today** [1] - 6:24

**together** [1] - 173:4

**took** [2] - 51:2, 63:6

**top** [7] - 16:2, 21:8, 31:9, 61:9, 89:4, 141:16, 141:21

**topic** [5] - 20:24, 21:1, 23:16, 24:6, 25:13

**topics** [16] - 7:23, 7:24, 8:2, 8:6, 8:7,

8:8, 8:13, 8:16, 22:17, 23:15, 23:24, 33:25, 34:4, 34:13, 40:6, 65:6

**totally** [3] - 111:1, 111:6, 152:22

**touching** [1] - 22:19

**towards** [1] - 15:14

**township** [2] - 118:11, 118:13

**townships** [1] - 118:14

**track** [1] - 57:1

**training** [6] - 138:13, 138:22, 138:23, 138:25, 139:1, 139:6

**transcript** [4] - 77:6, 94:6, 94:13, 151:11

**transfer** [4] - 128:15, 129:14, 129:18, 130:4

**transparency** [2] - 29:19, 104:1

**transposed** [2] - 105:20, 106:7

**transposition** [5] - 105:9, 105:14, 105:16, 105:23, 106:4

**trepidation** [1] - 164:1

**trial** [1] - 64:2

**tried** [1] - 129:17

**tries** [1] - 89:4

**true** [6] - 78:17, 139:18, 163:11, 170:9, 173:15

**truth** [4] - 64:1, 170:6, 170:7

**truthfully** [2] - 6:18, 63:19

**try** [11] - 5:15, 6:10, 15:19, 53:17, 93:12, 93:21, 101:24, 102:25, 128:13, 139:23, 151:25

**trying** [16] - 9:19, 11:10, 11:11, 30:4, 51:23, 70:20, 73:1, 102:13, 106:21, 106:25, 109:7, 127:21, 154:23, 162:17, 162:21, 162:22

**turn** [1] - 55:2

**turning** [3] - 8:17, 30:19, 85:11

**twice** [3] - 15:6, 19:8, 68:6, 105:17, 109:1

**two** [22] - 8:18, 14:12, 18:14, 31:21, 33:25,

53:20, 53:23, 54:18, 55:18, 82:14, 93:11, 93:20, 98:22, 113:21, 115:22, 124:9, 125:13, 142:20, 161:5, 163:5, 166:11, 167:4

**two-thirds** [1] - 31:21

**two-year-old** [1] - 166:11

**type** [3] - 44:10, 68:21, 70:18

**types** [2] - 50:7, 103:2

**typically** [4] - 47:20, 48:24, 49:5, 103:3

### U

**U.S** [1] - 32:20

**U.S.C** [1] - 79:24

**UFO** [1] - 141:15

**ultimate** [1] - 64:7

**ultimately** [1] - 32:21

**un-un** [1] - 129:4

**unable** [1] - 6:18

**unaware** [1] - 86:14

**unclear** [1] - 26:14

**under** [40] - 6:25, 27:23, 33:1, 34:10, 55:1, 58:17, 62:14, 63:5, 63:15, 64:5, 67:20, 68:21, 78:8, 80:8, 80:12, 81:7, 82:13, 82:17, 82:18, 85:19, 85:25, 86:3, 86:11, 86:16, 86:21, 90:24, 91:20, 92:5, 115:19, 115:20, 130:7, 138:15, 148:3, 150:23, 150:25, 154:7, 154:8, 168:15, 168:16

**undergraduate** [1] - 139:7

**underneath** [1] - 31:22

**understood** [5] - 9:15, 11:10, 121:18, 147:7, 147:16

**uniformed** [1] - 118:6

**uninterested** [1] - 111:6

**unions** [1] - 130:20

**United** [5] - 31:16, 96:1, 137:19, 145:4, 150:25

**UNITED** [1] - 1:1

**Unless** [1] - 167:24

**unless** [4] - 22:4,

40:16, 42:13, 121:9
**unrelated** [1] - 77:2
**unreliability** [1] -
168:20
**untrue** [1] - 139:22
**UOCAVA** [8] - 93:18,
100:2, 100:4, 100:5,
118:10, 118:12,
118:15
**up** [53] - 25:21, 27:12,
33:25, 49:5, 49:20,
49:22, 52:17, 52:22,
53:4, 53:12, 55:22,
60:24, 71:14, 77:17,
77:18, 85:1, 85:17,
86:21, 86:23, 88:16,
88:20, 89:13, 93:22,
96:21, 98:9, 100:22,
103:23, 105:5,
105:8, 121:24,
122:6, 123:16,
123:20, 123:24,
124:7, 127:2, 127:6,
127:11, 128:3,
128:9, 128:11,
136:10, 141:20,
142:8, 149:20,
155:1, 156:16,
160:1, 160:15,
161:13, 164:13,
167:20
**updated** [1] - 158:1
**uploaded** [1] - 126:7
**usage** [1] - 165:22
**usages** [1] - 22:22
**useful** [3] - 35:11,
49:22, 107:10
**uses** [7] - 28:17,
41:18, 47:24, 77:5,
113:11, 114:24,
157:6
**utility** [12] - 102:20,
103:2, 103:5, 103:6,
103:7, 103:9,
103:10, 103:13,
104:8, 104:10,
104:12, 104:20
**utilize** [3] - 131:13,
131:15, 131:16
**utilizes** [1] - 28:8

## V

**vacant** [1] - 45:1
**vague** [2] - 103:6,
126:18
**valid** [4] - 41:16, 63:4,
68:19, 68:20
**validation** [1] - 130:25
**value** [1] - 137:23

**variety** [18] - 8:7, 14:7,
14:10, 18:19, 38:5,
41:21, 42:1, 42:18,
69:22, 70:19, 71:17,
77:25, 88:7, 91:16,
91:20, 105:18,
106:2, 128:21
**various** [13] - 10:12,
11:14, 13:16, 52:8,
72:23, 78:8, 101:5,
115:20, 125:2,
125:3, 126:15,
159:20, 167:1
**varying** [1] - 11:2
**vehemently** [1] -
134:15
**Vehicles** [1] - 142:19
**vendor** [3] - 127:25,
128:16, 129:3
**vendor's** [1] - 128:23
**vendors** [12] - 125:16,
128:6, 129:5, 129:7,
130:16, 130:19,
130:22, 131:2,
131:6, 131:18,
131:21, 132:7
**veracity** [1] - 146:21
**verification** [1] -
168:10
**version** [4] - 143:8,
143:19, 147:17,
148:17
**versus** [10] - 31:15,
37:1, 39:19, 60:5,
61:16, 67:4, 96:1,
115:13, 137:21,
145:5
**via** [2] - 6:8, 170:5
**victim** [1] - 90:13
**victims** [2] - 68:16,
69:14
**VIDEO** [1] - 170:6
**VIDEOCONFERENC
E** [2] - 1:17, 4:1
**view** [6] - 33:16, 44:4,
64:21, 65:12, 65:13,
138:6
**views** [2] - 30:15,
68:24
**violate** [1] - 63:8
**violating** [1] - 119:15
**Violation** [1] - 48:20
**violation** [6] - 34:7,
50:15, 64:5, 64:22,
72:10, 76:22
**Virginia** [34] - 37:4,
59:10, 59:13, 59:18,
59:21, 59:22, 59:25,
60:13, 69:21, 86:13,
86:23, 140:8,

140:24, 141:9,
141:19, 142:4,
142:7, 142:13,
142:14, 143:25,
145:4, 146:8, 151:4,
151:8, 153:4,
153:11, 153:12,
153:16, 153:21,
154:12, 154:17,
155:16, 168:6
**visit** [2] - 44:24, 45:11
**voluntarily** [3] - 55:14,
83:3, 85:23
**voluntary** [1] - 162:8
**Vote** [2] - 86:13, 169:4
**vote** [42] - 13:16, 39:3,
39:8, 39:13, 39:16,
39:25, 40:10, 41:4,
41:8, 68:2, 68:13,
68:14, 68:18, 70:21,
70:24, 71:12, 71:13,
71:16, 71:19, 71:20,
71:24, 72:3, 72:14,
72:17, 87:17, 88:5,
88:22, 88:25, 89:9,
89:14, 113:2, 113:3,
113:16, 113:18,
114:12, 116:8,
119:11, 119:12,
119:22, 134:19,
143:4, 169:7
**voted** [4] - 116:9,
121:5, 121:15,
140:24
**voter** [144] - 28:16,
29:4, 30:2, 30:5,
30:9, 30:10, 30:13,
30:19, 30:23, 33:6,
33:10, 40:14, 40:19,
41:1, 41:2, 41:5,
41:7, 41:13, 42:11,
47:7, 48:25, 49:5,
49:14, 50:8, 50:11,
50:25, 51:11, 54:16,
54:17, 54:18, 54:22,
55:17, 55:23, 57:12,
57:15, 57:17, 58:18,
58:22, 58:24, 59:4,
59:5, 70:15, 70:22,
71:2, 71:9, 72:2,
78:24, 79:2, 79:8,
79:21, 79:22, 81:8,
81:24, 82:6, 83:24,
86:10, 88:20, 90:1,
90:4, 90:10, 90:16,
90:21, 92:6, 99:18,
100:4, 100:8,
100:12, 100:15,
102:3, 103:4, 103:8,
104:16, 105:18,

106:22, 107:17,
108:24, 111:20,
111:23, 112:8,
112:13, 112:22,
114:23, 115:2,
115:7, 115:9,
115:16, 115:17,
115:21, 115:23,
116:3, 116:5,
116:14, 116:16,
116:22, 117:2,
117:8, 117:14,
117:16, 117:20,
118:19, 119:19,
120:4, 123:5,
123:16, 123:24,
124:7, 126:4,
131:22, 133:19,
133:22, 134:2,
134:18, 135:5,
135:19, 136:3,
136:16, 136:23,
137:4, 138:1, 142:5,
143:3, 143:5,
143:21, 144:1,
144:4, 144:20,
145:15, 146:16,
147:8, 149:3, 149:7,
149:9, 149:13,
152:17, 152:20,
152:23, 152:25,
154:10, 154:13,
157:6, 160:16,
167:14, 169:8
**Voter** [3] - 48:21,
58:18, 115:19
**voter's** [2] - 92:21,
101:7
**voters** [22] - 35:1,
35:22, 36:16, 36:17,
37:25, 40:21, 118:6,
118:11, 118:13,
118:15, 120:12,
121:3, 121:12,
121:21, 122:16,
123:2, 123:3,
142:14, 142:16,
142:17
**votes** [2] - 72:1, 72:11
**voting** [12] - 67:12,
72:13, 72:19, 72:21,
72:25, 73:6, 73:23,
134:9, 134:13,
140:7, 143:2, 158:15
**Voting** [6] - 34:7,
34:10, 62:15, 63:8,
65:19, 141:8
**VRA** [1] - 63:17
**vs** [1] - 1:10

## W

**wager** [1] - 40:13
**Wait** [1] - 96:6
**wait** [1] - 74:18
**waive** [1] - 169:14
**wants** [2] - 30:16, 75:2
**warrant** [1] - 159:13
**Washington** [2] - 2:8,
171:8
**waste** [3] - 110:16,
110:23, 159:11
**wasted** [1] - 117:15
**wasting** [2] - 56:18,
122:19
**ways** [6] - 44:24,
109:12, 129:21,
132:13, 159:20,
166:3
**web** [1] - 58:3
**website** [20] - 16:7,
20:18, 20:19, 21:16,
21:18, 23:18, 25:8,
25:22, 26:6, 57:22,
77:8, 78:4, 78:6,
88:4, 92:4, 94:25,
95:12, 96:23, 120:11
**weeded** [2] - 54:10,
54:12
**weeks** [3] - 89:12,
113:21, 142:20
**weight** [1] - 46:3
**weighty** [1] - 35:3
**welcome** [1] - 141:18
**welcomed** [1] - 51:22
**West** [1] - 37:4
**Western** [1] - 97:10
**WHEREOF** [1] -
170:16
**whittle** [1] - 54:8
**whole** [4] - 6:1, 69:14,
88:9, 170:7
**wholly** [1] - 77:2
**willing** [2] - 78:15,
122:18
**willingness** [1] - 49:25
**wish** [1] - 171:14
**witness** [7] - 22:9,
23:6, 75:1, 76:5,
76:7, 76:21, 76:25
**WITNESS** [1] - 170:16
**wondering** [2] - 92:14,
132:25
**word** [1] - 141:20
**words** [12] - 26:14,
56:17, 57:13,
113:18, 123:12,
125:16, 125:17,
126:5, 129:17,
160:23, 166:13,

168:23
**works** [5] - 18:9, 23:8, 106:5, 117:1, 132:7
**write** [2] - 168:23, 169:7
**writing** [1] - 153:14
**written** [2] - 8:23, 9:1
**wrongdoer** [1] - 154:16
**wrote** [1] - 153:14

## Y

**year** [14] - 98:22, 104:18, 104:24, 105:3, 105:10, 105:16, 105:19, 106:17, 106:23, 107:6, 107:9, 107:18, 166:11
**years** [12] - 54:18, 57:14, 98:22, 112:11, 112:18, 113:8, 116:8, 124:10, 125:13, 136:4, 149:21
**York** [9] - 31:17, 89:7, 89:8, 89:9, 89:11, 89:15, 89:20, 89:23, 96:3
**yourself** [3] - 17:6, 84:3, 84:9
**yup** [9] - 16:10, 34:17, 35:25, 38:21, 46:19, 47:23, 83:15, 94:2, 95:14

## Z

**zero** [1] - 36:11
**ZOOM** [3] - 1:17, 4:1, 170:5
**Zoom** [1] - 5:15