UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PUBLIC INTEREST LEGAL
FOUNDATION, INC.,

                    Plaintiff,

          v.                                          Docket No. 1:20-cv-00061-GZS

SHENNA BELLOWS, in her official capacity
as the Secretary of State for the State of
Maine,

                    Defendant.

**SECRETARY OF STATE'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant Shenna Bellows, in her official capacity as Secretary of State ("Secretary"),

moves for summary judgment against Plaintiff Public Interest Legal Foundation, Inc. ("PILF")

and also, through this consolidated filing, opposes PILF's motion for summary judgment (ECF

No. 35).

**Memorandum of Law**

The Secretary of State and municipal registrars throughout Maine periodically conduct

list maintenance on Maine's database of registered voters, checking for voters who have

relocated or died and, if necessary, changing their voter status or updating their data.  These list

maintenance activities are strictly regulated by § 8 of the National Voter Registration Act of

1993 ("NVRA"), 52 U.S.C. § 20507, to ensure that eligible voters are not incorrectly purged

from Maine's voter list.  One of the safeguards that the NVRA puts in place to deter such

improper purging is a "sunlight" provision, which requires states to retain for two years and

allow public inspection of records "concerning the implementation of programs and activities

1

conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."  52 U.S.C. § 20507(i).  Reasonably read, this provision requires simply that states preserve and offer for public inspection records that show what steps they have taken as part of their list-maintenance efforts to remove ineligible voters and otherwise ensure the accuracy and currency of their voter lists.

This lawsuit is an effort by PILF, an organization dedicated to fighting "lawlessness" in elections, to stretch § 8's public disclosure requirement beyond all recognition.  PILF asserts that § 8(i) requires states to publicly disclose not just documentation of their list maintenance activities, but registration information on every single registered voter in the state, including data on the voter's name, mailing and residence address, year of birth, party enrollment, and participation in past elections, among other fields.  In Maine's case, this would mean providing PILF with a data file containing personal information on over *1.1 million* Maine voters.

The Maine Legislature has, quite sensibly, forbidden the Secretary from indiscriminately disclosing personal information contained in Maine's voter file.  Concerned that such disclosure would deter Mainers from registering to vote and could even facilitate voter fraud, Maine enacted 21-A M.R.S. § 196-A, which makes confidential the data in Maine's Central Voter Registration system ("CVR"), subject to various enumerated exceptions.  Thus, when PILF demanded under the NVRA that the Secretary provide it with voter data that Maine's voter privacy law restricts to political parties and campaigns (subject to stringent restrictions on further dissemination or commercial use), the Secretary properly denied the request.  This suit followed.

The NVRA does not preempt Maine's voter privacy law.  PILF's reading of the NVRA's disclosure provision grossly exaggerates the scope of that provision by focusing only on the broader terms and phrases in the statutory language—*all records*, *concerning*, *programs and*

2

*activities*—while ignoring the two significant qualifiers that Congress wrote into the law.  If Congress had required states to produce "all records concerning voter registration programs and activities," it might be a closer question whether the statute covers registration information about all of Maine's voters.  But that is not what the statute says.  It requires states to produce records only to the extent that they concern the "implementation" of programs and activities, and only to the extent those programs and activities were "conducted for the purpose of ensuring" list accuracy and currency.  These two textual constraints on the scope of records—which, under the rule against surplusage, must be given effect—forecloses PILF's attempt to convert the disclosure provision into a catch-all requirement that makes public all records having anything to do with voter registration, no matter how sensitive, and no matter how far removed from the actual conduct of list maintenance efforts.  Rather, these qualifiers make clear that Congress was focused on requiring states to disclose the mechanics of their efforts to remove ineligible voters and otherwise keep their lists accurate and up to date.  A static list of registered voters' personal information sheds no meaningful light at all on these topics.

The surrounding statutory text also refutes PILF's reading of the disclosure provision. Section 8(b), for example, makes clear that the "programs and activities" at issue in § 8 are those that "confirm[]" registrants' eligibility to vote, directly contradicting PILF's view that the disclosure provision extends indiscriminately to all activities somehow relating to voter registration.  *See* Pl.'s Mot. at 7–8.  Moreover, § 8 repeatedly refers to "official lists of eligible voters"—including even in the disclosure provision itself—and yet never straightforwardly says that such lists are subject to disclosure.  Such an omission is inexplicable if it was indeed Congress's intent that lists be made public.  In addition, the disclosure provision includes a second paragraph providing that the universe of disclosable documents "shall include" a limited

3

set of records containing personally identifying information of voters directly affected by list maintenance activities.  If Congress felt it necessary to clarify that this limited set of records was within the disclosure provision, its failure to also specify that full voter lists are included in the provision should be taken as dispositive of its lack of intent to require such disclosure.

Unable to effectively defend its audacious interpretation of § 8(i) based on the language or structure of the statute, PILF relies upon a pair of district court decisions from Maryland and Mississippi that gave broad readings to the NVRA's disclosure requirement.  Pl.'s Mot. at 12–14. But the scope of § 8(i) is a matter of first impression in this District and in the First Circuit, and this Court is not bound by those out-of-jurisdiction decisions.  Moreover, the Maryland court was operating under a deeply flawed Fourth Circuit controlling precedent that, among other things, failed to give distinct meaning to either of the key textual restrictions in the statute.  And the Mississippi decision, read in its full context, appears to largely support the Secretary's position, as the court's holding was to *refuse* the plaintiffs access to the data they were seeking.

Finally, even if the NVRA requires disclosure of states' voter lists—and it does not—it certainly does not require disclosure of such files without any protections for the privacy of voters.  Even PILF's flawed caselaw largely recognizes as much.  Thus, even if the Court were to conclude that § 8(i) encompasses voter lists, it should hold that the semi-anonymized voter file that the Secretary already makes available to the public under 21-A M.R.S. § 196-A(1)(F) is sufficient to comply with the NVRA's disclosure requirement.

Because the NVRA by its plain language, as well as its structure and purpose, does not require Maine to publicly disclose a list containing personal information about all of its registered voters and, even if it did, an adequate version of that list is already available to PILF, the Court should grant summary judgment to the Secretary and deny it to PILF.

## Summary of Undisputed Facts

### *The NVRA*

In 1993, Congress enacted the NVRA.  *See* Pub. L. No. 103–31, 107 Stat. 77 (1993).  The NVRA required the States to make a number of reforms and improvements to their voter registration practices.  The NVRA has four stated purposes: "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," to "make it possible for Federal, State, and local governments to implement [the Act] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office," to "protect the integrity of the electoral process," and to "ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b).  Congress issued three findings supporting its passage of the NVRA, which relate to the importance of protecting and promoting the right to vote and the "damaging effect on voter participation" of "discriminatory and unfair registration laws and procedures."  *Id.* § 20501(a).

Although the most well-known aspect of the NVRA is its "motor voter" provision, which required states to allow citizens to register to vote when they applied for driver's licenses, *see id.* § 20504, the Act also contains a variety of other requirements intended to make it easier for Americans to register to vote.  *See id.* § 20505 (requiring states to accept mail-in registrations); § 20506 (requiring states to designate agencies to assist voters with registration).

At issue in this litigation is § 8 of the NVRA, "Requirements With Respect to Administration of Voter Registration."  *Id.* § 20507.  Section 8 regulates, in large part, how states should maintain what it refers to as their "official lists of eligible voters."  *Id.* § 20507(a)(4).  Most notably, it requires states to conduct a general program that makes a reasonable effort to remove voters from such lists who are deceased or have changed residences, while

simultaneously requiring considerable precautions to avoid removing still-eligible voters.  *Id.*
§ 20507(a)(4), (b), (c), (d).  Among those precautions is a requirement that, before a State
removes a voter from its rolls on grounds of a change of address, it must either confirm in
writing that the voter has changed addresses or mail the voter a notice, the requirements of which
are described in subsection (d)(2).  In the latter case, the state may remove the voter only if the
voter fails to respond to the notice *and* has failed to vote or appear to vote in two general
elections subsequent to the notice.  *Id.* § 20507(d)(1)(B).

As an added safeguard against improper purging of voters from registration lists, § 8
imposes on states a requirement that they make records of their list maintenance activities
available to the public.  That requirement provides:

> (1) Each State shall maintain for at least 2 years and shall make
> available for public inspection and, where available, photocopying
> at a reasonable cost, all records concerning the implementation of
> programs and activities conducted for the purpose of ensuring the
> accuracy and currency of official lists of eligible voters, except to
> the extent that such records relate to a declination to register to
> vote or to the identity of a voter registration agency through which
> any particular voter is registered.

> (2) The records maintained pursuant to paragraph (1) shall include
> lists of the names and addresses of all persons to whom notices
> described in subsection (d)(2) are sent, and information concerning
> whether or not each such person has responded to the notice as of
> the date that inspection of the records is made.

*Id.* § 20507(i).

### Maine's Creation of a Centralized Voter Registration System

At the time the NVRA passed in 1993, Maine, like many states, had no centralized voter
registration database.  Def.'s Statement of Mat. Facts ("DSMF") (ECF No. 38), ¶ 43.  Rather,
because Maine elections are administered primarily at the municipal level, each of Maine's more
than 500 municipalities was responsible for maintaining voter rolls for its residents.  *Id.* ¶ 44.

Municipalities maintained these records in a variety of forms, including handwritten lists and a variety of electronic formats. *Id*.

That changed after Congress enacted the Help America Vote Act of 2002 (HAVA). HAVA required States to modernize election administration in various ways, including by requiring each State to implement "a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained and administered at the State level that contains the name and registration information of every legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A). HAVA recognizes the sensitivity of these databases, expressly requiring that the administrator of the database "shall provide adequate technological security measures to prevent the unauthorized access" to the database. *Id.* § 21083(a)(3).

By 2007, Maine had complied with its obligation under HAVA to create a centralized voter registration database. DSMF ¶ 46. That system, known as the Central Voter Registration system, or CVR, currently (as of January 1, 2021) contains registration data on 1,134,245 active status voters and 3,595 inactive status voters. *Id.* ¶ 49. Realizing that CVR would become a repository of sensitive information on hundreds of thousands of Maine voters, the Maine Legislature enacted legislation in 2005 to protect the confidentiality of CVR data. *Id.* ¶ 51; *see* 2005 P.L. ch. 404 (codified at 21-A M.R.S. § 196, recodified as amended at 21-A M.R.S. § 196-A). The Legislature identified three "compelling state interests" at stake in regulating public access to CVR data: preventing voter fraud, preventing the potential disenfranchisement of voters, and ensuring that voters are not discouraged from participating in the voting process. 2005 P.L. ch. 404, § 9; *see* 21-A M.R.S. § 195; DSMF ¶¶ 52–54.

*Maine's Current Voter Privacy Law*

The current statute, now codified as amended at 21-A M.R.S. § 196-A, provides that

"information contained electronically in the central voter registration system and any information or reports generated by the system are confidential," subject to nine exceptions lettered A through I.  *See* 21-A M.R.S. § 196-A(1)(A)–(I).  The exceptions allow, for example, that the Secretary may disclose certain information in response to queries about specific voters, *see id.* § 196-A(1)(A) & (H), that the Secretary shall provide certain data to law enforcement and the courts, *see id.* § 196-A(1)(G) & (I), and that the Secretary may provide certain data to other governmental and quasi-governmental entities for their authorized use, *see id.* § 196-A(1)(E).

Exception F notably requires the Secretary to provide, free of charge, a data file on any number of Maine voters—up to and including Maine's entire voter list—that includes those voters' year of birth, county and congressional district, date of registration, and date of the last time the voter voted.  *Id.* § 196-A(1)(F).  The data must be semi-anonymized by including only the first or last name of the voter and omitting detailed residence information.  *Id.*  That same exception allows the Secretary to provide, free of charge, "any report or statistical information that does not contain the names, dates of birth, voter record numbers or addresses of individual voters."  *Id.*

PILF seeks the data that is the subject of Exception B.  That provision authorizes "A political party, or an individual or organization engaged in so-called 'get out the vote' efforts directly related to a campaign or other activities directly related to a campaign, or an individual who has been elected or appointed to and is currently serving in a municipal, county, state or federal office" to purchase certain CVR data from the Secretary.  *Id.* § 196-A(1)(B).  This report, known as the "party/campaign-use voter file" contains extensive personal information about each voter, namely:

- the voter's name
- residence address

- date of registration,
- date of change of the voter record if applicable,

- mailing address
- year of birth
- enrollment status (i.e. party)
- electoral districts
- voter status

- voter participation history
- voter record number
- any special designations indicating uniformed service voters, overseas voters or township voters

*Id.*; DSMF ¶¶ 56–57.  The statute allows political parties and officials to access this detailed voter information in recognition of the fact that giving candidates, parties, and other participants in the electoral process the ability to find and communicate with registered voters can increase civic engagement and participation in the electoral process as well as ensuring that political parties are able to associate with their enrolled voters.   DSMF ¶ 58.  However, Exception B places strict limitations on what the recipients of this data are permitted to do with it.  Recipients "may not sell, distribute or use the data for any purpose that is not directly related to the activities of a political party, "get out the vote" efforts directly related to a campaign or other activities directly related to a campaign."  21-A M.R.S. § 196-A(1)(B).  Knowing violation of this restriction is a Class E crime.  21-A M.R.S. § 32(1).

Individuals requesting a party/campaign-use voter file under Exception B are required to submit an application to the Secretary documenting that they qualify to receive the data and agreeing that they will use it only for the purposes permitted by statute.  DSMF ¶ 59.  Requests for this data by unauthorized parties or for unauthorized purposes are rejected.  *Id.*

*The Secretary's List Maintenance Efforts*

Since implementation of CVR in 2007, the Secretary has engaged in a program of maintaining the data in CVR, as required by the NVRA and HAVA.  *Id.* ¶ 61.  The Secretary routinely works with municipalities to identify and remove records of deceased voters, voters who have moved, and duplicate voter records.  *Id.* ¶ 62.  In 2007, 2009, 2011 and 2013, the Secretary conducted a system-wide voter list maintenance process, using U.S. Postal Service

National Change of Address data, as specifically contemplated by the NVRA.  *Id.* ¶ 64.  In 2017, the Secretary conducted additional maintenance activities using the Interstate Voter Registration Crosscheck Program, which enabled cancellation of registrations for voters who had registered and voted in other states after having previously registered in Maine.  *Id.* ¶ 65.  The Secretary had planned to conduct additional list maintenance operations in 2020, including the mailing of notices under § 8(d)(2), but was unable to do so due to the COVID-19 pandemic.  *Id.* ¶ 66. Those efforts are now scheduled for 2021.  *Id.*

The Secretary's office generated various records documenting the list maintenance efforts of 2007, 2009, 2011, 2013, and 2017.  *Id.* ¶ 67.  While some of these records no longer exist because of the expiration of the two-year retention period in 52 U.S.C. § 20507(i)(1), all or virtually all of these records would have been available for public inspection and copying at the time, including records documenting which voter registrations were cancelled as a result of the Secretary's efforts.  *Id.* ¶ 68.  Similarly, all or virtually all records documenting the list maintenance efforts planned for 2021 will be available to the public for inspection and copying. *Id.* ¶ 69.

*PILF's Demand for Confidential CVR Data*

PILF is an Indiana-based organization dedicated to fighting "lawlessness" in elections. *Id.* ¶ 76.  It publishes reports on alleged irregularities in various jurisdictions relating to voter registration.  *Id.* ¶ 77.  In 2017, PILF issued a report called *Alien Invasion II*, which alleged a "[c]overup" of noncitizen registration and voting in Virginia.  *Id.* ¶ 78.  The report appended government records showing the names and contact information of specific individuals who turned out to be legal Virginia voters, resulting some of those voters bringing a federal civil rights lawsuit against PILF.  *Id.* ¶¶ 79–82.  PILF ultimately reissued the report with an apology

10

for "any characterization of those registrants as felons." *Id.* ¶ 83. Even after that, PILF continues to publicize personal information about voters, issuing a report in 2019 containing the names, addresses, and birthdates of individual Florida voters that it alleged were registered to vote twice. *Id.* ¶ 84.

In October 2019, PILF wrote a letter to Maine's previous Secretary of State, notifying him of PILF's view that 21-A M.R.S. § 196-A, by making CVR data confidential, violated § 8(i) of the NVRA. *Id.* ¶ 85. The letter requested that the Secretary "provide us with an electronic copy of the statewide voter registration list." *Id.* ¶

Following additional correspondence, Deputy Secretary of State Julie Flynn wrote to PILF on January 30, 2020. *Id.* ¶ 86. She described Maine's CVR system, and noted that state law prohibited disclosure of CVR data or reports except as permitted in Exceptions D and F of § 196-A(1). *Id.* ¶ 86. Deputy Secretary Flynn's correspondence enclosed a report submitted to the Legislature on administration of the CVR that summarized the Secretary's list maintenance activities. *Id.* ¶ 87. Deputy Secretary Flynn offered to produce paper records documenting the Secretary's 2017 list maintenance effort using the CrossCheck system. *Id.* And the correspondence further offered to produce a list of the voters who received the § 8(d)(2) notices that the Secretary had planned to send out later in 2020, as is required by the NVRA under § 8(i)(2). *Id.* ¶ 88.

In response, PILF requested that the Secretary produce the party/campaign-use voter file described in Exception B of § 196-A. *Id.* ¶ 89. Deputy Secretary Flynn responded:

> Although our office does not have authority under state law to
> provide you with an electronic copy of [the party/campaign use
> voter file] from CVR, as explained in my letter of January 30,
> 2020, we have offered—and continue to offer—an opportunity for
> you to inspect relevant records pursuant to section 8(i) of the
> NVRA, 52 U.S.C. § 20507(i). We are also willing to provide you

> with copies of records reflecting the list maintenance activities
> planned for the time period after the March or June 2020 primary
> elections, in accordance with section 8(d)(2) and 8(i) of the
> NVRA, as described in my letter of January 30, 2020.
>
> In short, we are willing to work with you to resolve this issue.
> Please advise whether you are prepared to do so.  Thank you.

*Id.* ¶ 90.

PILF then filed the current action.  PILF brings a single claim: that the Secretary's denial of its request for the party/campaign-use voter file violates § 8(i) of the NVRA.

<b>Argument</b>

## I.    Legal Standard

"Generally, a party is entitled to summary judgment if, on the record before the Court, it appears 'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Friends of Merrymeeting Bay v. Hydro Kennebec, LLC*, No. 1:11-CV-00035-GZS, 2015 WL 1523830, at *1 (D. Me. Apr. 2, 2015) (quoting Fed. R. Civ. P. 56(c)(2)).  A fact is material if it has "the potential to affect the outcome of the suit under the applicable law."  *Id.* (quoting *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993)).  The standard is identical where, as here, there are cross-motions for summary judgment.  *Id.* (citing *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 34 (1st Cir.2005)).  "[T]he court must mull each motion separately, drawing inferences against each movant in turn."  *Id.* (quoting *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir.2003)).

## II.   The NVRA Does Not Require Maine to Disclose Personal Data on 1.1 Million Registered Voters

### A.    To Prevail, PILF Must Establish that the NVRA Preempts Maine's Voter Privacy Statute

The parties do not dispute that Maine law forbids the Secretary from providing the party/campaign-use voter file to PILF and would also prevent PILF from using it.  *See* DSMF

12

¶ 14.  Thus, the issue becomes whether the public-disclosure provision in § 8 of the NVRA preempts Maine law protecting the confidentiality of Maine voters' personal information.

Legislation such as the NVRA, which is enacted under Congress's power under the Elections Clause to regulate the "Times, Places and Manner" of congressional elections, preempts state law "so far as the two are inconsistent, and no farther."  *Ex parte Siebold*, 100 U.S. 371, 386 (1879).  Such federal legislation is not subject to a traditional preemption analysis but is interpreted "simply to mean what it says." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14, (2013).

But while the typical preemption analysis may not apply, state election laws must still be "examined in light of the particular federal-state balance achieved in that arena," in which the Founders "delegated substantial authority over Federal Elections to the States."  *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 730 (S.D. Miss. 2014).  In considering that balance, a State's authority is "particularly potent" regarding "procedural regulations and rules to oversee and ensure the integrity of elections."  *Id.* (citing *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995)).  Thus, even if the Court may not apply the traditional presumption against preemption in interpreting the NVRA, it conversely may not read the NVRA's provisions more expansively than Congress intended.  *Id.* (citing *Ex parte Siebold*, 100 U.S. at 392).

Here, the Court should be particularly cautious about adopting an expansive interpretation § 8(i) for two reasons.  First, while the Supreme Court has recognized that Congress's power under the Election Clause is broad enough to encompass regulation of voter registration, *Inter Tribal*, 570 U.S. at 8–9, a requirement that states publicly disclose personal information about individual voters would surely be at the outer edge of Congress's power to regulate the "Times, Places and Manner" of congressional elections.  U.S. Const., art. I, § 4, cl.

1.  Such a requirement would be far removed from typical Elections Clause legislation addressing the "when, where, and how" of congressional elections.  *Inter Tribal*, 570 U.S. at 29 (Thomas, J., dissenting) (quoting T. Parsons, Notes of Convention Debates, Jan. 16, 1788)).

Second, *Inter Tribal* eschewed a traditional preemption analysis in part because regulating congressional elections does not involve States' "historic police powers," and, as a result, the "federalism concerns . . . are somewhat weaker" than in Supremacy Clause preemption cases.  570 U.S. at 14.  But § 196-A is only partly an election law.  It is also a privacy law, protecting Maine citizens from, among other things, commercial exploitation of their private data.  *See* 21-A M.R.S. § 196-A(1)(B) (prohibiting sale of data).  This Court has recognized that privacy is a "field of traditional state regulation."  *ACA Connects v. Frey*, 471 F. Supp. 3d 318, 325 (D. Me. 2020) (citing *Medtronic v. Lohr*, 518 U.S. 470, 475 (1996)).  Thus, even if the Court may not start with the usual presumption against preemption, it can and should, in assessing the plausibility of PILF's interpretation, take into account the extent to which PILF's expansive interpretation of the NVRA violates principles of federalism and intrudes into matters that Congress has traditionally left to the States to regulate.

### B.    The Plain Language of § 8(i) Does Not Require Maine to Disclose Personal Data on 1.1 Million Maine Voters

In construing § 8(i) of the NVRA, the Court should "start with the statutory text."  *Woo v. Spackman*, 988 F.3d 47, 50–51 (1st Cir. 2021).  This means considering "the plain meaning of the words in 'the broader context of the statute as a whole.'"  *United States v. Godin*, 534 F.3d 51, 56 (1st Cir. 2008) (quoting *United States v. Roberson*, 459 F.3d 39, 51 (1st Cir.2006)).  "Words in a statute are not islands but 'must be read in their context and with a view to their place in the overall statutory scheme.'"  *New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38, 55 (1st Cir. 2021) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529

U.S. 120, 133 (2000)).  Moreover, courts should consider all of the words of the statute and "generally ought not to interpret statutes in a way that renders words or phrases either meaningless or superfluous."  *City of Providence v. Barr*, 954 F.3d 23, 37 (1st Cir. 2020).  Courts should also assume that the words in a statute "carry their plain and ordinary meaning" unless expressly defined.  *In re Hill*, 562 F.3d 29, 32 (1st Cir. 2009).

Applying these interpretive principles to § 8 shows that a data file containing personal information on all of Maine's 1.1 million voters is outside the scope of the NVRA's public disclosure provision.  It would have been easy for Congress to write a provision that simply requires state and local governments to make public all records relating to the registration of voters.[1]  Indeed, if PILF's view is accepted, that is precisely what § 8(i) will become.  But Congress chose a more targeted approach.  Section 8(i) requires states to provide access to records "concerning the *implementation* of programs and activities *conducted for the purpose of ensuring* the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507 (emphasis added).  Thus, to be subject to disclosure under the NVRA, voter registration–related records must meet two key requirements:  First, the records must concern programs and activities "conducted for the purpose of ensuring" the accuracy and currency of voter rolls.  And, second, the records must concern the "implementation" of those programs and activities.

*"Conducted for the purpose of ensuring."*  The first notable textual constraint on the scope of § 8(i) is its limitation to records concerning programs and activities that are "conducted for the purpose of ensuring" the accuracy and currency of voter rolls.  While Congress could

---

[1]    Congress knows how to write such a provision.  In 52 U.S.C. § 20701 it required election officials to preserve for 22 months "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." Notably, however, Congress did not require disclosure of such records but actually required them to be kept confidential to the extent they came into the custody of the federal government.  52 U.S.C. § 20704.

have chosen to broadly require production of documentation of activities and programs "relating to" the accuracy and currency of voter lists, it instead chose to limit the universe of the records subject to disclosure.  Specifically, the phrase "conducted for the purpose of ensuring," by its plain and ordinary meaning, narrows the universe of documents covered by § 8(i) in two ways:

First, the program or activity must be conducted to "ensur[e]" accuracy or currency. *Ensure* means "to make certain" or "guarantee."  Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/ensure#.  The use of this term indicates Congress's intent to direct the disclosure obligation not toward day-to-day administrative functions such as adding individual registrants to the system—which cannot fairly be described as activities that "guarantee" or "make certain" that the rolls are accurate and current—but rather the government's oversight activities and programs to make sure that data, once it is in the system, *remains* accurate and current.

This limit is confirmed by language in § 8(b).  That section uses almost identical language to § 8(i), referring to any "program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll."  Section 8(b)'s heading offers a shorthand phrase to summarize these programs and activities: "Confirmation of voter registration."  52 U.S.C. § 20507(b).  By referring to these programs as activities relating to "confirmation" of registration information, § 8(b) confirms that the programs and activities described in § 8(i) relate to efforts to validate the accuracy and currency of the data in voter lists, and not day-to-day administrative tasks.

Second, the program or activity must be "conducted for the purpose" of ensuring accuracy and currency.   That qualifier requires the activities and programs to be intentionally designed to fulfill this oversight function.  Activities and programs that merely have the

incidental effect of ensuring accuracy or currency of voter rolls are thus outside the scope of the provision.

This plain reading of § 8(i) as limited to purposeful oversight activities to maintain the integrity of the voter list is confirmed by the larger context of the statutory provision in which § 8(i) appears.  Section 8 earlier requires states to conduct a "general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. § 20507(a)(4).  Much of the remainder of the section is devoted to regulating what states' programs or activities relating to voter list maintenance may and may not do to remove voters from states' voter rolls.  Section 8(b), for example, requires such "programs and activities" to be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965" and to comply with the restrictions in subsection d on purging voters.  *Id.* § 20507(b). Section 8(c) allows for the use of USPS change-of-address information in such a program.  *Id.* § 20507(c).  Thus, when the words of § 8(i) are properly read "with a view to their place in the overall statutory scheme,'"  *N.H. Lottery Comm'n*, 986 F.3d at 55, it is apparent that the "programs and activities" referenced in that provision are the voter-roll maintenance programs and activities described and regulated in the prior subsections, such as Maine's efforts in 2007, 2009, 2011, 2013, and 2017, *see* DSMF ¶ 64, and not the entirety of state and local governments' activities relating to voter registration.

*"Implementation."*  This second significant limitation of the scope of § 8's disclosure provision is its use of the term *implementation*.  Section 8(i) does not require all records concerning the state's intentional programs and activities to ensure the accuracy and currency of voter lists, but, rather, only records concerning the "implementation" of those programs and

activities.  Under the rule against surplusage, this word should be given effect and should not be rendered superfluous.  *City of Providence*, 954 F.3d at 37.

By limiting the scope of records available to those concerning "implementation," § 8(i) targets only a subset of the government's records concerning its voter-roll maintenance programs and activities: records that would describe, document, or otherwise concern how the relevant "programs and activities" were put into practice.  For example, correspondence between decision-makers concerning list maintenance activities or documentation showing specific edits of voter information or changes to voter status resulting from maintenance would be covered. What would not be covered is a static list of voters that may "reflect" list maintenance efforts, *see* Pl.'s Mot. at 10, but does not provide any information on the actual implementation of those efforts.  And a static list of voter data is precisely what the party/campaign-use voter file is.

\* \* \*

By giving effect to these two significant textual limitations that Congress placed on § 8(i)'s disclosure requirement, it becomes clear that the provision does not extend to PILF's request for confidential personal data on all of Maine's 1.1 million registered voters.  A data file containing voters' names, years of birth, addresses, party registration, etc., does not provide any meaningful information about how the state went about "implementing" any programs or activities "conducted for the purpose of ensuring" the accuracy and currency of its voter rolls. All it does is provide a static list of who is currently registered, as well as personal information about each registrant.  While PILF may wish to use that personal data to conduct *its own* list maintenance analysis, nothing in the text of § 8(i) suggests an intent to require states to facilitate such a private effort.  Rather, the purpose of § 8(i) is to allow voters to better understand what steps that the government is taking to maintain the currency and accuracy of its list.

PILF's argument to the contrary is predicated on simply ignoring these substantial restrictions in the text of the statute. PILF points to the fact that Maine registrars interact with CVR—the source of the party/campaign-use voter file—on a routine basis, inputting new registrations, updating voter record information, and cancelling individual voter registration records. Pl.'s Mot. at 8–9. It characterizes these ministerial acts as "voter list maintenance activities." *Id.* at 8. But § 8(i) does not extend indiscriminately to all "voter list maintenance activities"; as shown above, it covers only those list maintenance activities that are specifically and purposely aimed at "ensuring"—or, as § 8(b) puts it, "confirming"—the accuracy and currency of the voter lists. A registrar entering voter registration data into CVR is hopefully doing her best to enter the data accurately, but no one would say, as a matter of plain English, that simply by entering the data she is "ensuring" its accuracy and currency. Rather, that term implies a secondary review process that checks the accuracy and currency of the data after it is entered by the registrar; in other words, the programs and activities of list maintenance required and regulated by the other parts of § 8.

PILF also attempts to overcome the textual limits in the disclosure provision by relying heavily on the requirement that states make public all data "concerning" the limited topics set forth in the statute, which PILF analogizes to the phrase "relating to." Pl.'s Mot. at 7–9. In interpreting the similar phrase "related to" in the context of ERISA preemption, the Supreme Court has cautioned that the phrase has the potential to become all-encompassing and should not be "taken to extend to the furthest stretch of its indeterminacy." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). Rather than engaging in "an uncritical literalism" that would allow for "infinite relations," the Court looked to "the objectives of the . . . statute as a guide" to the intended meaning of the phrase. *Id.* at 656.

Here, the objectives of § 8 are apparent from its various provisions: Congress directed states to engage in certain list maintenance operations while placing extensive guardrails on how states could conduct those operations.  Section 8(i) is intended to allow the public to understand how the state has chosen to "implement[]" those required programs and activities.  Given this clear purpose, the term "concerning" should be limited to records that actually describe or document those NVRA-required programs and activities in some meaningful way.

In interpreting "concerning" more broadly, PILF attempts to make precisely the interpretive move that the Supreme Court eschewed in the ERISA context.  There is of course one sense in which every byte of data and shred of paper in the State's possession having anything to do with elections "concern[s]" the subject matter addressed in § 8(i), given a sufficiently attenuated chain of reasoning.  But that cannot possibly be the sense in which Congress used "concerning" in § 8(i).  Otherwise, the use of that term would overwhelm the remaining carefully calibrated language in the provision, rendering it superfluous.

PILF argues for example, that the party/campaign-use voter file "concern[s]" the implementation of list maintenance programs and activities simply because it is generated from CVR—which, as the State's centralized database of voter registration information, reflects the results of both routine data entry by registrars and the Secretary's periodic list maintenance activities.  Pl.'s Mot. 10–12.  But this claim interprets the meaning of "concerning" in precisely the manner that the *Travelers* cautions against, bringing the voter file within the scope of the statute through a lengthy chain of reasoning.

In fact, the party/campaign-use voter file has no direct relationship to the Secretary's maintenance activities.  It is not used for list maintenance activities.  DSMF ¶ 70.  It does not describe any program of list maintenance.  *Id.* ¶ 56.  It does not contain any information about

what steps the State took to implement such a program.  *Id.*  It does not say whether a particular

voter's information was altered as result of list maintenance efforts.  *Id.* ¶ 72.  It is simply a static

table of voters' personal data, generated at a particular point in time by the Secretary to provide

to political parties and campaigns.  *Id.* ¶ 56.  The voter file "concern[s]" list-maintenance

programs and activities only in sense that it is shorter than it might have been had those activities

not been undertaken (due to removal of ineligible voters), and in the sense that some of the

entries will contain different data than they would have absent list maintenance programs and

activities (with no way to tell which ones).  The mere fact that the list is different than it would

have been without list maintenance activities does not make it a record "concerning" the

implementation of the Secretary's NVRA-related list maintenance efforts except in the most

attenuated sense of the word.

### C.    PILF's Reading of the Disclosure Provision Is Inconsistent with § 8 as a Whole

In addition to the express textual constraints in § 8(i)(1), which PILF's interpretation

ignores, language throughout § 8 indicates Congress had no intention of including voter lists

within the scope of § 8(i).  There is no doubt from the text of § 8 that Congress understood what

a voter list was and expressly and repeatedly considered the role of such lists in the NVRA's

statutory framework.  *See, e.g.*, 52 U.S.C. § 20507(a)(3), (a)(4), (b)(2), (c)(2)(A), (c)(2)(B(i),

(d)(1), (d)(3) (referencing "the official list [or lists] of eligible voters").  Given how extensively

§ 8 addresses the topic of voter lists, if Congress had wanted to mandate that states make public

their voter lists, it would have just said so.  Yet it instead drafted a complex disclosure provision

full of qualifiers that could be interpreted to cover entire voter lists only by stretching the word

"concerning" well past its breaking point.

It is particularly notable in this regard that subsection (i)(1) *itself* specifically references "official lists of eligible voters."  Yet despite mentioning the precise record that PILF claims is an object of that provision, the provision does not say that "official lists of eligible voters" are public records.  Rather, it uses the phrase as a modifier, requiring states to preserve and disclose records concerning "implementation" of programs and activities to ensure the accuracy and currency of "official lists of eligible voters."  52 U.S.C. § 20507(i)(1).  That Congress mentioned such lists in the disclosure provision at issue without wording the provision to expressly mandate their disclosure further confirms that it did not intend to require their disclosure.

Another structural indicator that Congress had no intent to require disclosure of voter lists are the opening words of § 8(i)(1).  Paragraph 1 starts with a requirement that states should "maintain for at least 2 years" the documents described in the section.  That requirement provides another clue that Congress had in mind historical documentation of the state's list maintenance efforts and not the voter lists themselves, which constantly evolve as voter records are added, deleted, and amended by registrars.  PILF's reading of the statute would suggest that, each time a voter is added or removed from CVR, or voter information is edited, Congress intended that states make a copy of the entire revised list and preserve it for a two-year period. The result would be an obligation to preserve innumerable iterations of the voter list.  Such a reading is not plausible, particularly where the NVRA was enacted long before states were required to move to electronic systems that might have the technological capacity to track such iterations.

Finally, the requirement in paragraph 2 of § 8(i) that states disclose lists of voters who received subsection (d)(2) notices further confirms that Congress did not have voting lists in mind when it drafted paragraph 1.  Paragraph 2 explains that the list-maintenance records

described in paragraph 1 "shall include lists of the names and addresses of all persons to whom notices in subsection (d)(2) are sent" along with information on those voters' responses. 52 U.S.C. § 20507(i)(2). Paragraph 2 thus requires states to retain and make public a specific narrow subset of data that includes voters' personally identifying information.

Congress presumably included paragraph 2 because it recognized that the general disclosure provision in paragraph 1 did not unambiguously extend to records of such notices. Paragraph 2 thus shows that Congress reflected on the circumstances under which states might have to retain and produce personally identifying information on voters. It chose to expressly require production of such data only for the limited subset of individuals on the states' rolls who have received subsection (d)(2) notices.

PILF's claim that paragraph 1 requires production of personal data on every voter in Maine is far less plausible than a claim that paragraph 1 (absent paragraph 2's clarification), would require production of lists of voters who received subsection (d)(2) notices. The (d)(2) notices are, after all, a key element of states' NVRA-required list maintenance activities. Yet while Congress felt the need to clarify that lists of (d)(2) notices were subject to disclosure, it included no paragraph 3 clarifying that the entire contents of a state's voter list are also within the scope of subsection 1. Under the "venerable canon" of *inclusio unius est exclusio alterius*, "if one of a category is expressly included within the ambit of a statute, others of that category are implicitly excluded." *Sasen v. Spencer*, 879 F.3d 354, 362 (1st Cir. 2018). Here, the fact that Congress specifically considered the circumstances under which voter identifying information must be disclosed, and yet did not expressly provide for public disclosure of entire lists of voters, demonstrates that Congress in fact had no such intent to authorize such an invasion of voters' privacy.

**D.**     **PILF's Interpretation of § 8(i) Is Inconsistent with a Key Purpose of the NVRA**

Another problem with PILF's interpretation of § 8(i) is that it would run afoul of one of the NVRA's key purposes: to "make it possible for Federal, State, and local governments to implement [the Act] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(2). PILF's interpretation of § 8(i), if adopted, would not help Maine to implement the NVRA in a manner that enhances the participation of eligible citizens to vote. Quite the opposite. If Maine citizens know that, despite state law to the contrary, the personal information they provide on a registration form will be indiscriminately disclosed to private parties, some may well be deterred from registering to vote. The fact that groups like PILF may use such information to publicize the names and addresses of voters whom they believe—sometimes inaccurately—to be improperly registered only enhances the potential for deterring legal voters from registering. *See* DSMF ¶¶ 78–84. Indeed, the Maine Legislature enacted § 196-A in part because of its concern that a failure to protect voter privacy may deter some eligible Mainers from participating in Maine elections. DSMF ¶ 54; *see* 21-A M.R.S. § 195.

PILF, in its motion, points to dicta in an unpublished district court decision to claim that its broad interpretation of § 8(i) is consistent with another alleged purpose of the NVRA: allowing the public to be "monitoring the state of the voter rolls and the adequacy of election officials' list maintenance programs." Pl.'s Mot. at 15 (quoting *Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617, at *12–13 (S.D. Fla. Mar. 30, 2018)). The second half of this formulation—monitoring the adequacy of election officials' list maintenance programs—is certainly a plausible purpose of § 8(i). And, indeed, the Secretary's interpretation of § 8(i) fully embraces this purpose by inviting public access to the records documenting her office's list

maintenance activities.  But the first part of the formulation—allowing the public to monitor *the voter rolls themselves*—is entirely untethered from the statutory text.  There is simply nothing in § 8(i) or elsewhere in the NVRA that suggests that one of its goals was to give private parties access to personal data about individual voters in order to "monitor[] the state of the voter rolls." Indeed, allowing such unfettered access is as likely to result in voter suppression and intimidation—outcomes inimical to the purposes of the NVRA—as it is to result in any list maintenance benefits.

### E.    The Court Should Not Follow PILF's Flawed Out-of-Jurisdiction Caselaw

The scope of § 8(i) is a matter of first impression in this District and in the First Circuit. Indeed, few decisions anywhere in the country have addressed the scope of this provision. However, PILF's motion relies heavily on decisions from the District of Maryland and the Southern District of Mississippi that gave broad interpretations to § 8(i).  Because those cases lack persuasive authority, this Court should not follow them here.

PILF relies most prominently on *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019), which interpreted § 8(i) as requiring the disclosure of the list of all registered voters in Montgomery County, Maryland.  Pl.'s Mot. at 13–14.  *Lamone*, in turn, relied heavily on a controlling Fourth Circuit decision, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012), which had concluded that individual completed voter registration applications were subject to public disclosure under § 8(i).  *Id.* at 340.

While *Long* was controlling authority for the *Lamone* court, it does not control in the District of the Maine.  And it is a deeply flawed decision.  Like PILF's argument here, the *Long* court gave insufficient consideration to the key textual constraints in § 8(i), concluding that the largely ministerial act of processing a voter registration form somehow amounts to the implementation of both a program and an activity for the purpose of ensuring the accuracy and

currency of the voter list.  *See Long*, 682 F.3d at 335–36.  *Long*'s boundless interpretation of "implementation" and "for the purpose of ensuring" essentially reads those words out of the statute completely, as it is hard to imagine any registration-related record that *Long*'s interpretation would exclude from § 8(i) on the basis of those terms.  Nor did *Long* adequately consider the structure of § 8, which makes clear that the disclosure provision is intended to grant public access to records documenting NVRA-required and regulated list maintenance operations, and not such acts as inputting information from an individual voter's registration application into a database.[2]  *See* Part II.B, above.

Long further relies in part for its holding on the mere fact that the NVRA contains the word "Registration" in its title and in the title of § 8—asserting that Congress's choice of these general labels confirms that the detailed statutory language in § 8(i) somehow collapses into a generic requirement that states make available all "voter registration records."  *Long*, 682 F.3d at 337.  But this observation necessarily raises the question of why, if Congress intended to simply make all voter registration records public, it did not plainly say so in § 8(i).  The answer is that Congress intended something more limited and nuanced than *Long* acknowledges.

Lamone is necessarily built on *Long*'s overly broad reading of § 8(i).  *See Lamone*, 399 F. Supp. 3d at 437 (noting that *Long* "has clarified the meaning of [§] 8(i)'s key terms").  It reasons, essentially, that if the information on a particular voter's registration form is a public record, as *Long* erroneously held, then a list compiling a subset of that information for all voters in a

---

[2]       *Long*'s consideration of § 8's structure is largely limited to debunking what appears to be almost a straw-person argument by the defendants: that paragraph 2 of § 8(i) acts as a limitation on paragraph 1, and thus "only the documents described in [paragraph 2] must be disclosed."  *Long*, 682 F.3d at 337.  While that argument is indeed wrong—paragraph 2, while important to understanding the meaning of paragraph 1, ultimately provides only a useful example of what sorts of records are within paragraph 1's scope—it does not somehow follow that paragraph 1 requires disclosure of *all* voter registration records.

particular electoral district must also be a public record.  *Id.* at 440.  Thus, if the Court is unpersuaded by *Long*—as it should be—it may disregard *Lamone* as well.

But *Lamone* contains an additional analytic error.  Even assuming *arguendo* that an individual voter's completed registration application is a record within the scope of § 8(i), it does not follow that a voter list or report generated from CVR, which is only partially and indirectly derived from such applications, is also within the scope of § 8(i).  Defendants in *Lamone* made that point, noting that placing voter lists within the scope of § 8(i) would create a circular requirement in which "the *voter list* is a record concerning the implementation of a program or activity undertaken to ensure the accuracy of the *voter list*."  399 F. Supp. 3d at 442 (emphasis in original).  *Lamone* dismissed this argument as "quibbling over semantics."  *Id.*  But that ignored defendants' deeper point, which was that the voter list merely reflects the *results* of voter registration "programs and activities."  It does not in any way describe or illuminate the implementation of those programs or activities.

PILF also cites *True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S.D. Miss. 2014).  Pl.'s Mot. at 14.  But that decision's observation that Mississippi's "voter roll" was disclosable under § 8(i) because it was Mississippi's "official list[] of eligible voters" is pure dicta, since the court ultimately held that the issue was moot since the plaintiffs already had a copy of the list.  43 F. Supp. 3d at 723–24.  Moreover, it is dicta supported by only a single sentence of analysis, robbing it of any persuasive authority.  43 F. Supp. 3d at 723.

Moreover, *True the Vote* goes on to conclude that Mississippi's "poll books"—lists of active voters generated from Mississippi's version of CVR and provided to voting precincts one week before an election—were *not* disclosable under § 8(i).  *Id.* at 725.  The Court offered several rationales, but most notable are its observations that "[p]oll books are not used to update

27

lists of eligible voters" and "[v]oter statuses do not change as result of the State's processing of poll books." *Id.*  Exactly the same can be said of the party/campaign-use voter file at issue here: the Secretary generates it for parties and campaigns, but does not otherwise use it for anything. DSMF ¶ 70.

In short, the Court is not bound by, and should not follow, the unpersuasive caselaw from other jurisdictions relied upon by PILF.  It should rule instead that the text, structure, and purpose of the NVRA do not preempt Maine's voter privacy statute and require public disclosure of personal data on all 1.1 million Maine voters.

## III.  Even If the Court Concludes that § 8(i) Extends to Voter Lists, It Should Hold that the Version of Maine's List Available to the Public under Exception F Is Sufficient

Even the out-of-jurisdiction decisions PILF relies upon have recognized that, simply because the NVRA requires disclosure of certain records, it does not necessarily require disclosure of all *information* within those records.  *See True the Vote*, 43 F. Supp. 3d at 733.  In *True the Vote*, for example, the court recognized that interpreting the NVRA to require disclosure of sensitive information like birthdates and social security numbers would violate the purposes of NVRA by making citizens "hesitant to register to vote."  *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 736 (S.D. Miss. 2014); *see also Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010) ("a person's SSN is precluded from disclosure, as disclosure of that information would undermine the purposes of the statute").

Although most of the few decisions considering the issue have drawn the line at birthdates and partial social security numbers, those parsimonious exceptions are insufficient to protect the weighty interests at stake.  Rather, the NVRA's overriding goal of encouraging voter registration makes strict privacy protections appropriate except where the NVRA directly

specifies otherwise.  *E.g.*, 52 U.S.C. § 20507(i)(2) (requiring disclosure of names and addresses of voters who received (d)(2) notices).

Thus, even if the Court were to conclude—and it should not—that § 8(i) requires Maine to disclose a list of all of its 1.1 million registered voters, it should not go on to conclude that restrictions in Exception B on the party/campaign-use voter file are preempted by the NVRA. Rather, it should conclude that Maine law poses no obstacle to the enforcement of the NVRA because it allows for the disclosure of just such a list through Exception F.  *See Siebold*, 100 U.S. at 386 (Elections Clause legislation preempts state law "so far as the two are inconsistent, and no farther").  That exception requires the Secretary to provide to any requestor, free of charge and in electronic form:

> either the voter's first name or last name, but not both names in the same report; year of birth; enrollment status; electoral districts to include congressional district and county only; voter status; date of registration or date of change of the voter record if applicable; date of the last statewide election in which the voter voted; and any special designations indicating uniformed service voters, overseas voters or township voters.

21-A M.R.S. § 196-A(1)(F).

The semi-anonymized report authorized by Exception F would provide precisely the sorts of data that could be used by PILF to "monitor . . . the state of the voter rolls," as it claims it is entitled to do.  Pl.'s Br. at 15 (quoting *Bellitto*, 2018 U.S. Dist. LEXIS 103617, at *12–13).  It would allow, for example, an analysis of whether there were a disproportionate number of extremely elderly individuals on the list, suggesting deceased voters had not been removed.  It would allow an analysis of whether there are voters who had not voted in an extremely long time, suggesting they may have died or registered elsewhere.  It would allow a comparison between the number of registered voters in an electoral district and the voting-age population.  It would allow the requestor to see how many voters have been designated inactive for failure to

respond to a change-of-address inquiry.  Moreover, it would allow all these analyses while protecting the privacy of the 1.1 million Mainers who have registered to vote and effectuating the policy goals of both the NVRA and 21-A M.R.S. § 196-A to avoid discouraging eligible citizens from becoming and remaining registered voters.

Thus, even if the Court disagrees with the Secretary that Maine's party/campaign-use voter file is outside the scope of § 8(i), it should still conclude that Maine law is consistent with § 8(i) because, under Exception F, it makes a complete list of registered voters available to the public, in a manner that is fully consistent with the policies underlying the NVRA.

## Conclusion

For the foregoing reasons, the Court should grant summary judgment to the Secretary and deny summary judgment to PILF.

Dated: April 9, 2021

AARON M. FREY
Attorney General


/s/ Jonathan R. Bolton
Jonathan R. Bolton
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8800
jonathan.bolton@maine.gov