UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| PUBLIC INTEREST LEGAL FOUNDATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> SHENNA BELLOWS, in her official capacity as the Secretary of State for the State of Maine, <br><br> Defendant. | Docket No. 1:20-cv-00061-GZS |

**SECRETARY OF STATE'S MOTION TO
DISMISS THE AMENDED COMPLAINT**

Secretary of State Shenna Bellows ("Secretary"), moves under Fed. R. Civ. P. 12(b)(1) &

(6) to dismiss the amended complaint of Plaintiff Public Interest Legal Foundation, Inc. (PILF).

**Memorandum of Law**

In this action, PILF seeks unregulated disclosure of personal information about every

registered voter in Maine from Maine's Central Voter Registration (CVR) database.  PILF

invokes § 8(i) of the National Voter Registration Act (NVRA), which requires disclosure of "all

records concerning the implementation of programs and activities conducted for the purpose of

ensuring the accuracy and currency of official lists of eligible voters."  52 U.S.C.A. § 20507(i).

The Secretary's position throughout this litigation has been that this carefully worded provision

describes records showing governmental activities to maintain voter lists and does not extend to

a database of voters' personal information.  Thus, absent a change to the state law making CVR

data confidential, *see* 21-A M.R.S. § 196-A(1), PILF was not entitled to obtain it.

In June 2021, however, the Legislature enacted just such a change.  The new law allows

1

groups like PILF to obtain increased access to CVR data to evaluate Maine's compliance with its list-maintenance obligations under the NVRA.  But PILF is apparently unwilling to take "yes" for an answer.  It has amended its complaint to challenge the privacy protections in the new law designed to prevent abuse of CVR data.  PILF attacks, among other things, the law's prohibition on publicizing the personal information of individual voters as well as its prohibition on using the data for purposes other than evaluating Maine's compliance with the NVRA.

The NVRA contains no requirement that states permit unlimited and potentially abusive uses of voters' private information.  Indeed, it contains no requirement that CVR data be disclosed at all.  But, even if it did require such disclosure, reasonable limitations on sale, use, and further dissemination such private data are entirely consistent with the text and purposes of § 8(i).  In fact, such limitations actively further the NVRA's stated purpose of encouraging voter participation.  Because Maine has enabled PILF to access the voter data it seeks, its original claim is moot and its new claims should be dismissed for failure to state a claim.

## Background and Alleged Facts

### *The NVRA*

The NVRA, enacted in 1993, required the States to make reforms and improvements to their voter registration practices.  The NVRA has four stated purposes: "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office[,]" to "make it possible for Federal, State, and local governments to implement [the Act] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office[,]" to "protect the integrity of the electoral process[,]" and to "ensure that accurate and current voter registration rolls are maintained."  52 U.S.C.A. § 20501(b).  Congress issued three findings supporting its passage of the NVRA, which relate to the importance of promoting the

right to vote and the "damaging effect on voter participation" of "discriminatory and unfair registration laws and procedures." *Id.* § 20501(a).

At issue in this litigation is § 8 of the NVRA. *Id.* § 20507. Section 8 regulates, in large part, how states should maintain what it refers to as their "official lists of eligible voters." *Id.* § 20507(a)(4). Most notably, it requires states to conduct a general program that makes a reasonable effort to remove voters from such lists who are deceased or have changed residences, while simultaneously requiring considerable precautions to avoid removing still-eligible voters. *Id.* § 20507(a)(4), (b), (c), (d).

As an added safeguard against such improper purges, § 8 requires states to make records of their list maintenance activities available to the public. That requirement provides:

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

*Id.* § 20507(i).

### Maine's Centralized Voter Registration System

The 2002 Help America Vote Act (HAVA) required states to implement "a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State." 52 U.S.C.A. § 21083(a)(1)(A).

Recognizing that this centralized database would become a repository of sensitive information on hundreds of thousands of Maine voters, the Maine Legislature enacted legislation in 2005 to protect the confidentiality of data in the nascent CVR system.  *See* 2005 P.L., ch. 404 (codified at 21-A M.R.S. § 196, recodified as amended at 21-A M.R.S. § 196-A).  The Legislature identified three "compelling state interests" at stake in regulating public access to CVR data: preventing voter fraud, preventing the potential disenfranchisement of voters, and ensuring that voters are not discouraged from participating in the voting process.  2005 P.L., ch. 404, § 2; *see* 21-A M.R.S.A. § 195.  The Legislature has frequently amended the confidentiality protections governing CVR data to balance voters' privacy interests against the legitimate needs of candidates, researchers, and others.  *See* P.L. 2011, ch. 534, § 11; P.L. 2013, ch. 131, § 10; P.L. 2013, ch. 330, § 1; P.L. 2015, ch. 447, § 7; P.L. 2021, ch, 310, §§ 1–4.

*Maine's Voter Privacy Law*

The current statute, now codified as amended at 21-A M.R.S. § 196-A, provides that "information contained electronically in the [CVR] system and any information or reports generated by the system are confidential."  *See* 21-A M.R.S.A. § 196-A(1).  The statute then lists 10 exceptions that allow for release of voter data in certain circumstances.  *See id.* § 196-A(1)(A)–(J).

Prior to October 18, 2021, a person wishing to obtain CVR data to assess Maine's compliance with the NVRA could obtain bulk data on Maine voters via Exception F, which requires the Secretary to provide such information in semi-anonymized form.  *See id.* § 196-A(1)(F).  The 130th Legislature enacted a new exception, Exception J, that expanded access to CVR data for NVRA purposes while placing safeguards on the proper use of that data.  P.L. 2021, ch. 310.  Exception J, which became effective October 18, 2021, reads in full:

> An individual or organization that is evaluating the State's
> compliance with its voter list maintenance obligations may,
> consistent with the National Voter Registration Act of 1993, 52
> United States Code, Section 20507(i) (2021), purchase a list or
> report of the voter information described in paragraph B from the
> central voter registration system by making a request to the
> Secretary of State and paying the fee set forth in subsection 2. A
> person obtaining, either directly or indirectly, voter information
> from the central voter registration system under this paragraph may
> not:
>
>> (1) Sell, transfer to another person or use the voter information
>> or any part of the information for any purpose that is not
>> directly related to evaluating the State's compliance with its
>> voter list maintenance obligations; or
>
>> (2) Cause the voter information or any part of the voter
>> information that identifies, or that could be used with other
>> information to identify, a specific voter, including but not
>> limited to a voter's name, residence address or street address,
>> to be made accessible by the general public on the Internet or
>> through other means.

*Id.* § 2.  The law also amends Exception B, which governs access to CVR data by political

parties and similar groups, to impose nearly identical limitations.  *Id.* § 1.

The personal voter information available under the new Exception J is extensive:

- the voter's name
- residence address
- mailing address
- year of birth
- enrollment status (i.e. party)
- electoral districts
- voter status
- date of registration
- date of change of the voter record if applicable
- voter participation history
- voter record number
- any special designations indicating uniformed service voters, overseas voters or township voters

21-A M.R.S.A. § 196-A(1)(B) & (J).

The new law establishes civil penalties of up to $5,000 for violations of the privacy

protections in subsection 1 or certain anti-discrimination provisions enacted in subsection 4.  *Id.*

§ 196-A(5).  Under the previous version of the statute, knowing violations of § 196-A were Class

E crimes.  *See* 21-A M.R.S.A. § 32(1)(A).

*Procedural History*

PILF began seeking data on individual voters from Maine's CVR in October 2019.  Am. Compl. ¶ 23 (ECF No. 55).  Although the Deputy Secretary of State offered to provide PILF with records concerning Maine's list-maintenance efforts, she explained to PILF that the version of 21-A M.R.S.A. § 196-A(1) then in effect prohibited the release of the full statewide party/campaign use voter file (the "voter file") requested by PILF.  Am. Compl., Ex. E.  PILF then filed this action.

The parties made cross-motions for summary judgment in the spring of 2021.  ECF Nos. 35 & 39.  On June 24, 2021, the Secretary notified the Court of the enactment of the new Exception J.  ECF No. 47.  On November 1, 2021, PILF moved for leave to amend its complaint to address the new law.  ECF No. 51.  The Secretary did not oppose the motion and PILF filed its amended complaint on November 29, 2021.  ECF. No. 55.  The Court then denied the pending motions for summary judgment as moot.  ECF No. 54.

*PILF's Amended Complaint*

In its amended complaint, PILF acknowledges the enactment of Exception J, but contends that its limitations on sale, use, and dissemination (hereinafter, the "Privacy Protections") are inconsistent with § 8(i) of the NVRA.  Am. Compl. ¶¶ 42–62 (ECF No. 55). PILF alleges that it intends to "use the [voter file] for uses legally prohibited by" Exception J. *Id.* ¶ 45.  PILF suggests that it would use the data to evaluate NVRA compliance by other states or local governments, and not just Maine.  *Id.* ¶ 46.  It also suggests that it would use the data for other purposes, such as "enforc[ing]" list-maintenance requirements and "educating the public." *Id.* ¶¶ 47–48.  It expresses a concern that if it transfers the data to other states and local governments, the data may be subject to those states open records laws.  *Id.* ¶ 51.  PILF further

alleges that the Secretary's process for releasing data on Exception J violates NVRA because it requires PILF to submit an application to receive the data, which requires PILF to agree to the restrictions on use of the data. *Id.* ¶¶ 53–62.

Based on these allegations, PILF continues to assert in Count I that the Secretary is violating § 8(i) by wrongfully withholding the voter file. PILF also adds a Count II, asserting "impermissible use restrictions" on the file, and a Count III, asserting "impermissible fines."

## Argument

### I.   Legal Standard

"A motion to dismiss under Rule 12(b)(6) tests the 'legal sufficiency' of a complaint." *Courthouse News Serv. v. Glessner*, No. 1:21-CV-00040-NT, 2021 WL 3024286, at *8 (D. Me. July 16, 2021) (quoting *Maine Educ. Ass'n Benefits Tr. v. Cioppa*, 842 F. Supp. 2d 373, 376 (D. Me. 2012)). The facts alleged in the complaint must "state a claim to relief that is plausible on its face." *Maine Educ. Ass'n Benefits Tr.*, 842 F. Supp. 2d 373, 376 (D. Me. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although the Court must accept as true all well-pled allegations, it need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

Motions to dismiss on mootness grounds are reviewed under Rule 12(b)(1). *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362 (1st Cir. 2001). "Plaintiffs generally bear the burden of demonstrating subject matter jurisdiction." *Laufer v. Mar-Lyn in Maine, LLC*, No. 2:21-CV-00007-GZS, 2021 WL 1993553, at *1 (D. Me. May 18, 2021). The Court applies the same "plausibility" standard as applies to motions under Rule 12(b)(6), but may also consider evidence outside the pleadings if submitted by the parties. *Id.*

### II.   Count I of the Complaint Is Moot

Count I of the Amended Complaint continues to assert that the Secretary is denying PILF

access to the voter file.  PILF claims that the Secretary is required under federal law to provide this data under § 8(i) of the NVRA.  This claim is mooted by the enactment of Exception J to § 196-A(1), which expressly allows for PILF to obtain a copy of the voter file that PILF seeks.

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *D.H.L. Assocs., Inc. v. O'Gorman*, 199 F.3d 50, 54 (1st Cir. 1999) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  The Legislature's amendment or repeal of a statute can moot any legal claims based on that statute.  *See Town of Portsmouth, R.I. v. Lewis*, 813 F.3d 54, 59 (1st Cir. 2016) (legislative repeal of disputed tolls mooted controversy).

PILF is now entitled under state law to obtain the precise data it claims to seek.  The Secretary has provided an updated application to the public, by which parties seeking access to the voter file for NVRA purposes may request it.  *See* https://www.maine.gov/sos/cec/elec/data/index.html.  If PILF completes and submits this application, the complaint provides no basis to infer that the Secretary would deny the application.  Because the voter file is now available to PILF, its claim that the Secretary is violating § 8(i) by denying access to that file is moot.

## III.  The Complaint Fails to State a Claim for Which Relief Can Be Granted

Counts II and III of the of Complaint claim, respectively, that the privacy protections in Exception J and the fines for violating those privacy protections are preempted by the NVRA and therefore invalid.  For the reasons below, these new claims, as well as the claim in Count I if it is not moot, should be dismissed for failure to state a claim.

### A.  PILF Must Establish that the NVRA Preempts the Privacy Protections

Legislation such as the NVRA, which is enacted under Congress's power under the Elections Clause to regulate the "Times, Places and Manner" of congressional elections, preempts state law "so far as the two are inconsistent, and no farther."  *Ex parte Siebold*, 100

U.S. 371, 386 (1879).  Such federal legislation is not subject to a traditional preemption analysis but is interpreted "simply to mean what it says." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14 (2013).

While the typical preemption analysis may not apply, state election laws must still be "examined in light of the particular federal-state balance achieved in that arena," in which the Founders "delegated substantial authority over Federal Elections to the States." *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 730 (S.D. Miss. 2014).  In considering that balance, a State's authority is "particularly potent" regarding "procedural regulations and rules to oversee and ensure the integrity of elections." *Id.* (citing *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995)).  Thus, even if the Court may not apply the traditional presumption against preemption in interpreting the NVRA, it conversely should not read the NVRA's provisions more expansively than Congress intended.  *Id.* at 731.

Here, the Court should be particularly cautious about adopting PILF's maximalist interpretation § 8(i) for two reasons.  First, a requirement that states disclose personal information about voters is far removed from typical Elections Clause legislation addressing the "when, where, and how" of congressional elections.  *Inter Tribal*, 570 U.S. at 29 (Thomas, J., dissenting) (quoting T. Parsons, Notes of Convention Debates, Jan. 16, 1788).  While it may be within Congress's power to impose such a requirement, it should not be lightly inferred from a generalized disclosure requirement like § 8(i).  Second, § 196-A is not just an election law, but a privacy law as well.  This Court has recognized that privacy is a "field[] of traditional state regulation." *ACA Connects v. Frey*, 471 F. Supp. 3d 318, 325 (D. Me. 2020) (citing *Medtronic v. Lohr*, 518 U.S. 470, 475 (1996)).  Thus, federalism concerns are stronger in this case than a typical preemption case involving the Elections Clause.  *Cf. Inter Tribal*, 570 U.S. at 14.

Since § 8 lacks an express preemption provision, the species of preemption analysis that applies here is conflict preemption.  Conflict preemption exists where "compliance with both state and federal law is impossible" or where "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *ACA Connects*, 471 F. Supp. 3d. at 323 (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015)).  "[A] court should not find pre-emption too readily in the absence of clear evidence of a conflict." *Comcast of Me./N.H., Inc. v. Mills*, 435 F. Supp. 3d 228, 243 (D. Me. 2019) (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000)).

**B.      The NVRA Cannot Preempt the Privacy Protections Because It Does Not Apply to CVR Data**

Whether § 8(i) applies to a state's electronic voter registration database at all is a question of first impression in this Circuit.  The Court should rule that § 8(i) does not extend to this data, and therefore cannot conflict with the Privacy Protections applicable to the data.

1.      *The Plain Language of § 8(i) Does Not Extend to CVR Data*

In construing § 8(i) of the NVRA, the Court should "start with the statutory text."  *Woo v. Spackman*, 988 F.3d 47, 50–51 (1st Cir. 2021).  This means considering "the plain meaning of the words in 'the broader context of the statute as a whole.'"  *United States v. Godin*, 534 F.3d 51, 56 (1st Cir. 2008) (quoting *United States v. Roberson*, 459 F.3d 39, 51 (1st Cir. 2006)). Courts should consider all of the words of the statute and "generally ought not to interpret statutes in a way that renders words or phrases either meaningless or superfluous." *City of Providence v. Barr*, 954 F.3d 23, 37 (1st Cir. 2020).  Words in a statute "carry their plain and ordinary meaning" unless specifically defined.  *In re Hill*, 562 F.3d 29, 32 (1st Cir. 2009).

It would have been easy for Congress to write a provision that simply requires state and

local governments to make public all records relating to the registration of voters.[1]  But Congress

chose a more targeted approach.  Section 8(i) requires states to provide access to records

"concerning the *implementation* of programs and activities *conducted for the purpose of ensuring*

the accuracy and currency of official lists of eligible voters."  52 U.S.C.A. § 20507(i)(1)

(emphasis added).  Thus, to be subject to disclosure under the NVRA, voter registration–related

records must meet two key requirements: First, the records must concern programs and activities

"conducted for the purpose of ensuring" the accuracy and currency of voter rolls.  And, second,

the records must concern the "implementation" of those programs and activities.

     *"Conducted for the purpose of ensuring."*  The phrase "conducted for the purpose of

ensuring," by its plain and ordinary meaning, narrows the universe of documents covered by

§ 8(i) in two ways:  First, the program or activity must be conducted to "ensur[e]" accuracy or

currency.  *Ensure* means "to make sure, certain, or safe" or "guarantee."[2]  The use of this term

indicates Congress's intent to direct the disclosure obligation not toward day-to-day

administrative functions such as adding individual registrants to the system—which cannot fairly

be described as activities that "guarantee" or "make certain" that the rolls are accurate and

current—but rather the government's oversight activities and programs to make sure that data,

once it is in the system, *remains* accurate and current.

     This limit is confirmed by language in § 8(b).  That section uses almost identical

---

[1]      Congress knows how to write such a provision.  In 52 U.S.C. § 20701 it required election
officials to preserve for 22 months "all records and papers which come into [their] possession relating to
any application, registration, payment of poll tax, or other act requisite to voting in such election."
Notably, however, Congress did not require disclosure of such records but actually required them to be
kept confidential to the extent they came into the custody of the federal government.  52 U.S.C. § 20704.

[2]      Merriam-Webster Dictionary, available at https://www.merriam-
webster.com/dictionary/ensure#.

language to § 8(i), referring to any "program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll."  Section 8(b)'s heading offers a shorthand phrase to summarize these programs and activities: "*Confirmation* of voter registration."  52 U.S.C. § 20507(b) (emphasis added).  By referring to these programs as activities relating to "confirmation" of registration information, § 8(b) confirms that the programs and activities described in § 8(i) relate to efforts to validate the accuracy and currency of the data in voter lists.

Second, the program or activity must be "conducted for the purpose" of ensuring accuracy and currency.  That qualifier requires the activities and programs to be intentionally designed to fulfill this oversight function.  Activities and programs that have the incidental effect of ensuring accuracy or currency of voter rolls are thus outside the scope of the provision.

This plain reading of § 8(i) as limited to purposeful oversight activities to maintain the integrity of the voter list is confirmed by the larger context of the statutory provision in which § 8(i) appears.  Section 8 earlier requires states to conduct a "general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. § 20507(a)(4).  Much of the remainder of the section is devoted to regulating what states' programs or activities relating to voter list maintenance may and may not do to remove voters from states' voter rolls.  *See id.* § 20507(b) & (c).  Thus, when the words of § 8(i) are properly read "with a view to their place in the overall statutory scheme," *N.H. Lottery Comm'n*, 986 F.3d 38, 55 (1st Cir. 2021), it is apparent that the relevant "programs and activities" are the maintenance programs and activities described in the prior subsections, and not the entirety of state and local governments' activities relating to voter registration.

*"Implementation."*  The second significant limitation of the scope of § 8's disclosure

provision is its use of the term *implementation*.  Section 8(i) does not require all records concerning the state's intentional programs and activities to ensure the accuracy and currency of voter lists, but, rather, only records concerning "implementation" of those programs and activities.  Under the rule against surplusage, this word should be given effect and should not be rendered superfluous.  *See City of Providence*, 954 F.3d at 37.

By limiting the scope of records available to those concerning "implementation," § 8(i) targets only a subset of the government's records concerning its voter-roll maintenance programs and activities: records that would describe, document, or otherwise concern how the relevant "programs and activities" were put into practice.  For example, correspondence between decision-makers concerning list-maintenance activities or documentation showing specific edits of voter information or changes to voter status resulting from maintenance would be covered.  A static list of voters' personal data like the voter file does not fall within this scope.

2.      *The Structure of § 8 Supports the Secretary's Interpretation of § 8(i)*

In addition to the express textual constraints in § 8(i)(1), language throughout § 8 indicates Congress had no intention of including voter lists within the scope of § 8(i).  There is no doubt that Congress understood what a voter list was and expressly and repeatedly considered the role of such lists in the NVRA's statutory framework.  *See, e.g.*, 52 U.S.C. § 20507(a)(3), (a)(4), (b)(2), (c)(2)(A), (c)(2)(B)(i), (d)(1), (d)(3) (referencing "the official list [or lists] of eligible voters").  Given how extensively § 8 addresses the topic of voter lists, if Congress had wanted to mandate that states make public their voter lists, it would have just said so.  Yet it instead drafted a complex disclosure provision full of qualifiers that could be interpreted to cover entire voter lists only by stretching the word "concerning" well past its breaking point.

It is particularly notable in this regard that subsection (i)(1) itself specifically references

"official lists of eligible voters."  Yet despite mentioning the precise record that PILF claims is an object of that provision, the provision does not say that "official lists of eligible voters" are public records.  Rather, it uses the phrase as a modifier, requiring states to preserve and disclose records concerning "implementation" of programs and activities to ensure the accuracy and currency of "official lists of eligible voters."  52 U.S.C. § 20507(i)(1).  That Congress mentioned such lists in the disclosure provision at issue without wording the provision to expressly mandate their disclosure further confirms that it did not intend to require their disclosure.

Another structural indicator that Congress had no intent to require disclosure of voter lists are the opening words of § 8(i)(1).  Paragraph 1 starts with a requirement that states should "maintain for at least 2 years" the documents described in that section.  That requirement provides another clue that Congress had in mind historical documentation of the state's list-maintenance efforts and not the voter lists themselves, which constantly evolve as voter records are added, deleted, and amended.

Finally, the requirement in paragraph 2 of § 8(i) that states disclose lists of voters who received subsection (d)(2) notices further confirms that Congress did not have voting lists in mind when it drafted paragraph 1.  Paragraph 2 explains that the list-maintenance records described in paragraph 1 "shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent" along with information on those voters' responses.  52 U.S.C. § 20507(i)(2).  Paragraph 2 thus requires states to retain and make public a specific narrow subset of data that includes voters' personally identifying information.

Congress presumably included paragraph 2 because it recognized that the general disclosure provision in paragraph 1 did not unambiguously extend to records of such notices.  Paragraph 2 thus shows that Congress reflected on the circumstances under which states might

have to retain and produce personally identifying information on voters.  It chose to expressly require production of such data only for the limited subset of individuals on the states' rolls who have received subsection (d)(2) notices.  Under the "venerable canon" of *inclusio unius est exclusio alterius*, "if one of a category is expressly included within the ambit of a statute, others of that category are implicitly excluded."  *Sasen v. Spencer*, 879 F.3d 354, 362 (1st Cir. 2018).  Here, the fact that Congress considered the circumstances under which voter identifying information must be disclosed, and yet did not provide for public disclosure of full voter lists, demonstrates that Congress had no intent to authorize such an invasion of voters' privacy.

### C.     The Privacy Protections Do Not Conflict With the NVRA

Even if PILF is correct that § 8(i) extends to lists of voter personal information, Counts II and III of the Complaint should still be dismissed because the NVRA does not preempt reasonable limitations on the use and further dissemination of that personal information.

It is not the case here that "compliance with both state and federal law is impossible." *ACA Connects*, 471 F. Supp. 3d. at 323.  Even assuming *arguendo* that Maine's voter file is among the records covered by § 8(i), the Privacy Protections make those records available for "inspection" and (the modern-day electronic equivalent of) "photocopying," as required by § 8(i).  The Privacy Protections simply impose restrictions on subsequent use and dissemination of those records—substantially the same restrictions applicable to others that may lawfully acquire the data, *see* 21-A M.R.S.A. § 196-A(1)(B)—intended to prevent commercial use of the data, "doxxing" of voters, and similar harms that could undermine voter trust and participation in elections.  Nothing in § 8(i) expressly forbids such state-law restrictions.

Nor do the Privacy Protections stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  *Id.*  A key purpose of the NVRA is to "make it possible for Federal, State, and local governments to implement [the NVRA] in a manner that

enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(2). The Privacy Protections "implement" the NVRA in precisely such a manner. They provide assurance to registered Maine voters and, perhaps more importantly, potential registrants, that the State will share their personal information only for legitimate purposes and subject to reasonable limitations on sale, use, and further dissemination. Maine citizens are more likely to participate in the democratic process if they know their personal information will not be sold to commercial interests. They are more likely to participate if they know those obtaining their data cannot post their personal information to the internet. They are more likely to participate knowing that individuals seeking to use the data to discriminate on the basis of race or other protected classes will be subject to civil penalties.[3]

Courts have recognized that the voter-participation goals of NVRA mandate something less than a maximalist reading of § 8(i). In *True the Vote*, for example, the court recognized that the NVRA did not preempt a state law requiring redaction of certain sensitive personal information, such as birthdates and social security numbers. *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 736 (S.D. Miss. 2014). In rejecting the Plaintiffs' contrary argument, the court noted:

> Plaintiffs' unrestrained interpretation of required NVRA disclosures would create a gaping hole in the statutory landscape whereby personal, otherwise protected information would lose its protection once a citizen registered to vote. It is hard to imagine that in enacting the NVRA, Congress intended to abrogate all protections provided for by Federal and State laws against the disclosure of private and confidential information.

*Id.* at 735. Recognizing that, in passing the NVRA, "Congress sought to ensure that the NVRA

---

[3] This congressional purpose of enhancing voter participation also supports the Secretary's argument in Part III.B that CVR data is beyond the scope of § 8(i) entirely.

increased, not discouraged, voter registration and participation," the Court concluded that the

state privacy law did not conflict with the NVRA, and was in fact consistent with legislative

intent.  *Id.* at 736; *see also Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711

(E.D. Va. 2010) ("a person's SSN is precluded from disclosure, as disclosure of that information

would undermine the purposes of the statute").

Even the Fourth Circuit—which was bound by its expansive (and flawed) interpretation

of § 8(i) in *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012)[4]—has

recognized that § 8(i)'s disclosure requirement "does not encompass any relevant record from

any source whatsoever, but must be read in conjunction with the various statutes enacted by

Congress to protect the privacy of individuals and confidential information held by certain

governmental agencies."[5]  *Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections*

*(PILF)*, 996 F.3d 257, 264 (4th Cir. 2021).  Citing the potential for "embarrassment or

harassment" of individual voters, that decision recognized that the NVRA did not require, among

---

[4]      In holding that voter registration applications were public records under § 8(i), the
*Project Vote* court gave insufficient consideration to the key textual constraints in § 8(i), concluding that
the largely ministerial act of processing a voter registration form somehow amounts to the implementation
of both a program and an activity for the purpose of ensuring the accuracy and currency of the voter list.
See *Project Vote*, 682 F.3d at 335–36.  *Project Vote*'s boundless interpretation of "implementation" and
"for the purpose of ensuring" essentially reads those words out of the statute completely, as it is hard to
imagine any registration-related record that Long's interpretation would exclude from § 8(i) on the basis
of those terms.  In any event, it does not follow from *Project Vote*'s holding that a database that compiles
personal information from thousands or millions of individual registrations is also a public record.

[5]      Among the federal statutes cited in *PILF* is the Privacy Act of 1974, 5 U.S.C. § 552a,
which prohibits disclosures of government records containing personally identifying information, subject
to certain exceptions.  Although the Privacy Act only applies to federal agencies, its provisions
demonstrate congressional concern about dissemination of precisely the sort of records that are contained
in CVR.  Congress's enactment of the Privacy Act therefore strongly suggests that § 8(i) was not intended
to preempt state laws protecting such information.  HAVA, which requires states to secure their voter
registration databases against unauthorized access, *see* 52 U.S.C. § 21083(a)(3), and the confidentiality
protections for registration records collected by the Department of Justice at 52 U.S.C. § 20704, further
underscore this longstanding federal concern.

other things, disclosure of the identities of registrants who had been flagged by the state as "potential[]" non-citizens but later exonerated. *Id.* at 267.  The court held these records to be outside the scope of § 8(i) even though they would be far more illuminating of the state's programs and activities to maintain its voter lists than the static voter list at issue here.

This Court, which, unlike the *PILF* court, is not bound by *Project Vote*, should extend the reasoning of *PILF* to its logical conclusion: that Congress's concern for privacy, as reflected in statutes like the Privacy Act of 1974, 5 U.S.C.A. § 552a, as well as its concern in the NVRA for encouraging electoral participation, leaves room for states to craft safeguards consistent with § 8(i) to prevent misuse of voter registration data containing personal information.

PILF may argue that the Privacy Protections, even if consistent with the NVRA's broader purposes, nevertheless interfere with the more specific purposes of § 8(i).  But they do not.  As discussed above, § 8(i) is meant to increase transparency as to the activities a state is undertaking to maintain its voter lists.  Records documenting such activities are available to any member of the public under Maine's Freedom of Access Act, 1 M.R.S.A. § 401 *et seq*., without limitation. *See* 21-A M.R.S.A. § 22(1).  Similarly, Maine imposes no restrictions on public access to the "lists of the names and addresses" receiving notices under § 8(d)(2) expressly mentioned in § 8(i)(2) of the NVRA.  Even though those records reveal personal information, they are not stored in CVR and do not implicate the same privacy concerns as bulk data requests.

What is more, the Secretary makes available a version of the voter file to the public, free of charge and with no restrictions.  Under Exception F of § 196-A(1), the public can obtain a semi-anonymized report from CVR that includes every registered voter in the state.  21-A M.R.S.A. § 196-A(1)(F).  This semi-anonymized voter data would allow, for example, an analysis of whether there were a disproportionate number of extremely elderly individuals on the

list, suggesting deceased voters had not been removed.  It would allow an analysis of whether there are voters who had not voted in an extremely long time, suggesting they may have died or registered elsewhere.  It would allow a comparison between the number of registered voters in an electoral district and the voting-age population.  It would allow the requestor to see how many voters have been designated inactive for failure to respond to a change-of-address inquiry.

Given this wide scope of the information on voter registration that is available to the public without limitation—including a version of the voter use file itself—Maine's decision to impose reasonable use and dissemination restrictions on a single class of record with a significant potential for abuse cannot be said to conflict with Congress's purpose of providing transparency with regard to states' voter registration maintenance programs and activities.

Finally, § 8(i) contains a textual clue that Congress intended something less than PILF's maximalist interpretation.  While it provides for "inspection" of records in all applicable cases, it provides that "photocopying" of records is only required "where available."  Section 8(i) thereby expressly contemplates a disclosure regime in which—depending on the availability of a photocopier—requestors would be prevented from performing the sort of data analysis PILF claims is contemplated by § 8(i).  Given that Congress expressly wrote this potential restriction into the text of the statute, it is difficult to imagine that it intended to bar other, far less onerous limitations imposed by the states to protect voter privacy.

### D. The Specific Uses PILF Claims Are Prohibited by the Privacy Protections Do Not Establish a Conflict with the NVRA

Finally, PILF cannot show a conflict between the NVRA and the Privacy Protections based on the specific proposed uses it identifies in its complaint.  PILF alleges, for example, that it intends to use the voter use file in a manner that could result in the public disclosure of voter personal information, in violation of § 196-A(1)(J)(2).  Am. Compl. ¶¶ 50–51.  Because such an

act would directly thwart the NVRA's purpose of encouraging voter participation, prohibiting such uses creates no conflict with the NVRA.  Similarly, PILF contends that it may wish to use Maine's voter data not just to evaluate Maine's compliance with § 8, but other states' compliance.  *Id.* ¶ 46.  There is no reason to think, however, that Congress had such purposes in mind in enacting § 8(i).  Rather, Congress almost certainly intended to require each state to provide information about *its own* list maintenance activities, not other states' activities.

PILF further complains that it wishes to use the data not just to "evaluate" but also to "enforce" compliance with the NVRA.  *Id.* ¶ 47.  But a suit alleging non-compliance with the NVRA based on an analysis of the voter file would itself be an exercise in "evaluating" the state's "compliance with its voter list maintenance obligations," and would therefore fall within the scope of permissible uses under the statute.  In any such suit, protective orders would presumably be available to allow PILF to comply with § 196(1)(J)(2).

PILF's complaint that the Privacy Protections prevent it from using the data to educate the public similarly miss the mark.  *Id.* ¶ 48.  Nothing in the Privacy Protections would prevent PILF from "educating" the public by sharing the results of any evaluation it might make of Maine's list maintenance activities, and the Secretary expressly disavows any such illogical interpretation of the statute.  The only limitation on such "educat[ional]" activities is the prohibition on disclosing the personal information of individual voters.

In short, the uses proposed by PILF for the voter file are either outside the purposes of § 8(i), and thus within the scope of state authority to regulate, or are based on an overreading of the scope of the Privacy Protections.  None establish a conflict with the NVRA.

## Conclusion

For the foregoing reasons, the Court should dismiss the amended complaint.

Dated: December 20, 2021

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton
Jonathan R. Bolton
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8800
jonathan.bolton@maine.gov

*Attorney for Secretary of State Shenna Bellows*