# United States Court of Appeals
## For the First Circuit

No. 23-1361

PUBLIC INTEREST LEGAL FOUNDATION, INC.,

Plaintiff, Appellee,

v.

SHENNA BELLOWS, in her official capacity as the Secretary of
State for the State of Maine,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Gelpí, Montecalvo, and Rikelman,
Circuit Judges.

Jonathan R. Bolton, Assistant Attorney General, with whom
Aaron M. Frey, Attorney General, and Thomas A. Knowlton, Deputy
Attorney General, were on brief, for appellant.

Noel H. Johnson, with whom Kaylan L. Phillips and Public
Interest Legal Foundation, Inc., were on brief, for appellee.

Kristen Clarke, Assistant Attorney General, Civil Rights
Division, U.S. Department of Justice, Tovah R. Calderon, and Noah
B. Bokat-Lindell, Attorneys, Civil Rights Division, were on brief
for the United States of America, amicus curiae.

Caitriona Fitzgerald, John Davisson, Tom McBrien, and Suzanne
Bernstein, were on brief for the Electronic Privacy Information

Center, amicus curiae.

Michael Bekesha, and Eric W. Lee, were on brief for Judicial Watch, Inc., amicus curiae.

February 2, 2024

**GELPÍ**, <u>**Circuit Judge**</u>.  This appeal presents two questions.  The first is whether Section 8(i)(1) of the National Voter Registration Act ("NVRA"), which requires public disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," 52 U.S.C. § 20507(i)(1), applies to Maine's Party/Campaign Use Voter File ("Voter File").  If so, the second question is whether Maine's restrictions on the use and publication of the Voter File are preempted by the NVRA.  The United States District Court for the District of Maine answered both questions in the affirmative.  We agree.

## I. BACKGROUND

### A. Statutory Background

In 1993, Congress enacted the NVRA, Pub. L. No. 103-31, 107 Stat. 77 (codified as amended at 52 U.S.C. §§ 20501-20511), to establish procedures that would "increase the number of eligible citizens who register to vote in elections for Federal office;" "enhance[] the participation of eligible citizens as voters in elections for Federal office;" "protect the integrity of the electoral process;" and "ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b)(1)-(4). Section 8 of the NVRA prescribes requirements with respect to state administration of voter registration for federal elections.  52

U.S.C. § 20507.   Section 8(i)(1), titled "Public disclosure of voter registration activities," provides:

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C. § 20507(i)(1).

In 2002, Congress enacted the Help America Vote Act ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1668 (codified as amended at 52 U.S.C. §§ 20901-21145).   HAVA requires each state to maintain, "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State."   52 U.S.C. § 21083(a)(1)(A).   Under HAVA, "[t]he computerized list shall serve as the single system for storing and managing the official list of registered voters throughout the State," shall "contain[] the name and registration information of every legally registered voter in the State," and "shall serve as the official voter

registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. § 21083(a)(1)(A)(i), (ii), (viii).

Pursuant to HAVA, Maine created the Central Voter Registration system ("CVR"), a statewide electronic system designed to standardize and centralize Maine voter registrations. The CVR is a "browser-based" system that consists of (1) a "software application for carrying out the voter registration functions required by federal and state law" and (2) a "relational database for storage of the voter registration information and related municipal data . . . entered through the application." The CVR's database contains personal information about every registered voter in Maine, including nearly all the information that a voter provides in his or her registration form, such as name, address, party affiliation, and date of birth, as well as other information inputted by municipal registrars, such as voter participation history.[1]

Using the CVR's software application, Maine election officials can generate reports from the CVR's database.  One of

---

[1] Voter registration records are created, updated, and changed in the CVR based on several sources of information, including but not limited to: new voter registration applications; applications containing changes of name, address, or political party; change of address information received through the Bureau of Motor Vehicles; Notices of New Registrations received from other jurisdictions; vital records notices of death; United States Postal Service notices of change of address; voter responses to Change of Address Confirmation Cards; and direct notification from a voter that they have moved or wish to cancel their registration record.

those reports is the Voter File, which captures the following
information for each registered voter eligible to vote in Maine as
of the date the Voter File is generated:

> [T]he voter's name, residence address, mailing
> address, year of birth, enrollment status,
> electoral districts, voter status, date of
> registration, date of change of the voter
> record if applicable, voter participation
> history, voter record number and any special
> designations indicating uniformed service
> voters, overseas voters or township voters.

Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(B).

The CVR became fully operational in 2007.  In 2005,
however, Maine enacted legislation to regulate public access to
CVR data (hereinafter the "Privacy Law").  The Privacy Law provides
that "information contained electronically in the [CVR] and any
information or reports generated by the [CVR] are confidential and
may be accessed only by municipal and state election officials for
the purposes of election and voter registration administration."
Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1).

In 2019, at the outset of the events giving rise to this
action, the Privacy Law contained only nine exceptions under which
certain CVR data, including the Voter File, could be disclosed to
specified entities for specified purposes.  One of those
exceptions, Exception B, allows "[a] political party, or an
individual or organization engaged in so-called 'get out the vote'
efforts directly related to a campaign or other activities directly

related to a campaign," to purchase the Voter File "by making a request to the Secretary of State." Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(B). Receivers of the Voter File under Exception B are prohibited from using it "for any purpose that is not directly related to activities of a political party, 'get out the vote' efforts directly related to a campaign or other activities directly related to a campaign." Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(B)(1).

## B. Relevant Facts

Plaintiff-Appellee Public Interest Legal Foundation, Inc. ("PILF") is a nonprofit organization that "seeks to promote the integrity of elections nationwide through research, education, remedial programs, and litigation." PILF's regular programmatic activities include evaluating whether states are complying with voter list maintenance laws; pursuing legal action to enforce state and federal voter list maintenance laws; educating the public through published reports, blog posts, press releases, newsletters, and emails; and providing voter list maintenance leads and potentially irregular registration data to state governments. Defendant-Appellant Shenna Bellows, the Maine Secretary of State (hereinafter the "Secretary"), "is the

coordinator of [Maine's] responsibilities under the [NVRA]."  Me. Rev. Stat. Ann. tit. 21-A, § 180.

On October 17, 2019, PILF sent a letter to the then-Maine Secretary of State requesting a copy of the Voter File pursuant to Section 8(i)(1) but acknowledging that, under Exception B of the Privacy Law, PILF was "prohibit[ed] from receiving the [Voter File] and using it for research, commentary, and other purposes."  After further communication with PILF, Maine Deputy Secretary of State Julie L. Flynn denied PILF's request on February 5, 2020, concluding that she did not have authority under Exception B to provide PILF with a copy of the Voter File.  To date, PILF has not been provided with a copy of the Voter File.

On February 19, 2020, PILF filed suit against the then-Maine Secretary of State in the United States District Court for the District of Maine alleging that the denial of access to the Voter File was a violation of Section 8(i)(1).  The parties then filed cross-motions for summary judgment.  However, in June 2021, while the cross-motions were pending, the Maine legislature amended the Privacy Law to add a new exception, Exception J.  Under Exception J, "[a]n individual or organization that is evaluating the State's compliance with its voter list maintenance obligations may[] . . . purchase . . . the [Voter File] from the [CVR] by making a request to the Secretary of State."  Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(J).  Exception J also limits the use and

publication of the Voter File.  Specifically, a person obtaining the Voter File under Exception J may not:

> (1) Sell, transfer to another person or use the voter information or any part of the information for any purpose that is not directly related to evaluating the State's compliance with its voter list maintenance obligations [(hereinafter the "Use Ban")]; or

> (2) Cause the voter information or any part of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means [(hereinafter the "Publication Ban")].

Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(J)(1)-(2).

Under the amended Privacy Law, a violation of Exception J is "a civil violation for which a fine of not more than $1,000 may be adjudged."  Me. Rev. Stat. Ann. tit. 21-A, § 196-A(5)(A). Those who have previously violated Me. Rev. Stat. Ann. tit. 21-A, §§ 196-A(1) or 196-A(4) face an increased fine of not more than $5,000 for any subsequent violation.  Me. Rev. Stat. Ann. tit. 21-A, § 196-A(5)(B).  "[E]ach voter's information that a person causes to be made accessible to the general public in violation of [Exception J] constitutes a separate offense."  Me. Rev. Stat. Ann. tit. 21-A, § 196-A(5).  The statutory changes took effect in October 2021.

### C. Procedural History

On November 29, 2021, PILF filed an amended complaint against the Secretary, alleging three violations of the NVRA. Count I alleged that Exception J impermissibly denied PILF access to the Voter File. Count II alleged that Exception J was preempted by the NVRA. Count III alleged that the fines imposed by the Privacy Law for each violation of Exception J were similarly preempted by the NVRA. The Secretary moved to dismiss the amended complaint for lack of subject matter jurisdiction due to mootness, Fed. R. Civ. P. 12(b)(1), and failure to state a claim, Fed. R. Civ. P. 12(b)(6).

On March 4, 2022, the district court granted in part and denied in part the Secretary's motion to dismiss. The district court dismissed Count I as moot on the basis that "no live controversy exist[ed] regarding access to the [Voter File]" since PILF could obtain a copy of the Voter File through the newly created Exception J. The district court then declined to dismiss Counts II and III. The district court first determined "that the Voter File is a 'record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters' within the meaning of [Section 8(i)(1)] and thus is subject to disclosure under the NVRA." The district court then concluded that PILF "ha[d] pleaded sufficient facts that, when taken as true,

establish[ed] a plausible claim of obstacle preemption." Both parties moved for summary judgment on Counts II and III.

On March 28, 2023, the district court granted summary judgment for PILF on both counts. First, the district court declined to reconsider its prior determination that Section 8(i)(1) applies to the Voter File. Second, the district court determined that PILF's challenge to Exception J is an as-applied challenge. As to Count II, the district court "conclude[d] that the NVRA preempts Exception J" because, "by limiting the disclosure of information within the ambit of [Section 8(i)(1)], [Exception J] poses 'sufficient obstacle[s]' to the accomplishment and execution of Congress's purposes." Accordingly, as to Count III, the district court found "that [Section 8(i)(1)] preempts the fines imposed by [Me. Rev. Stat. Ann. tit. 21-A, § 196-A(5)] for a violation of Exception J."

The Secretary timely appealed.[2]

## II. DISCUSSION

### A. Standard of Review

This appeal involves two questions of statutory interpretation, which we review de novo. See DiFiore v. Am.

---

[2] We acknowledge and thank the amici curiae for their helpful submissions in this case. The United States and Judicial Watch, Inc. filed amicus curiae briefs in support of PILF. The Electronic Privacy Information Center submitted an amicus curiae brief in support of the Secretary.

Airlines, Inc., 646 F.3d 81, 85 (1st Cir. 2011); United States v. Troy, 618 F.3d 27, 35 (1st Cir. 2010).

## B. Section 8(i)(1) and the Voter File

We begin with the Secretary's argument that "[t]he plain language of [Section 8(i)(1)] cannot be reasonably construed" to encompass the Voter File. "[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous." BedRoc Ltd. v. United States, 541 U.S. 176, 183 (2004). "Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 388 (1993) (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)). "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (quoting Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 809 (1989)).

Section 8(i)(1) provides that "[e]ach State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C.

§ 20507(i)(1).  Thus, prior to determining whether the Voter File is a "record[]" under this statutory text, a threshold question is which programs and activities are conducted for the purpose of ensuring the accuracy and currency of Maine's official lists of eligible voters.

Federal law requires Maine to conduct activities for the purpose of ensuring the accuracy and currency of the state's official lists of eligible voters.  HAVA, for example, requires Maine's election system to "include provisions to ensure that voter registration records in the State are accurate and are updated regularly."  52 U.S.C. § 21083(a)(4) (emphasis added).  HAVA also provides that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official."  52 U.S.C. § 21083(a)(1)(A)(vi) (emphasis added).  HAVA further requires "appropriate State or local election official[s to] perform list maintenance with respect to the computerized list on a regular basis . . . in a manner that ensures that . . . the name of each registered voter appears in the computerized list;" that "only voters who are not registered or who are not eligible to vote are removed from the computerized list; and" that "duplicate names are eliminated from the computerized list."  52 U.S.C. § 21083(a)(2)(A), (a)(2)(B)(i)-(iii) (emphasis added).

Maine law follows suit. The state's election statute provides that "[t]he registrar in each municipality shall keep the [CVR] <u>current</u> at all times for the voters in the registrar's municipality." Me. Rev. Stat. Ann. tit. 21-A, § 161(2-A) (emphasis added). "Upon receipt of [a voter registration] application by the registrar of voters, the applicant's name and other information from the voter registration application must be entered into the [CVR] <u>as expeditiously as possible</u>." Me. Rev. Stat. Ann. tit. 21-A, § 152(2) (emphasis added). Upon a voter's change of name or address, "[t]he registrar shall correct the voter's name or address in the [CVR]." Me. Rev. Stat. Ann. tit. 21-A, § 129(2). Maine election officials must cancel a voter's registration record in the CVR "[w]hen it is determined that a voter has registered to vote in another jurisdiction in the State" or "in another jurisdiction outside of the State." Me. Rev. Stat. Ann. tit. 21-A, § 161(2-A)(A)-(B). "The registrar shall [also] review the records of marriage, death, change of name and change of address . . . and [] revise the [CVR] accordingly." Me. Rev. Stat. Ann. tit. 21-A, § 128(1).

Thus, both federal and state law require Maine election officials to create and update voter registration records in the CVR. By their very nature, these activities (hereinafter "voter list registration and maintenance activities") fall within Section 8(i)(1). The activity of "expeditiously" inputting voter

registration information into the CVR is conducted to ensure that Maine is keeping an accurate and current account of its official lists of eligible voters as Maine citizens register to vote. See Me. Rev. Stat. Ann. tit. 21-A, § 152(2); see also 52 U.S.C. § 21083(a)(1)(A)(vi). Similarly, the activities of updating voters' already-existing information in the CVR and removing ineligible voters from the CVR are conducted to ensure that Maine is keeping an accurate and current account of its official lists of eligible voters as those voters move, die, or otherwise change their personal information. See 52 U.S.C. § 21083(a)(2)(A); Me. Rev. Stat. Ann. tit. 21-A, §§ 128(1), 129(2), 161(2-A)(A)-(B).

In the Secretary's view, however, the term "ensure" in Section 8(i)(1) "indicates Congress's intent to direct [the provision's] retention and disclosure obligation not toward day-to-day administrative functions such as adding individual registrants to the system[] . . . but rather toward the government's oversight activities and programs to make sure that data, once it is in the system, remains accurate and current." Not so. The Secretary admits that "ensure" means "'to make certain' or 'guarantee.'" See Ensure, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/ensure (last visited Dec. 8, 2023). And "[i]t is unclear what other purpose [the input of voter registration information into the CVR] would serve" other than to make certain that Maine is keeping an

accurate and current account of those who are eligible to vote in the state.  See Project Vote/Voting for Am., Inc. v. Long, 682 F.3d 331, 335 (4th Cir. 2012).  Indeed, "the establishment, and proper administration, of voter registration procedures, about which the NVRA seems primarily concerned, directly informs whether the lists of eligible voters are current and accurate," for "'official lists of eligible voters' would be inaccurate and obsolete" if they did not contain accurate and current voter registration information.  See Project Vote/Voting for Am., Inc. v. Long, 752 F. Supp. 2d 697, 706 (E.D. Va. 2010).

The Secretary further contends that agency interpretation of the NVRA supports her position that Section 8(i)(1) does not extend to the activities of processing additions, removals, and changes to Maine's official lists of eligible voters. We are unpersuaded.  In 1994, the Federal Election Commission ("FEC") issued a guidance document that, after quoting Section 8(i), states that "[a]s a matter of prudence, though not as a requirement of the [NVRA], States might also want to retain . . . all records of removals from the voter registration list -- the date and the reason." National Clearinghouse on Elec. Admin., Fed. Elec. Comm'n, Implementing the Nat'l Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples 7-1 (Jan. 1, 1994) (hereinafter the "FEC Guide"). Contrary to the Secretary's assertion, the FEC was not "responsible

for implementing the NVRA."  Rather, the FEC was tasked with "provid[ing] information to the States with respect to the responsibilities of the States under th[e NVRA]."  52 U.S.C. §§ 20508(a)(4), 21132.  It is thus unsurprising that the FEC Guide itself "note[s] that the [FEC] does not have legal authority [] to interpret the [NVRA]" and that the FEC Guide "is intended only as a general reference tool" and "any suggestions contained in th[e FEC Guide] are . . . offered without force of law."  FEC Guide at P-1 (emphasis in original); see also A. Philip Randolph Inst. v. Husted, 907 F.3d 913, 921 (6th Cir. 2018).  Thus, the FEC Guide's interpretation is "'entitled to respect' . . . but only to the extent that [it has] the 'power to persuade.'"  Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).  For the reasons explained above, the interpretation is unpersuasive.

The question then becomes whether the Voter File "concern[s] the implementation of" Maine's voter list registration and maintenance activities.  52 U.S.C. § 20507(i)(1).  Similar to its synonym "regarding," the term "concerning" used "'in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject.'"  Patel v. Garland, 596 U.S. 328, 339 (2022) (emphasis added) (quoting Lamar, Archer & Cofrin, LLP v. Appling, 584 U.S. 709, 710 (2018)).  To "implement," on the other

hand, means to "carry out" or to "accomplish."  Implement, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/implement (last visited Dec. 8, 2023).  Thus, for Section 8(i)(1) to encompass the Voter File, the Voter File must relate to the carrying out of Maine's voter list registration and maintenance activities.

The Voter File is an electronic report generated from the CVR, the database through which Maine carries out its voter list registration and maintenance activities.  The Voter File captures voter record and voter participation history information from the CVR on eligible Maine voters as of the date the Voter File is generated.  Accordingly, as of the date it is generated, the Voter File reflects the additions and changes made by Maine election officials in the CVR pursuant to federal and state law as part of Maine's voter list registration and maintenance activities.  The Voter File can thus be characterized as the output and end result of such activities.  In this way, the Voter File plainly relates to the carrying out of Maine's voter list registration and maintenance activities and is thereby subject to disclosure under Section 8(i)(1).

The Secretary counters that Section 8(i)(1) does not apply to the Voter File because, "[b]y limiting the scope of records available to those concerning 'implementation,' [the provision] targets only . . . records that would describe,

document, or otherwise concern how the relevant 'programs and activities' were put into practice[,]" such as "correspondence between decision-makers concerning list-maintenance activities or documentation showing specific edits of voter information or changes to voter status resulting from maintenance." This argument, however, adds limitations to Section 8(i)(1) where Congress did not. Nothing in the ordinary meaning of the term "implementation" supports the Secretary's contention. Furthermore, the Secretary's narrow construction of Section 8(i)(1) overlooks the sweeping language that Congress adopted, which makes "all records concerning the implementation of" Maine's voter list registration and maintenance activities subject to disclosure. 52 U.S.C. § 20507(i)(1) (emphasis added). Similar to the word "any," the word "all" reflects a "broadly inclusive intent," giving Section 8(i)(1) an expansive meaning. See United States v. Dion, 37 F.4th 31, 35 (1st Cir. 2022), cert. denied, 143 S. Ct. 387 (2022); see also Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen, 152 F.3d 283, 290 (4th Cir. 1998) ("[T]he use of the word 'all' . . . suggests an expansive meaning because 'all' is a term of great breadth.").

The Secretary then turns to the structure of Section 8(i), arguing that Section 8(i)(2) limits the reach of Section 8(i)(1). Section 8(i)(2) provides:

> The records maintained pursuant to [Section
> 8(i)(1)] <u>shall include</u> lists of the names and
> addresses of all persons to whom notices
> described in subsection (d)(2) are sent, and
> information concerning whether or not each
> such person has responded to the notice as of
> the date that inspection of the records is
> made.

52 U.S.C. § 20507(i)(2) (emphasis added). This provision, the
Secretary contends, "shows that Congress reflected on the
circumstances under which states might need to retain and produce
personally identifying information regarding voters" and "chose to
expressly require production of such data only for the limited
subset of individuals on the states' rolls who have received
subsection (d)(2) notices." But Section 8(i)(2) does not make use
of the word "only." Instead, Section 8(i)(2) makes clear that
"[t]he records maintained pursuant to [Section 8(i)(1)] <u>shall
include</u> lists of the names and addresses of all persons to whom
notices described in subsection (d)(2) are sent." 52 U.S.C.
§ 20507(i)(2) (emphasis added). And the term "shall include" is
by no means exhaustive. <u>See</u> 2A Norman J. Singer & J.D. Shambie
Singer, <u>Sutherland Statutory Construction</u> § 47:7 (7th ed. 2023)
("The word 'includes' is usually a term of enlargement, and not of
limitation, and conveys the conclusion that there are other items
includable, though not specifically enumerated."). If anything,
Section 8(i)(2) is further evidence that Section 8(i)(1) extends
to personal information such as that contained in the Voter File.

In resorting to the structure of Section 8(i), the Secretary ignores the last clause of Section 8(i)(1). There, Congress explicitly exempted from disclosure records that "relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1). And it is well established that, "[u]nder the principle of expressio unius est exclusio alterius, the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." United States v. Newman, 982 F.2d 665, 673 (1st Cir. 1992) (quoting United States v. Rocha, 916 F.2d 219, 243 (5th Cir. 1990)). Thus, because Congress carved out two exceptions to Section 8(i)(1), neither of which the Voter File falls into, "additional exceptions are not to be implied" by referencing Section 8(i)(2). Andrus v. Glover Const. Co., 446 U.S. 608, 616-17 (1980).[3]

If anything, the structure of the NVRA further reinforces our conclusion that Section 8(i)(1) covers records that are related to the carrying out of Maine's voter list registration and maintenance activities. The statute itself is titled the

---

[3]    The Secretary further argues that both a "general federal privacy policy" and the purpose of the NVRA support her contention that the Voter File is not covered by Section 8(i)(1). We address these arguments in the context of federal preemption, see infra Part II.D., in which we examine the policies and purposes behind the NVRA.

"National Voter Registration Act," Pub. L. No. 103-31, 107 Stat. 77 (emphasis added). Section 8(i)(1), in turn, is located in a section titled "Requirements with respect to administration of voter registration," 52 U.S.C § 20507 (emphasis added), and a subsection titled "Public disclosure of voter registration activities," 52 U.S.C § 20507(i) (emphasis added). See Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998) ("We also note that 'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute.") (quoting Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 528-29 (1947)). Additionally, throughout Section 8, Congress specified when the NVRA's provisions apply exclusively to voter list maintenance activities. For example, Section 8(c), titled "Voter removal programs," regulates the time frame for completing "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C § 20507(c)(2)(A) (emphasis added). Similarly, Section 8(a)(4) requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" due to voters' death or change of address. 52 U.S.C § 20507(a)(4) (emphasis added). By contrast, Section 8(i)(1) contains no such specifying language, instead directing its disclosure obligation towards all "programs and activities

conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C § 20507(i)(1); see also United States v. Saemisch, 70 F.4th 1, 10 (1st Cir. 2023) ("[C]ourts generally should presume that Congress 'acts intentionally when it uses particular language in one section of a statute but omits it in another.'") (quoting Dep't of Homeland Sec. v. MacLean, 574 U.S. 383, 391 (2015)). Indeed, as we discuss infra Part II.D., the NVRA seeks "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4). And, here, whether voter registration rolls are accurate and current cannot be determined without inspecting the Voter File, which contains the voter registration information necessary to examine whether Maine and other states are properly evaluating applicants and registering voters, as well as timely processing applications and submissions of new voter registration information. In other words, the evaluation of voter registration rolls would be impossible if the results of Maine's voter list registration and maintenance activities were not subject to public disclosure.

For the above reasons, Maine's Voter File is a "record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" and is thus subject to disclosure under Section 8(i)(1). 52 U.S.C. § 20507(i)(1).

## C. Standing

Before proceeding to our preemption analysis, we first address the Secretary's argument that PILF lacks standing to challenge Exception J's Use Ban because "the Secretary of State and the Attorney General have expressly . . . disclaimed any intent to enforce [the Use Ban] in the manner that PILF claims to fear."  We disagree.

The "[f]irst and foremost" element of standing analysis under Article III of the Constitution is the requirement that the plaintiff establish injury in fact. Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (alteration in original) (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998)).  "To establish an injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  Id. at 339 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  An "injury is imminent if it is certainly impending or if there is a substantial risk that harm will occur."  Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014)).

Under the Use Ban, a recipient of the Voter File may not "[s]ell, transfer to another person or use the voter information [in the Voter File] or any part of the information for any purpose

that is not directly related to evaluating <u>the State's</u> compliance with its voter list maintenance obligations." Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(J)(1) (emphasis added). PILF intends to use the Voter File to conduct its regular programmatic activities, including to evaluate the list maintenance activities of states other than Maine and to enforce voter list maintenance laws in states other than Maine. Because these activities would contravene the plain language of the Use Ban, <u>see</u> <u>infra</u> Part II.D.1, there is a "substantial risk" that PILF will be subject to an enforcement action by Maine. <u>Reddy</u>, 845 F.3d at 500.

For purposes of summary judgment, however, Maine Deputy Secretary of State Julie L. Flynn submitted a declaration in which she stated that the Elections Division would not view the following activities as a violation of Exception J: "using Maine data to evaluate other states' voter list maintenance practices" and "us[ing] the Voter File in judicial proceedings relating to list maintenance or the integrity of voter lists." The declaration further stated that "[t]he Secretary of State agrees with these interpretations." The Office of the Maine Attorney General represented that it held the same view.

We are unpersuaded that, on the face of these representations, "PILF is under absolutely no threat . . . that it would be subject to an enforcement action for engaging in" the above activities. These representations do not promise

nonenforcement of the Use Ban but rather state that the Elections Division would not view PILF's intended activities as violations of Exception J.  As the district court noted, these statements do not have the force of law and are not binding on future officeholders.  Indeed, Supreme Court "precedent warns against accepting as 'authoritative' an Attorney General's interpretation of state law when 'the Attorney General does not bind the state courts or local law enforcement authorities,'" Stenberg v. Carhart, 530 U.S. 914, 940 (2000) (quoting Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 395 (1988)), "as is the case in Maine." NCTA -- The Internet & Television Ass'n v. Frey, 7 F.4th 1, 19 n.13 (1st Cir. 2021) (citing Auburn Sav. Bank v. Campbell, 273 A.2d 846, 847 (Me. 1971)).

To this end, the Secretary points to two cases in which we have purportedly "accepted similar statements as legally sufficient."  Neither case is apposite here.  First, in National Organization for Marriage v. McKee, we accepted the defendants' proposed narrowing construction of specific terms in the challenged statutes. 649 F.3d 34, 66-67 (1st Cir. 2011), abrogated on other grounds by Ams. for Prosperity Found. v. Bonta, 141 S. Ct. 2373 (2021).  However, our adoption of the narrow construction there had no bearing on standing.  See id. at 67.  Importantly, as opposed to the case here, see infra Part II.D.1, the proposed and adopted narrow construction in McKee was not contrary to the plain

language of the challenged statutes. McKee, 649 F.3d at 67. Second, in Reddy v. Foster, we held that the plaintiffs lacked standing to bring a pre-enforcement action in part because the state had affirmatively disavowed prosecution unless and until certain preconditions were met according to the challenged statute's terms. 845 F.3d at 502. At issue here, however, are not unmet preconditions, but rather state officials' nonbinding representations to adopt one of multiple interpretations of Exception J, a provision that carries significant fines. See Me. Rev. Stat. Ann. tit. 21-A, § 196-A(5). Thus, the Secretary and Attorney General's nonbinding representations do not suffice to eliminate PILF's standing to challenge the Use Ban.

### D. Federal Preemption[4]

Having concluded that the Voter File is subject to disclosure under Section 8(i)(1) and that PILF has standing to challenge the Use Ban, we now turn to the Secretary's argument

---

[4] In its amicus brief, the United States asks us to certify the question of Exception J's scope to the Maine Supreme Judicial Court. Because no Maine court has yet determined the meaning of Exception J, the United States argues that "[a] binding, limiting construction of state law could eliminate the preemption dispute over the Use Ban." While we acknowledge the concerns set forth by the United States, we decline to certify the question of Exception J's scope to the Maine Supreme Judicial Court. Neither the Secretary nor PILF has asked us to certify this question. And, as we explain below, the language of Exception J is clear and unambiguous.

that the Use Ban and the Publication Ban, as applied to PILF, are not preempted by the NVRA.

"The Supremacy Clause sits at the epicenter of every preemption question." Brown v. United Airlines, Inc., 720 F.3d 60, 63 (1st Cir. 2013). It instructs, in relevant part, that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the Clause, "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." Free v. Bland, 369 U.S. 663, 666 (1962).

"In all [preemption] cases, . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). Such assumption, however, "does not hold when Congress acts under th[e Elections Clause], which empowers Congress to 'make or alter' state election regulations." Arizona v. Inter Tribal Council of Ariz., Inc., 570 U.S. 1, 14 (2013) (quoting U.S. Const. art. I, § 4, cl. 1). "Because the power the Elections Clause confers is none other than the power to [preempt], the reasonable assumption is that the statutory text accurately

communicates the scope of Congress's [preemptive] intent." Id.
Thus, "because Congress's authority for the NVRA is rooted in the
[Elections Clause]," the presumption against preemption does not
apply here. League of Women Voters of Ind., Inc. v. Sullivan, 5
F.4th 714, 723 (7th Cir. 2021).

There are three types of preemption: conflict, express,
and field. Murphy v. Nat'l Collegiate Athletic Ass'n, 138 S. Ct.
1461, 1480 (2018). At issue here is conflict preemption. Conflict
preemption may occur "where the challenged state law 'stands as an
obstacle to the accomplishment and execution of the full purposes
and objectives of Congress.'" Arizona v. United States, 567 U.S.
387, 399 (2012) (quoting Hines v. Davidowitz, 312 U.S. 52, 67
(1941)). "What is a sufficient obstacle is a matter of judgment,
to be informed by examining the federal statute as a whole and
identifying its purpose and intended effects." Crosby v. Nat'l
Foreign Trade Council, 530 U.S. 363, 373 (2000); see also Wyeth v.
Levine, 555 U.S. 555, 565 (2009) ("[T]he purpose of Congress is
the ultimate touchstone in every [preemption] case." (quoting
Lohr, 518 U.S. at 485)). With this in mind, we turn to the purposes
and intended effects of the NVRA.

"For many years, Congress left it up to the States to
maintain accurate lists of those eligible to vote in federal
elections, but in 1993, with the enactment of the [NVRA], Congress
intervened." Husted v. A. Philip Randolph Inst., 138 S. Ct. 1833,

1838 (2018). The NVRA "erected a complex superstructure of federal regulation atop state voter-registration systems." Arizona, 570 U.S. at 5. In enacting the NVRA, Congress found that "the right of citizens of the United States to vote is a fundamental right;" that "it is the duty of the Federal, State, and local governments to promote the exercise of that right; and" that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(1)-(3).

As stated by Congress, the purposes of the NVRA are "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;" "to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;" "to protect the integrity of the electoral process; and . . . to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1)-(4). To further these purposes, Congress created Section 8(i)(1) along with a private right of action for members of the public to enforce the provision's disclosure mandate. 52 U.S.C. §§ 20507, 20510(b). Thus, it is of no surprise that the NVRA "embodies Congress's

conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." Project Vote, 682 F.3d at 334-35. And Maine may not "condition[] that right . . . upon compliance with a rule . . . [that] is inconsistent in both purpose and effect with the remedial objectives of the [NVRA]." Cf. Felder v. Casey, 487 U.S. 131, 153 (1988).

### 1. Use Ban

The Use Ban provides that a person obtaining the Voter File under Exception J may not "[s]ell, transfer to another person or use the voter information or any part of the information for any purpose that is not directly related to evaluating the State's compliance with its voter list maintenance obligations." Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(J)(1) (emphasis added). The district court found that this statutory text would prohibit PILF "from using the Voter File to evaluate another state's compliance with its voter list maintenance obligations" or from "using the Voter file to enforce the NVRA when the basis for such action was the evaluation (via Maine's Voter File) of another state's voter list maintenance obligations."[5] These restrictions, the district court concluded, are preempted by the NVRA.

_____

[5] The district court, however, found that the Use Ban would not prohibit the use of the Voter File to enforce the NVRA "[t]o

On appeal, the Secretary does not directly challenge the district court's finding of preemption as to the Use Ban. Instead, the Secretary argues that Exception J's use of the singular "State[]" should be read to include states other than Maine. In doing so, the Secretary posits that "the only interpretation consistent with [Exception J's] legislative purpose is one that allows cross-state analyses." As textual support for her argument, the Secretary cites Maine's equivalent of the Dictionary Act, which provides that "'State,' used with reference to any organized portion of the United States, may mean a territory or the District of Columbia." Me. Rev. Stat. Ann. tit. 1, § 72(21).

This argument fails. We need not inquire into the purpose of Exception J, for the language of the Use Ban plainly refers to "the State[]" as opposed to "states." See Desjardins v. Reynolds, 162 A.3d 228, 234 (M.E. 2017) ("[W]e look first to the plain language of the provision. If that language is unambiguous, we interpret it according to its unambiguous meaning." (citations omitted)). Thus, we agree with the district court that, given its singular, capitalized form and its placement in Maine's election statute, "the State[]," as employed by the Use Ban, refers to Maine and only Maine. There is ample support throughout Maine's election

the extent that [the] evaluation of Maine's Voter File would form the basis of [such] legal action." The parties do not dispute this finding on appeal.

statute for such conclusion. <u>See</u> Me. Rev. Stat. Ann. tit. 21-A,
§ 675 ("The Secretary of State shall accept and maintain a record
of reports of threats to or harassment . . . in <u>the State</u>.")
(emphasis added); Me. Rev. Stat. Ann. tit. 21-A, § 1203-C
(referencing "<u>the State</u> Senate") (emphasis added); Me. Rev. Stat.
Ann. tit. 21-A, § 1205-A (dividing "<u>[t]he State</u>" into two
congressional districts) (emphasis added); Me. Rev. Stat. Ann.
tit. 21-A, § 1206 (providing for the reapportionment of "<u>the State</u>"
into congressional districts) (emphasis added); <u>see also</u> <u>United
States</u> v. <u>Letter from Alexander Hamilton to Marquis de Lafayette
Dated July 21, 1780</u>, 15 F.4th 515, 525 (1st Cir. 2021) ("Every
indication is that the legislature said what it meant and meant
what it said."). Lastly, nothing in Me. Rev. Stat. Ann. tit. 1,
§ 72(21) suggests that "the State[]" here refers to states other
than Maine; the provision simply suggests that "State" may include
a United States territory or the District of Columbia.

Accordingly, we agree with the district court that the
plain language of the Use Ban would prohibit PILF "from using the
Voter File to evaluate <u>another</u> state's compliance with its voter
list maintenance obligations" or from "using the Voter file to
enforce the NVRA when the basis for such action was the evaluation
(via Maine's Voter File) of <u>another</u> state's voter list maintenance
obligations." These restrictions, in turn, are preempted by the
NVRA.

As stated above, the NVRA seeks "to protect the integrity of the electoral process; and . . . to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)-(4). Yet, by prohibiting PILF from using Maine's Voter File data to evaluate other states' compliance with their voter list maintenance obligations or to enforce the NVRA against states other than Maine, the Use Ban "stands as an obstacle to the accomplishment and execution" of these purposes. Arizona, 567 U.S. at 399. After all, Congress intended for these purposes to be fulfilled throughout every state. See S. Rep. No. 101-140, at 13 (1989) ("[A]n effective national voter registration program must also include a private civil enforcement . . . [which] can encourage action to assure that reasonable effort is undertaken to achieve its objectives in all States and, indeed, it may be essential to the success of such a program in some areas."). And the restrictions imposed by the Use Ban erect an impenetrable barrier for those seeking to use the Voter File to evaluate and enforce compliance with the NVRA nationwide. Accordingly, the Use Ban, as applied to PILF, is preempted by the NVRA.

### 2. Publication Ban

The Publication Ban provides that a person obtaining the Voter File under Exception J may not:

> Cause the voter information or any part of the voter information that identifies, or that could be used with other information to

- 34 -

> identify, a specific voter, including but not
> limited to a voter's name, residence address
> or street address, to be made accessible by
> the general public on the Internet or through
> other means.

Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(J)(2). The district

court found, and neither party disputes, that the Publication Ban

would prohibit PILF from publicly releasing Voter File data. This

restriction, however, "is [in]consistent with the structure and

purpose of the [NVRA] as a whole." Gade v. Nat'l Solid Wastes

Mgmt. Ass'n, 505 U.S. 88, 98 (1992).

Section 8(i)(1) requires the public release of the Voter

File by mandating "all records concerning the implementation of"

Maine's voter list registration and maintenance activities to be

"ma[d]e available for public inspection." 52 U.S.C. § 20507(i)(1)

(emphasis added). Such a provision evinces Congress's belief that

public inspection, and thus public release, of Voter File data is

necessary to accomplish the objectives behind the NVRA. Indeed,

the analysis and subsequent dissemination of Voter File data to

the public is necessary if members of the public, or organizations

such as PILF, are ever to identify, address, and fix irregularities

in states' voter rolls by exercising their private right of action

under the NVRA. See Project Vote, 682 F.3d at 339 ("It is

self-evident that disclosure will assist the identification of

both error and fraud in the preparation and maintenance of voter

rolls."). To find otherwise would be to prevent the public from

- 35 -

"protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter registration rolls are maintained" throughout the states.  52 U.S.C. § 20501(b)(3)-(4).

The Secretary, however, asserts that the Publication Ban is not preempted by Section 8(i)(1) because the ban furthers the NVRA's purpose of "enhanc[ing] the participation of eligible citizens as voters in elections for Federal office" by "provid[ing] assurance to Mainers that registering to vote will not expose their personal data to [] inappropriate uses" as well as "safeguard[ing] Maine voters from . . . invasions of privacy."  In advancing this argument, the Secretary urges us to consider "the myriad federal statutes that already existed when the NVRA was enacted that protect personal privacy and protect voters from harassment and intimidation."

We are unpersuaded.  First, our task is to determine whether Exception J "stands as an obstacle to the accomplishment and execution of the <u>full</u> purposes and objectives of Congress." <u>Arizona</u>, 567 U.S. at 399 (emphasis added).  In doing so, we must "examin[e] the [NVRA] as a <u>whole</u>" to "identify[] its purpose and intended effects." <u>Crosby</u>, 530 U.S. at 373 (emphasis added).  And, for the aforementioned reasons, even if the Publication Ban does further the NVRA's objective of enhancing the participation of eligible citizens as voters, it nonetheless creates an obstacle to

the accomplishment and execution of the <u>full</u> purposes and objectives of Congress as stated in 52 U.S.C. § 20501(b)(1)-(4).

Second, let us be clear in our recognition of the privacy concerns implicated by the public release of the Voter File to which the Secretary calls our attention. However, "[i]t is not [our] province . . . to strike the proper balance between transparency and voter privacy." <u>Project Vote</u>, 682 F.3d at 339. Instead, such function is well within the legislative sphere of Congress, which has already determined that "[w]ithout [the] transparency [afforded by public disclosure], public confidence in the essential workings of democracy will suffer." <u>Id.</u> It is not our call to revisit the careful balance struck by Congress in weighing the privacy risks posed by public disclosure against the interests favoring the same.

Third, as the Secretary indicates, there are federal statutory frameworks already in place that aim to protect voters from potential invasions of privacy, intimidation, discrimination, and harassment. <u>See, e.g.</u>, 5 U.S.C. § 552a(b) (prohibiting federal agencies' disclosure of records containing information about an individual except pursuant to a written request by or with the prior consent of the individual to whom the record pertains); 5 U.S.C. § 552(b)(6) (exempting from public disclosure records that would constitute an unwarranted invasion of personal privacy); 52 U.S.C. § 20704 (prohibiting the Attorney General from disclosing

certain voter registration records); 18 U.S.C. § 594 (authorizing prosecution for intimidating, threatening, or coercing another person for the purpose of interfering with the right of such other person to vote); 52 U.S.C. § 10307(b) (prohibiting the intimidation and coercion of any person for voting or attempting to vote). The NVRA itself makes knowingly and willfully intimidating, threatening, or coercing any person exercising any right under the statute punishable by a fine and up to 5 years' imprisonment. 52 U.S.C § 20511. However, far from suggesting that the Voter File must not be publicly released, these statutes impose their own set of restrictions on the dissemination of personal information and protections against potential voter intimidation that, when read in tandem with the NVRA, seek to address the privacy concerns posed by public disclosure of the Voter File.

In addition, nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File. See, e.g., Matthews, 589 F. Supp. at 942 ("[T]o the extent that political committees and governmental entities are able to protect privacy in the way general public disclosure of the [Voter File] cannot, the Court believes that proper redaction of highly sensitive information can be accomplished without an undue burden on the State."); Project Vote, Inc. v. Kemp, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) ("Section

8(i) requires the disclosure of individual voter registration records, but it does not require the disclosure of sensitive information that implicates special privacy concerns."); <u>True the Vote</u> v. <u>Hosemann</u>, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014) ("[T]he NVRA Public Disclosure Provision does not require the disclosure of unredacted voter registration documents, including voter registrant birthdates."); <u>Project Vote</u>, 752 F. Supp. at 711-12 (finding that the NVRA does not preclude redaction of Social Security Numbers in voter registration applications before public disclosure of such applications). Nor does the NVRA prohibit the redaction of personal information that can be particularly sensitive in certain circumstances, including those circumstances explicitly recognized by federal courts. <u>See, e.g.</u>, <u>Pub. Int. Legal Found., Inc.</u> v. <u>N.C. State Bd. of Elections</u>, 996 F.3d 257, 267 (4th Cir. 2021) (noting that information subject to redaction can include personal information of those subject to criminal investigations and those citizens initially identified as potentially failing to meet citizenship requirement for voter registration but ultimately exonerated). Accordingly, the proper redaction of certain personal information in the Voter File can further assuage the potential privacy risks implicated by the public release of the Voter File.

For the above reasons, the Publication Ban, as applied to PILF, is preempted by the NVRA.

### 3. Fines

Because Exception J's Use Ban and Publication Ban are preempted by the NVRA, the fines stemming from violations of such restrictions, <u>see</u> Me. Rev. Stat. Ann. tit. 21-A, § 196-A(5), are necessarily preempted by the NVRA as well.

### III. CONCLUSION

For the foregoing reasons, we **<u>affirm</u>**.